No. 23-11138

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

National Association for Gun Rights, Incorporated; Texas Gun Rights, Incorporated; Patrick Carey; James Wheeler; Travis Speegle,

Plaintiffs-Appellees,

v.

Merrick Garland, U.S. Attorney General; United States Department of Justice; Steven Dettelbach, in his official capacity as Director of the Bureau of Alcohol, Tobacco, Firearms, and Explosives; Bureau of Alcohol, Tobacco, Firearms, and Explosives,

Defendants-Appellants.

On Appeal from the United States District Court
for the Northern District of Texas
District Court Case No. 4:23-cv-830 (Hon. Reed O'Connor)

## EMERGENCY MOTION PURSUANT TO CIRCUIT RULE 27.3
## FOR STAY PENDING APPEAL

BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney General*

LEIGHA SIMONTON
*United States Attorney*

MARK B. STERN
BRAD HINSHELWOOD
*Attorneys, Appellate Staff*
*Civil Division, Room 7256*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-7823*

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ............................................................................................ 1

STATEMENT .................................................................................................. 3

ARGUMENT ................................................................................................. 10

I.     These Forced Reset Triggers Are Machineguns ................................... 10

II.    A Stay is Necessary to Preserve the Status Quo Pending Appeal and Avoid Injury to the Public Health and Safety. ....................................... 16

CONCLUSION .............................................................................................. 22

CERTIFICATE OF COMPLIANCE

ADDENDUM

## INTRODUCTION

Defendants-appellants Merrick Garland, et al., respectfully move the Court to stay pending appeal the district court's preliminary injunction which bars the government from enforcing its longstanding classification of certain "forced reset triggers" as machineguns against plaintiffs, including thousands of unknown members of two organizations and "downstream customers" of commercial members of those organizations. The district court denied a motion for a stay on November 16, 2023. Because each day that the injunction remains in effect causes further irreparable harm to the government and the public interest, we respectfully request a ruling from this Court by Friday, December 1.

At issue here are forced reset trigger devices known as the FRT-15 and the Wide Open Trigger (WOT). When installed in a semi-automatic weapon, these devices allow a shooter to pull and hold the trigger to fire repeatedly at approximately 900 rounds per minute—the same rate as an M16-type machinegun. Like an M16, these devices enable a shooter to fire "automatically more than one shot . . . by a single function of the trigger," and are properly classified as machineguns. 26 U.S.C. § 5845(b). Accordingly, ATF has classified functionally similar devices as machineguns since 1975.

The district court in this case nevertheless entered a preliminary injunction barring the government from enforcing the statutory prohibition on machineguns with respect to these devices. The district court believed that these devices are not

meaningfully distinguishable from the "non-mechanical bump stock" devices this Court held not to be machineguns in *Cargill v. Garland*, 57 F.4th 447 (5th Cir. 2023) (en banc), *cert. granted*, __ S. Ct. __, 2023 WL 7266996 (Nov. 3, 2023); that ATF had not treated devices like the ones at issue here as machineguns prior to the 2018 rule that classified non-mechanical bump stocks as machineguns; and that other devices an eight-judge plurality of this Court in *Cargill* made clear are machineguns were not comparable to the devices at issue here. The court was mistaken in all respects.

Forced-reset trigger devices differ from "non-mechanical bump stocks" in ways critical to the *Cargill* plurality's analysis. The district court believed that the *Cargill* plurality's reasoning dictates that a weapon is not a machinegun if the trigger moves to release the hammer for each shot fired. Add. 28. But that was equally true of a device known as the "Akins Accelerator," and the plurality was clear that its reasoning "would not apply to the Akins Accelerator" because "a shooter using an Akins Accelerator need only pull the trigger once to activate the firing sequence" and the device then "maintained the bump fire of its own accord." *Cargill*, 57 F.4th at 462 n.8. That is equally true here: the shooter need only pull the trigger once to activate the firing sequence, and the device automatically produces multiple shots as long as the shooter holds the trigger. Indeed, the district court in *United States v. Rare Breed Triggers, LLC*, __ F. Supp. 3d __, 2023 WL 5689770 (E.D.N.Y. Sept. 5, 2023), properly recognized these points in issuing a preliminary

2

injunction under the Fraud Injunction Act against a manufacturer of FRT-15s,
explaining that the *Cargill* plurality's analysis "in fact provides further grounds to
find that the [forced-reset trigger] is a machinegun." *Id.* at *23.

We respectfully ask the Court to stay the preliminary injunction pending
appeal. The injunction is premised on legal error and on the court's mistaken
assumption that its order would preserve a status quo that had been altered by the
2018 bump stock rule. Instead, the injunction effectively permits plaintiffs for the
first time to manufacture, distribute, acquire, and possess devices long classified as
machineguns. The destructive capacity of these weapons is undisputed and cannot
be overstated. The devices have repeatedly been linked to criminal activity, and the
district court's order legalizing these devices while the litigation proceeds will
irreparably frustrate efforts to protect the public safety by halting their manufacture
and transfer. And a stay is particularly warranted given the breadth of the
injunction, which extends to cover not only named individual plaintiffs but two
organizational plaintiffs who claim many thousands of members, as well as
"downstream customers" of any commercial member of an organizational plaintiff.

## STATEMENT

**A. 1.** Federal law generally prohibits the transfer or sale of new "machineguns"
by the general public. 18 U.S.C. § 922(o). A "machinegun" is defined in the National
Firearms Act as "any weapon which shoots, is designed to shoot, or can be readily

3

restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger." 26 U.S.C. § 5845(b). The definition also encompasses parts that can be used to convert a weapon into a machinegun. A "machinegun" thus includes "the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person." *Id.*; *see* Gun Control Act of 1968, Pub. L. No. 90-618, 82 Stat. 1213, 1231; H.R. Rep. No. 90-1956, at 34 (1968) (Conf. Rep.) (noting that the Gun Control Act expanded the definition of "machinegun," one of the "gangster-type weapons" covered by the National Firearms Act, to include parts).

**2.** For nearly fifty years, ATF has classified certain forced reset triggers as machineguns. *See National Firearms Act Handbook* § 7.2.4, 7.2.4.1 (Apr. 2009) (noting that ATF encourages manufacturers to submit new devices for "the agency's official position concerning the status of the firearms under Federal firearms laws" before a manufacturer "go[es] to the trouble and expense of producing" the weapon or device). These devices replace the standard trigger assembly on a semiautomatic rifle and allow the shooter to pull the trigger once (or, more precisely, the curved metal component of the trigger mechanism known as the "trigger shoe"), maintain pressure on the trigger, and fire repeatedly. As ATF's expert testified at the preliminary

4

injunction hearing, ATF first classified a device that operated on these principles as a machinegun in 1975.  Add. 137.  ATF reached the same conclusion with a similar device in 1994, and again with other devices in 2004, 2005, 2006, and 2017.  *See* Add. 141-42; Add. 155-81 (1975, 1994, and 2006 classifications); *Rare Breed Triggers,* 2023 WL 5689770, at *10, *31 (discussing 2006 classification and noting "obvious parallels" with the devices here).  ATF applied this longstanding understanding in concluding that the specific devices at issue in this suit—the FRT-15 and WOT—are machineguns.  ATF classified the AR1—a predecessor device to the FRT-15—as a machinegun in 2018, and reached the same conclusion about the WOT in 2021.  *See* Add. 91; *see also* Dkt. No. 40-2 at ATF0093, ATF0111; Dkt. No. 40-4 at ATF0178, 0196-0197.

Forced reset triggers alter the operation of semiautomatic rifles in crucial respects.  On most semiautomatic rifles, pulling the trigger releases the hammer from the weapon's "sear," causing the hammer to swing and strike the firing pin, which is housed inside the rifle's "bolt carrier."  Add. 81-82.  The firing pin strikes the bullet cartridge, which in turn causes ignition of the gunpowder and the bullet to fire.  Add. 82.  The gases from this explosion are channeled to force the rifle's bolt carrier rearward.  Add. 83.  On an ordinary AR-15 type semiautomatic rifle, the bolt carrier depresses the hammer, eventually forcing it into a position where it is retained by the "disconnector."  Add. 83-86.  The bolt carrier then travels forward to its original

position, aligning the firing pin to shoot another round. Add. 87-88. The disconnector holds the hammer in place until the shooter releases the trigger, at which point the hammer again comes to rest on the weapon's sear and the shooter may fire another shot by a subsequent pull on the trigger. Add. 89.

A weapon equipped with an FRT-15 or WOT, by contrast, has no disconnector. Instead, the rearward travel of the bolt carrier presses the hammer directly onto the trigger sear surface. Add. 86-87. The bolt carrier also pushes down on the trigger itself, causing it to move forward slightly, and also engages a component called the "locking bar," which prevents the trigger from releasing the hammer while the bolt carrier is still traveling (releasing the hammer too early could result in a malfunction, like a failure to fire or a dangerous "out-of-battery detonation" of the ammunition). *Id.* As the bolt carrier travels forward, it strikes the locking bar, thus releasing the trigger and firing another shot. Add. 88-89. Indeed, to enable this action by the bolt carrier, these devices are designed to work with AR15-type rifles that have been equipped with bolt carriers for M16-type rifles, because those bolt carriers include a "contact surface" central to the automatic firing of those weapons that is otherwise useless on an AR-15 type weapon. That contact surface is similarly used with these devices to "'trip' the 'locking bar' . . . during the operating cycle" and enable repeated fire. Add. 80.

In testing, ATF consistently found that AR15-type rifles equipped with FRT-15s or WOTs fired multiple rounds automatically when the shooter "pulled the trigger and held it to the rear." Dkt. No. 40-2 at ATF0111; *accord* Dkt. No. 40-4 at ATF0178, ATF0195. ATF achieved the same results by using a zip tie to apply continuous pressure to the trigger: in each instance, the weapon fired multiple shots. *See* Dkt. No. 40-2 at ATF0091; *see also* Dkt. No. 41-1 at 4. The rate of firing—measured as 933 rounds per minute in one instance—is comparable to the 700-970 rounds per minute fired by an M16-type machinegun. Dkt. No. 40-4 at ATF0196.

**B.** Plaintiffs here are three individuals and two organizations. Among the individuals, Patrick Carey asserts that he turned over two FRT-15s to ATF after he was advised that they have been classified as machineguns under Federal law, but states that he wishes to purchase such devices in the future. Add. 62. James Wheeler states that he personally owns an FRT-15 and that he is co-owner of a firearms business that owns two additional FRT-15s. Add. 63. Travis Speegle states that he owns 10 FRTs and intends to purchase more. *Id.*

All three individuals are also members of two plaintiff organizations—the National Association for Gun Rights and Texas Gun Rights. Dkt. No. 47-1 at 105-07. Other members of those organizations also submitted declarations outlining their possession of these devices. Dkt. No. 47-1 at 85-86, 90-91, 95-96, 101-02.

Plaintiffs urged that ATF's classification of these devices as machineguns is inconsistent with the statutory definition of machinegun and sought a temporary restraining order and a preliminary injunction. After initially granting a temporary restraining order as to the individual plaintiffs, the district court issued a preliminary injunction precluding enforcement against the organizational plaintiffs and their members as well as the three individuals. The court declared that this Court's decision in *Cargill v. Garland*, 57 F.4th 447 (5th Cir. 2023) (en banc), dictated that plaintiffs were likely to succeed on the merits. The court believed that *Cargill* established a rule that a weapon is not a machinegun if "[f]or each and every round fired, the trigger moves forward into its reset state and is depressed to release the hammer from its sear surface," Add. 26—or, more succinctly, if "the trigger moves for every shot fired," Add. 28. Because "the trigger in an FRT-equipped firearm releases the hammer for every shot," the district court concluded that these devices are not machineguns.

The district court also believed that the equities favored a preliminary injunction. The court believed that plaintiffs have "interests in lawfully exercising freedoms they have enjoyed for several years" including possessing these devices, which was "lawful until the ATF said otherwise." Add. 37-38. The court regarded the explanation of the risks to public safety posed by machineguns as "a non sequitur" because "FRTs are not machineguns." Add. 39.

8

The preliminary injunction bars the government from "[i]nitiating or pursuing criminal prosecutions" or "civil proceedings" for "possessing, selling, or manufacturing FRTs," or "for representing to the public of potential buyers and sellers that FRTs are not machineguns," based on "the claim that FRTs are machineguns," as well as from "[s]ending 'Notice Letters' or other similar communications stating that FRTs are machineguns," "[r]equesting 'voluntarily' [sic] surrender of FRTs to the government based on the claim that FRTs are machineguns," "[d]estroying any previously surrendered or seized FRTs," or "[o]therwise interfering in the possession, sale, manufacture, transfer, or exchange of FRTs based on the claim that FRTs are machineguns." Add. 42-43. Those prohibitions extend to the individual plaintiffs and any members of the plaintiff organizations, expressly providing that "manufacturers or sellers who are members of an Organizational Plaintiff may continue to manufacture, sell, exchange, transfer, and/or market FRTs under this injunction," and further immunizing "downstream customers" of commercial sellers covered by the injunction. Add. 43-44, 45. The court excluded from the coverage of its injunction parties enjoined by the district court in Rare Breed Triggers, Add. 43-44, and individuals prohibited from possessing firearms under 18 U.S.C. § 922(g). Add. 45.

The government appealed and sought a stay pending appeal from the district court. The district court denied the stay motion on November 16, 2023, Add. 46-59,

concluding again that "the preliminary injunction broadly maintains the status quo of general non-enforcement against law-abiding citizens" and reiterating its view that because FRTs are not properly classified as machineguns, concerns that "allowing FRTs to be possessed, distributed, sold, or transferred is uniquely dangerous because of their rate of fire similar to a machinegun has no bearing on the analysis." Add. 57, 58.

## ARGUMENT

All of the four familiar factors governing the grant of a stay pending appeal favor staying the preliminary injunction. *See Nken v. Holder*, 556 U.S. 418, 426 (2009).

## I.    These Forced Reset Triggers Are Machineguns

**A.** There is no dispute that when a shooter replaces the standard trigger on an AR15-type rifle with an FRT-15 or WOT, the weapon will fire repeatedly from a single continuous pull on the trigger. In this respect, these weapons are indistinguishable from military M16-type rifles or similar weapons all agree are machineguns, which likewise allow a shooter to pull and hold the trigger to fire repeatedly. All such weapons enable a shooter to fire "automatically more than one shot . . . by a single function of the trigger," and are properly classified as machineguns. 26 U.S.C. § 5845(b). Accordingly, for nearly 50 years, ATF has classified devices that operate on this principle as machineguns. ATF first classified a device of this type as a machinegun in 1975, Add. 137, and it reached the same

Case: 23-11138    Document: 11-1    Page: 13    Date Filed: 11/17/2023

conclusion with materially similar devices in 1994, 2004, 2005, 2006, and 2017 before addressing the specific devices at issue in this suit beginning in 2018. *See* Add. 141-42; Add. 155-81 (1975, 1994, and 2006 classifications); *Rare Breed Triggers,* 2023 WL 5689770, at *10 (discussing 2006 classification); Add. 91; Dkt. No. 40-2 at ATF0093, ATF0111; Dkt. No. 40-4 at ATF0178, 0196-0197.

These classifications accord with judicial interpretations of the statute and its legislative history. In summarizing the scope of the provision, the Supreme Court has explained that the definition encompasses at least a weapon where "once its trigger is depressed, the weapon will automatically continue to fire until its trigger is released or the ammunition is exhausted." *Staples v. United States*, 511 U.S. 600, 602 n.1 (1994). As the Eleventh Circuit explained, "[t]he plain language of the statute defines a machinegun as any part or device that allows a gunman to pull the trigger once and thereby discharge the firearm repeatedly." *Akins v. United States*, 312 F. App'x 198, 201 (11th Cir. 2009) (per curiam); *see also United States v. Olofson*, 563 F.3d 652, 658-59 (7th Cir. 2009) (holding that a weapon modified to allow a shooter to "exhaust[] a twenty-round magazine with one continuous depression of the trigger" was a machinegun).

In concluding that the FRT-15 was likely a machinegun, the district court in *Rare Breed Triggers* observed that the statutory term "single function of the trigger" should be read in conjunction with the rest of the definition, which encompasses

weapons that enable a shooter to fire "automatically more than one shot . . . by a single function of the trigger[.]"  The court noted that "[w]hen Congress passed the NFA in 1934, a machine was 'automatic' precisely because, once activated, it acted of its own accord and replaced a task that was previously completed manually."  2023 WL 5689770, at *22.  It then explained that "[t]his describes the FRT-15 exactly: if the shooter pulls the trigger one time, the repetitive mechanism in the FRT-15 is entirely self-executing until the shooter releases the trigger, notwithstanding the fact that the trigger mechanically pushes against the shooter's finger throughout the process.  Such a device operates 'automatically' within the ordinary understanding of that word."  *Id.*

The legislative history confirms this understanding.  The House Report accompanying the bill enacted as the NFA described the statute as containing "the usual definition of machine gun as a weapon designed to shoot more than one shot without reloading and by a single pull of the trigger."  H.R. Rep. No. 73-1780, at 2.  The then-president of the National Rifle Association explained that "[t]he distinguishing feature of a machine gun is that by a single pull of the trigger the gun continues to fire as long as there is any ammunition," and that any weapon "which is capable of firing more than one shot by a single pull of the trigger, a single function of the trigger, is properly regarded, in my opinion, as a machine gun."  *National Firearms Act: Hearings Before the House Comm. on Ways and Means on H.R. 9066*, 73d Cong 40

12

(1934) (statement of Karl T. Frederick, President, National Rifle Association of America).

**B.**  The district court misunderstood the nature of the devices at issue here, ATF's treatment of such devices, and this Court's decision in *Cargill*.  The district court believed that these devices are not meaningfully distinguishable from the bump stocks at issue in *Cargill* and that ATF had not treated such devices as machineguns prior to the 2018 rule that classified bump stocks as machineguns.  The court was mistaken in all respects.

The language from *Cargill* on which the district court relied reflected the views of a plurality of this Court, not a holding,[1] but, in any event, as the *Cargill* plurality explained, the rule that ATF issued in 2018 concerned the manufacture, sale, and possession of bump stocks following their use in a tragic Las Vegas shooting.  *Id.* at 450.  The devices here differ from a non-mechanical bump stock in ways directly relevant to the *Cargill* plurality's reasoning as to why certain bump stocks are not machineguns.

---

[1] The only portion of the cited opinion that garnered a majority of the Court was Section V, which discusses application of the rule of lenity.  *See Cargill*, 57 F.4th at 449 n.* (explaining that only eight of sixteen judges joined the portions of the lead opinion setting out the interpretation of the statute); *id.* at 476-77 nn.1-2 (Ho., J., concurring in part) (discussing reasoning of "the plurality").

13

*Cargill* concerned the ATF regulation that addressed "non-mechanical bump stocks. Those devices replace the stock on an ordinary semiautomatic rifle and allow the gun to slide back and forth in the device between shots from the combination of the recoil of each shot and the shooter's forward pressure on the barrel of the weapon, repeatedly forcing the trigger against the shooter's finger (which remained stationary on the device's "trigger ledge"). 57 F.4th at 453-54. It was critical to the plurality's analysis that a shooter using a non-mechanical bump stock could not simply pull the trigger and have the weapon fire repeatedly, but must also "maintain manual, forward pressure on the barrel and manual, backward pressure on the trigger ledge." *Id.* at 463.

The plurality also explained, however, that this analysis did not apply to mechanical bump stocks such as the Akins Accelerator. That device used a spring to harness the weapon's recoil energy and repeatedly force the trigger against the shooter's finger after the initial shot. *Id.* at 454, 462 n.8; *see Akins*, 192 F. App'x at 198. This Court explained that its concerns regarding the application of the term "single function of the trigger" to non-mechanical bump stocks "would not apply to the Akins Accelerator" because "a shooter using an Akins Accelerator need only pull the trigger once to activate the firing sequence" and the device then "maintained the bump fire of its own accord," *Cargill*, 57 F.4th at 462 n.8, with no need "to maintain pressure on the barrel and trigger ledge in order to maintain this firing sequence," *id.*

14

at 454.  The same is true of the devices here: the shooter need only "pull the trigger once to activate the firing sequence" which the device then "maintain[s] . . . of its own accord."  *Id.* at 462 n.8; *see Rare Breed Triggers*, 2023 WL 5689770, at *23 (explaining that the *Cargill* plurality "provides further grounds to find that the FRT-15 is a machinegun").

The district court dismissed the relevance of the Akins Accelerator and similar devices by suggesting that the triggers on weapons equipped with those devices do not "perform the same mechanical function as any normal trigger by releasing the hammer prior to each shot."  Add. 30.  That is simply mistaken.  As the *Cargill* plurality recognized, for every shot from a weapon equipped with an Akins Accelerator, the spring action of the device must force the weapon's trigger against the shooter's finger to release the hammer.  *Cargill*, 57 F.4th at 454.  Instead, the central point is that after the initial function of the trigger caused by the shooter's pull, the device operates automatically to produce repeated fire.

With FRTs, "the act of pulling and holding the trigger is one function, and that function produces more than one shot," *Cargill*, 57 F.4th at 463, and both devices fall squarely within even the *Cargill* plurality's understanding of the statutory definition of machinegun.

15

## II.     A Stay is Necessary to Preserve the Status Quo Pending Appeal and Avoid Injury to the Public Health and Safety.

**1.**  Because the district court failed to recognize the salient distinctions between a non-mechanical bump stock and the forced reset triggers at issue here, it mistakenly assumed that the 2018 bump stock rule marked the first time that ATF had determined that a forced reset trigger device was a machinegun and thus declared that its preliminary injunction would "preserve the status quo until a final decision on the merits is rendered."  Add. 44; *see* Add. 36 (plaintiffs "face potential pressure to comply with a regulation that is likely unlawful due to ATF's arbitrary and capricious interpretation of 'machineguns'"); Add. 58 ("[T]he preliminary injunction broadly maintains the status quo of general non-enforcement against law-abiding citizens").

The premise of the court's ruling was incorrect.  As discussed, ATF's classification of the FRT-15 and WOT is fully consistent with its treatment of other devices of this type in 1975, 1994, 2004, 2005, 2006, and 2017 before addressing the specific devices at issue in this suit beginning in 2018.  *See* Add. 141-42; Add. 155-81; *see also Rare Breed Triggers*, 2023 WL 5689770, at *27-34 (concluding that defendants likely did not act in good faith in telling customers that possession of the FRT-15 was legal).

That error crucially infected the court's assessment of the balance of harms. The 2018 bump stock rule did not bear on ATF's classification of forced reset trigger devices, and plaintiffs are no more or less subject to a possible enforcement action

now than manufacturers, distributors, or possessors of similar devices in the past five decades. The injunction effectively permits plaintiffs for the first time to manufacture, distribute, and acquire devices long classified as machineguns. The ruling thus upends a decades-old understanding of how the law applies to these devices, legalizing weapons that have long been understood to qualify as machineguns.

The court's description of the "status quo" assertedly preserved by its order also disregards the actual sweep of the injunction. The court described its injunction as "memorializing the status quo" in which there would be "no prosecution for FRT possession or ownership by these Plaintiffs because no concrete threat to public safety exists." Add. 40. That characterization disregards the scope of the injunction, which applies not only to enforcement actions based on possession, but applies as well to the continued manufacture, sale, and transfer of these devices. Add. 42-43.

The injunction thus permits plaintiffs to manufacture, distribute, and transfer devices that pose a substantial risk to the safety of the public and law enforcement. These devices permit a shooter to apply continuous pressure to the trigger and achieve a rate of fire equivalent to an M16-type machinegun used by the military, making their destructive capacity comparable to weapons all agree are machineguns. That unique capacity for destruction is precisely why Congress banned such weapons in the first place.

The speed with which such devices can be manufactured and distributed underscores the potential impact of the injunction. To the best of the government's knowledge, Rare Breed Triggers alone likely distributed over 100,000 of these devices nationwide in roughly two years, while other manufacturers distributed a significant number of similar devices, such as the WOT. Add. 143-44. And because these devices are sold without the background checks or recordkeeping ordinarily required of firearms, they are difficult, if not impossible, to locate after the fact. Add. 145, 147-48.

Such widespread devices inevitably form part of criminal activity. Since January 2021, ATF "has conducted approximately seventy-one criminal examinations of these types of devices as a part of criminal cases," including dozens of investigations of criminal conduct independent of the possession, manufacture, or distribution of these devices. Add. 150-51. In addition, these devices are at issue in multiple pending criminal prosecutions in other districts, including for criminal defendants who face multiple other charges. Add. 152. There is also significant evidence that these dangerous devices are ending up in the hands of convicted felons otherwise prohibited from possessing firearms. Even with ATF's limited data on sales of these devices, the agency has identified at least 63 instances in which these devices were transferred to individuals prohibited from possessing firearms under 18

U.S.C. § 922(g) from three different sources in a span of just three to six months. Add. 151.

These statistics understate the prevalence of these devices in crime. These devices "can be installed on AR-type rifles without any visible modification to the firearm," such that state and local law enforcement may not be aware that a weapon they have recovered has been equipped with a device. Add. 150. Even when such devices are identified, the law enforcement agency may not capture that information in a way that allows ATF to properly assess the true scope of recoveries. For example, the ordinary firearm tracing process undertaken when a law enforcement agency submits a tracing request to ATF would not capture whether the weapon being traced was equipped with an FRT. Add. 149. Given the nationwide surge in the use of machinegun conversion devices generally, and a documented increase in instances of automatic fire recorded by ShotSpotter systems, there is every reason to believe that these devices will increasingly be used in criminal activity. Add. 153. Indeed, ATF has determined that as of October 11, 2023, there has been an approximately 44% increase in the number of machinegun conversion devices recovered by law enforcement as compared to recoveries in 2022. *Id.* As of the same date, for 2023, the state with highest number of recoveries is Texas. *Id.* Further, during the same time-period, there has been an approximately 400% increase in firearm traces involving such weapons in which the trace was also associated with a

crime of violence. *Id.* The district court nevertheless dismissed concerns about public safety as "grounded entirely in the conclusion that FRTs are machineguns," and stated that those concerns are "a *non sequitur*" because "FRTs are not machineguns." Add. 39; *accord* Add. 56-57. But machineguns are dangerous because of the rapid rate of fire they permit, and no one disputes that the devices here, whatever their classification, are capable of firing at the same rate as an M16-type machinegun—approximately 900 rounds per minute.

The district court also suggested that public safety concerns were irrelevant because the government stated that it had no imminent plans to prosecute the individual plaintiffs. Add. 39-40. That reasoning gets matters backwards. Because ATF has no immediate plans to take any action with respect to the three named individual plaintiffs, they have not carried their burden of demonstrating irreparable injury requiring relief pending resolution of their claims. That ATF has no immediate plans with respect to these individuals does not detract from the seriousness of the concerns posed by these devices. ATF has prioritized recovery of devices from individuals with criminal histories, from distributors, and from individuals who have purchased large quantities of forced reset triggers (which may be indicative of plans to distribute).

In any event, the injunction applies not only to the named plaintiffs but extends as well to members of the two plaintiff organizations, which each claim to include

thousands of members in the Northern District of Texas alone, and commercial members' downstream customers. The injunction thus precludes enforcement of the law with respect to thousands of individuals and entities about whom neither the district court nor the government has any information.

**2.** The government's likelihood of success and the balance of equities strongly weigh in favor of a stay pending appeal. At a minimum, these considerations would warrant a stay of the injunction insofar as it applies beyond the named individual plaintiffs identified to the district court, or as it applies beyond possession and permits the continued manufacture, distribution, and transfer of these devices, which will open the door to widespread distribution of deadly weapons. As ATF's declarant explains, attempts to recover forced-reset triggers purchased or otherwise transferred while the injunction is in place may "be particularly dangerous to law enforcement." Add. 56. "ATF prioritizes retrievals from individuals who meet certain risk factors," and "[t]hese individuals are likely to be armed, and sometimes may be dangerous." *Id.* Such a stay would at least limit the injunction's most irreversible consequences. And while the injunction should clearly be stayed in its entirety, a stay directed to manufacture, distribution and transfer would at least mirror the status quo the district court purported to be preserving based on "FRT possession or ownership." Add. 40.

## CONCLUSION

For the foregoing reasons, the district court's preliminary injunction should be stayed.

Respectfully submitted,

BRIAN M. BOYNTON
*Acting Assistant Attorney General*

LEIGHA SIMONTON
*United States Attorney*

MARK B. STERN

*s/ Brad Hinshelwood*
BRAD HINSHELWOOD
*Attorneys, Appellate Staff*
*Civil Division, Room 7256*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-7823*
*bradley.a.hinshelwood@usdoj.gov*

November 2023

## CERTIFICATE OF COMPLIANCE

This motion complies with the type-volume limit of Federal Rule of Appellate Procedure 27(d)(2)(A) because it contains 5,116 words.  This motion also complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 27(d)(1)(E) and 32(a)(5)-(6) because it was prepared using Microsoft Word 2016 in Garamond 14-point font, a proportionally spaced typeface.  I further certify that this emergency motion complies with the requirements of 5th Cir. R. 27.3 because it was preceded by a telephone call to the Clerk's Office and contact with opposing counsel on November 17, 2023, advising of the intent to file this emergency motion.  I further certify that the facts supporting emergency consideration of this motion are true and complete.  I further certify under 5th Cir. R. 27.4 that appellees oppose this motion and intend to file an opposition.

*s/ Brad Hinshelwood*
Brad Hinshelwood