No. 23-11138

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

———————————

National Association for Gun Rights, Incorporated; Texas Gun Rights, Incorporated; Patrick Carey; James Wheeler; Travis Speegle,

Plaintiffs-Appellees,

v.

Merrick Garland, U.S. Attorney General; United States Department of Justice; Steven Dettelbach, in his official capacity as Director of the Bureau of Alcohol, Tobacco, Firearms, and Explosives; Bureau of Alcohol, Tobacco, Firearms, and Explosives,

Defendants-Appellants.

———————————

On Appeal from the United States District Court
for the Northern District of Texas
District Court Case No. 4:23-cv-830 (Hon. Reed O'Connor)

———————————

## ADDENDUM TO EMERGENCY MOTION
## FOR STAY PENDING APPEAL

———————————

BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney General*

LEIGHA SIMONTON
*United States Attorney*

MARK B. STERN
BRAD HINSHELWOOD
*Attorneys, Appellate Staff*
*Civil Division, Room 7256*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-7823*

# TABLE OF CONTENTS

Opinion and Order Granting Preliminary
    Injunction (Oct. 7, 2023) (Dkt. 53) .................................................................Add. 1

Order Denying Stay Pending Appeal (Nov. 16, 2023) (Dkt. 73) .........................Add. 46

Complaint (Dkt. 1) ............................................................................................Add. 60

ATF Report of Technical Examination, FRT-15 (Dkt. 40-5) ...............................Add. 76

Transcript of Preliminary Injunction Hearing (Excerpt)
    (Oct. 2, 2023) (Dkt. 56) ..............................................................................Add. 133

Declaration of Craig Saier and Attached
    Exhibits (Nov. 6, 2023) (Dkt. 64-1)...............................................................Add. 138

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
### FORT WORTH DIVISION

| | | |
|---|---|---|
| **NATIONAL ASSOCIATION FOR** | § | |
| **GUN RIGHTS, INC.,** *et al.*, | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | **Civil Action No. 4:23-cv-00830-O** |
| **v.** | § | |
| | § | |
| **MERRICK GARLAND,** *et al.*, | § | |
| | § | |
| **Defendants.** | § | |
| | § | |

## OPINION & ORDER ON PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Before the Court are Plaintiffs' Motion for Preliminary Injunction with Brief in Support (ECF No. 22) and Appendix (ECF No. 23), filed August 15, 2023; Defendants' Response (ECF No. 39), Appendix (ECF No. 40), and Notice of Manual Filing of Video Exhibits (ECF No. 41), filed September 8, 2023; and Plaintiffs' Reply (ECF No. 47), filed September 22, 2023. The Court also heard evidence at an oral hearing on October 2, 2023 (ECF No. 51). Having considered the parties' arguments and applicable law, the Court **GRANTS** Plaintiffs' Motion for Preliminary Injunction to preserve the status quo until a final decision on the merits is rendered.

## I.  BACKGROUND[1]

The United States Congress delegated authority to the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") to regulate firearms in interstate commerce under the Gun Control Act of 1986. In a 2018 regulation, the ATF expanded the statutory definition of "machinegun." A few years later, the ATF determined that additional types of firearms qualify as machineguns and are thus illegal to possess or transfer. One of those prohibited firearms is a

---

[1] Unless otherwise indicated, all facts are taken from the Court's August 30, 2023 Opinion & Order that granted a temporary restraining order. *See* Order & Op. on Pls.' Mot. for TRO, ECF No. 36.

forced reset trigger. Alleging incongruence between the statutory definition and the ATF's interpretation, Plaintiffs bring this suit under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701 *et seq.*, to challenge the legality of the ATF's broadened definition.

### A.  Forced Reset Triggers

A forced reset trigger ("FRT") is an assembly that allows the trigger of a semi-automatic weapon to reset quicker than it otherwise would using the standard trigger-return spring. Due to the swift trigger reset, a firearm equipped with an FRT enables the user to fire at a faster rate than with a traditional trigger.

Reviewing the basic mechanism of a firearm is necessary to understand how an FRT works. The basic function of any trigger is to release the hammer. This occurs when the trigger is pulled back to the point that a "trigger sear" releases the hammer from its retained position. Once released by the trigger, the hammer pivots to contact the firing pin. Once contacted, the firing pin then strikes a chambered ammunition cartridge or "round," causing gunpowder in the cartridge to combust. The combustion effect propels the cartridge's bullet out of the barrel of the firearm. Once fired, a standard semi-automatic trigger returns to its "reset" state—ready-to-fire or "set" position—by allowing the firearm to function once again by starting the mechanism anew. In other words, the firearm only functions again upon the reset of the trigger to release the hammer.

An FRT is a device that forcibly returns the trigger to its reset state. In the commercialized FRT designs at issue in this litigation, the trigger is forcibly reset by the hammer when the bolt carrier cycles to the rear. A "locking bar" mechanically locks the trigger in its reset state, preventing the user from moving the trigger rearward to function by releasing the hammer, until the bolt has returned to the in-battery position and the firearm is safe to fire. When firing multiple shots using an FRT, the trigger must still reset after each round is fired and must

**Add. 2**

separately function to release the hammer by moving far enough to the rear in order to fire the next round.

### B. Statutory Background

The National Firearms Act of 1934 ("NFA") regulates certain firearms in interstate commerce. 26 U.S.C. §§ 5801 *et seq.* At the time of its proposal, the NFA "was known to many as the 'the Anti-Machine Gun Bill.'" *Cargill v. Garland*, 57 F.4th 447, 450 (5th Cir. 2023), *pet. for cert. filed*, No. 22-976 (2023). Among other things, the NFA criminalized the possession or transfer of certain unregistered firearms while also prohibiting the registration of firearms otherwise banned by law. 26 U.S.C. §§ 5812(a), 5861. In the decades following its enactment, Congress passed the Gun Control Act of 1968 (the "GCA"), which criminalized the possession of firearms for certain classes of people. 18 U.S.C. § 921 *et. seq.* The GCA was amended in 1986 by the Hughes Amendment to the 1986 Firearm Owners Protection Act—colloquially referred to as "the machinegun ban"—in order to prohibit the possession or transfer of machineguns. 18 U.S.C. § 922(o). With limited exceptions,[2] it is a federal felony today to possess or transfer a machinegun. *Id.* This offense is punishable by up to ten years in federal prison for first-time offenders. 18 U.S.C. § 924(a)(2).

> According to both the NFA and GCA, a "machinegun" is statutorily defined as
>
> [a]ny weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. The term shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machine gun, and any combination of parts from which a machine gun can be assembled if such parts are in the possession or under the control of a person.

---

[2] These exceptions are limited to government actors, as well as machineguns in existence and registered prior to May 19, 1986—the effective date of the statute. 18 U.S.C. § 922(o)(2)(A)–(B).

**Add. 3**

26 U.S.C. § 5845(b) (providing the original statutory definition of "machinegun"); 18 U.S.C. § 921(a)(24) (incorporating the NFA's definition of "machinegun" into the GCA). In other words, a machinegun is a "rifle capable of automatic fire" due to "firing more than one round per trigger-action." *Cargill*, 57 F.4th at 452. Firearms incapable of automatic fire per trigger-action are thus not machineguns. *Id.*

### C. Regulatory Background

For decades, the ATF's regulations mirrored the federal statutory definition of "machinegun." *Compare* 27 C.F.R. §§ 478.11, 479.11 (2017) *with* 26 U.S.C. § 5845(b). This statutory parity was disrupted in 2018 when the ATF broadened the meaning of machinegun in its most recent regulation by re-interpreting the statutory definition to add additional language:

> Any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. The term shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machine gun, and any combination of parts from which a machine gun can be assembled if such parts are in the possession or under the control of a person. *For purposes of this definition, the term "automatically" as it modifies "shoots, is designed to shoot, or can be readily restored to shoot," means functioning as the result of a self-acting or self-regulating mechanism that allows the firing of multiple rounds through a single function of the trigger; and "single function of the trigger" means a single pull of the trigger and analogous motions. The term "machine gun" includes a bump-stock-type device, i.e., a device that allows a semi-automatic firearm to shoot more than one shot with a single pull of the trigger by harnessing the recoil energy of the semi-automatic firearm to which it is affixed so that the trigger resets and continues firing without additional physical manipulation of the trigger by the shooter.*

27 C.F.R § 479.11 (2018) (emphasis added).

Three years after the ATF broadened its interpretation of the statutory definition, agency subdivisions issued reports applying the revised definition of "machinegun" to FRTs. For instance, the Firearms Technology Criminal Branch ("FTCB") issued a Technical Examination

Report on July 15, 2021, which purportedly classified the FRT-15—a version of the FRT—as a machinegun. The FTCB issued a similar report several months later on October 21, 2021 regarding the Wide Open Enterprises "WOT" version of the FRT. Both the WOT and the FRT-15 operate on the same mechanical principles. At the beginning of the next year, the FTCB issued its "Open Letter to All Federal Firearms Licensees" (the "Open Letter") on March 22, 2022. The Open Letter advised that the ATF "recently examined devices commonly known as 'forced reset triggers' (FRTs)" and "determined that *some* of them are 'firearms' and 'machineguns' as defined in the [GCA]." Most important for this case, the Open Letter further explained that "ATF's examination found that *some* FRT devices allow a firearm to automatically expel more than one shot with a single, continuous pull of the trigger" and that "any FRT that allows a firearm to automatically expel more than one shot with a single, continuous pull of the trigger is a 'machinegun.'" One month later, the ATF's Firearms and Ammunition Technology Division ("FATD") issued yet another report on the FRT-15 trigger.

The ATF's application of its revised definition is not merely contained to agency reports. In fact, ATF and other government actors are actively pursuing civil and criminal enforcement actions against manufacturers, sellers, and owners of FRTs. Specifically, the Department of Justice ("DOJ") has brought several criminal prosecutions against individuals for possessing FRTs—including at least one individual located in the State of Texas.[3] The DOJ has also initiated civil proceedings against at least one company and two individuals for manufacturing

---

[3] *See, e.g.*, Second Superseding Indictment at Count One, *United States v. Bruggeman*, 2:22-cr-185 (S.D. Tex. Nov. 9, 2022) (charging defendant with "knowingly posess[ing] a machinegun, that is, six (6) Rare Breed Triggers FRT-15"); Indictment at Count Two, *United States v. Berrios-Aquino*, 3:22-cr-473 (D.P.R. Apr. 20, 2023) (charging defendant with possession of a machinegun for possessing a Rare Breed FRT-15 trigger); Superseding Indictment at Count One, *United States. v. Augusto*, 3:22-cr-30025 (D. Mass. Sept. 1, 2022) (charging defendant with possession of a machinegun in part for possessing three Rare Breed FRT-15 forced reset triggers and one Tommy Triggers FRT-15-3 MD forced reset trigger).

Add. 5

and selling FRTs.[4] And more proceedings seem inevitable given that the ATF is sending cease-and-desist letters regarding possession of FRTs.[5]

### D.  Parties

Plaintiffs comprise of both individuals and organizations. Plaintiffs Patrick Carey, Travis Speegle, and James "J.R." Wheeler are three individual citizens located in the Texas–Louisiana area (the "Individual Plaintiffs"). Each Individual Plaintiff has owned, currently owns, and/or plans to own FRTs in the future. Plaintiffs also include two organizations—National Association for Gun Rights, Inc. ("NAGR") and Texas Gun Rights, Inc. ("TGR")—with thousands of members in the Northern District of Texas (the "Organizational Plaintiffs").

Plaintiff Carey owned two FRTs prior to receiving a warning notice from the ATF on August 22, 2022. The warning notice informed Plaintiff Carey that "ATF has information that you have acquired one or more [FRTs]," that "[t]hese items have been classified as machineguns that were unlawfully manufactured," that "[p]ossession of these devices is a violation of law due to their illegal manufacture," and that "*the unlawful receipt and possession of any of these devices is a felony violation of Federal law*." Due to the direct threat of civil and criminal enforcement, Plaintiff Carey surrendered his two FRTs to ATF agents. Plaintiff Wheeler personally owns one FRT and has a 50% ownership stake in a small firearms and ammunition business that owns two additional FRTs. Plaintiff Speegle personally owns ten FRTs. Both Plaintiffs Wheeler and Speegle wish to maintain possession of their FRTs, but fear they are at risk of civil and criminal prosecution for continued possession. The Individual Plaintiffs' prior or current conduct—possession or transfer of FRTs—is subject to enforcement on account of the

---

[4] *See, e.g.*, Complaint, *United States v. Rare Breed Triggers, LLC, et al.*, No. 1:23-cv-00369-NRM-RML, 2023 WL 5689770 (E.D.N.Y. Jan. 19, 2023) (seeking injunctive relief to enjoin a commercial entities and related individuals from marketing FRT-15s as lawful weapons despite the ATF's contrary interpretation that FRTs are machineguns).

[5] *See, e.g.*, Pls.' App'x 5, 7–8, ECF No. 23 (cease-and-desist letter to Plaintiff Patrick Carey).

Add. 6

ATF's broadened definition of machinegun.

In addition to the Individual Plaintiffs, other unnamed members of the Organizational Plaintiffs are also subject to enforcement under the ATF's broadened definition of machinegun. Formed in 2000, NAGR is a Virginia non-profit organization with its headquarters in Loveland, Colorado.[6] NAGR's purpose is to "preserve and defend the Second Amendment rights of gun owners."[7] It represents over 3,000 members in the Northern District of Texas alone.[8] Certain members of NAGR either already own FRTs or wish to acquire them but for the challenged ATF definition.[9] Since this case was filed, at least three new NAGR members have reported receiving warning letters from the ATF regarding their FRTs.[10]

Similarly, TGR is another non-profit corporation representing unnamed members in this lawsuit.[11] Its mission is "to protect the Second Amendment rights of its members, including protecting the liberty of individuals to defend themselves, their families, and their property without having to first ask government for permission."[12] Headquartered in Hudson Oaks, Texas, TGR represents over 14,000 members residing in the Northern District of Texas alone.[13] Among these members are those who own FRTs or wish to acquire them but for the challenged ATF definition.[14]

Without immediate relief, Plaintiffs fear civil and criminal prosecution. For those reasons, among others, Plaintiffs are suing various government officers and entities—the

---

[6] Pls.' Compl. 2, ECF No. 1.
[7] *Id.*
[8] *Id.*
[9] *Id.*
[10] Pls.' Reply in Support of Mot. for Prelim. Inj. 20 (describing declarations of Ryan Flugaur, Chris McNutt, and John Kordenbrock); *see also* Pls.' Reply App'x 94, ECF No. 48 (Declaration of Ryan Flugaur); *id.* at 85–93, 95–98, 101–04 (Declarations of other NAGR Members).
[11] Pls.' Compl. 2–3.
[12] *Id.*
[13] *Id.*
[14] *Id.* at 3.

**Add. 7**

Attorney General of the United States, the DOJ, the ATF, and the Director of the ATF (collectively, the "Defendants")—over the ATF's newly broadened definition and implementation of the machinegun regulation. In the instant action, Plaintiffs bring an APA challenge to the validity of Defendants' interpretation of the "machinegun" definition. According to Plaintiffs, this definition is unlawful because "Defendants' interpretation of the law and their specific actions to threaten and potentially initiate enforcement actions against Plaintiffs are thus arbitrary, capricious, and otherwise contrary to law." To protect the status quo during the pendency of the lawsuit, Plaintiffs seek a preliminary injunction enjoining Defendants from enforcing or otherwise implementing the novel definition until the Court is able to rule on the merits.[15] Such relief is available under the Court's inherent equitable powers and pursuant to statutory authorization under 5 U.S.C. § 705.

### E. Temporary Restraining Order

On August 30, 2023, this Court granted a temporary restraining order ("TRO") to the Individual Plaintiffs only.[16] Finding that the ATF's expanded definition of "machinegun" is likely unlawful, the TRO enjoined Defendants from implementing or enforcing, in any civil or criminal manner, the definition against the Individual Plaintiffs.[17] The TRO was narrow in scope, limiting temporary injunctive relief to current and former possession of FRTs by the Individual Plaintiffs.[18] The TRO was extended once by the Court for good cause to avoid a gap between the temporary relief afforded to the Individual Plaintiffs and any subsequent preliminary injunction the Court may award.[19] The parties subsequently agreed to extend the TRO on two occasions.[20]

---

[15] Pls.' Mot. for Prelim Inj. 1–2, ECF No. 22.
[16] Order & Op. on Pls.' Mot. for TRO, ECF No. 36.
[17] *Id.* at 27.
[18] *Id.* at 25.
[19] *Id.* at 26.

**Add. 8**

The TRO expires after October 7, 2023.[21]

### F.  Eastern District of New York's Preliminary Injunction

Shortly after the Court granted the TRO to the Individual Plaintiffs,[22] a federal district court in the Eastern District of New York granted a preliminary injunction in favor of Defendants in a similar lawsuit involving the ATF's definition as applied to FRTs (the "E.D.N.Y. Lawsuit" and "E.D.N.Y. Decision"). *United States v. Rare Breed Triggers, LLC*, No. 23-cv-369 (NRM) (RML), 2023 WL 5689770 (E.D.N.Y. Sept. 5, 2023). The E.D.N.Y. Lawsuit enjoined two commercial entities—Rare Breed Triggers, LLC and Rare Breed Firearms, along with their agents, officers, and employees—from "engaging in any sales of [various FRTs] and other machinegun conversion devices." *Id.* at *50.

### G.  Evidentiary Hearing[23]

On October 2, 2023, the Court held an evidentiary hearing.[24] As with the E.D.N.Y. Lawsuit, each party was permitted an expert witness to testify about the mechanics of FRTs.[25] Notably, the hearing made clear that there are no factual disputes regarding how FRTs work.[26] Instead, the hearing confirmed that the parties' dispute centers entirely on whether FRTs qualify as machineguns under the statutory definition. Plaintiffs' expert, Daniel O'Kelly, testified that FRTs *do not* exhibit the attributes of a machinegun. Defendants' expert, Anthony Ciravolo,

---

[20] Joint Mot. for Extension of Time 1–2, ECF No. 37 (extending the TRO by three days); Joint Mot. to Reschedule Hrg. 1–2, ECF No. 43 (extending the TRO by one week).
[21] Order, ECF No. 44.
[22] Order & Op. on Pls.' Mot. for TRO, ECF No. 36.
[23] The hearing transcript will be forthcoming at a later date.
[24] *See* Electronic Minute Entry, ECF No. 51 (describing the Court's hearing held on October 2, 2023). Just like the E.D.N.Y. Lawsuit, this Court heard expert testimony regarding how FRTs function. *See* Defs.' Opp. to Mot. for Prelim. Inj. 24 (referencing the evidentiary hearing held in the E.D.N.Y. Lawsuit); *see also United States v. Rare Breed Triggers, LLC*, No. 23-cv-369 (NRM) (RML), 2023 WL 5689770, at *8 (E.D.N.Y. Sept. 5, 2023) (referencing the evidentiary hearing held on August 1–2, 2023).
[25] *See* Order, ECF No. 51 (setting time limits and scope of expert testimony).
[26] Even without the October 2, 2023 hearing, Defendants' briefing makes clear that they agree to the basic facts of how the FRT device works. *See* Defs.' Opp. to Mot. for Prelim. Inj. X, ECF No. 39.

Add. 9

testified that FRTs *do* exhibit the attributes of a machinegun. This live testimony mirrored the positions these same experts proffered during the two-day hearing in the E.D.N.Y. Lawsuit.[27] Having heard the live testimony and briefing on the issues, Plaintiffs' Motion for Preliminary Injunction is now ripe for the Court's review.

## II.    THRESHOLD ISSUES

Defendants renew the same threshold issue initially raised at the TRO stage: standing and the veracity of pre-enforcement challenges.[28] Before turning to the question of whether a preliminary injunction is warranted in this situation, the Court first addresses these threshold issues.

### A.  Individual Standing

Nothing in Defendants' renewed standing challenge contradicts the operative facts the Court relied upon when granting the TRO.[29] Yet Defendants once again argue that the Plaintiffs lack standing because there is no credible threat of prosecution and there are no *current* plans to prosecute the Plaintiffs.[30] But this phrasing reveals the implicit threat that the Plaintiffs fear: the Defendants could change their *current* plans at any time by deciding to prosecute. That is why, as the Fifth Circuit makes clear, standing exists here. *See Franciscan All., Inc. v. Becerra*, 47 F.4th 368, 376 (5th Cir. 2022) (emphasizing that "plaintiffs have standing in the face of similar prosecutorial indecision," including when an agency "has not to date evaluated" whether it will pursue enforcement); *see also Zimmerman v. City of Austin*, 881 F.3d 378, 391 (5th Cir. 2018) (explaining that standing in pre-enforcement challenges requires a showing "of an intention to

---

[27] *See generally* Transcript of Hearing, *United States v. Rare Breed Triggers, LLC* (E.D.N.Y. Sept. 5, 2023) (No. 23-cv-369 (NRM) (RML)), 2023 WL 5689770.

[28] Defs.' Opp. to Pls.' Mot. for Prelim. Inj. 10–15, 20–22, ECF No. 39.

[29] *See* Order & Op. on Pls.' Mot. for TRO 7–9, ECF No. 36 (finding that the Individual Plaintiffs successfully established standing).

[30] Defs.' Opp. to Pls.' Mot. for Prelim. Inj. 12, ECF No. 39.

**Add. 10**

engage in a course of conduct arguably affected with a constitutional interest, but proscribed by statute, . . . as well as credible threat of prosecution").

Defendants disagree that they are engaging in "prosecution indecision" comparable to the government in *Franciscan Alliance*.[31] In that case, the government "repeatedly refused to disavow enforcement [of the rule at issue] against" the plaintiff and further represented that it had "not to date evaluated whether it will" do so," effectively "conced[ing] that it may." *Franciscan All.*, 47 F.4th at 376. But this is precisely the same course that Defendants have followed in this case. No amount of "unequivocal" statements regarding "no current intention[s] to arrest or bring charges against the Individual Plaintiffs" can change the fact that Defendants have refused and *continue* their refusal to disavow prosecution until after the Court rules on the merits.[32] And whether or not Defendants vow to "notify this Court prior to issuing any . . . warning notice or taking other enforcement action" likewise does not show that Defendants have "determined [their] position."[33] All that Defendants have determined to do is provide an empty guarantee *today* to those who may become subject to enforcement tomorrow. This "unequivocal . . . guarantee" falls short of a disavowal of enforcement during the litigation, which demonstrates that Defendants "concede that [they] may" and have not sufficiently "determined [their] position" such that a credible threat of enforcement would no longer exist. *Franciscan All.*, 47 F.4th at 376. To the contrary, credible threats of enforcement continue to loom over Plaintiffs such that there is standing.[34]

---

[31] *Id.*

[32] *Id.*

[33] *Id.*

[34] Notably, it seems that the Fifth Circuit finds the government's refusal to fully disavow enforcement during litigation instructive. *See* Request for Supplemental Briefing at 1, *VanDerStok v. Garland*, No. 23-10718 (requesting the government answer whether it "intend[s] to enforce ATF's Final Rule pending appeal with respect to the parties in this case?").

Applying Fifth Circuit precedent here, the Individual Plaintiffs successfully satisfy standing requirements. There is no dispute that the Individual Plaintiffs "inten[d] to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by statute." *Zimmerman*, 881 F.3d at 391. Each Individual Plaintiff currently possesses—or previously possessed—a newly proscribed FRT. What is disputed is whether engaging in the newly proscribed FRT ownership carries "a credible threat of prosecution." *Id.* Defendants liken the Plaintiffs' concern to no more "than a general threat of prosecution" that cannot support pre-enforcement relief, particularly because the "ATF has no *current* intention to arrest or bring charges against the Individual Plaintiffs."[35] The Court disagrees and instead finds that a sufficiently credible threat exists to establish standing.

By bringing this action, the Individual Plaintiffs place themselves in potential jeopardy due to acknowledging their possession of FRTs. *See Mock v. Garland*, No. 4:23-CV-00095-O, 2023 WL 6457920, at *8 (N.D. Tex. Oct. 2, 2023) (noting that the plaintiffs, by bringing their lawsuit, necessarily provided sensitive information to the ATF regarding their regulatory noncompliance and facilitating potential future prosecution based on that information). Despite Defendants' rejection of this reality, this is not an imaginary or speculative concern. In fact, Defendants' recent enforcement activity continues to breathe life into this very fear and the factual record bears this out. Plaintiff Carey has already experienced armed ATF agents arriving at his home to warn that he could face prosecution by not surrendering his FRTs and by purchasing additional FRTs in the future.[36] Plaintiffs also cite to examples of enforcement activity and search warrants carried out against other individual owners of FRTs, including new

---

[35] Defs.' Opp.. to Pls. Mot. for Prelim. Inj. 12, 14, ECF No. 39 (emphasis added).
[36] Decl. of Patrick Carey, Pls.' Br. App'x 5, ECF No. 19.

**Add. 12**

examples since the filing of this lawsuit.[37] Specifically, at least three individuals are currently
facing prosecution and there have been sixty-seven ATF seizures to date.[38]

Based on this record, Defendants certainly appear to be "chomping at the bit" to seize
FRTs.[39] Further evidence of this is Defendants' refusal to disavow prosecuting the Individual
Plaintiffs during the pendency of this case—the exact type of "prosecutorial indecision" that the
Fifth Circuit has "repeatedly held" as more than enough to "have standing." *Franciscan All.,
Inc.*, 47 F.4th at 376. Given this flurry of recent enforcement activity—stemming from the same
interpretation of the law that proscribes Plaintiffs' conduct here—and Defendants refusal to
guarantee that no action will be taken against the Individual Plaintiffs during pending disposition
of this action, there is more than a specter of enforcement sufficient to confer standing.

Consequently, because the Individual Plaintiffs face a credible threat of civil or criminal
prosecution for prior and current ownership of FRTs, the Court finds that this constitutes more
than a *de minimis* harm to confer standing to seek a preliminary injunction.

### B. Associational Standing

The Court most also determine whether there is associational standing. When an
organization seeks a preliminary injunction on behalf of its members, it must establish
associational standing. *Hunt v. Wash. St. Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).
Defendants argue that the Organizational Plaintiffs lack associational standing.[40] The
associational standing doctrine permits a traditional membership organization "to invoke the

---

[37] Pls.' Compl. 11, ECF No. 1; Pls.' Br. in Support of Mot. for TRO 2, ECF No. 18; Pls.' Reply in
Support of Mot. for Prelim. Inj. 20 (describing declarations of Ryan Flugaur, Chris McNutt, and John
Kordenbrock). *see also* Pls.' Reply App'x 94, ECF No. 48 (Declaration of Ryan Flugaur); *id.* at 85–93,
95–98, 101–04 (Declarations of other NAGR Members).

[38] Pls.' Reply in Support of Mot. for TRO 2, 5, 9 n.3, ECF No. 33. Plaintiffs previously referenced at the
TRO stage the ATF's Official Notification showing multiple seizures of FRTs. Pls.' Reply App'x 66,
ECF No. 34.

[39] Decl. of Michael Columbo, Pls.' Br. App'x 9, ECF No. 19.

[40] Defs.' Opp. to Pls. Mot. for Prelim. Inj. 10–11, ECF No. 39.

court's [injunctive or declaratory] remedial powers on behalf of its members." *Warth v. Seldin*, 422 U.S. 490, 515 (1975). To do so, the organization must satisfy a three-prong *Hunt* test by showing that "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 143 S. Ct. 2141, 2157 (2023) (quoting *Hunt*, 432 U.S. at 343). Finally, the Fifth Circuit has explained that "[w]here the policy remains non-moribund, . . . that the policy causes self-censorship among those who are subject to it" shows that "there is standing." *Speech First, Inc. v. Fenves*, 979 F.3d 319, 336–37 (5th Cir. 2020).

Here, the Organizational Plaintiffs satisfy the three-prong *Hunt* test. First, NAGR and TGR both seek relief on behalf of their members.[41] Among these members are the Individual Plaintiffs,[42] who have standing to sue for the reasons stated above. Moreover, at least three other NAGR members have received warning letters for their FRT possession, including a member within the Northern District of Texas.[43] It is well established that a plaintiff does not need to "expose himself to liability before bringing suit." *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128–29 (2007). "The plaintiff's own action (or inaction) in failing to violate the law eliminates the imminent threat of prosecution, but nonetheless does not eliminate Article III jurisdiction." *Id.* at 129. Thus, each Individual Plaintiff's prior or current possession of FRTs gives rise to a credible threat of civil or criminal prosecution that establishes standing to sue in their own right, satisfying prong one of the *Hunt* test.

---

[41] Pls.' Compl. 2–4, ECF No. 1.
[42] Pls.' Reply in Support of Mot. for Prelim. Inj. 19, ECF No. 47 (stating that the Individual Plaintiffs are members of both Organizational Plaintiffs).
[43] *Id.* at 24; *see also* Pls.' Reply App'x 94, ECF No. 48 (Declaration of Ryan Flugaur); *id.* at 85–93, 95–98, 101–04 (Declarations of other NAGR Members).

Second, NAGR and TGR share similar organizational purposes that are clearly germane to this lawsuit challenging Defendants' asserted authority to classify and regulate FRTs as machineguns. NAGR's mission is "to preserve and defend the Second Amendment rights of gun owners."[44] Likewise, TGR's mission is "to protect the Second Amendment rights of its members, including protecting the liberty of individuals to defend themselves, their families, and their property without having to first ask government for permission and to push back on firearms-related licensing requirements."[45] And, third, because NAGR and TGR seek injunctive relief, there is no need for all of their individual members to participate in the lawsuit.

Having satisfied all three prongs of the *Hunt* test, the Court finds that the Organizational Plaintiffs demonstrate associational standing and may pursue relief on behalf of their members. Moreover, given that the record at this stage shows that ATF's enforcement policy "remains non-moribund" and is "caus[ing] self-censorship among those who are subject to it," the Court is satisfied that "there is standing." *Speech First, Inc. v. Fenves*, 979 F.3d 319, 336–37 (5th Cir. 2020).

## C. Pre-Enforcement Challenges

Defendants once again call into question the veracity of pre-enforcement judicial review of laws carrying criminal penalties. According to Defendants, such review would "ride roughshod across constitutional limitations on the judiciary's equitable powers to enjoin hypothetical future law enforcement action."[46] As the Court previously explained, the basic contours of Defendants' pre-enforcement contentions are true.[47] But it still remains that separation of powers does not preclude pre-enforcement judicial review of laws carrying

---

[44] Pls.' Compl. 2, ECF No. 1.
[45] *Id.* at 2–3.
[46] Defs.' Opp. to Pls. Mot. for Prelim. Inj. 21, ECF No. 39.
[47] Op. & Order 9, ECF No. 36.

**Add. 15**

criminal penalties. *See Babbitt v. Farm Workers*, 442 U.S. 289, 298 (1979) (emphasizing that a plaintiff facing "a credible threat of prosecution . . . should not be required to await and undergo a criminal prosecution as the sole means of seeking relief") (internal quotation marks omitted)); *see also Nat'l Rifle Ass'n of Am. v. Magaw*, 132 F.3d 272, 279 (6th Cir. 1997) ("Although in regard to criminal statutes, courts are wary of . . . intervening prior to prosecution and foreshortening the prosecutor's action, courts have allowed pre-enforcement review of a statute with criminal penalties.").

To begin, Defendants do not retract from their previous averments that certain safeguards weigh in favor of no pre-enforcement intervention by the judicial branch.[48] As this Court previously explained, "this line of argument runs afoul of multiple Supreme Court decisions."[49] *See, e.g.*, *Steffel v. Thompson*, 415 U.S. 452, 459 (1974) ("[I]t is not necessary that [a plaintiff] first expose himself to actual arrest or prosecution to be entitled to challenge a statute that he claims deters the exercise of his constitutional rights."); *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) ("When an individual is subject to such a threat [of enforcement of a law], an actual arrest, prosecution, or other enforcement action is not a prerequisite to challenging the law."). And that is to say nothing of the potential harm that such insulation from pre-enforcement judicial review would likely cause individuals subject to prosecution. Without access to courts to bring pre-enforcement challenges, vulnerable citizens may surrender the ability to promptly challenge unlawful executive branch actions. This cannot be.

---

[48] *See, e.g.,* Defs.' Resp. 6, ECF No. 32 (suggesting that "federal criminal procedure provides a host of opportunities to test the lawfulness of the government's exercise of prosecutorial authority").
[49] Op. & Order 11, ECF No. 36.

**Add. 16**

Defendants now concede that a narrow exception exists, but only for "those cases in which the very act of filing an indictment may chill *constitutional rights*."[50] But Defendants offer little support for this bold proposition. In fact, Defendants only point to a single out-of-circuit case that directly shores up their position.[51] According to the Third Circuit in *Stolt-Nielsen v. United States*, the district court lacked the authority to enjoin executive branch officials from filing an indictment because the plaintiffs had access to a federal forum post-indictment. 442 F.3d 177, 187 (3d Cir. 2006) as amended (May 16, 2006). The Third Circuit only recognized the narrow exception for chilled constitutional rights. *Id.* To be sure, *Stolt-Nielsen* contains broad language consistent with Defendants' position that pre-enforcement review of future enforcement is only available where constitutional rights are at stake. But a comparison with the issue in this case renders that language unpersuasive. In *Stolt-Nielsen*, the plaintiff sued to enforce a conditional leniency agreement that the government purported to revoke as a consequence of plaintiff's behavior. *Id.* at 179–80. This was a fundamentally individualized determination rather than a review of a generally applicable administrative action. This distinction is key.

Under the APA, federal courts have the authority to review challenges to agency actions on a pre-enforcement basis. These challenges include an endless variety of agency actions that are "otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Notably, such judicial review of agency actions "contrary to constitutional right, power, privilege, or immunity; . . . [or] in excess of statutory jurisdiction, authority, or limitations," *id.* § 706(2)(B)–(C), is cumulative under the arbitrary and capriciousness standard, which "governs review of *all* proceedings that are subject to challenge under the APA." *Menkes v. DHS*, 637 F.3d 319, 330 (D.C. Cir. 2011)

---

[50] Defs.' Opp. to Pls. Mot. for Prelim. Inj. 20, ECF No. 39 (citing *Stolt-Nielsen, S.A. v. United States*, 442 F.3d 177 (3d Cir. 2006), as amended (May 16, 2006)).

[51] *Id.*

17

**Add. 17**

(citing *Consumers Union of U.S.., Inc. v. FTC*, <u>801 F.2d 417, 422</u> (D.C. Cir. 1986)). Thus, "[i]n *all* cases" of judicial review under § 706, "agency action must be set aside if the action was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law' or if the action failed to meet statutory, procedural, or constitutional requirements." *Citizens to Preserve Overton Park, Inc. v. Volpe*, <u>401 U.S. 402, 413</u>–414 (1971) (citing <u>5 U.S.C. § 706(2)(A)</u>, <u>(B)</u>, <u>(C)</u>, <u>(D))</u> (emphasis added). This is also consistent with the Supreme Court's emphasis that the APA's "'generous review provisions' must be given a 'hospitable' interpretation." *Abbott Lab'ys v. Gardner*, <u>387 U.S. 136, 140</u> (1967) (quoting *Shaughnessy v. Pedreiro*, <u>349 U.S. 48, 51</u> (1955)).

Even so, Defendants still reject this broad statutory authorization of judicial review, arguing that "the APA's general conferral of authority to review certain agency actions and to grant interim relief has no bearing on whether the particular equitable remedy sought here is available."[52] Once again, this bold statement lacks any direct support. Not only that, Defendants' interpretation also runs counter to the text of the APA itself. The APA's text refers to "mandatory or injunctive decree[s]" issued thereunder. <u>5 U.S.C. § 702</u>. The import of this text is that injunctive relief is available under the APA without any express limitation precluding the availability of such relief on a pre-enforcement basis. Moreover, the text of § 702 makes clear that "[a] person suffering a legal wrong because of agency action, or adversely affected or aggrieved by agency action" is "entitled to judicial review thereof." *Id.* And the APA expressly provides that criminal proceedings are *included* in such review. *Id.* § 703. This ability to obtain an appropriate remedy is not contingent on the person being subject to existing enforcement. To the contrary, the APA recognizes judicial authority to "issue all necessary and appropriate

---

[52] *Id.*

process . . . to preserve status or rights" from "irreparable injury" caused by agency action.[53] *Id.* § 705. Indeed, the APA's explicit textual entitlement would be undermined by an interpretation that § 702 confers no right to obtain meaningful equitable relief on a pre-enforcement basis when wronged by agency action. Provided that the claim is justiciable, the APA's broad entitlement to judicial review is not limited in the way Defendants portray.

Based on the text, the APA empowers courts with specific authority to "hold unlawful and set aside agency action, findings, and conclusions found to be" unlawful without subjecting that authority only to post-enforcement situations. *Id.* § 706. This is the only reading of the text that gives "a 'hospitable' interpretation" to the APA's "'generous review provisions.'" *Abbott Lab'ys*, 387 U.S. at 140 (quoting *Shaughnessy*, 349 U.S. at 51). It also tracks with the important purpose the APA serves. *See Franciscan Alliance*, 47 F.4th at 378 ("[A]n agency 'literally has no power to act . . . unless and until Congress authorizes it to do so by statute.'" (quoting *Fed. Election Comm'n v. Cruz*, 142 S. Ct. 1638, 1649 (2022)).

James Madison warned that "[t]he accumulation of all powers, legislative, executive and judiciary, in the same hands . . . may justly be pronounced the very definition of tyranny." THE FEDERALIST No. 47, at 301 (James Madison) (Clinton Rossiter ed. 1961). The crux of this case is that the executive branch has improperly usurped legislative authority by enacting criminal prohibitions that are beyond the scope of its legislatively granted authority. Now, Defendants seek to arrogate unto themselves the judicial authority as well by placing their actions beyond the reach of pre-enforcement judicial review. This is not and cannot be.

To be sure, the constitutional check of judicial review is an essential component of separation-of-powers principles to oblige another branch to control itself. *See* THE FEDERALIST

---

[53] *See generally* Jonathan F. Mitchell, *The Writ-of-Erasure Fallacy*, 104 VA. L. REV. 933, 1012–17 (2018) (explaining that, although the power of judicial review is not akin to an executive veto, the APA expressly grants courts additional authority to review agency action).

No. 78, at 380 (Alexander Hamilton) (Dover ed., 2014) ("There is no position which depends on clearer principles, than that every act of a delegated authority, contrary to the tenor of the commission under which it is exercised, is void."). And this remains just as important today as it was at the Founding. Not only would Defendants have this Court ignore decades of Supreme Court precedent and the APA's plain textual authorization of judicial review, they would also have this Court twist the foundational value of separation of powers into something it is not. The Court declines this invitation for the second time. Instead, the Court finds that it possesses both constitutional and statutory authority to review pre-enforcement challenges to agency action with criminal consequences and does so here.

*    *    *    *    *

Accordingly, finding no bar to the authority to afford equitable relief to Plaintiffs, the Court proceeds with its analysis of the requested preliminary injunction.

## III.    LEGAL STANDARDS

The decision to grant or deny injunctive relief is committed to the district court's discretion. *See Miss. Power & Light Co. v. United Gas Pipe Line*, 760 F.2d 618, 621 (5th Cir. 1985). To establish entitlement to injunctive relief, the movant must demonstrate: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable harm; (3) that the balance of hardships weighs in its favor; and (4) that the issuance of the preliminary injunction will not disserve the public interest. *Daniels Health Servs., L.L.C. v. Vascular Health Scis., L.L.C.*, 710 F.3d 579, 582 (5th Cir. 2013). The last two factors merge when the government is the opposing party. *Nken v. Holder*, 556 U.S. 418, 435 (2009). As the movant, it is the party seeking relief who bears the burden of proving all four elements of the requested injunctive relief. *Nichols v. Alcatel USA, Inc.*, 532 F.3d 364, 372 (5th Cir. 2008); *Miss. Power & Light Co.*,

760 F.2d at 621.

Upon determining that a party is entitled to injunctive relief, a court must also decide the appropriate scope of that prospective injunction. "[T]he scope of injunctive relief is dictated by the extent of the violation established[.]" *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). And because it is considered an extraordinary remedy, an injunction "should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 756 (1994) (cleaned up). Thus, an injunction must "redress the plaintiff's particular injury," and no more. *Gill v. Whitford*, 138 S. Ct. 1916, 1934 (2018) (citation omitted).

## IV.    ANALYSIS

### A.  Substantial Likelihood of Success on the Merits[54]

Plaintiffs are likely to succeed on the merits. To show a substantial likelihood of success on the merits, Plaintiffs need not show they are entitled to summary judgment on their claim, but must instead present a prima facie case. *Daniels Health Servs.*, 710 F.3d at 582. The Administrative Procedure Act ("APA") instructs courts to "hold unlawful and set aside agency action . . . found to be . . . in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(C). Judicial review of agency actions "contrary to constitutional right, power, privilege, or immunity" or "in excess of statutory jurisdiction, authority, or limitations," *id.* § 706(2)(B)–(C), are cumulative under the arbitrary and capriciousness standard, which "governs review of *all* proceedings that are subject to challenge under the APA." *Menkes v. DHS*, 637 F.3d 319, 330 (D.C. Cir. 2011) (citing *Consumers Union of U.S., Inc. v. FTC*, 801 F.2d 417, 422 (D.C. Cir. 1986)). Thus, "[i]n *all* cases" of judicial review under Section 706, "agency action must be set

---

[54] The Court's discussion of facts concerning the mechanical operation of FRTs is drawn from (1) the pleadings, (2) the October 2, 2023 hearing, and (3) the E.D.N.Y. Lawsuit.

**Add. 21**

aside if the action was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law' or if the action failed to meet statutory, procedural, *or* constitutional requirements." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 413–414 (1971) (citing 5 U.S.C. § 706(2)(A)–(D)) (emphases added).

Here, Plaintiffs contend that the ATF's regulation broadening the machinegun definition is an arbitrary and capricious expansion of the agency's authority.[55] Plaintiffs are likely correct. Accordingly, the Court concludes that Plaintiffs have carried their burden at this stage to show that the expanded definition of machinegun likely exceeds the scope of ATF's statutory authority. Therefore, Plaintiffs have satisfied "arguably the most important" of the four factors. *Tesfamichael v. Gonzales*, 411 F.3d 169, 176 (5th Cir. 2005).

> i. Statutory Interpretation in *Cargill v. Garland*[56]

The Court does not begin its statutory analysis with a blank slate. Rather, the Court is bound by the Fifth Circuit's recent analysis in *Cargill v. Garland* concerning the exact statutory language at issue here. According to the en banc Fifth Circuit, a weapon that qualifies as a machinegun under the NFA and GCA must be capable of (1) firing multiple rounds by a single function of the trigger and (2) do so automatically. *Id.* at 460. In other words, the NFA unambiguously "requires that a machinegun be capable of firing automatically once the *trigger* performs a single function." *Cargill*, 57 F.4th at 463. The definition of machinegun "utilizes a

---

[55] Pls.' Compl. 15, ECF No. 1.

[56] *Cargill* also discussed the relevance of deference under *Chevron USA, Inc. v. Nat. Res. Def. Council*. 57 F.4th at 456–57 (citing 267 U.S. 837 (1984)). The Court recognizes that the ATF does not receive interpretive deference under *Chevron*. This is primarily due to the Step Zero command that interpretive rules—which the ATF's broadened machinegun definition appears to be—are not eligible for *Chevron* deference. *United States v. Mead Corp.*, 533 U.S. 218, 232 (2001). But even assuming otherwise, *Chevron* deference would still not apply for at least two reasons. First, the Court finds the statutory definition to be unambiguous. *See, e.g.*, *Western Refining Southwest, Inc. v. FERC*, 636 F.3d 719, 727 (5th Cir. 2011) ("[If] the statute's text is unambiguous, we need not proceed to Step Two of *Chevron*."). Additionally, "[t]he Supreme Court has never held that the Government's reading of a criminal statute is entitled to any deference." *Cargill*, 57 F.4th at 466–67 (cleaned up).

grammatical construction that ties the definition to the movement of the trigger itself, and not the movement of a trigger finger" such that "the statutory definition of machinegun unambiguously turns on the movement of the trigger and not a trigger finger." *Id.* *Cargill* explained that the definition is solely concerned with the mechanical operation of the trigger rather than the actions of the user. *Id.* at 460. Based on this, *Cargill* rejected the ATF's regulatory interpretation of "machinegun" because it exceeded the agency's statutory authority in violation of the APA. *Id.* at 472–73.

*Cargill* emphatically rejected the ATF's interpretation of machinegun set forth in section 479.11. *Id.* at 460. As *Cargill* explained, the ATF's expanded definition was aimed at criminalizing the manufacture, sale, and possession of "bump stocks" following the tragic Las Vegas shooting. *Id.* at 450. Similar to FRTs, a bump stock is an accessory that attaches to a semi-automatic weapon to increase the rate of fire. *Id.* at 453. By harnessing the firearm's natural recoil to quickly reengage the trigger, a skilled shooter utilizing this "bump firing" technique can rapidly fire multiple rounds. *Id.* at 454. Yet despite this increase in firing speed, *Cargill* determined that bump stocks are not machineguns because the device did not meet both elements of the statutory definition: (1) capable of firing multiple rounds by a single function of the trigger and (2) operate automatically. *Id.* at 462, 462 n.9 (citation omitted) (emphasizing that the conclusions regarding each element are "independent, alternative holdings").

As the Fifth Circuit's statutory interpretation makes clear, a "single function of the trigger" means what it says: a single function of the *trigger*. It does not mean a single pull by the shooter. *Id.* at 459. In fact, the word "pull" is not found anywhere in the statutory definition. The only place "pull" exists is in the ATF's broadened regulatory definition interpreting the statute. *See* 27 C.F.R § 479.11 (2018) ("'[S]ingle function of the trigger' means a single pull of the

trigger[.]"). But according to *Cargill*, "[t]he statutory definition of machinegun unambiguously turns on the movement of the trigger and not a trigger finger." *Cargill*, 57 F.4th at 460. Indeed, the statute does not say "by a single pull of the trigger finger." Nor does it say "by single function of the trigger finger." *Cargill* refused to read words into the statute. *Id.* at 460. Rather, the best reading of the definition is that after the shooter initiates the trigger's relevant function by some action—such as pulling the trigger or some other action by the user—it is the follow-on action of the trigger acting out its mechanical purpose that informs the operative "function." *Id.* Based on this reasoning, the Court cannot accept Defendants' suggestion that "function" is synonymous with "pull."[57] To do so would directly contradict *Cargill*'s holding. The E.D.N.Y. Decision likewise concluded that "function" and "pull" are synonymous. But, once again, *Cargill* controls since decisions from the Fifth Circuit—not the Eastern District of New York—are binding on this Court.

---

[57] Defs.' Opp. to Pls.' Mot. for Prelim. Inj. 3, ECF No. 39 (quoting *Staples v. United States*, 511 U.S. 600, 602 n.1 (1994)). Although *Staples* uses the same terms as Defendants—"release" and "pull" of the trigger—in a footnote discussing the characteristics of a machinegun, the Court determines that the holding in *Staples* is not applicable to these facts. First, *Staples* involved a different context than the one before this Court. *Id.* The Supreme Court addressed the government's burden of proof regarding a *mens rea* question about an individual's knowledge that he possessed an unregistered machinegun. *Id.* at 604–05. Not only was a specific semi-automatic accessory like an FRT or bump stock not before the Court, but the footnote in *Staples* only unpacks the meanings of "automatic" and "fully automatic." *Id.* at 602, 602 n.1. That is because the statutory definition at issue in the instant case was not before the *Staples* Court, making an analysis of *both* required statutory elements—(1) automatic and (2) single function of the trigger—unnecessary. The Supreme Court did not—and did not need to—address how "single function of the trigger" modifies "automatically" in order to answer the question before it. However, this question regarding the interplay of the two required elements was directly addressed in *Cargill*. Therefore, the footnote containing the terms "release" and "pull" in *Staples* does not constitute a binding holding of the Supreme Court. *See Webster v. Fall*, 266 U.S. 507, 511 (1924) ("Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents."); *see also District of Columbia v. Heller*, 554 U.S. 570, 625 n.25 (2008) (refusing to follow statement in previous decision characterized as "dictum" because "the point was not at issue and was not argued"); *Brecht v. Abrahamson*, 507 U.S. 619, 631 (1993) ("[S]ince we have never squarely addressed the issue, and have at most assumed [it], we are free to address the issue on the merits.").

Even if "automatically" refers to a single pull of the trigger, the statutory definition does not endorse a reading of automatic in isolation from the single function of the trigger. Rather, *Cargill* explained that "the phrase 'by a single function of the trigger' modifies the adverb 'automatically.'" *Id.* at 463. That is because "automatically" cannot be read in isolation. *Id.* (citing *Guedes v. ATF*, 920 F.3d 1, 43 (D.C. Cir. 2019) (Henderson, J., concurring in part and dissenting in part)). Instead, "automatically" is understood as limited by the "single function of the trigger" clause. *Id.* On its own, "automatically" simply means that firing "maintain[s] if all a shooter does it initially pull the trigger." *Id.* at 463. But *Cargill* explains that this alone is insufficient to qualify as a machinegun.

Moreover, Defendants read too much into *Cargill*'s discussion of mechanical versus non-mechanical bump stocks. Defendants contend that *Cargill* recognized that the outcome would have been different if the device before it were a mechanical bump stock that only required the shooter to pull the trigger once to activate the firing sequence and thereafter maintain bump fire on its own accord.[58] This is an inaccurate reading of *Cargill*. The Fifth Circuit merely recognized that the only issue before it was whether non-mechanical bump stocks were machineguns, and that the outcome may differ for a mechanical bump stock depending on how it worked. *Cargill*, 57 F.4th at 462 ("[T]he case *might* well be different if we were considering a semiautomatic weapon equipped with a mechanical bump stock." (emphasis added)). While "[i]t could be the case that a switch activating a mechanical bump stock would be the legal trigger," *Cargill* acknowledged that it was "not considering that case." *Id.* Certainly, this was the situation in other cases where some additional device functionally replaced the traditional trigger and converted the weapon into a machinegun. *Id.* (referencing a switch-operated mechanical bump stock and a

---

[58] Defs. Opp. to Pls.' Mot. for Prelim. Inj. 7–8, ECF No. 39.

**Add. 25**

switch-operated electric motor add-on). That a "trigger activator" pushes the trigger towards its reset position does not mean it becomes the new trigger. *Id.* at 462 (citing *United States v. Camp*, 343 F.3d 743, 745 (5th Cir. 2003)).

    ii. <u>Application of *Cargill* to FRTs</u>

    Applying *Cargill*'s holding here, FRTs do not fire multiple rounds with a single function of the trigger and do not qualify as machineguns. For each and every round fired, the trigger moves forward into its reset state and is depressed to release the hammer from its sear surface. Because the operative mechanical function of the trigger is to release the hammer, that the trigger of an FRT-equipped firearm functions for each shot fired disqualifies it as a machinegun under the current statutory definition. Moreover, if all the shooter does is initially pull the trigger, the FRT-equipped firearm will only fire one round. And if the shooter attempts to reset and hold the trigger in a fully depressed position so that the trigger cannot reset, the weapon will malfunction.

    By characterizing a "single function of the trigger" as a "single constant rearward pull of the trigger," Defendants seek to transform the required statutory focus away from the objective trigger mechanics to the subjective actions of the gun user instead.[59] This is incorrect and is the same rewriting of the statute Defendants already attempted with bump stocks before *Cargill* emphatically rejected it. *Cargill*, 57 F.4th at 460 ("The statute does not care what human input is required to activate the trigger—it cares only whether more than one shot is fired each time the trigger acts."). Under *Cargill*, the Court cannot look to the shooter's actions in deciding whether FRTs are machineguns. Indeed, the "notion that the definition turns on the actions of an unnamed shooter is inconsistent with both the [definition's] grammatical and statutory contexts." *Id.* at 461.

---

[59] *Id.* at 8.

**Add. 26**

In light of *Cargill*, the critical consideration is how the trigger mechanically functions. And that function is the "follow-on action where the trigger acts out its mechanical design or purposes" *after* the shooter has initiated it by some action. *Id.* at 460. *Cargill* leaves no doubt that this required "action" is in relation to the function of the trigger itself, which is defined purely mechanically under the statute rather than an action taken by the user. *See id.* at 461 ("Congress did not use words describing the shooter's perspective of the weapon's rate of fire. . . . Instead, it made up an entirely new phrase—by single function of the trigger—that specifically pertains to the mechanics of a firearm."). Whether prudent or not, "Congress defined the term 'machinegun' by reference to the trigger's mechanics." *Id.* In a hammer-fired gun like those an FRT enhances, the trigger's function is still to release the hammer as part of a "simple mechanical process." *See id.* at 459 (explaining that "the trigger disengages the hammer from the sear" starts the "process" that "happens every single time one bullet is fired"). This definition is consistent with prior Fifth Circuit precedent. *See, e.g.*, *United States v. Jokel*, 969 F.2d 132, 134 (5th Cir. 1992) (concluding that the role of the trigger is "the part of the action of a firearm moved by the finger *to release the hammer* . . . in firing*") (emphasis added)). Defendants attempt to characterize *Jokel* as describing the trigger's "function" as the "mechanism . . . used to initiate the firing sequence."[60] Although it is true that the trigger initiates this firing sequence, *Cargill* makes clear that the operative function is the release and reset of the hammer as part of certain functions in the firing sequence that must recur before each round is fired. *Cargill*, 57 F.4th at 447 (quoting *Jokel*, 969 F.2d at 135).

---

[60] *Id.* at 9–10. (cleaned up).

Add. 27

The parties agree that the trigger in an FRT-equipped firearm releases the hammer for every shot.[61] By contrast, the auto sear in a fully automatic gun takes over to retain and release the hammer for all subsequent shots so that its trigger functions only once in a string of automatic fire. *See Cargill*, 57 F.4th at 454 (contrasting the auto sear of a "fully automatic gun" with a bump stock). Although an FRT-equipped firearm contains a locking bar that prevents a subsequent trigger function until the weapon is safe to fire again, this is not the same as an auto sear. But unlike an auto sear, the locking bar prevents firing until it is safe to do so again after unlocking the trigger. Unlike a fully automatic weapon's auto sear, the FRT's locking bar does not alter the basic mechanical process where the trigger moves for every shot fired. Whether that movement occurs by the shooter "apply[ing] forward pressure to the weapon's forebody in order to maintain the shooting mechanism" for bump stocks, *id.* at 454, or by the hammer maintaining the shooting mechanism for FRTs, the fact remains that the trigger resets the hammer each time before the next shot can be fired. *Cargill* explains that this is a separate function of the trigger. *Id.* at 459. Like bump stocks, FRTs do not enable a weapon to automatically fire multiple rounds with a single function of the trigger itself.

This is even true in Defendants' video of the zip-tie test, which purports to show that FRTs fire with "a single constant depression of the trigger."[62] In a machinegun, the trigger must be held in its rearmost position for the gun to fire automatically. The machinegun's trigger does not reset in between each shot. But in an FRT-equipped firearm, the trigger *must* still reset in between each shot—even when depressed in a rearward state by the zip tie. Defendants' zip tie

---

[61] *See id.* at 9 ("[T]he FRT uses the firing sequence to automatically reset itself along with the locking bar to lock and then automatically time the re-release of the hammer so that as soon as the bolt locks into battery the next round will automatically be fired."). Moreover, both parties confirmed at the October 2, 2023 hearing that there is no disagreement as to how FRTs function.

[62] Defs. Opp. to Pls.' Mot. for Prelim. Inj. 5-6, ECF No 39; Defs.' Notice of Manual Filing of Video Ex., ECF No. 41.

**Add. 28**

does not appear to hold the FRT trigger still in its most rearward position. If it did, the weapon would malfunction and not fire subsequent shots. Instead, the elasticity in the zip tie allows for sufficient movement to allow for a trigger reset. All this test establishes is that the trigger need not move to its most rearward position. It can still reset from sufficient rearward pressure and forward movement propelled by the stretched zip tie. In other words, the zip tie test does not demonstrate that a single function of the trigger does not occur for each shot since the trigger's operative function is the reset of the hammer—not how the user or a zip tip pulls the trigger. The zip tie test is irrelevant to the statutory definition provided by Congress and as interpreted by *Cargill*.

Even without the aid of expert testimony during the October 2, 2023 hearing—which revealed that there are no relevant fact issues regarding the mechanics of FRTs—Defendants' efforts to distinguish *Cargill* are unavailing. Similar to the government in *Cargill*, the Defendants here cannot "overcome this plain reading" of the statutory language. *Id.* When the ATF revised its interpretation of machinegun to define a "single function of the trigger" as the same thing as "a single pull of the trigger and analogous motion," its definition conflicted with the definition provided by the controlling statutes. 27 C.F.R. § 479.11 (2018). And where an agency regulation contradicts the statute, not only is that regulation likely arbitrary and capricious, but the statute governs. *Id.* at 458–60. Because of this contradiction, the ATF's broadened definition is likely unlawful.

Furthermore, unlike a switch-activated device that takes over as the legal trigger of the weapon, FRTs do not alter the basic operation the trigger: the trigger must still move sufficiently rearward for each shot based on external manual input from the shooter. This, in turn, activates the trigger's function—releasing and resetting the hammer—which occurs before each

subsequent shot and is not set in motion by a switch. Unlike Defendants' comparison to the Akins Accelerator and electronic motor devices,[63] triggers in FRT-equipped firearms perform the same mechanical function as any normal trigger by releasing the hammer prior to each shot.

The closest Defendants come to analogizing FRTs to machineguns is by pointing to two similarities that FRTs and machineguns share: (1) the comparable rates of fire and (2) the absence of a disconnector.[64] But these arguments are foreclosed by the statutory definition and *Cargill*. The statutory definition does not define machineguns "according to how quickly they fire." *Cargill*, 57 F.4th at 464. Nor does it identify the absence of a disconnector as the dispositive characteristic. *See id.* at 460 (declining to "read words into the statute"). Instead, a weapon need only be capable of firing automatically once the trigger itself performs a single function to qualify as a machinegun under the statute. *Id.* at 460, 465. If Congress wants to amend the statutory definition in the future to define machineguns based on rate of fire or absence of a disconnector, it knows how to do so. Until such time, a comparable—and even identical—rate of fire and absence of a disconnector have no bearing on whether a firearm is a machinegun. Therefore, these comparators do not alter the Court's determination that FRTs most likely are not machineguns.

*    *    *    *    *

Because Plaintiffs point to binding Fifth Circuit precedent that is squarely dispositive of the issue in this case, the Court concludes that Plaintiffs have demonstrated, at this stage, a strong likelihood of success on the merits. That is, the ATF's regulation is likely an arbitrary and capricious interpretation of the statutory definition of "machinegun" that exceeds the scope of the agency's authority under 5 U.S.C. § 706. When such a determination is made, § 705

---

[63] Defs.' Opp. to Pls.' Mot. for Prelim. Inj. 7, 9–10, ECF No. 39.
[64] *Id.* at 4, 4 n.3, 9.

**Add. 30**

authorizes injunctive relief. And that relief should mirror the final remedy that would be proper for such a finding: the "agency action must be set aside if the action was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law' or if the action failed to meet statutory, procedural, *or* constitutional requirements." *Citizens to Preserve Overton Park*, 401 U.S. at 413–414 (1971) (citing 5 U.S.C. § 706(2)(A)–(D)). Therefore, for the reasons discussed, the Court concludes that Plaintiffs have carried their burden and are entitled to an injunction setting aside the ATF's machinegun definition as applied to them.

### B. Substantial Threat of Irreparable Harm

In the Fifth Circuit, it is "well-established" that a harm is considered "irreparable only 'if it cannot be undone through monetary remedies.'" *Dennis Melancon, Inc. v. City of New Orleans*, 703 F.3d 262, 279 (5th Cir. 2012) (quoting *Interox Am. v. PPG Indus., Inc.*, 736 F.2d 194, 202 (5th Cir.1984)). A showing of economic loss is usually insufficient to establish irreparable harm because damages are typically recoverable at the conclusion of litigation. *Janvey v. Alguire*, 647 F.3d 585, 599–601 (5th Cir. 2011). However, where costs are not recoverable because the government-defendant enjoys sovereign immunity from monetary damages, irreparable harm is generally satisfied. *Wages & White Lion Invs., L.L.C. v. FDA*, 16 F.4th 1130, 1142 (5th Cir. 2021) (citing *Texas v. EPA*, 829 F.3d 405, 433 (5th Cir. 2016)).

Likewise, "complying with [an agency order] later held invalid almost *always* produces the irreparable harm of nonrecoverable compliance costs." *Id.* For harms that are non-pecuniary, the alleged irreparable injury must also be concrete—"speculative injury is not sufficient" and "there must be more than an unfounded fear on the part of the applicant." *Daniels Health Servs.*, 710 F.3d at 585 (quoting *Holland Am. Ins. Co. v. Succession of Roy*, 777 F.2d 992, 997 (5th Cir. 1985)). So long as "'the threatened harm is more than de minimis, it is not so much the

31

**Add. 31**

magnitude but the irreparability that counts for purposes of a preliminary injunction.'" *Enter. Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana*, <u>762 F.2d 464, 472</u> (5th Cir. 1985) (citing *Canal Auth. v. Callaway*, <u>489 F.2d 567, 572</u> (5th Cir. 1974)).

Without injunctive relief, Plaintiffs allege that they are suffering, and will continue to suffer, irreparable harms in at least two ways.[65] These identified harms take the form of (i) unrecoverable compliance costs that are more than *de minimis* and (ii) non-pecuniary injuries, such as credible threats of criminal prosecution and civil liability and deprivations of ownership and constitutional rights.[66] Defendants contest Plaintiffs' alleged injuries on grounds that there is no substantial threat of injury, irreparable or otherwise, *at this time*.[67] According to Defendants, Plaintiffs waited too long to bring this lawsuit and do so based on a record "devoid of any evidence of criminal enforcement action against a small-scale owner of a FRT device who is otherwise law-abiding."[68] The Court disagrees that these arguments militate against issuing an injunction. Instead, the Court concludes that Plaintiffs have carried their burden to show that irreparable harms exist at this stage.

### i. Credible Threat of Prosecution

First, Plaintiffs face a credible threat of criminal prosecution. As explained at the TRO stage, Plaintiffs place themselves in potential jeopardy by bringing this challenge to the ATF's regulation of FRTs.[69] *Mock*, <u>2023 WL 6457920</u>, at *8. Defendants' recent enforcement activity only validates those fears. Armed federal agents visited Plaintiff Carey at his home, prompting

---

[65] Pls.' Mot. for Prelim. Inj. 12–15, ECF. No. 22.
[66] *Id.*
[67] Defs.' Resp. to Pls.' Mot. for TRO 8, ECF No. 32; Defs.' Opp. to Pls.' Mot. for Prelim. Inj. 15–18, ECF No. 39.
[68] *Id.* at 16.
[69] Op. & Order, ECF No. 36.

him to surrender his FRTs to avoid prosecution.[70] Other individual FRT owners have experienced similar enforcement activities, such as seizures and search warrants.[71] And as early as the TRO stage, Defendants were prosecuting at least three individuals.[72] Plaintiffs and these other FRT owners share an important commonality: they are all engaging in conduct proscribed by the ATF's interpretation of "machinegun." That the ATF has primarily targeted large sellers and distributors[73] does not obviate the existence of real, non-moribund enforcement threats individual FRT owners also face. Combined with the amount of recent enforcement activity and Defendants repeated refusals to disavow taking any action against Plaintiffs during this lawsuit, the Court agrees that a credible threat of prosecution exists.

Additionally, Defendants argue that "[t]he lengthy delay between ATF's determination and Plaintiff's action . . . demonstrates a lack of irreparable harm."[74] But there are at least two problems with this argument. First, Defendants ignore that the case they rely on—*Opulent Life Church v. City of Holy Springs*—considered and *rejected* the lengthy delay argument. 697 F.3d 279, 297 (5th Cir. 2012). Indeed, the Fifth Circuit explained that a court must consider the particular facts before it. *Id.* (concluding that, "[w]hether frivolous or not," the argument that plaintiff's "'long litigation delay' suggests it is not suffering irreparable harm" is "unconvincing on these facts"). Second, the Fifth Circuit emphasized that "[t]he loss of [constitutionally protected] freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Id.* at 295 (cleaned up). This is true even if the right at issue is statutory. *See id.* ("This principle applies with equal force to the violation of RLUIPA rights because RLUIPA enforces First Amendment freedoms.").

---

[70] Pls.' Compl. 3, ECF No. 1.
[71] *Id.* at 11–12.
[72] Pls.' Reply in Support of Mot. for TRO 5, 9 n.2, ECF No. 33.
[73] Defs.' Opp. to Pls.' Mot. for Prelim. Inj. 13, ECF No. 39.
[74] *Id.* at 16.

Reviewing the facts at issue in this case, the regularity of enforcement activity concerning FRTs—including against small-scale targets—and Defendants' refusal to disavow enforcement while this litigation is pending weighs in favor of finding any delays "unconvincing on these facts." *Id.* Additionally, the APA statutorily broadly protects against agency action "contrary to constitutional right, power, privilege, or immunity" or "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(B)–(C). Given that these protections are cumulative under § 706(A)'s arbitrary and capriciousness standard "govern[ing] review of *all* proceedings that are subject to challenge under the APA," *Menkes*, 637 F.3d at 330), Defendants' use of *Opulent Life Church* here is unavailing.

Finding that Plaintiffs face a credible threat of civil or criminal prosecution for possession of FRTs, the Court concludes—just as it did at the TRO stage—that this constitutes more than a *de minimis* harm justifying the need for equitable protection until a full decision on the merits is rendered. Plaintiffs need not wait for Defendants to bring an actual prosecution to vindicate their rights.

### ii. Economic Compliance Costs

Second, Plaintiffs risk pecuniary compliance costs. These costs stem from the Hobson's choice Plaintiffs still face: continue to exercise ownership and constitutionally protected freedoms while risking federal prosecution *or* forfeit those freedoms to avoid civil and criminal consequences. Without immediate relief, Plaintiffs will continue to suffer under the illusion that an actual choice exists due to Defendants' refusal to disavow prosecution during this lawsuit.

Compliance with an impermissible or illegal interpretation of the law carries the potential for economic costs. *Texas v. EPA*, 829 F.3d at 433 ("Indeed, 'complying with a regulation later held invalid almost always produces the irreparable harm of nonrecoverable compliance costs.'"

(citation omitted)). Threats that lead to an individual surrendering FRTs—as was the case for Plaintiff Carey—often lack compensation after the fact for the deprived use and enjoyment of the surrendered weapons (assuming the weapons are even returned). *See VanDerStok v. Garland*, 625 F.Supp.3d 570, 584 (N.D. Tex. Sept. 2, 2022) (explaining that "compliance costs are 'likely unrecoverable,' usually 'because federal agencies generally enjoy sovereign immunity for any monetary damages'") (quoting *Texas v. EPA*, 829 F.3d at 433)). Because Defendants in this case are entitled to sovereign immunity, and therefore not liable for damages, any economic injuries to Plaintiffs likely cannot be recovered.

Likewise, compliance can also cause non-pecuniary harms and need not be financial in nature. Even "alleged" deprivations of constitutional or procedural rights may justify injunctive relief. *See, e.g.*, *Opulent Life Church*, 697 F.3d at 294–97 (finding irreparable harm where plaintiffs "alleged" violations of constitutional rights on grounds that "[t]he loss of [constitutional] freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury") (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)); *see also Louisiana v. Horseracing Integrity & Safety Auth. Inc.*, 617 F. Supp. 3d 478, 500 (W.D. La. July 26, 2022) (finding irreparable harm where plaintiffs alleged the government exceeded its statutory authority and violated the APA).

Plaintiffs' Complaint alleges that deprivations of both their constitutional and ownership rights hang in the balance. For instance, Plaintiffs' use and enjoyment of FRTs is "chilled . . . by virtue of Defendants' impermissible interpretation of law."[75] Defendants did not sufficiently address this point at the TRO stage and once again fail to do so at this stage. According to Defendants, "there is no irreparable harm from a hypothetical seizure of Plaintiffs' property"

---

[75] Pls.' Reply in Support of Mot. for TRO 7, ECF No. 33.

**Add. 35**

since "[a]ny seized property could be returned via a forfeiture action or some other proceeding."[76] But this argument completely ignores that any seizure or surrender under duress would deprive Plaintiffs of the use and enjoyment of their property. *See VanDerStok*, 625 F. Supp at 584. And, relatedly, Defendants' enforcement activity also chills Plaintiffs from purchasing—and therefore exercising the use and enjoyment of—additional FRTs which the Court preliminarily determines are lawful weapons.[77] The empty guarantee Defendants reiterate—that "ATF has no plans to seize Plaintiffs' property in the *immediate future*"— provides little, if any, reassurance.[78]

But therein lies the problem. Plaintiffs face potential pressure to comply with a regulation that is likely unlawful due to ATF's arbitrary and capricious interpretation of "machineguns." The Court is unpersuaded by Defendants' continued assertion that there are no current plans to seize Plaintiffs' property in the immediate future.[79] As explained above, without disavowing that these plans will not change during this lawsuit, Plaintiffs face endemic uncertainty and pressure to comply with Defendants' interpretation of the definition to avoid prosecution. Such uncertainty and pressure chill constitutional and ownership rights. A plaintiff's purported choice to comply—or else—with a government dictate adequately establishes irreparable harm when it leads to the chilling of rights, such as giving up property or refraining from purchasing additional FRTs under duress.

Simply put, Plaintiffs face irreparable injury in whichever course they choose—suffer injury by complying with a regulation they allege Defendants lack the authority to enforce *or* risk civil and criminal enforcement by not complying. For this reason, and because Defendants'

---

[76] Defs.' Opp. to Pls.' Mot. for Prelim. Inj. 17, ECF No. 39.
[77] Pls.' Mot. for Prelim. Inj. 15, ECF No. 22.
[78] Defs.' Resp. to Pls.' Mot. for TRO 8, ECF No. 32 (emphasis added); *see also* Defs.' Opp. to Pls.' Mot for Prelim. Inj. 12, ECF No. 39.
[79] *Id.*

**Add. 36**

contrary arguments overlook clear Fifth Circuit precedent identifying compliance costs as irreparable harms, the Court is satisfied that Plaintiffs' alleged injuries are based on a credible threat of prosecution, placing them in immediate danger of irreparable injury.

*     *     *     *     *

Accordingly, the Court concludes that Plaintiffs have demonstrated a substantial threat of irreparable harm at this stage and are entitled to injunctive relief.

### C. Balance of Hardships and the Public Interest

The final factor the Court must weigh is the balance of the equities and the public interest, which "merge" when the Government is a party. *Nken*, <u>556 U.S. at 435</u>. A court must "pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter v. Nat. Res. Def. Council, Inc.*, <u>555 U.S. 7, 24</u> (2008). At the same time, a court must weigh any purported injuries the enjoined party may experience against the strong likelihood that they will not succeed on the merits. *See Freedom From Religion Found., Inc. v. Mack*, <u>4 F.4th 306, 316</u> (5th Cir. 2021) (explaining that "any injury to [the enjoined party] is outweighed by [a] strong likelihood of success on the merits" by the requesting party).

Both parties offer interests that the Court now weighs. On one side, Plaintiffs assert interests in "lawfully exercising freedoms they have enjoyed for several years."[80] As law-abiding citizens, this includes the ability possess firearms that are not machineguns.[81] Absent protection from an injunction, Plaintiffs contend that they would suffer compliance costs from any civil and criminal enforcement actions, in addition to experiencing a chilling effect on the exercise of their freedoms going forward.[82] On the other side, Defendants reiterate that their interests in retaining

---

[80] Pls.' Mot. for Prelim. Inj. 16, ECF No. 22.
[81] *Id.* at 12–16.
[82] *Id.*

37

**Add. 37**

prosecutorial discretion and protecting public safety tilt the equitable scale in their direction.[83]
Weighing these interests, the Court finds that, on balance, the equities favor Plaintiffs just as they
did at the TRO stage.

      Defendants' primary argument as to why the balance of the equities favors them is that
"public safety would undoubtedly be jeopardized by removing restrictions on the manufacturing,
sale, and possession of these deadly devices."[84] An injunction "would cripple the government's
ability to take virtually any enforcement action with regard to a FRT device anywhere in the
United States."[85] This particular harm to Defendants is purportedly grounded in their "strong and
continuing interest in being able to enforce [the] laws restricting the possession and sale of
machineguns where the circumstances warrant action in the government's law enforcement
discretion."[86] And given this interest, Defendants fear that "[a] broad injunction would
undermine ATF's ability to respond in real time to serious future threats implicating FRTs."[87]
But Defendants do not dispute that Plaintiffs are law-abiding citizens who wish to engage in the
lawful conduct of possessing specific firearms—conduct that was lawful until the ATF said
otherwise. Instead, Defendants argue that "[e]ven if . . . presently true" that Plaintiffs "are law-
abiding and will not misuse their weapons," Plaintiffs "cannot guarantee that will inevitably be
the case and that their ownership of such devices will not, in the future, create public safety risks
that would warrant action by the government."[88]

      Yet just as the government cannot prosecute based on what a person *might* do, the
government similarly cannot seriously argue there is a threat to public safety based on what a

---

[83] Defs.' Opp. to  Mot. for Prelim. Inj. 18–22, ECF No. 39; Defs.' Resp. to Mot. for TRO 6, 9–10, ECF
No. 32.
[84] *Id.* at 18.
[85] *Id.*
[86] *Id.* at 19.
[87] *Id.*
[88] *Id.*

**Add. 38**

person *might* do without some justification. Just as our system presumes a criminal defendant is innocent until proven guilty, Plaintiffs do not need to "guarantee they will not in the future violate other gun laws."[89] Their record as law-abiding citizens who have possessed FRTs already without incident differentiates them from individuals who create the very public safety risks Defendants fear. That is why NAGR, for instance, "avers that it only seeks to vindicate the rights of its members who are lawfully able to possess firearms in this matter."[90]

Notably, Defendants provide no specific causal arguments explaining how the public would be harmed by an injunction. Such arguments would point to facts connecting the public safety interest to FRTs generally and Plaintiffs specifically. Despite citing concerns about mass shootings in earlier briefing, Defendants fail to identify a tragic incident that involved an FRT.[91] Instead, Defendants offer nothing more than conclusory assertions about "public safety." And these assertions are grounded entirely in the conclusion the FRTs are machineguns. Defendants supply no independent reasons showing a threat to public safety. Given that the Court has already concluded Plaintiffs are likely to succeed on the merits that FRTs are *not* machineguns, that machineguns are a threat to public safety is a *non sequitur*. Without more, all Defendants have left to stand on is a vague assertion of "public safety." Such a general public safety concern simply cannot serve as justification for enforcement of an illegal interpretation of a criminal statute.

Yet perhaps most damaging to Defendants are their irreconcilable positions. On the one hand, Defendants generally argue that possession of FRTs by anyone—including possession by *these* Plaintiffs (who have no criminal history)—poses a threat to public safety. But, on the other hand, Defendants aver that they have no *current* plans to enforce the ATF Rule against these

---

[89] *Id.*
[90] Pls.' Mot. for Prelim. Inj. 16, ECF No. 22.
[91] Defs. Resp. to Mot. for TRO 10, ECF No. 32.

**Add. 39**

Plaintiffs due to the *historic* enforcement practices targeting large sellers. Even if Defendants' representation is true that they have primarily prosecuted large sellers in the past, how can they now claim that the threat to public safety is so grave because of ownership *by these specific law-abiding Plaintiffs* at the same time there are no current plans to prosecute any of them? Moreover, if the only targets of Defendants' enforcement actions are against are those who violate *other gun laws*, then the prohibition on FRTs does nothing to protect the public. It follows, then, that FRT ownership is neither a necessary nor sufficient condition for protecting public safety. Rather, FRT ownership merely gives rise to an extra charge that Defendants tack on *after* first determining that a given individual is a danger for other reasons (that is, violating other gun laws). This is hardly sufficient to sway the balance of harms in Defendants' favor.

The Court is unable to reconcile these contradictions. Taking Defendants' continued representation that they have no current plans to prosecute as true, this dissonance suggests a lack of substance underlying the proffered public safety concern. Defendants offer no argument specifically linking how public safety would be harmed by the Court granting an injunction to enjoin enforcement actions for ownership (and not some other unlawful use of the FRT) with *these* Plaintiffs. And if Defendants indeed have no current plans to prosecute, the Court concludes that they should not seriously object to the issuance of an injunction memorializing the status quo: no prosecution for FRT possession or ownership by these Plaintiffs because no concrete threat to public safety exists.[92] Thus, the Court finds that Defendants would experience little, if any, harm by issuance of an injunction during the pendency of this litigation.

---

[92] Defendants argue that the status quo is instead the "classify[cation] of FRTs as machineguns for years." Defs.' Opp. to Mot. for Prelim. Inj. 15, ECF No. 39. The Court disagrees with this characterization. Although true that FRTs have been classified by the ATF as machineguns since at least July 2021, Defendants' statements regarding no enforcement plans against these Plaintiffs constitutes the operable status quo. This is supported by Defendants' assertions that they have focused enforcement actions against large-scale manufacturers and distributors. *Id.* at 13, 19.

**Add. 40**

In contrast, Plaintiffs face the very real potential to experience harm if an injunction is not granted. These harms include a credible threat of civil or criminal prosecution should Defendants change their mind, compliance costs, and a chilling of constitutional and ownership rights. Defendants contentions that Plaintiffs asserted injuries are hypothetical and that any they would have an opportunity to challenge future injuries once any enforcement action occurs falls flat.[93] On balance, the equities and public interest weigh in favor of Plaintiffs.[94] Defendants have not identified any concrete harms to counterbalance the real harms facing Plaintiffs. And any injury to Defendants is further outweighed by Plaintiffs' strong likelihood of success on the merits of its APA statutory interpretation claim. *Mack*, 4 F.4th at 316. Notably, this injury is further mitigated by the Court's cabining of injunctive relief to only the parties in this lawsuit.[95]

\*    \*    \*    \*    \*

In sum, Plaintiffs have successfully demonstrated to the Court that they are entitled to injunctive relief. Having considered the arguments, evidence, and law, the Court holds that the relevant factors weigh in favor of **GRANTING** the preliminary injunction.

## V.    SCOPE OF THE INJUNCTION

Having determined that Plaintiffs carried their burden showing that an injunction is warranted in this situation, the Court must next decide how to provide those parties with

---

[93] *See* Defs. Opp. to Pls.' Mot. for Prelim. Inj. 18, ECF No. 39.

[94] The Court previously noted that there is also an interest in ensuring that the government adheres to its constitutional and statutory obligations. *Polymer80, Inc. v. Garland*, 4:23-cv-00029-O, 2023 WL 3605430, at \*11 (N.D. Tex. Mar. 19, 2023). Indeed, there is undoubtedly "an overriding public interest [in] . . . an agency's faithful adherence to its statutory mandate." *Jacksonville Port Auth. v. Adams*, 556 F.2d 52, 59 (D.C. Cir. 1977). And "[t]he public interest is served when administrative agencies comply with their obligations under the APA." *N. Mariana Islands v. United States*, 686 F. Supp. 2d 7, 21 (D.D.C. 2009).

[95] Defendants contend that the "calculus" at this stage is "radically different where Plaintiffs seek an injunction broader than at the TRO stage." Defs.' Opp. to Mot. for Prelim. Inj. 19, ECF No. 39. This is because the injunctions Plaintiffs seek "ask[s] the Court to enjoin not only enforcement actions related to *their possession* of FRTS, but *all* potential enforcement actions against anyone." *Id.* However, this concern fails to materialize in light of the Court's injunction just to these Plaintiffs.

**Add. 41**

appropriate relief. When ordering equitable relief, the Court is obligated to state "specifically" and "in reasonable detail . . . the act or acts restrained or required" under the injunction. FED. R. CIV. P. 65(d)(1)(b)–(c). The scope of injunctive relief is "dictated by the extent of the violation established." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). An injunction "should be crafted to provide 'complete relief to the plaintiffs.'" *Mock v. Garland*, F.4th 563, 587 (5th Cir. 2023) (quoting *Yamasaki*, 442 U.S. at 702). At the same time, the injunction "should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Madsen*, 512 U.S. at 765 (cleaned up). And it must be tailored to "redress the plaintiff's particular injury." *Gill*, 138 S. Ct. at 1934 (citation omitted). Under appropriate circumstances, however, the demand for "complete" relief may necessitate that injunctive redress benefit many claimants of a common legal right in order to prevent "more confusion" and "multiplicity of suits" in the courts. *Mock*, 75 F.4th at 587 (quoting *Feds for Med. Freedom*, 63 F.4th at 388).

In keeping with these obligations, the Court tailors the scope of the injunction with careful attention fully redress the violation established and to also avoid upsetting the competing interests. Thus, the Court **ENJOINS** Defendants from the following actions against the Individual Plaintiffs and their immediate families, the Organizational Plaintiffs and their members, and the downstream customers of any commercial member of an Organizational Plaintiff:

    **(1)**    Initiating or pursuing criminal prosecutions for possession of FRTs;

    **(2)**    Initiating or pursuing civil proceedings for possessing, selling, or manufacturing FRTs based on the claim that FRTs are machineguns;

    **(3)**    Initiating or pursuing criminal prosecutions for representing to the public of potential buyers and sellers that FRTs are not machineguns;

    **(4)**    Initiating or pursuing civil actions for representing to the public of potential buyers and sellers that FRTs are not machineguns;

**Add. 42**

**(5)**    Sending "Notice Letters" or other similar communications stating that FRTs are machineguns;

**(6)**    Requesting "voluntarily" surrender of FRTs to the government based on the claim that FRTs are machineguns;

**(7)**    Destroying any previously surrendered or seized FRTs; and

**(8)**    Otherwise interfering in the possession, sale, manufacture, transfer, or exchange of FRTs based on the claim that FRTs are machineguns.

The implications of this preliminary injunction's scope bear further explanation. First, the Court declines Plaintiffs' invitation to extend the scope of the injunctive relief nationwide based on recent Fifth Circuit guidance. *See Mock*, 75 F.4th at 587. As such, this injunction covers only the parties in this lawsuit. These parties are protected from civil or criminal enforcement of the challenged rule until the Court renders a final decision on the merits. Parties beyond this lawsuit are *not* covered. Crucially, this Court's award of injunctive relief does not offer Plaintiffs blanket immunity from prosecution for all firearm-related offenses. Plaintiffs may still be prosecuted for violating otherwise lawful provisions of the NFA and GCA, as well as other lawful firearms regulations. This relief should alleviate Plaintiffs' demonstrable injuries without unnecessarily burdening Defendants.

Finally, respect for coordinate courts also guides the scope of the relief awarded here. *See W. Gulf Mar. Ass'n v. ILA Deep Sea Loc. 24*, 751 F.2d 721, 729 (5th Cir. 1985) (holding that district courts should "avoid rulings which may trench upon the authority of sister courts"). Although this Court reaches a different conclusion than the E.D.N.Y. Decision, Fifth Circuit precedent is clear regarding overlapping decisions from coordinate courts. To the extent that Rare Breed Triggers, LLC, Rare Breed Firearms, LLC, or any of their agents, officers, and employees (the "Rare Breed Parties") are members of any Organizational Plaintiff, the Court's injunction is further narrowed by carving out the Rare Breed Parties. Other manufacturers or

**Add. 43**

sellers who are members of an Organizational Plaintiff may continue to manufacture, sell, exchange, transfer, and/or market FRTs under this injunction. With these limitations in place, the Court finds that the aforementioned relief appropriately narrows the scope of this extraordinary remedy in order to maintain the status quo without overly burdening Defendants and without trenching upon the E.D.N.Y. Decision.

## VI.    CONCLUSION

For the foregoing reasons, the Court **GRANTS** Plaintiffs' Motion for Preliminary Injunction (ECF No. 22) to preserve the status quo until a final decision on the merits is rendered. The Court **ORDERS** that Defendants—along with their respective officers, agents, servants, and employees—are hereby **ENJOINED** from implementing or enforcing against the parties in this lawsuit, in any civil or criminal manner described below, the ATF's expanded definition of "machinegun" that this Court has determined is likely unlawful:

**(1)**    Initiating or pursuing criminal prosecutions for possession of FRTs;

**(2)**    Initiating or pursuing civil proceedings for possessing, selling, or manufacturing FRTs based on the claim that FRTs are machineguns;

**(3)**    Initiating or pursuing criminal prosecutions for representing to the public of potential buyers and sellers that FRTs are not machineguns;

**(4)**    Initiating or pursuing civil actions for representing to the public of potential buyers and sellers that FRTs are not machineguns;

**(5)**    Sending "Notice Letters" or other similar communications stating that FRTs are machineguns;

**(6)**    Requesting "voluntarily" surrender of FRTs to the government based on the claim that FRTs are machineguns;

**(7)**    Destroying any previously surrendered or seized FRTs; and

**(8)**    Otherwise interfering in the possession, sale, manufacture, transfer, or exchange of FRTs based on the claim that FRTs are machineguns.

This injunction covers the Individual Plaintiffs and their families, the Organizational Plaintiffs and their members, and the downstream customers of any commercial member of an Organizational Plaintiff. Furthermore, this injunctive relief shall not extend to any individual prohibited from possessing firearms under 18 U.S.C. § 922(g). For those parties covered by this injunction, the relief shall take effect immediately and remain in effect pending the final disposition of this lawsuit. *See* 5 U.S.C. § 705. Finally, the Court waives the security requirement of Federal Rule of Civil Procedure 65(c).[96] *See Kaepa, Inc. v. Achilles Corp.*, 76 F.3d 624, 628 (5th Cir. 1996) (holding that the district court has discretion to waive the security requirement).

**SO ORDERED** this **7th day** of **October, 2023**.


_Reed O'Connor_
**UNITED STATES DISTRICT JUDGE**

---

[96] Because neither party raises the security requirement in Rule 65(c), no security is ordered. *See* FED. R. CIV. P. 65(c).

**Add. 45**

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
### FORT WORTH DIVISION

| | | |
|---|---|---|
| NATIONAL ASSOCIATION FOR GUN RIGHTS, INC., *et al.*, | § § § | |
| Plaintiffs, | § § | |
| v. | § § § | Civil Action No. 4:23-cv-00830-O |
| MERRICK GARLAND, *et al.*, | § § | |
| Defendants. | § § | |

## ORDER

Before the Court are Defendants' Motion to Stay Preliminary Injunction Pending Appeal (ECF No. 64), filed November 6, 2023; Plaintiffs' Response (ECF No. 69) and Appendix (ECF No. 70), filed November 10, 2023; and Defendants' Reply (ECF No. 71), filed November 13, 2023. Defendants ask this Court to consider their motion on an expedited basis and issue a decision by November 16, 2023. Having considered the briefing and applicable law, the Court **DENIES** Defendants' request for a stay pending appeal.

## I.    BACKGROUND

Plaintiffs filed this action on August 9, 2023.[1] Five days later, on August 14, 2023, Plaintiffs moved for a temporary restraining order ("TRO").[2] Plaintiffs sought to enjoin Defendants from (1) initiating criminal or civil enforcement actions against Patrick Carey, Travis Speegle, and James Wheeler (the "Individual Plaintiffs") based on their current or prior possession of forced reset triggers ("FRTs") as well as from (2) seizing Individual Plaintiffs' FRTs and requesting that Individual Plaintiffs voluntarily surrender FRTs.[3] The Court granted the TRO on

---

[1] Pls.' Compl., ECF No. 1.
[2] Pls.' Mot. for TRO, ECF No. 17.
[3] *Id.* at 1.

August 30, 2023, enjoining Defendants from implementing or enforcing the ATF's definition of "machinegun" as against the Individual Plaintiffs.[4]

Plaintiffs also moved for a preliminary injunction seeking broader protection beyond just that afforded to the Individual Plaintiffs.[5] Specifically, Plaintiffs sought to enjoin Defendants from civil and criminal enforcement actions related to FRTs against the Individual Plaintiffs, as well as National Association for Gun Rights, Inc. ("NAGR"), Texas Gun Rights, Inc. ("TGR," and, together with NAGR, the "Organizational Plaintiffs"), and the Organizational Plaintiffs' members and downstream customers.[6] On October 7, 2023, the Court granted the preliminary injunction, enjoining Defendants from undertaking civil and criminal enforcement actions related to FRTs against the parties in this lawsuit: "the Individual Plaintiffs and their families, the Organizational Plaintiffs and their members, and the downstream customers of any commercial member of an Organizational Plaintiff."[7]

Notably, the preliminary injunction contains important *exclusions*. First, the injunctive relief does not cover "parties beyond this lawsuit" and carves out specific parties subject to a sister court's injunction.[8] The preliminary injunction also excludes "any individual prohibited from possessing firearms under 18 U.S.C. § 922(g)" and emphasized that this "award of injunctive relief does not offer Plaintiffs blanket immunity from prosecution for all firearm-related offenses."[9]

---

[4] August 30, 2023 Opinion & Order, ECF No. 36.

[5] Pls.' Mot. for Prelim. Inj., ECF No. 22.

[6] Pls.' Br. in Support of Mot. for Prelim. Inj. 16–17, ECF No. 22. Among other things, Plaintiffs requested protection for selling or manufacturing FRTs. The Court understood this request to logically include downstream customers. Without such protection, there would be no market for which Plaintiffs could sell FRTs.

[7] October 7, 2023 Opinion & Order 42-43, ECF No. 53.

[8] *Id.* at 43. Specifically, the Court excluded "Rare Breed Triggers, LLC, Rare Breed Firearms, LLC," and "any of their agents, officers, and employees" to avoid trenching upon an order issued by a sister court in the Eastern District of New York. *Id.*

[9] *Id.* at 43, 45.

Crucially, "Plaintiffs may still be prosecuted for violating otherwise lawful provisions of the [National Firearms Act] and [Gun Control Act], as well as other lawful firearms regulations."[10]

Despite these exclusions, Defendants appealed the preliminary injunction to the Fifth Circuit on November 6, 2023.[11] Shortly thereafter, Defendants moved the Court to enter a stay pending appeal of the preliminary injunction to Plaintiffs.[12] Specifically, Defendants urge the Court to stay the preliminary injunction pending appeal on grounds that they "face irreparable harm with each day that the injunction . . . remains in effect," that "[t]hese irreparable and ongoing injuries to the Government and public outweigh any risk of injury to Plaintiffs if a stay is granted," and that they "have shown a likelihood of success on the merits."[13] The parties have fully briefed this issue[14] and the motion is ripe for review.

## II.    LEGAL STANDARD

"While an appeal is pending from an interlocutory order . . . that grants . . . an injunction, the court *may* suspend . . . an injunction . . . on terms that secure the opposing party's rights." FED. R. CIV. P. 62(d) (emphasis added). Such "[a] stay pending appeal is 'extraordinary relief' for which defendants bear a 'heavy burden.'" *Plaquemines Parish v. Chevron USA, Inc.*, 84 F.4th 362, 373 (5th Cir. 2023). In determining whether to grant a stay pending appeal, this Court considers "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public

---

[10] *Id.* at 43.
[11] Defs.' Notice of Appeal, ECF No. 63.
[12] Defs.' Mot. to Stay Prelim. Inj. Pending Appeal, ECF No. 64. Among other attachments, Defendant's Motion to Stay includes the Declaration of Special Agent Craig Saier (ECF No. 64-1) and Memorandum in Support of Defendants' Motion to Stay (ECF No. 64-2).
[13] Defs.' Mem. in Support of Mot. to Stay Prelim. Inj. Pending Appeal 1–2, ECF No. 64-2.
[14] In addition to Defendants' motion and supporting memorandum, Plaintiffs submitted a response (ECF No. 69) and Defendants filed a reply (ECF No. 71).

interest lies." *Nken v. Holder*, <u>556 U.S. 418, 426</u> (2009). Of these, "[t]he first two factors . . . are the most critical." *Plaquemines Parish*, <u>84 F.4th at 373</u>. "The party requesting a stay bears the burden of showing that the circumstances justify an exercise of [the court's] discretion." *Nken*, <u>556 U.S. at 433</u>–34. Importantly, "[a] stay is not a matter of right, even if irreparable injury might otherwise result," but "[i]t is instead an exercise of judicial discretion, and [t]he propriety of its issue is dependent upon the circumstances of the particular case." *Plaquemines Parish*, <u>84 F.4th at 373</u> (quoting *Nken*, <u>556 U.S. at 433</u>). A court must thoughtfully consider the factors because "'a stay is an intrusion into the ordinary processes of administration and judicial review.'" *Campaign for S. Equality v. Bryant*, <u>773 F.3d 55, 57</u> (5th Cir. 2014) (quoting *Nken*, <u>556 U.S. at 427</u>).

## III.    ANALYSIS

Applying the four well-established factors here and considering the arguments raised by the parties, the Court determines that Defendants have *not* met their burden to show that the Court should "exercise . . . judicial discretion" to stay the preliminary injunction pending appeal in this "particular case." *Plaquemines Parish*, <u>84 F.4th at 373</u>.

### A.  Strong Likelihood of Success on the Merits

To begin, the Court considers whether Defendants have made a *strong* showing that they are likely to succeed on the merits. *U.S. Navy Seals 1-26 v. Biden*, <u>27 F. 4th 336, 349</u>–50 (5th Cir. 2022) (citing *Nken*, <u>556 U.S. at 426</u>). Having reviewed Defendants' arguments as to this factor, the Court concludes that they have not made a strong showing of likely success on the merits.

First, Defendants argue that an appellate court is likely to render a different outcome than the decision reached by this Court.[15] In support of this contention, Defendants note that the Supreme Court recently granted certiorari in *Garland, et al. v. Cargill*, No. 22-976 (Nov. 3,

---

[15] Defs.' Mem. in Support of Mot. to Stay Prelim. Inj. Pending Appeal 7, ECF No. 64-2.

2023)—the case this Court viewed as dispositive for the likelihood of success on the merits factor.[16] Despite this development, the Court cannot make any inferences—including a presumption that the Fifth Circuit will be reversed—based on the Supreme Court's decision to grant of certiorari in *Cargill*. This is especially true given that *all* parties to that case supported the petition for certiorari to resolve a circuit split regarding bump stocks. *See* Brief in Support of Certiorari, *Garland, et al. v. Cargill*, No. 22-976 (U.S. June 7, 2023). At this point, the Supreme Court has not overruled *Cargill*, meaning that it remains good law still binding on this Court.

Second, Defendants remind the Court that the Eastern District of New York reached a contrary conclusion in a different case: that the government is "'highly likely to succeed in proving that the FRT-15 satisfies the statutory definition of a machinegun' even in light of the *Cargill* plurality's opinion."[17] But this argument is not new.[18] In fact, the Court previously considered and rejected this argument at the preliminary injunction stage.[19] The Court stands on its previous determination. Simply reiterating the fact that another district court in another circuit reached a contrary conclusion is not enough to show a *strong* likelihood of success on the merits. This is particularly true when clear precedential guidance on this question from *Cargill* exists here.[20]

Even if these legal developments suggest that Defendants have a chance of success on the merits, "more than a mere possibility of relief is required" to justify a stay pending appeal. *Nken*, 556 U.S. at 434 (cleaned up). "It is not enough that the chance of success on the merits be better than negligible." *Id.* (cleaned up). Rather than providing something new to demonstrate that there

---

[16] *Id.* at 7–8.
[17] *Id.* at 8 (quoting *United States v. Rare Breed Triggers, LLC*, No. 1:23-cv-00369-NRM-RML, 2023 WL 5689770, at *15 (E.D.N.Y. Sept. 5, 2023).
[18] *See* Defs. Resp. in Opp. to Pls.' Mot. for Prelim. Inj. 7–9, ECF No. 39 (raising the same argument regarding the contrary decision reached by the Eastern District of New York).
[19] October 7, 2023 Opinion & Order 24, 29–30, ECF No. 53.
[20] *See id.* at 24 ("*Cargill* controls since decisions from the Fifth Circuit—not the Eastern District of New York—are binding on this Court.").

is a strong likelihood of success on the merits, Defendants largely focus on relitigating issues already decided at the TRO and preliminary injunction stages. But the Court previously determined in two separate orders that the ATF's interpretation of "machinegun" is very likely unlawful.[21] Defendants have still not made any showing—let alone a strong showing—that this conclusion is incorrect. Simply rehashing arguments twice rejected does not eventually transform those points into a cognizable showing—let alone a strong showing—that Defendants are likely to succeed on the merits. Without more, the Court finds that Defendants have failed to meet their burden.

The Court has already concluded *twice* that Plaintiffs—not Defendants—are likely to succeed on the merits. Defendants offer nothing to compel a different conclusion. There are no new arguments or authority beyond noting the grant of certiorari in *Cargill*. Accordingly, the Court finds that Defendants, who bear the burden, fail to demonstrate a likelihood of success on the merits, let alone the "strong" showing required for such "extraordinary relief" as a stay pending appeal. Therefore, this factor weighs heavily against granting a stay.

### B. Irreparable Harm

Turning to the second stay factor, the Court concludes that Defendants have not shown that they will suffer irreparable harm absent a stay pending appeal. Although Defendants focus considerable attention on this factor in their briefing, none of their arguments are availing.

First, Defendants contend that complying with the preliminary injunction pending appeal will make it harder for them to seize FRTs from otherwise law-abiding citizens.[22] Not only does this presume that FRTs are illegal machineguns (meaning that this articulation of harm is tethered

---

[21] August 30, 2023 Opinion & Order, ECF No. 36; October 7, 2023 Opinion & Order, ECF No. 53.
[22] Defs.' Mem. in Support of Mot. to Stay Prelim. Inj. Pending Appeal 5, ECF No. 64-2.

entirely to the merits), but this harm also does not rise to the level of irreparability. Should Defendants prevail on the merits, they would simply restart their retrieval efforts anew. There is nothing in the record actually showing that Defendants will be completely unable to later contact individuals suspected of transferring or selling FRTs during the preliminary injunction and trace the movement of those FRTs based on that information. All Defendants have shown is that these retrievals efforts will be more challenging.[23] When paired with the Court's determination that such confiscation of law-abiding citizens' FRTs is likely unlawful, this plea that the injunction interferes with Defendants' ability to seize FRTs merits no sympathy. And the fact that the Defendants have likely acted in violation of the law for years does not make the action any less unlawful.[24]

Next, Defendants lament that the preliminary injunction will result in the acquisition of FRTs by prohibited persons.[25] But this concern exists with *any* firearm—not just FRTs. More importantly, the Court is not persuaded that Defendants should be allowed to restrict the rights of law-abiding citizens simply because some criminal somewhere might break the law. The Court cannot grant the extraordinary remedy of a stay pending appeal based on what a prohibited person *might* do. Even more fundamental is the fact that FRTs only work with a preexisting firearm, which, by definition, prohibited persons cannot legally possess. If Defendants are concerned with prohibited persons acquiring FRTs, they already possess the authority to arrest that person now, with or without the preliminary injunction. *See* 18 U.S.C. § 922(g) (listing persons prohibited from using firearms). The Court was careful to emphasize this point when granting the preliminary injunction: "Plaintiffs may still be prosecuted for violating otherwise

---

[23] *Id.* at 5–6 (arguing that "the Government would face significant hardships" because, without a stay, the injunction will "make recovery even more challenging and resource intensive with each passing day") (citing *Rare Breed Triggers, LLC*, 2023 WL 5689770, at *48).

[24] *See id.* at 1, 3–4 (discussing ATF's history of classifying FRTs and similar devices as machineguns).

[25] *Id.* at 4–6.

lawful provisions of the NFA and GCA, as well as other lawful firearms regulations."[26] Thus, Defendants' fear regarding prohibited persons is—and continues to be—a non sequitur.

Even if Defendants' interest in enforcing their interpretation of machinegun is legitimate, that interest carries less weight in the stay analysis. *Cf. Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott*, 734 F.3d 406, 419 (5th Cir. 2019) (staying injunction where the government's interest in enforcing its laws was *coupled with* its strong showing of likely success on the merits). The Fifth Circuit stressed that "any injury to [the enjoined party] is outweighed by [a] strong likelihood of success on the merits" by Plaintiffs. *Freedom from Religion Foundation, Inc. v. Mack*, 4 F.4th 306, 316 (5th Cir. 2021). As such, even if Defendants are correct that the identified harms are irreparable, this alone would still not satisfy Defendants' burden of showing the Court that it should exercise discretion to grant a stay when likelihood of success is the main bearing wall of the test. Indeed, "simply showing some 'possibility of irreparable injury'" does not weigh in favor of a stay because, on its own, that "standard is too lenient." *Nken*, 556 U.S. at 434–35.

Moreover, contrary to Defendants renewed argument that pre-enforcement judicial review is harmful by undermining separation of powers,[27] it is no "intrusion by a federal court into the workings of a coordinate branch of Government" to require the Defendants to comply with the law. *Legalization Assistance Project*, 510 U.S. 1301, 1305–06 (1993) (O'Connor, J., in chambers). That is precisely the role of the judicial branch and particularly in the Administrative Procedure Act ("APA") context.[28] Indeed, the APA's text makes clear that "[a] person suffering a legal wrong

---

[26] October 7, 2023 Opinion & Order 43, ECF No. 53.

[27] Defs.' Mem. in Support of Mot. to Stay Prelim. Inj. Pending Appeal 9–10, ECF No. 64-2.

[28] The APA recognizes judicial authority to "issue all necessary and appropriate process . . . to preserve status or rights" from "irreparable injury" caused by agency action. 5 U.S.C. § 705. Indeed, the APA's explicit textual entitlement would be undermined by an interpretation that § 702 confers no right to obtain meaningful equitable relief on a pre-enforcement basis when wronged by agency action. The Court

because of agency action, or adversely affected or aggrieved by agency action" is "entitled to judicial review thereof," including criminal proceedings. 5 U.S.C § 702. And it is certainly not unduly burdensome to require Defendants, as executive officials, to follow the law they are tasked with enforcing. If Defendants prefer to ban all FRTs, there is a pathway to achieving that end—they and their supporters can lobby Congress to change the definition. *See Franciscan All., Inc. v. Becerra*, 47 F.4th 378, 372 (5th Cir. 2022) ("[A]n agency 'literally has no power to act . . . unless and until Congress authorizes it to do so by statute.'" (quoting *Fed. Election Comm'n v. Cruz*, 142 S. Ct. 1638, 1649 (2022)). Defendants cannot arrogate the legislative power to themselves in the absence of statutory authority. Thus, until Congress changes the law, allowing enforcement of a "likely unlawful" interpretation of a criminal statute should not be left to mere prosecutorial discretion. And any claimed harm to Defendants by virtue of this loss of discretion is immaterial under *Cargill*.

Accordingly, Defendants have, at best, demonstrated inconvenience as a result of the preliminary injunction. Without more, Defendants fail to satisfy their burden of showing that the circumstances justify a stay pending appeal. Therefore, this factor also weighs against a stay.

## C. Balance of Equities and the Public Interest

---

previously acknowledged that "'[i]n all cases' of judicial review under § 706, 'agency action must be set aside if the action was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law' or if the action failed to meet statutory, procedural, or constitutional requirements.'" October 7, 2023 Opinion & Order 17–18, ECF No. 53 (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 413–14 (1971)). The APA's text refers to "mandatory or injunctive decree[s]" issued thereunder. 5 U.S.C. § 702. The import of this text is that injunctive relief is available under the APA without any express limitation precluding the availability of such relief on a pre-enforcement basis. "[T]he Administrative Procedure Act's 'generous review provisions' must be given a 'hospitable' interpretation." *Abbott Laboratories v. Gardner*, 387 U.S. 136, 140 (1967) (quoting *Shaughnessy v. Pedreiro*, 349 U.S. 48, 51 (1955)). The APA authorizes courts to review agency actions on a pre-enforcement basis, including various agency actions that are "otherwise not in accordance with law" and "contrary to constitutional right, power, privilege, or immunity; ... [or] in excess of statutory jurisdiction, authority, or limitations," a power of judicial review that is "cumulative under the arbitrary and capricious standard." October 7, 2023 Opinion & Order 17–18, ECF No. 53 (quoting 5 U.S.C. § 706(2)(A)–(B); *Menkes v. DHS*, 637 F.3d 319, 330 (D.C. Cir. 2011)).

The Court also finds that the remaining two factors—comparative balance of the equities and the public interest—likewise do not justify a stay pending appeal. The Court previously balanced these competing interests and reaffirms that conclusion absent convincing otherwise.[29] Because Defendants once again fail to shift the equities in their favor, the Court addresses the public interest factor.[30]

In their third bite at the apple, Defendants concentrate on the potential harm the public will face absent a stay.[31] For instance, Defendants state "ATF has encountered these devices in numerous criminal settings."[32] But this is not a causal argument. Nor is it evidence that FRTs are uniquely dangerous or more likely to be involved in criminal activity than any other firearm or firearm accessory. Even in the example Defendants provide involving "an eight-time convicted felon on state probation" who possessed an FRT, the felon also illegally possessed twenty-two other firearms, along with narcotics and other drug paraphernalia.[33] It is not at all clear what causal work the FRT is doing in this example that is not equally applicable to the other illegally possessed firearms. And it is similarly unclear how the FRT added to the danger of this situation. Thus, just like the TRO and preliminary injunction stages, Defendants "provide no specific causal arguments explaining how the public would be harmed by an injunction."[34]

The causal deficiencies become even more apparent when Defendants admit that their "criminal enforcement proceedings pertaining to FRT-15s and WOTs have mainly targeted those

---

[29] August 30, 2023 Opinion & Order 20–23, ECF No. 36; October 7, 2023 Opinion & Order 37–41, ECF No. 53.

[30] Unlike the Court's prior orders, the public interest factor does not merge here because the government is the moving—rather than the opposing—party. *See U.S. Navy Seals 1-26*, 27 F.4th at 353 ("Those factors merge 'when the Government is the opposing party[,] i.e., when the government is not the party applying for a stay." (quoting *Nken*, 556 U.S. at 435)).

[31] Defs.' Mem. in Support of Mot. to Stay Pending Appeal 3–6, ECF No. 64-2.

[32] *Id.* at 4.

[33] Decl. of Special Agent Craig Saier ¶ 34, ECF No. 64-1.

[34] October 7, 2023 Opinion & Order 39, ECF No. 53.

individuals charged with multiple other gun-related felonies."[35] As observed when granting the preliminary injunction, "if the only targets of Defendants' enforcement actions are against those who violate other gun laws, then the prohibition on FRTs does nothing to protect the public."[36] And, it follows, then, "that FRT ownership is neither a necessary nor sufficient condition for protecting public safety."[37] Beyond the broad statement that the ATF has encountered FRTs "in numerous criminal settings" and pointing to examples of felons in possession of other illegal firearms, all of the dangerous situations Defendants fear involve other illegal activities.

Despite being on their third round of briefing, Defendants have identified just two criminal shootings that may have involved FRTs, one of which involved a "narcotics trafficker" who was likely ineligible to possess any firearms in the first place.[38] This is hardly sufficient to establish that FRTs are unique threats to public safety, let alone that possession or transfer of FRTs by Plaintiffs—who, by definition in this case, are not prohibited persons—pose a public safety threat. For a third time the Court concludes: "[s]uch a general public safety concern simply cannot serve as justification for enforcement of an illegal interpretation of a criminal statute."[39] There is no evidence suggesting that FRTs in the hands of law-abiding citizens will disserve the public interest.

Furthermore, Defendants also repeatedly highlight that the FRT's rate of fire is similar to how quickly a machinegun fires. But this fact is irrelevant to any consideration of the potential harm posed. That is because the statutory definition of machinegun—as emphasized by *Cargill*—does not define a machinegun based on this attribute. 57 F.4th 447, 461 (5th Cir. 2023) ("Congress did not use words describing the shooter's perspective of the weapon's rate of fire. . .

---

[35] Defs.' Mem. in Support of Mot. to Stay Pending Appeal 10, ECF No. 64-2.
[36] October 7, 2023 Opinion & Order 39, ECF No. 53.
[37] *Id.*
[38] Decl. of Special Agent Craig Saier ¶¶ 34–35, ECF No. 64-1.
[39] October 7, 2023 Opinion & Order 39, ECF No. 53.

. Instead, it made up an entirely new phrase—by single function of the trigger—that specifically pertains to the mechanics of a firearm."). Rate of fire may be Defendants' *preferred* way of defining machineguns. But until Congress changes the statutory definition, any contentions regarding rate of fire have no bearing on the Court's analysis. For better or for worse, the statutory definition of machinegun does not presently include the rate of fire as an attribute of machineguns. As such, Defendants intensified efforts to show that allowing FRTs to be possessed, distributed, sold, or transferred is uniquely dangerous because of their rate of fire similar to a machinegun has no bearing on the analysis.

In contrast, Plaintiffs would be substantially injured by a stay. The Court has already found—twice, in slightly different contexts—that Plaintiffs face a substantial risk of irreparable harm if Defendants are not enjoined from engaging in enforcement activities.[40] Not only do Plaintiffs face a credible threat of prosecution (including when used coercively to confiscate property without filing charges), Plaintiff also face the loss of the use and enjoyment of their property as a result of Defendants "active retrieval" efforts.[41] Contrary to Defendants' prior statements downplaying the scope of their enforcement activities, Defendants' supporting declaration now reverses course and claims that "the FRT-15 and WOT are subject to active retrieval efforts."[42] There is every reason to believe these "retrieval efforts" will be directed at members of the Organizational Plaintiffs in the absence of the preliminary injunction, which reaffirms the very need for such protection.

As before, Defendants' "sky is falling" arguments do not overcome the serious harms Plaintiffs face. Defendants' arguments are premised entirely on a presumption that FRTs are

---

[40] August 30, 2023 Opinion & Order 16–20, ECF No. 36); October 7, 2023 Opinion & Order 31–37, ECF No. 53.
[41] Decl. of Special Agent Craig Saier 8, ECF No. 64-1.
[42] *Id.*

machineguns—a conclusion already twice rejected. For the third time in this litigation, Defendants offer speculative, conclusory statements about the supposed danger of FRTs that are not supported by their own facts. And the realities discussed above cast doubt on the parade of horribles that Defendants say will occur if the injunction remains in force pending appeal. Defendants do not carry their burden to show how the equities now weigh in their favor. Nor do Defendants show how the public interest will be served by a stay pending appeal. To the contrary, the preliminary injunction broadly maintains the status quo of general non-enforcement against law-abiding citizens and serves the public interest by preventing Defendants from enforcing their likely unlawful definition of machinegun. For these reasons, the final two factors also weigh against a stay.

## IV.    CONCLUSION

At bottom, the preliminary injunction may frustrate Defendants enforcement and retrieval interests. But for the reasons discussed, any injury to Defendants continues to be "outweighed by [Plaintiffs'] strong likelihood of success on the merits." *Freedom From Religion Found., Inc. v. Mack*, 4 F.4th 306, 316 (5th Cir. 2021). Defendants have not only failed to make a strong showing of success on the merits but have also not identified how their asserted harms will still exist if they *do not* prevail on the merits—and these "two factors . . . are the most critical." *Plaquemines Parish*, 84 F.4th at 373. Given the combination of these factors, the Court finds that Defendants have demonstrated that issuance of a stay pending appeal is warranted.

Therefore, the Court concludes that Defendants have not met their burden of showing that the circumstances justify an exercise of the Court's discretion to grant a stay pending appeal. Accordingly, the Court **DENIES** Defendants' Motion (ECF No. 64).

**SO ORDERED** this **16th day** of **November, 2023**.

_____

Reed O'Connor

**UNITED STATES DISTRICT JUDGE**

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | | |
|---|---|---|
| NATIONAL ASSOCIATION FOR GUN RIGHTS, INC., | ) | |
| TEXAS GUN RIGHTS, INC., | ) | |
| PATRICK CAREY, | ) | |
| JAMES WHEELER, | ) | Case No. _____ |
| | ) | |
| and | ) | |
| | ) | |
| TRAVIS SPEEGLE, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| MERRICK GARLAND, | ) | |
| IN HIS OFFICIAL CAPACITY AS | ) | |
| ATTORNEY GENERAL | ) | |
| OF THE UNITED STATES, | ) | |
| U. S. DEPARTMENT OF JUSTICE, | ) | |
| | ) | |
| STEVEN DETTELBACH, | ) | |
| IN HIS OFFICIAL CAPACITY AS | ) | |
| DIRECTOR OF THE | ) | |
| BUREAU OF ALCOHOL, TOBACCO, | ) | |
| FIREARMS AND EXPLOSIVES, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| BUREAU OF ALCOHOL, TOBACCO, | ) | |
| FIREARMS AND EXPLOSIVES, | ) | |
| | ) | |
| Defendants. | ) | |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

1.    Plaintiffs National Association for Gun Rights, Inc., Texas Gun Rights, Inc., Mr. Patrick

Carey, Mr. James Wheeler, and Mr. Travis Speegle bring this action against Mr. Merrick Garland,

in his official capacity as Attorney General of the United States, the U.S. Department of Justice, Mr.

Steven Dettelbach, in his official capacity as Director of the Bureau of Alcohol, Tobacco, Firearms,

and Explosives, and the Bureau of Alcohol, Tobacco, Firearms, and Explosives under the Administrative Procedure Act, 5 U.S.C. §§ 701, *et seq*. and the Declaratory Judgement Act, 28 U.S.C. §§ 2201 and 2202, seeking declaratory and injunctive relief to end Defendants' arbitrary, capricious, and otherwise unlawful efforts to misclassify Forced Reset Triggers as "machineguns" under the National Firearms Act of 1934.

## JURISDICTION AND VENUE

2.    The Court has jurisdiction over this action pursuant to 5 U.S.C. § 702 and 28 U.S.C. § 1331. This Court has authority to grant the remedy Plaintiffs seek under 28 U.S.C. §§ 2201 and 2202 and 5 U.S.C. § 706.

3.    Venue is proper in this district pursuant to 5 U.S.C. § 703 and 28 U.S.C. § 1391(e) because one or more Plaintiffs resides within the Northern District of Texas and Plaintiff Texas Gun Rights, Inc., is headquartered in the Fort Worth Division.

## PARTIES

4.    Plaintiff National Association for Gun Rights, Inc. ("NAGR") is a Virginia corporation with its headquarters in Loveland, Colorado. NAGR is organized and operated as a non-profit membership organization that is exempt from federal income taxes under Section 501(c)(4) of the U.S. Internal Revenue Code. NAGR was formed in 2000 to preserve and defend the Second Amendment rights of gun owners. NAGR has over 3,000 members in the Northern District of Texas, including some who own forced reset triggers ("FRTs") or who wish to acquire them and would do so but for the challenged ATF statutory interpretation.

5.    Plaintiff Texas Gun Rights, Inc. ("TGR") is a 501(c)(4) non-profit, non-partisan, grassroots citizen organization headquartered in Hudson Oaks, Texas.  Its mission is to protect the Second Amendment rights of its members, including protecting the liberty of individuals to defend

2

**Add. 61**

themselves, their families, and their property without having to first ask government for permission and to push back on firearms-related licensing requirements. It has over 14,000 members in the Northern District of Texas, including some who own FRTs or who wish to acquire them and would do so but for the challenged ATF statutory interpretation.

6. Plaintiff Patrick Carey is a natural person, a United States citizen, and resident of Zachary, Louisiana.

7. Prior to August 22, 2022, Mr. Carey owned two "FRT 15 – Rare Breed Trigger" forced reset triggers. *See* Exhibit A (Declaration of Patrick Carey).

8. The Bureau of Alcohol, Tobacco, Firearms, and Explosives provided Mr. Carey with a "Warning Notice" dated August 22, 2022 (attached to Exhibit A), informing him that "ATF has information that you have acquired one or more Forced/Hard Reset Trigger (FRT) devices," that "[t]hese items have been classified as machineguns that were unlawfully manufactured," that "[p]ossession of these devices is a violation of law due to their illegal manufacture," and that "***the unlawful receipt and possession of any of these devices is a felony violation of Federal law***" (emphasis in the original).

9. In response to the personalized threat of criminal enforcement, that same day Mr. Carey surrendered two FRTs to the Bureau of Alcohol, Tobacco, Firearms, and Explosives.

10. But for the threat of civil and criminal liability, Mr. Carey intends to purchase additional FRTs in the future.

11. Thus, Mr. Carey is harmed by the Bureau of Alcohol, Tobacco, Firearms, and Explosives unlawful determination that FRTs are "machineguns," which compelled him to surrender possession of two FRTs with a market value of approximately $750 and prevents him from owning and possessing additional FRTs.

**Add. 62**

12. Plaintiff James "J.R." Wheeler is a United States citizen, and resident of Crandall, Texas. *See* Exhibit B (Declaration of James Joseph Ross Wheeler).

13. Mr. Wheeler is located in the Northern District of Texas.

14. Mr. Wheeler has a Federal Firearms License and is the 50% owner of a small business selling firearms and ammunition.

15. Mr. Wheeler personally owns one FRT; his business owns two additional FRTs.

16. Mr. Wheeler seeks to maintain lawful possession of his FRTs and intends to continue selling FRTs to U.S. citizens qualified to lawfully possess firearms.

17. Mr. Wheeler is harmed by the Bureau of Alcohol, Tobacco, Firearms, and Explosives unlawful determination that FRTs are "machineguns," which would force Mr. Wheeler to surrender his own FRTs or risk civil and criminal penalties and to cease selling FRTs, which would cause him tangible economic harm.

18. Plaintiff Travis Speegle is an U.S. Citizen and resident of Austin, Texas. *See* Exhibit C (Declaration of Travis Speegle).

19. Mr. Speegle owns 10 FRTs.

20. Mr. Speegle intends to purchase additional FRTs.

21. Mr. Speegle is harmed by the Bureau of Alcohol, Tobacco, Firearms, and Explosives unlawful determination that FRTs are "machineguns," which places him at risk of civil and criminal enforcement and prevents him from purchasing additional FRTs.

22. The individual Plaintiffs, along with the organizational Plaintiffs, their members, and their supporters, will be irreparably harmed if the Bureau of Alcohol, Tobacco, Firearms, and Explosives is permitted to continue confiscation, criminal enforcement, and threats thereof against owners of FRTs based on its classification of FRTs as machineguns. Not only will many of the Plaintiffs lose

**Add. 63**

the monetary value of their possessions (through forced surrender, confiscation, or destruction) and their ability to use them, but all the Plaintiffs will be deprived of the ability to purchase, own, and use FRTs in the future. Plaintiffs who are FRT owners have lost and will continue to lose the use and enjoyment of their belongings, along with the ability to keep and bear firearms equipped with FRTs. Finally, any FRT owner who retains an FRT will be at risk of felony prosecution—and accompanying permanent loss of his or her Second Amendment rights.

23. Defendant Merrick Garland is the Attorney General of the United States.  In his official capacity as Attorney General, he oversees the U.S. Department of Justice, including the Bureau of Alcohol, Tobacco, Firearms, and Explosives.  He also has statutory authority to prescribe rules and regulations concerning firearms.  *See* 18 U.S.C. § 926; 26 U.S.C. § 7801(a)(2); 28 U.S.C. § 599A(c)(1); Homeland Security Act of 2002, Pub. L. 107-296, 116 Stat. 2135 (Nov. 25, 2002).

24. Defendant U.S. Department of Justice ("DOJ") is a federal executive branch agency within the federal government of the United States. DOJ is headquartered at 950 Pennsylvania Avenue NW, Washington, D.C. 20530.  DOJ is charged with enforcing federal firearms laws.

25. Defendant Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") is a component agency of DOJ responsible for enforcing federal criminal laws and regulating the firearms and explosives industries, including the registration and regulation of "machineguns."  *See* 28 U.S.C. § 599A(b)(1); 28 C.F.R. § 0.130. ATF has limited authority under the Gun Control Act and National Firearms Act to promulgate certain regulations.  *See* 18 U.S.C. § 926(a); 26 U.S.C. § 7805(a). ATF is headquartered at 99 New York Avenue NE, Washington, D.C. 20226. Homeland Security Act of 2002, Pub. L. 107-296, 116 Stat. 2135 (Nov. 25, 2002).

26. Defendant Steven Dettelbach is the Director of the ATF.  In his official capacity as Director of the ATF, he oversees the ATF and its enforcement and regulatory activities.

**Add. 64**

## STATEMENT OF FACTS

**Forced Reset Triggers**

27. An FRT is a semi-automatic trigger assembly that allows the trigger to "reset" quicker than it would using a traditional trigger-return spring, in turn allowing the user to fire the firearm quicker than with a traditional trigger. *See* Exhibit D (Declaration of Daniel O'Kelly).

28. For example, in an AR-15 equipped with a standard semi-automatic trigger, the function of the trigger is to release the hammer. This occurs when the trigger is pulled back to the point that a "trigger sear" releases the hammer from its retained position. After being released by the trigger, the hammer pivots to contact a firing pin. The firing pin then strikes a chambered ammunition cartridge or "round," causing gunpowder in the cartridge to combust and propel the cartridge's bullet out of the barrel of the firearm, *i.e.*, firing.

29. Once fired, a standard semi-automatic trigger will not fire again until the trigger is "reset." This is what distinguishes a semi-automatic firearm from a machinegun, which is a fully automatic firearm. In a machinegun, the trigger does not need to reset to fire subsequent rounds after the first and can fire multiple rounds from a single function of the trigger.

30. A standard semi-automatic trigger resets due to its trigger-return spring moving the trigger forward until the trigger sear retains the hammer again. When this occurs, the trigger is in its ready-to-fire or "set" position and can function once again by releasing the hammer.

31. An FRT is a device that forcibly returns the trigger to its "reset" state, *i.e.*, its ready-to-fire or "set" position.

32. In the commercialized FRT designs at issue in this litigation, the trigger is forcibly reset by the hammer when the bolt carrier cycles to the rear. A "locking bar" mechanically locks the trigger in its reset state, preventing the user from moving the trigger rearward to function by

**Add. 65**

releasing the hammer, until the bolt has returned to the in-battery position and the firearm is safe to fire.

33. When firing multiple shots using an FRT, the trigger must still reset after each round is fired and must separately function to release the hammer by moving far enough to the rear in order to fire the next round.

34. This process is visible in the two videos illustrating the mechanics of an FRT and comparing the operations of an AR-15 fitted with an FRT to a machinegun, available here: https://dhillonlaw.app.box.com/s/83pwi4a97id478f1nv31rv05okda2ccd. *See also* Exhibit E (Declaration of Cole Leleux) (describing the videos and creation of same).

**The Statutory Definition of a "Machinegun"**

35. The 1934 National Firearms Act (26 U.S.C. Chapter 53) ("NFA") criminalized the possession or transfer of an unregistered firearm, while also prohibiting the registration of firearms otherwise banned by law. *See* 26 U.S.C. §§ 5812(a) (registration prohibited "if the transfer, receipt, or possession of the firearm would place the transferee in violation of law"), 5861 (prohibited acts).

36. In 1968, Congress passed the Gun Control Act (GCA) criminalizing possession of firearms for certain classes of people. *See* 18 U.S.C. § 921 *et seq.*

37. The Hughes Amendment to the 1986 Firearm Owners Protection Act ("the machinegun ban") amended the GCA to generally prohibit Americans from possessing and transferring machineguns.[1] 18 U. S.C. § 922(o).

38. Thus, with limited exceptions for governmental actors and machineguns that were in existence and registered prior to the effective date of the statute, May 19, 1986, it is a federal felony

---

[1] There are exceptions for government actors and machineguns that were in existence and registered prior to the effective date of the statute, May 19, 1986.

**Add. 66**

offense for any person to "transfer or possess a machinegun." 18 U.S.C. § 922(o). This offense is

punishable by up to 10 years in federal prison for first-time offenders. 18 U.S.C. § 924(a)(2).

39. As defined under both the GCA and NFA, the term "machinegun" means:

> any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. The term shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person.

26 U.S.C. § 5845(b); *see also* 18 U.S.C. § 921(24) ("The term 'machinegun' has the meaning

given such term in section 5845(b) of the National Firearms Act (26 U.S.C. 5845(b))").

40. The speed at which a weapon can be fired (i.e., "rate of fire") is not referred to in the

statutory definition of a machinegun.

**Add. 67**

**Federal Regulations and Statutory Interpretation/Enforcement**

41. Until 2018, ATF regulations mirrored the federal definition of the term "machinegun" with respect to firearms manufactured and owned in the United States. 27 C.F.R. §§ 478.11 and 479.11. For example, 27 C.F.R. § 479.11 (2017) stated:

> **Machine gun.** Any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. The term shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machine gun, and any combination of parts from which a machine gun can be assembled if such parts are in the possession or under the control of a person.

42. In 2018, in an effort to broaden the statutory definition, the ATF "re-interpreted" the statutory definition to add the language shown in italics below:

> **Machine gun.** Any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. The term shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machine gun, and any combination of parts from which a machine gun can be assembled if such parts are in the possession or under the control of a person. *For purposes of this definition, the term "automatically" as it modifies "shoots, is designed to shoot, or can be readily restored to shoot," means functioning as the result of a self-acting or self-regulating mechanism that allows the firing of multiple rounds through a single function of the trigger; and "single function of the trigger" means a single pull of the trigger and analogous motions. The term "machine gun" includes a bump-stock-type device, i.e., a device that allows a semi-automatic firearm to shoot more than one shot with a single pull of the trigger by harnessing the recoil energy of the semi-automatic firearm to which it is affixed so that the trigger resets and continues firing without additional physical manipulation of the trigger by the shooter.*

27 C.F.R. § 479.11 (2018) (emphasis added); *see also* ATF, *Final Rule: Bump-Stock-Type Devices*, 83 Fed. Reg. 66514 (2018).

43. On July 15, 2021, ATF's Firearms Technology Criminal Branch (FTCB) issued a Technical Examination report (attached as Exhibit F) in which it purportedly "classified the FRT-15 [version

of a forced reset trigger] as a machinegun as defined by the NFA and the GCA." *See* Complaint at

¶ 117, *United States of America v. Rare Breed Triggers, LLC, et al.*, Case No. 1:23-cv-00369-NRM-

RML (E.D.N.Y. Jan. 19, 2023).

44. On October 21, 2021, FTCB issued a report on the Wide Open Enterprises "WOT" version

of an FRT (attached as Exhibit G), opining that the WOT is a machinegun. The WOT operates on

the same mechanical principles as the Rare Breed FRT-15. *See* Exhibit D (Declaration of Daniel

O'Kelly). The report was similarly flawed and based on the since-rejected statutory interpretation

in § 479.11.

45. On March 22, 2022, the ATF issued an "Open Letter to All Federal Firearms Licensees"

("Open Letter") (attached as Exhibit H) stating the ATF "recently examined devices commonly

known as 'forced reset triggers' (FRTs) and has determined that ***some*** of them are 'firearms' and

'machineguns' as defined in the National Firearms Act (NFA), and 'machineguns' as defined in the

Gun Control Act (GCA)" (emphasis added). The Open Letter further explained "ATF's examination

found that ***some*** FRT devices allow a firearm to automatically expel more than one shot with a single,

continuous pull of the trigger" and "any FRT that allows a firearm to automatically expel more than

one shot with a single, continuous pull of the trigger is a 'machinegun'" *Id,* (emphasis added). The

vague description of "some FRT devices" creates a chilling effect in which purchasers do not know

whether (or not) the forced reset trigger they may possess has been condemned by ATF.

46. On April 27, 2023, ATF Firearms and Ammunition Technology Division ("FATD") issued

another report on the Rare Breed Triggers FRT-15 trigger. *See* Exhibit I.

47. FTCB and FATD provide technical support on firearms and ammunition to federal, state,

and local law enforcement agencies regarding the GCA and NFA. FTCB and FATD do not have

statutory authority to "classify" items or make "determinations" as to whether an item legally

constitutes a machinegun. Instead, FTCB examines and/or tests items and can issue a Technical

Examination report that represents the opinion of the ATF.

**Plaintiffs Face a Credible Threat of Enforcement**

48. Based on these and other similarly flawed reports, ATF has vigorously sought to implement

its interpretation of the law.

49. The ATF has sent cease-and-desist letters to multiple companies involved in the

manufacture, marketing, and sale of FRTs, including Rare Breed Triggers and 3rd Gen Machine.

*See* Complaint at ¶¶ 145, 149, *United States of America v. Rare Breed Triggers, LLC, et al*., Case

No. 1:23-cv-00369-NRM-RML (E.D.N.Y. Jan. 19, 2023).

50. The ATF has sent and continues to send letters to FRT owners demanding surrender of forced

reset triggers under threat of criminal prosecution.

51. One of these letters was delivered to Plaintiff Carey and is attached to Exhibit A.

52. ATF has made in-person visits to FRT owners' homes, including the home of Plaintiff Carey.

*See* Exhibit A.

53. The ATF has initiated civil proceedings against at least one company and two individuals

involved in the manufacture and sale of FRTs.  Complaint, *United States of America v. Rare Breed*

*Triggers, LLC, et al*., Case No. 1:23-cv-00369-NRM-RML (E.D.N.Y. Jan. 19, 2023).

54. The Department of Justice has brought several criminal prosecutions against individuals for

possessing FRTs, including at least one prosecution in Texas. *See* Second Superseding Indictment

at Count One, *U.S. v. Bruggeman*, 2:22-CR-185 (S.D. Tex. Nov. 9, 2022) (charging defendant with

"knowingly posess[ing] a machinegun, that is, six (6) Rare Breed Triggers FRT-15"); *see also*

Indictment at Count Two, *U.S. v. Berrios-Aquino*, 3:22-cr-473 (D.P.R. Apr. 20, 2023) (charging

**Add. 70**

defendant with possession of a machinegun for possessing a Rare Breed FRT-15 trigger);
Superseding Indictment at Count One, *U.S. v. Augusto*, 3:22-cr-30025 (D. Mass. Sept. 1, 2022)
(charging defendant with possession of a machinegun in part for possessing three Rare Breed FRT-15 forced reset triggers and one Tommy Triggers FRT-15-3 MD forced reset trigger).

55. On August 4, 2023, the DOJ executed a search warrant on the Fargo, North Dakota, office
of Rare Breed Triggers, LLC as part of its ongoing campaign against FRT owners, manufacturers,
and distributors.

56. Given the ATF and DOJ's specific threats of prosecution and civil enforcement actions
against one or more Plaintiffs and their history of prosecution and civil enforcement actions against
other individuals and companies selling, manufacturing, or possessing FRTs, Plaintiffs face a
credible threat of prosecution from Defendants.

**Defendant's Interpretation of the Term "Machinegun" is Contrary to Law**

57. Defendants' interpretation of the term "machinegun," which is the basis for the revised
version of 27 C.F.R. § 479.11, the Open Letter, and Defendants' hectoring conduct toward
Plaintiffs, is contrary to law.

58. In *Cargill v. Garland*, 57 F.4th 447 (5th Cir. 2023) (en banc), *petition for cert. filed* (Apr.
6, 2023) (No. 22-976), the Fifth Circuit held that the ATF's 2018 bump-stock rule, which expanded
the meaning of the term "machinegun," violated the Administrative Procedure Act by exceeding
the agency's statutory authority.

59. In doing so, the *Cargill* Court examined the statutory text defining "machinegun" and
concluded that the statutory term "single function of the trigger" is not synonymous with a single
pull of the trigger: "The problem with [the ATF's] interpretation is that it is based on words that

**Add. 71**

do not exist in the statute. The statute 'uses single function of the trigger, not single function of the shooter's trigger finger.'" *Cargill*, 57 F.4th at 459-460 (cleaned up) (internal quotation marks and citation omitted). The *Cargill* Court stated "we are obliged to conclude that the statutory definition of machinegun unambiguously turns on the movement of the trigger and not a trigger finger." *Id.* at 460. Instead, "the statute requires that a machinegun be capable of firing automatically once the *trigger* performs a single function." *Id.* at 463 (emphasis in original). *Cargill* further elaborated that the shooter's input is absent from the statutory "machinegun" definition:

> [T]he prepositional phrases [of the statutory definition] define the firing process's requirements from a mechanical perspective. The process must occur by a *single function*, and the single act must be *by the trigger*. In short, there is no mention of a shooter. The grammatical structure continuously points the reader back to the mechanics of the firearm. The statute does not care what human input is required to activate the trigger—it cares only whether more than one shot is fired each time the trigger acts.

*Id.* at 460-61 (emphasis in original). The *Cargill* Court favorably quoted from the Navy-Marine Corps Court of Appeals regarding the definition of a "machinegun:" "'The statute does not say 'by a single function of the trigger finger' nor does it say 'by a single pull of the trigger in addition to external pressure from the shooter's non-firing hand.' .... Had Congress wanted to use the phrase 'by a single pull of the trigger' for *machine guns*, it could have. But it did not.' [*United States v. Alkazahg*, 81 M.J. 764, 780–81 (N.M. Ct. Crim. App. 2021)]. We agree." *Id.* at 460.

60. *Cargill* is binding precedent on this Court.

61. *Cargill* "unambiguously" rejected the same reasoning Defendants purport to use in classifying forced reset triggers as "machineguns."

**Add. 72**

62. In the FATD reports referenced above and the Open Letter, the ATF explicitly claims that FRTs are "machineguns" because they may enable a user to fire multiple rounds with a "single, continuous *pull* of the trigger" (emphasis added). This interpretation is foreclosed by *Cargill*.

63. Defendants have not—and cannot—allege that FRTs allow users to fire multiple rounds by a single function *of the trigger*. An FRT resets after every round is fired and the trigger must engage in a separate function of releasing the hammer for *each and every* round fired.

64. Defendants' interpretation of the law and their specific actions to threaten and potentially initiate enforcement actions against Plaintiffs are thus arbitrary, capricious, and otherwise contrary to law.

## FIRST CAUSE OF ACTION

## DEFENDANTS' INTERPRETATION AND ENFORCEMENT OF THE NFA AND GCA IS ARBITRARY, CAPRICIOUS, AND OTHERWISE CONTRARY TO LAW

65. Plaintiffs repeat and incorporate by reference each of the foregoing paragraphs as if fully set forth herein.

66. Plaintiffs sell and/or possess FRTs and intend to continue to do so in the future.

67. Defendants have repeatedly stated that FRTs are "machineguns," expressly asserting that Plaintiffs' sale or possession of FRTs is unlawful.

68. Defendants have threatened enforcement against Plaintiffs and have pursued civil and criminal remedies against other similarly situated persons.

69. Defendants' claim that FRTs are "machineguns" is based on Defendants' interpretation that a device is a "machinegun" if it enables a user to fire multiple rounds with a single, continuous *pull* of the trigger.

70. Defendants' interpretation is contrary to the "unambiguous" text of the statutory definition of "machinegun," as recognized by the Fifth Circuit.

14

**Add. 73**

71. Defendants' interpretation, and any continued efforts to enforce Defendants' interpretation, is thus arbitrary, capricious, and otherwise contrary to law.

72. Plaintiffs are therefore entitled to declaratory relief correcting Defendants' unlawful interpretation and to injunctive relief preventing Defendants from continuing their unlawful campaign of harassment, intimidation, and abuse of the legal process through actions directed at enforcing Defendants' unlawful interpretation.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that the Court grant all appropriate relief, including:

a.        The issuance of a temporary restraining order preventing Defendants from pursuing civil or criminal enforcement actions against Plaintiffs while responding to this Complaint;

b.        The issuance of a preliminary injunction, halting Defendants' enforcement of the challenged statutory interpretation that forced reset triggers are machineguns.

c.        A declaratory judgment, pursuant to the Declaratory Judgment Act (28 U.S.C. §§ 2201-2202), 5. U.S.C. § 706, and/or other applicable law, that holds unlawful and sets aside ATF's action, finding that rapid, semi-automatic fire is not fully automatic fire and that FRTs are not machineguns under federal law.

d.        An order permanently enjoining Defendants from enforcing, civilly or criminally, the challenged statutory interpretation or in any other way regulating FRTs as "machineguns" under currently existing law.

e.        An order requiring that all FRTs seized by or surrendered to the Defendants be returned to their rightful owners or, if destroyed, the rightful owners be compensated for the value of their lost property.

**Add. 74**

f.        An award of attorneys' fees and costs to Plaintiffs pursuant to Equal Access to

Justice Act, 28 U.S.C. § 2412(d)(1)(A), and any applicable statute or authority; and

g.        Any other relief that this Court in its discretion deems just and proper.

Respectfully submitted,

/s/ Whitney A. Davis
Whitney A. Davis (TX Bar No. 24084843)
Ben Sley (TX Bar No. 18500300)
EGGLESTON KING DAVIS, LLP
102 Houston Avenue
Suite 300
Weatherford, TX 76086
Telephone: (703) 748-2266
whit@ekdlaw.com
ben@ekdlaw.com

Jonathan M. Shaw*
Gary M. Lawkowski*
David A. Warrington*
DHILLON LAW GROUP, INC.
2121 Eisenhower Avenue, Suite 608
Alexandria, VA 22314
Telephone: (703) 748-2266
Facsimile: (415) 520-6593
jshaw@dhillonlaw.com
glawkowski@dhillonlaw.com

ATTORNEY FOR PLAINTIFFS

Glenn Bellamy*
WOOD HERRON & EVANS
600 Vine Street, Suite 2800
Cincinnati, OH 45202
Telephone: 513-707-0243
gbellamy@whe-law.com

ATTORNEY FOR PLAINTIFF
NATIONAL ASSOCIATION OF
GUN RIGHTS, INC.

*Pro hac vice forthcoming

U.S. Department of Justice
Bureau of Alcohol, Tobacco, Firearms and Explosives

**Firearms Technology Criminal Branch**
**Report of Technical Examination**

|  |  |
|---|---|
| | **244 Needy Road**<br>**Martinsburg, WV 25401**<br><br>**Phone: 304-616-4300**<br>**Fax: 304-616-4301** |

| To: | | |
|---|---|---|
| Special Agent Dean Conigliaro<br>Bureau of Alcohol, Tobacco, Firearms and Explosives<br>32 Old Slip<br>7th Floor, Suite 700<br>New York, NY 10005 | **UI#:** | 765040-23-0011 |
| | **RE:** | Rare Breed Triggers |
| | **FTCB#:** | 2023-724-ALC<br>326038 |

| **Date Exhibit Received:** 4/20/2023 | **Type of Examination Requested:** |
|---|---|
| **Delivered by:** FedEx 7718 9820 5250 | Test, Examination, Classification |

*These findings are founded on my experience and my review of pertinent laws, materials, and records. I reserve the right to amend or supplement this report.*

**Exhibit:**

   **42.** Rare Breed Triggers, model FRT-15, no serial number (suspected machinegun).

**Pertinent Authority:**

Title 28 of the United States Code (U.S.C.) provides the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) the authority to investigate criminal and regulatory violations of Federal firearms law at the direction of the Attorney General. Under the corresponding Federal regulation at 28 C.F.R. 0.130 the Attorney General provides ATF with the authority to investigate, administer, and enforce the laws related to firearms, in relevant part, under 18 U.S.C. Chapter 44 (Gun Control Act) and 26 U.S.C. Chapter 53 (National Firearms Act). Pursuant to the aforementioned statutory and regulatory authority, the ATF Firearms and Ammunition Technology Division (FATD) provides expert technical support on firearms and ammunition to federal, state, and local law enforcement agencies regarding the Gun Control Act and the National Firearms Act.

The Gun Control Act (GCA), 18 U.S.C. § 921(a)(24), defines the term **"machinegun"** as having: "*... the meaning given such term in section 5845(b) of the National Firearms Act (26 U.S.C. 5845(b)).*"

The National Firearms Act (NFA), 26 U.S.C. § 5845(a), defines "**firearm**" to include: "*...(1) a shotgun having a barrel or barrels of less than 18 inches in length; (2) a weapon made from a shotgun if such weapon as modified has an overall length of less than 26 inches or a barrel or barrels of less than 18 inches in length; (3) a rifle having a barrel or barrels of less than 16 inches in length (4) a weapon made from a rifle if such weapon as modified has an overall length of less than 26 inches or a barrel or barrels of less than 16 inches in length;*

ATF Form    3311.2
Revised September 2014
ATF0232

Special Agent Dean Conigliaro

765040-23-0011
2023-724-ALC
Page 2

*(5) any other weapon, as defined, as defined in subsection (e); (**6**) **a machinegun**; (7) any silencer (as defined in 18 U.S.C. § 921); and (8) a destructive device.  The term "firearm" shall not include an antique firearm or any device (other than a machinegun or destructive device) which, although designed as a weapon, the…[Attorney General]…finds by reason of the date of its manufacture, value, design and other characteristics is primarily a collector's item and is not likely to be used as a weapon."*

The NFA, 26 U.S.C. § 5845(b), defines "**machinegun**" as: "...***any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger***.  *The term shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or **combination of parts designed and intended, for use in converting a weapon into a machinegun**, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person.*" (emphasis added)

The NFA, 26 U.S.C. § 5842, "**Identification of firearms**," states: "... *(a) Identification of firearms other than destructive devices. - Each manufacturer and importer and anyone making a firearm shall identify each firearm, other than a destructive device, manufactured, imported, or made by a serial number which may not be readily removed, obliterated, or altered, the name of the manufacturer, importer, or maker, and such other identification as the … [Attorney General]… may by regulations prescribe. (b) Firearms without serial number. - Any person who possesses a firearm, other than a destructive device, which does not bear the serial number and other information required by subsection (a) of this section shall identify the firearm with a serial number assigned by the … [Attorney General]… and any other information the…[latter]… may by regulations prescribe.*"

Finally, 27 CFR §§ 478.11 and 479.11, further define the term "**machinegun**" to include two sentences at the end of the statutory definition to read as follows: "*...For purposes of this definition, **the term ''automatically'' as it modifies ''shoots, is designed to shoot, or can be readily restored to shoot,'' means functioning as the result of a self-acting or self-regulating mechanism that allows the firing of multiple rounds through a single function of the trigger; and ''single function of the trigger'' means a single pull of the trigger** and analogous motions*. *The term ''machine gun'' includes a bump-stock-type device, i.e., a device that allows a semi-automatic firearm to shoot more than one shot with a single pull of the trigger by harnessing the recoil energy of the semiautomatic firearm to which it is affixed so that the trigger resets and continues firing without additional physical manipulation of the trigger by the shooter.*" (emphasis added)

**<u>Findings</u>:**

As background, Federal law defines "machinegun," in relevant part, as "any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger" as well as a "combination of parts designed and intended, for use in converting a weapon into a machinegun." Legislative history for the NFA indicates that the drafters equated a "single function of the trigger" with "single pull of the trigger." National Firearms Act: Hearings Before the Comm. On Ways and Means, House of Representatives, Second Session on H.R. 9066, 73rd Cong., at 40 (1934). ATF has long held that a single function of the trigger is a "single pull" or alternatively, a single release of a trigger. Therefore, a firearm is not a machinegun if a projectile is expelled when the trigger is pulled, and a second projectile is expelled when the trigger is released.

Special Agent Dean Conigliaro                                        765040-23-0011
                                                                    2023-724-ALC
                                                                          Page 3

Final rule 2018R-22F, which further defines the term "**machinegun**," became effective on March 26, 2019. The final ruling clarifies the term "***automatically***" (found in the NFA, 26 U.S.C. § 5845(b)) as it modifies "shoots, is designed to shoot, or can be readily restored to shoot," means functioning as the result of *a self-acting or self-regulating mechanism* that allows the firing of multiple rounds through a single function of the trigger. Additionally, the rule states *"**single function of the trigger**" means a single pull of the trigger and analogous motions* (27 CFR §§ 478.11 and 479.11). However, the term "trigger" is not defined by Federal law.

The term "trigger" is generally applied by the firearm industry to the mechanism that causes the firing sequence to begin, usually by releasing an energized component. The term "trigger" regarding Federal firearm laws, particularly the GCA and NFA, is context specific. Simply put, the "trigger" initiates the firing sequence.

Federal courts have noted that automatically means that the weapon "fires repeatedly with a single pull of the trigger." *Staples v. United States*, 511 U.S. 600, 602 n. 1 (1994). "That is, once its trigger is depressed, the weapon will automatically continue to fire until its trigger is released, or the ammunition is exhausted." *Id.* Courts have specifically affirmed ATF's interpretation that a single act of the shooter to initiate the firing sequence is a single function of the trigger. *Akins v. United States*, 312 F. App'x 197, 200 (11th Cir. 2009); *Freedom Ordnance Mfg., Inc. v. Brandon*, No. 3:16-cv-00243-RLY-MPB (S.D. Ind. Mar. 27, 2018). *United States v. Fleischli*, 305 F.3d 643, 655 (7th Cir. 2002) (in which electronic switch was the trigger when it served to initiate the firing sequence and the minigun continued to fire until the switch was turned off or the ammunition was exhausted). In the *Freedom Ordnance* case, the United States District Court of Indiana held that ATF was not arbitrary and capricious in the classification of an "electronic reset assist device" as a machinegun even though the firearm's trigger reset before each shot by pushing the trigger forward. *Freedom Ordnance Mfg., Inc*, No. 3:16-cv-00243-RLY-MPB. In these cases, a firearm is a machinegun when it uses an internal mechanism or operation that automatically forces the trigger forward allowing the weapon to fire more than one shot by a continuous pull of the trigger.

ATF has a long history of examining devices which manipulate the trigger of a firearm. As part of the examination process, I researched other trigger devices, some of which ATF has previously examined and classified and some of which it has not. This was completed to research the classification history of devices which may or may not have worked similarly and to maintain consistency in those classifications. These devices include, but are not limited to, the following:

- Rare Breed Triggers, model FRT-15 (classified as a machinegun, 2021 #317388)
- ▮▮▮▮▮▮▮▮▮ model AR1 (classified as a machinegun, 2018 #307385)
- Wide Open Enterprises, model Wide Open Trigger (classified as a machinegun, 2021 #317970)
- Flex-Fire Technology
- ▮▮▮▮▮ "trigger reset device" (classified as a machinegun, 2017 #307369)
- ▮▮▮▮▮ (classified as a machinegun, 2006 #2006-1060)
- ▮▮▮▮▮ "forced reset trigger" (classified as a machinegun, 2004 #254498)
- Tac-Con 3MR (not classified as a machinegun, 2013 #301071)
- FosTech ECHO (not classified as a machinegun, 2013 #301397)
- ▮▮▮▮▮▮▮▮▮ E-RAD (classified as a machinegun, 2016 #304847)
- ▮▮▮▮ trigger device (classified as a machinegun, 1994 #46717)

ATF Form    3311.2
Revised September 2014

ATF0234

Special Agent Dean Conigliaro

765040-23-0011
2023-724-ALC
Page 4

**Exhibit 42** is a Rare Breed Triggers, model FRT-15, "forced reset trigger" designed to allow drop in installation into AR15-type firearms. The Exhibit is not marked with a serial number.

Exhibit 42 bears the following markings on the right side of its aluminum housing:

- **RARE BREED**
- **-TRIGGERS-**
- **US PAT. 10514223**

I manually function tested the device and noted that in order to pull the trigger, I had to manually disengage the locking bar. In order to further examine the component parts of the Exhibit 42 device, I disassembled the device utilizing a common pin punch and hammer in approximately one minute.

Exhibit 42 is comprised of the following individual component parts:

- One aluminum housing
- One hammer
- One hammer spring
- Two tubular pins
- One trigger
- One trigger spring
- One "locking bar"
- One solid pin
- One locking bar spring
- Two pins with internal threads at both ends
- Four hex head screws with exterior threads

The hammer of the Exhibit 42 device is designed in such a way that it only incorporates one sear surface. This is different from a standard semiautomatic AR15-type hammer, which incorporates two sear surfaces. The second sear surface in a semiautomatic AR15-type firearm is designed to interact with the disconnector. A disconnector can be described as the part in a semiautomatic firearm that prevents the continued firing of the gun while the trigger remains depressed. Simply put, the disconnector holds the gun at full cock as long as the trigger is held back.

In a M16-type machinegun, the hammer incorporates three sear surfaces. The first two are identical to the semiautomatic hammer in design and location. The addition of the third surface allows the hammer to engage the automatic sear. With an M16-type machinegun (selector in the "automatic" position) the first two sear surfaces are taken completely out of "play" once the trigger is pulled, and only the automatic sear retains the hammer. Similar to the relationship between the locking bar of the FRT-15, once the bolt has completed its firing cycle (described in detail below), the M16-type bolt strikes the automatic sear, disengaging it.

I researched U.S. Patent No.: 10,514,223 B1, seeing that it is marked on the side of the Exhibit. This patent, which was applied for by the manufacturer of the AR1 trigger device, Wolf Tactical LLC (now assigned to Rare Breed Firearms), outlines the design and function of a "firearm trigger mechanism." The patent describes a "drop-in" trigger mechanism for an AR15-type firearm, as discussed below. This patent depicts a device which is virtually identical in geometry, but functions in the same manner as the Rare Breed Firearms FRT-15.

Special Agent Dean Conigliaro

765040-23-0011
2023-724-ALC
Page 5

U.S. Patent Number 10,514,223 B1 includes illustrations which closely parallel the Exhibit 42 Rare Breed FRT-15 device in its "drop-in" concept, though having differing geometry in its component parts (see attached patent) such as the hammer, trigger, and "locking bar." The device is designed to allow "drop-in" installation into an AR15-type firearm and function in conjunction with an H3 weight buffer and M16-type machinegun bolt carrier rather than a standard semiautomatic AR15-type bolt carrier. The M16-type bolt carrier incorporates a contact surface that is unnecessary on AR15-type semiautomatic firearms because this surface is designed to "trip" the automatic sear in standard M16-type machineguns. This surface is utilized to similarly "trip" the "locking bar" in FRT-15 equipped AR15-type firearms during the operating cycle. The M16-type bolt carrier interacts with the "locking bar" in the same manner that it interacts with an automatic sear. Indeed, it is telling that in the attached patent, Wolf Tactical LLC Patent.: U.S. 10,514,223 B1, includes the following in 4, 50, and 55 (emphasis in red added):

> *The bolt carrier assembly **52** used with the embodiments of this invention can be an ordinary (mil-spec) M16-pattern bolt carrier assembly, whether operated by direct impingement or a gas piston system, that has a bottom cut position to engage an auto sear in a fully automatic configuration. The bottom cut creates an engagement surface **54** in the tail portion **56** of the bolt carrier body **58**. This is distinct from a modified AR15 bolt carrier that is further cut-away so that engagement with an auto sear is impossible.*

U.S. Patent No.: 10,514,223 B1 also includes the following explanation revealing that the "locking bar" serves the same function as an automatic sear in a typical machinegun – to capture a fire control component until the additional surface on an M16-type bolt carrier contacts it and releases the fire control component to automatically fire a subsequent shot (emphasis added in red).

> *(57) Abstract*
>
> *The locking bar is pivotally mounted in a frame and spring biased toward a first position in which it mechanically blocks the trigger member against the spring bias to a second position when contacted by the bolt carrier reaching a substantially in-battery position, allowing the trigger member to be moved by an external force to a released position.*
> ...
>
> *4 (65) – 5 (2)*
>
> *An upper end of the locking bar **62** extends above the upper edge of housing **12** and lower receiver **50** to be engaged by the engagement surface **54** of the bolt carrier body **58** when the bolt carrier assembly is at or near its in-battery position.*

This *"external force"* allowing the trigger member to be moved to a released position, is merely the continuous pressure applied to the trigger during the initial single continuous function (pull) of the trigger. With both an FRT-15 equipped AR15-type firearm, and an M16-type machinegun (with the selector set in its "automatic" position), the shooter maintains a constant rearward pull of the trigger to fire subsequent shots with a single function (pull) of the trigger, through both the M16-type machinegun and FRT-15 equipped AR15-types self-acting or self-regulating mechanisms during the operating cycle of the firearms.

Special Agent Dean Conigliaro

765040-23-0011
2023-724-ALC
Page 6

Basic operation of the Rare Breed Triggers FRT-15 device installed within an AR15-type firearm having a M16-type machinegun bolt carrier is as follows (images pulled from a video animation previously available on Rare Breed Triggers website, showing comparative views of the semiautomatic AR15-type and FRT-15 mechanisms, with added ATF text and highlights):

- Image of semiautomatic AR15-type (left) and FRT-15 equipped firearm (right) with both firearms ready to fire with the hammer in a "cocked" position being held by the sear surface on the front of the trigger (yellow box).



Enlarged view of FRT-15

Special Agent Dean Conigliaro

765040-23-0011
2023-724-ALC
Page 7

## Firing:

- Rearward pressure is applied to "pull" the trigger, thus releasing the hammer, which falls impacting the firing pin and discharging the primer, which then ignites the propellant powder to accelerate the projectile (bullet) down the rifled bore.



Enlarged view of FRT-15

Special Agent Dean Conigliaro

765040-23-0011
2023-724-ALC
Page 8

**Unlocking:**

- As the projectile moves past the gas port, a quantity of the gas is bled off through the gas port to the gas tube, and subsequent bolt carrier key into a cylindrical section in the bolt carrier where it expands and drives the bolt carrier rearward. <u>Note that this happens **rapidly** while rearward "pull" pressure from the trigger pull is generally maintained on the trigger.</u> During the initial rearward travel of the carrier assembly, the bolt is rotated by the cam pin, acted on by the bolt carrier cam slot. This rotation disengages the bolt lugs from the barrel extension lugs so the bolt is unlocked. The bolt carrier group then continues rearward with the unlocked bolt assembly which starts to act upon the hammer.



Enlarged view of FRT-15

Special Agent Dean Conigliaro

765040-23-0011
2023-724-ALC
Page 9

## Extracting:

- The fired cartridge case is extracted/withdrawn from the chamber as the bolt carrier group continues its rearward travel, also continuing to further depress the hammer.



Enlarged view of FRT-15

ATF Form    3311.2
Revised September 2014

Add. 84

ATF0240

Special Agent Dean Conigliaro

765040-23-0011
2023-724-ALC
Page 10

**Ejecting**:

- As the spent case is fully extracted/withdrawn from the chamber, the spring-loaded ejector, acting against the left side of the case head, pushes the spent case out of the ejection port. The bolt carrier group continues rearward, still depressing the hammer.



Enlarged view of FRT-15

ATF Form    3311.2
Revised September 2014

Special Agent Dean Conigliaro

765040-23-0011
2023-724-ALC
Page 11

## Cocking:

- At this point, the operation of a firearm with an FRT-15 (right and bottom images) differs from a semiautomatic AR15-type firearm (left image). <u>In a semiautomatic AR-15-type firearm</u>, the hammer is pushed down by the bolt carrier and is retained by the disconnector and held there until the shooter releases the trigger (done after *feeding* and *chambering*), the disconnector releases the hammer, and the hammer comes to rest on the trigger sear surface, ready to expel a second projectile with a subsequent pull of the trigger. *Conversely*, <u>in the FRT-15 equipped firearm</u>, as the bolt carrier group continues rearward, the hammer is pushed down by the bolt carrier group, but it also pushes down on the trigger, which forces it forward. The trigger is pushed slightly forward as an automatic consequence of the FRT-15 design without any further action required by the shooter. This causes the hammer to engage the trigger sear surface. Differing from a standard semiautomatic firearm, the unique FRT-15 trigger design also engages the "locking bar" to <u>momentarily</u> keep the trigger in place so that the shooter may not override the timing of the automatic functioning of the weapon.



Enlarged view of FRT-15

ATF Form    3311.2
Revised September 2014

ATF0242

"Timing" in relation to automatic firearms can be described as ensuring that the firing mechanism is not activated until the bolt or breech is fully locked or in battery. Timing is especially important in automatic weapons because if the firing mechanism is engaged before the bolt or breech is fully locked or in battery, two possible outcomes can occur. The first being the firing mechanism *does not* have enough force to ignite the primer, causing a malfunction known as failure to fire, which would cause the shooter to manually clear the malfunction and begin the process over again. The second being that the firing mechanism *does* provide enough force to ignite the primer and an often catastrophic malfunction, known as an "out-of-battery detonation" occurs. An "out-of-battery detonation" occurs when a round is fired without being fully seated in the chamber and the chamber not being fully sealed to contain the explosion. This causes the pressure from the round (e.g.: approximately 55,000 psi in a .223 Remington cartridge) to be released into the action of the firearm, often causing catastrophic damage to the firearm, and possibly the shooter.

It is important to note that at this moment the hammer is solely retained by the trigger sear surface. The trigger, still being pulled rearwards by the shooter is unable to disengage from the hammer because the "locking bar" prevents the trigger from dropping out of engagement with the hammer. This is done to prevent the firearm from operating in what is known as a "hammer follow" condition. "Hammer follow" is described as when the hammer is not retained by the disconnector and follows the bolt as it feeds the cartridge into the chamber. Without mechanical delay in hammer travel imparted, the hammer fall is uncontrolled and may lack sufficient force to detonate the primer of the cartridge. Hammer follow AR-type firearms that shoot automatically are classified as "**machineguns.**"

This section is intentionally left blank.

Special Agent Dean Conigliaro

765040-23-0011
2023-724-ALC
Page 13

**Feeding/Chambering:**

- As the bolt carrier moves forward into battery, using the force of the action spring, the front of the bolt removes the next round from the magazine and feeds it into the chamber. Once the bolt is fully locked, and timed properly, the contact surface on the required M16-type machinegun bolt carrier (which is designed to interact with the automatic sear on M16-type firearms), strikes the FRT-15 (right and bottom images) "locking bar," releasing the trigger, which is still being pulled to the rear by the shooter. The necessity of an M16-type machinegun bolt carrier is clear at this point—it acts on the "locking bar" in the same way it acts on the M16-type machinegun automatic sear. Specifically, when the bolt moves forward into firing position, and is fully locked, it contacts the surface area on the "locking bar" or the automatic sear and automatically fires a subsequent round while the initial single pull is maintained on the trigger. Note that the disconnector on the semiautomatic AR15-type continues to retain the hammer until the shooter manually releases the trigger.



Enlarged view FRT-15

ATF Form    3311.2
Revised September 2014

**Add. 88**                                    ATF0244

Special Agent Dean Conigliaro

765040-23-0011
2023-724-ALC
Page 14

- After firing a shot with a <u>semiautomatic</u> AR15-type firearm, the shooter is required to manually release the trigger which releases the hammer from the disconnector (left image in yellow box) and the hammer comes to rest on the trigger sear surface (right image in yellow box), and then manually pull the trigger a second time to fire a subsequent shot. The disconnector is designed to retain the hammer and "disconnect" or stop the firing cycle from automatically continuing, until the shooter has manually manipulated the trigger by releasing it.

 

- If the shooter maintains constant rearward pressure from the original single function (pull) of the trigger, the FRT-15 trigger will automatically perform the functions described above in a self-acting or self-regulating mechanism, allowing subsequent projectiles to be fired during the continuing cycle of operation. This self-acting or self-regulating mechanism in the FRT-15 device is the function of the bolt carrier assembly pushing down the hammer, which then pushes down on the trigger, forcing it forward. This is done as an automatic function utilizing the operation of the AR15-type system, with no input needed from the shooter. The "locking bar" is a key component of this self-acting or self-regulating mechanism, as once the bolt carrier assembly has "tripped" the "locking bar," the firing cycle automatically continues, and will continue until the shooter manually releases the trigger, or the ammunition is exhausted.



ATF Form    3311.2
Revised September 2014

Special Agent Dean Conigliaro                                                765040-23-0011
                                                                             2023-724-ALC
                                                                             Page 15

From the moment the trigger is pulled, and as long as rearward pressure is applied to the trigger through a single constant pull, a firearm with an FRT-15 continues to fire until the finger is removed from the trigger, the weapon malfunctions, or the ammunition is exhausted. The described firing cycle takes place regardless of the purported "forced reset" pushing the trigger forward.

To demonstrate this, I installed Exhibit 42 into a Daniel Defense model DDM4 (ATF tag number 0581217) AR15-type rifle from the ATF National Firearms Collection (NFC). Installing the Exhibit into the NFC DDM4 was accomplished in approximately five minutes using a commonly available pin punch, hammer, and a standard "flat-head" screwdriver.

I first test fired the NFC DDM4 **without** Exhibit 42 installed on April 20, 2023, at the ATF test range, Martinsburg, West Virginia, using commercially available, Federal brand, .223 Remington caliber ammunition and a magazine from the NFC. I inserted a one-round ammunition load and pulled the trigger. The NFC DDM4 successfully expelled a projectile by the action of an explosive. I then inserted a two-round ammunition load and pulled the trigger. The NFC DDM4 expelled only one round for each separate function of the trigger. Next, I inserted a five-round ammunition load and pulled the trigger; the NFC DDM4 expelled only one round for each separate function of the trigger.

I then test fired the NFC DDM4 **with** Exhibit 42 installed on April 20, 2023, at the ATF test range, Martinsburg, West Virginia, using the same commercially available, Federal brand, .223 Remington caliber ammunition and the same magazine from the NFC. I inserted a one-round ammunition load, with the selector in the "semiautomatic" position and pulled the trigger. The NFC DDM4, with Exhibit 42 installed, successfully expelled a projectile by the action of an explosive. I repeated this same test with the magazine being removed after the cartridge was chambered, and noted that the hammer, rather than remaining in a cocked position, as would normally be the case with a standard AR15-type semiautomatic firearm, after firing one round with a single function (pull) of the trigger, had been released a second time, indicating that Exhibit 42 had initiated a second firing cycle with the original single function (pull) of the trigger. I repeated this method of test-fire one additional time, obtaining the same result.

I then inserted a two-round ammunition load and pulled the trigger; the NFC DDM4, with Exhibit 42 installed, fired both rounds automatically by a single function of the trigger. I repeated this method of test fire two additional times, achieving the same result.

Next, I inserted a five-round ammunition load and pulled the trigger. The NFC DDM4, with Exhibit 42 installed, fired all five rounds automatically, without manual reloading, by a single function of the trigger. I repeated this five-round method of test fire two additional times, achieving the same result.

The FRT-15 "drop-in" device is uniquely designed to interact with the required M16-type machinegun bolt carrier during the cycle of operation in the same manner that the M16-type machinegun bolt interacts with the machinegun automatic sear. This allows the weapon to function automatically with the FRT-15 self-acting, or self-regulating mechanism, with one continuous pull of the trigger, and allows the weapon to shoot automatically, more than one shot, without manual reloading, by a single function (pull) of the trigger, until the trigger is manually released by the shooter, or the ammunition is exhausted.

Special Agent Dean Conigliaro

765040-23-0011
2023-724-ALC
Page 16

While on standard semiautomatic AR15-type firearms, the cycle of operation is interrupted between shots by a disconnector which requires that the trigger be both manually released and then manually pulled again to fire a subsequent shot, no such action is required to fire subsequent shots on the FRT-15 equipped AR15-type firearm. Indeed, the FRT-15 design requires only that the shooter maintain the initial trigger pull, while the self-acting or self-regulating FRT-15 mechanism forces the trigger forward during the rearward movement of the required M16-type machinegun bolt carrier, and then automatically releases the trigger and hammer, as the "locking bar" interacts with the "trip surface" on the M16-type machinegun bolt carrier, as the firearm goes into battery. All of these actions occur if the shooter maintains a single, constant pull of the trigger.

For informational purposes, the cyclic rate of fire of an M16-type, M4 machinegun is approximately 700 to 970 RPM as published in U.S. Army Technical Manual TM 9-1005-319-10, page 0002 00-3. To verify this, FTCB has previously tested the rate of fire of a 5.56 caliber M16-type, M4 machinegun, (tag number 0488490) from the ATF NFC utilizing a Competition Electronics brand shot timer to measure the approximate rounds per minute (RPM). This test determined that the average rate of fire of the NFC M16-type, M4 machinegun (tag number 0488490) was **870.4** RPM.

To demonstrate that the cyclic rate of fire with an FRT-15 machinegun conversion device equipped semiautomatic AR-type rifle is comparable to an M16-type machinegun, the same test was previously conducted utilizing a .223 Remington caliber NFC AR15-type semiautomatic rifle receiver (tag number 0550101) equipped with an FRT-15 machinegun conversion device and utilized the same upper assembly, buffer, and recoil spring used with the NFC M16 rate of fire test. This test determined that the average rate of fire of the NFC semiautomatic AR15-type rifle receiver (tag number 0550101) equipped with a Rare Breed Triggers FRT-15 machinegun conversion device was **840.8** RPM.

It is significant to note that following the above outlined test procedure, utilizing the same magazine and ammunition obtained from the same lot, that the measured rate of automatic fire when both triggers were held to the rear with a single constant pull was similar (870.4/840.8) in both weapons' automatic cyclic rates.

Exhibit 42 is a combination of parts designed and intended for use in converting a weapon into a machinegun, and through demonstration, successfully converted the semiautomatic NFC S-15 rifle into a machinegun; therefore, Exhibit 42, is a "machinegun" as defined.

**<u>Conclusions</u>:**

**Exhibit 42** is a "**machinegun**" as defined in <u>18 U.S.C. § 921(a)(24)</u>.

**Exhibit 42** is a combination of parts designed and intended, for use in converting a weapon into a machinegun; thus, is a "**machinegun**" as defined in <u>26 U.S.C. § 5845(b)</u>.

**Exhibit 42**, being a machinegun, is also a "**firearm**" as defined in <u>26 U.S.C. § 5845(a)(6)</u>.

**Exhibit 42** bears no NFA manufacturers marks of identification or serial number as required by <u>26 U.S.C. § 5842</u>.

ATF Form    3311.2
Revised September 2014

ATF0247

Special Agent Dean Conigliaro

765040-23-0011
2023-724-\1 (
Page 17

Examined By:

**ANTHONY CIRAVOLO**
Digitally signed by ANTHONY CIRAVOLO
Date: 2023.04.27 14:27:12 -04'00'

Anthony Ciravolo
Firearms Enforcement Officer

Approved By:

**CODY TOY**
Digitally signed by CODY TOY
Date: 2023.04.27 15:05:45 -04'00'

Cody Toy
Chief, Firearms Technology Criminal Branch

Attachment:    Thirty pages bearing photographs and U.S. Patent 10,514,223 B1.

**This Firearms Technology Criminal Branch report is provided in response to your request for assistance. Please be aware that these documents may constitute "taxpayer return information" that is subject to the strict disclosure limitations provided in 26 U.S.C. § 6103. Exceptions to the non-disclosure provisions that permit the disclosure internally within ATF are set forth in 26 U.S.C. §§ 6103(h)(2)(C) and (o)(1). Any further disclosure of these reports is strictly limited and must be reviewed and approved by the Office of Chief Counsel prior to any information dissemination. Failure to adhere to the disclosure limitations provided in 26 U.S.C. § 6103 could result in civil and/or criminal liability.**

ATF Form    3311.2
Revised September 2014

ATF0248

Case: 23-13058 Document: 15-6 Date Filed: 11/27/2023

765040-23-001 Exhibit 42

Case 4:23-cv-00890-O Document 40-5 Filed 09/08/23 Page 18 of 57 PageID 1091

765040-23-0011
2023-724-ALC
Page 1




Add. 93

ATF0249

765040-23-0011
2023-724-ALC
Page 2

## Front



## Rear



## Bottom



ATF0250

Case 4:23-cv-00830-O    Document 40-5    Filed 09/08/23    Page 20 of 57    PageID 1043

# Exhibit 42

## Hammer Cocked

## Hammer Released





ATF0251

Case: 23-11138    Document: 12-1    Page: 98    Date Filed: 11/17/2023
Case 4:23-cv-00830-O    Document 40-5    Filed 09/08/23    Page 21 of 57    PageID 1094

Exhibit 42

765040-23-0011
2023-724-ALC
Page 4



Exhibit 42 Disassembled

Add. 96



FIG. 1

FIG. 2

ATF0252

Image contained in Patent No.: U.S. 10,514,223 B1.

Case 4:23-cv-00830-O   Document 40-5   Filed 09/08/23   Page 22 of 57   PageID 1095



Hammer Spring

Locking Bar Pin

Locking Bar

Locking Bar Spring

Aluminum Housing

Trigger

Hammer

Tubular Hammer Pin

"Anti-Walk" Pin Set

Tubular Trigger Pin

Trigger Spring

Add. 97

ATF0253

765040-23-0011
2023-724-ALC
Page 6

# Exhibit 42 Installed in NFC DDM4





**Add. 98**

ATF0254

Exhibit 42 Installed in NFC DDM4 (bottom)
Compared to NFC M4 Machinegun (top)

Case: 23-1198    Document: 12    Page: 101    Date Filed: 11/17/2023

Case 4:23-cv-00630-O    Document 40-5    Filed 09/08/23    Page 24 of 57    PageID 1097

765040-23-0011
2023-724-ALC
Page 7



ATF0255

765040-23-0011
2023-724-ALC
Page 8

Case: 23-1138    Document: 13    Page: 102    Date Filed: 11/17/2023
Case 4:23-cv-00830-O    Document 40-5    Filed 09/08/23    Page 25 of 57    PageID 1098

# Exhibit 42 Installed in NFC DDM4 (bottom)
# Compared to NFC M4 Machinegun (top)



ATF0256

# Exhibit 42 Installed in NFC DDM4 (bottom)
## Compared to NFC M4 Machinegun (top)



ATF0257

Exhibit **42** Installed in NFC DDM4 (middle)
NFC Colt SP1 Semiautomatic (bottom)



Add. 102

ATF0258

# NFC M4 Machinegun (top)

Exhibit **42** Installed in NFC DDM4 (middle)

NFC Colt SP1 Semiautomatic (bottom)



Add. 103

ATF0259

765040-23-0011
2023-724-ALC
Page 12

# Exhibit **42** Installed in NFC DDM4 (middle)
## NFC Colt SP1 Semiautomatic (bottom)



Add. 104

ATF0260

Still images pulled from FRT Full Video animation on Rare Breed Triggers website. Note that image on the left within blue box depicts a standard AR-15-type semiautomatic trigger mechanism. Image on the right, within red box depicts the FRT-15 trigger mechanism. ATF highlights added.

765040-23-0011
2023-724-ALC
Page 13



AR15 Semiautomatic

Hammer

FRT-15

When the trigger is first pulled with the weapon in battery having a cartridge chambered, it causes the sear (located on the front of the trigger), to release the hammer.

ATF0261

Still images pulled from FRT Full Video animation on Rare Breed Triggers web site. Note that image on the left within blue box depicts a standard AR15-type semiautomatic trigger mechanism. Image on the right within red box depicts the FRT-15 trigger mechanism. ATF highlights added.

Case: 23-11138    Document: 12    Page: 108    Date Filed: 11/17/2023

Case 4:23-cv-00830-O    Document 40-5    Filed 09/08/23    Page 31 of 57    PageID 1104

765040-23-0011
2023-724-ALC
Page 14

**AR15 Semiautomatic**



**FRT-15**



View of both the AR15 semiautomatic firearm (left), and the FRT-15 equipped firearm (right) having the trigger pulled to the rear. The sear, now clear of the hammer, allows the hammer to fall, striking the firing pin, thus firing the chambered cartridge.

Still images pulled from FRT Full Video animation on Rare Breed Triggers web site. Note that image on the left within blue box depicts a standard AR-15-type semiautomatic trigger mechanism. Image on the right within red box depicts the FRT-15 trigger mechanism. ATF highlights added.

Case: 23-11138    Document: 12    Page: 109    Date Filed: 11/17/2023

Case 4:23-cv-00830-O    Document 40-3    Filed 09/08/23    Page 32 of 57    PageID 1105

765040-23-0011
2023-724-ALC
Page 15



AR15 Semiautomatic



FRT-15

After the chambered cartridge is fired, the pressure of the gas generated by the burning propellant drives the projectile down the barrel and past the gas port, a small quantity of the gas is bled off through the gas port, gas tube and bolt carrier key into a cylindrical section in the bolt carrier where it expands and drives the bolt carrier rearward. Note that this happens rapidly while rearward "pull" pressure from the trigger pull is maintained on the trigger. During the initial rearward travel of the carrier, the bolt is rotated by the cam pin acted on by the bolt carrier cam slot. This rotation disengages the bolt lugs from the barrel extension lugs so the bolt is unlocked. The bolt carrier group then continues rearward with the unlocked bolt assembly which starts to act upon the hammer.

ATF0263

Still images pulled from FRT Full Video animation on Rare Breed Triggers web site. Note that image on the left within blue box depicts a standard AR-15-type semiautomatic trigger mechanism. Image on the right within red box depicts the FRT-15 trigger mechanism. ATF highlights added.

Case: 23-11138 Document: 12 Page: 110 Date Filed: 11/17/2023

Case 4:23-cv-00830-O Document 40-5 Filed 09/08/23 Page 33 of 57 PageID 1106

765040-23-0011
2023-724-ALC
Page 16



AR15 Semiautomatic

FRT-15

✓FIRING
✓UNLOCKING
✓EXTRACTING

The fired cartridge case is withdrawn from the chamber as the bolt carrier group continues its rearward travel, also continuing to further depresses the hammer.

ATF0264

Still images pulled from FRT Full Video animation on Rare Breed Triggers web site. Note that image on the left within blue box depicts a standard AR15-type semiautomatic trigger mechanism. Image on the right within red box depicts the FRT-15 trigger mechanism. ATF highlights added.

Case: 23-11138   Document: 12   Page: 111   Date Filed: 11/17/2023
Case 4:23-cv-00830-O   Document 40-5   Filed 09/08/23   Page 34 of 57   PageID 1107

765040-23-0011
2023-724-ALC
Page 17



AR15 Semiautomatic

FRT-15

✓FIRING
✓UNLOCKING
✓EXTRACTING
✓EJECTING

✓FIRING
✓UNLOCKING
✓EXTRACTING
✓EJECTING

The spent case is drawn out of the chamber, the spring-loaded ejector, acting against the left side of the case head, pushes the spent case out of the ejection port. The bolt carrier group continues rearward still depressing the hammer.

ATF0265

Case 4:23-cv-00830-O   Document 4045   Filed 09/08/23   Page 35 of 57   PageID 1108

Still images pulled from FRT Full Video animation on Rare Breed Triggers web site. Note that image on the left within blue box depicts a standard AR15-type semiautomatic trigger mechanism. Image on the right within red box depicts the FRT-15 trigger mechanism. ATF highlights added.

**AR15 Semiautomatic**



**FRT-15**



As the bolt carrier group continues rearward to recoil, it compresses the action spring and cocks the hammer. In a semiautomatic AR15-type rifle, when the trigger is pulled, the firing action of the rifle is generally much faster than human reaction, so a "disconnector" is employed to retain the hammer in a cocked position for the remainder of the operating cycle, thus limiting the weapon to firing one shot, without manual reloading, by a single function (pull) of the trigger

In the FRT-15 equipped firearm, as the bolt carrier group continues rearward to recoil also compressing the action spring, hammer contact with the bolt carrier group pushes down on the trigger which forces it forward allowing the "locking bar" to <u>momentarily</u> keep the trigger in place so that the shooter may not override the timing of the automatic functioning of the weapon. Note that it is possible to retain the pressure from the single function (pull) of the trigger during this self-acting or self-regulating phase of the mechanism's operation, as it is with the semiautomatic AR15 (left), though with different results as the firearm goes into battery on a subsequent cartridge later in the operating cycle.

ATF0266

Still images pulled from FRT Full Video animation on Rare Breed Triggers web site. Note that image on the left within blue box depicts a standard AR15-type semiautomatic trigger mechanism. Image on the right within red box depicts the FRT-15 trigger mechanism. ATF highlights added.

Case 4:23-cv-00830-O   Document 40-5   Filed 09/08/23   Page 36 of 57   PageID 1109

765040-23-0011
2023-724-ALC
Page 19

AR15 Semiautomatic

FRT-15



Bolt carrier contact "trip" surface".

"Locking Bar"

✓ FIRING
✓ UNLOCKING
✓ EXTRACTING
✓ EJECTING
✓ COCKING
✓ FEEDING

✓ FIRING
✓ UNLOCKING
✓ EXTRACTING
✓ EJECTING
✓ COCKING
✓ FEEDING

With pressure still maintained from the original continuous function (pull) of the trigger the hammer remains in a cocked position, still retained by the disconnector. The action spring drives the bolt carrier group forward. As the bolt carrier group moves forward, the lugs of the bolt pick up a cartridge from the magazine and feed it into the chamber. As the bolt locking lugs enter the barrel extension, the ejector is compressed against the left side of the cartridge head, and the extractor snaps into the extractor grove on the cartridge.

With pressure still maintained from the original continuous function (pull) of the trigger, the trigger is <u>momentarily</u> kept the forward position into which it was automatically placed by the self-acting or self-regulating mechanism (until the "locking bar" is struck by the "trip" surface on the M-16 "machinegun" type bolt carrier). This surface on the M-16 type bolt carrier is designed to interact with the automatic sear to effect automatic fire in "machinegun" variants of this operating system and serves no purpose in standard semiautomatic AR15-type firearms. The remainder of the feeding cycle remains similar. The action spring drives the bolt carrier group forward. As the bolt carrier group moves forward, the lugs of the bolt pick up a cartridge from the magazine and feed it into the chamber. As the bolt locking lugs enter the barrel extension, the ejector is compressed against the left side of the cartridge head, and the extractor snaps into the extractor groove on the cartridge.

ATF0267

Still images pulled from FRT Full Video animation on Rare Breed Triggers web site. Note that image on the left within blue box depicts a standard AR15-type semiautomatic trigger mechanism. Image on the right within red box depicts the FRT-15 trigger mechanism. ATF highlights added.

765040-23-0011
2023-724-ALC
Page 20

Case: 23-11138    Document: 12    Page: 114    Date Filed: 11/17/2023

Case 4:23-cv-00830-O    Document 40-5    Filed 09/08/23    Page 37 of 57    PageID 1110



AR-15 Semiautomatic

AR-15 Semiautomatic

The Rare Breed video animation depicts the standard semiautomatic AR15-type firing mechanism as moving from having the disconnector retaining the hammer (left view) in a cocked position, to having the trigger sear retaining the hammer in a cocked position (right view) during the "feeding" cycle. The video states that the shooter may release the trigger at this point to allow the trigger to reset. It is significant to note that for this to occur during at this point of the operating cycle, the shooter would be required to physically release the trigger within a fraction of a second after firing, unlike with the FRT-15, which does this automatically through its self-acting or self-regulating mechanism. See Wolf Tactical LLC U.S. Patent No.: 10,514,223 reference on next slide.

Still images pulled from FRT Full Video animation on Rare Breed Triggers web site. Note that images depict a standard AR15-type semiautomatic trigger mechanism. ATF highlights added. (Continuation of previous slide.)

Case: 23-11138    Document: 12    Page: 115    Date Filed: 11/17/2023

765040-23-0011
2023-724-ALC
Page 21

Case 4:23-cv-00830-O   Document 40-3   Filed 09/08/23   Page 38 of 57   PageID 1111



Approximate portion of bolt carrier assembly travel distance (forward stroke between red vertical lines), within overall operating cycle, that standard AR15 semiautomatic manual trigger release/reset is depicted within Rare Breed animation video.

To further explain the previous slide, the Rare Breed video states that a standard "mil-spec." AR-15 trigger can be released by the shooter to reset the trigger at this point. To duplicate what is happening at this point of the operating cycle, the shooter would be required to physically release the trigger within a <u>fraction of a second</u> after firing, unlike with the FRT-15, which does this automatically through its self-acting or self-regulating mechanism.

This is a small fraction of time within the overall duration of the operating cycle (incorporating rearward and forward movement) which in its entirety takes only a fraction of a second in and of itself. This appears to have been done to "sync" the position of the of a standard semiautomatic trigger with that of the FRT-15 trigger at the same point of the operating cycle in the Rare Breed FRT-15 video animation.

Approximate overall bolt carrier assembly travel distance (both rearward and forward strokes between purple lines) during entire operating cycle.

This phenomena is mentioned within Wolf Tactical LLC U.S. Patent No.: 10,514,223 B1.

" *A standard semiautomatic trigger mechanism includes a disconnector, which holds the hammer or striker in a cocked position until the trigger member is reset to engage the sear. This allows the firearm to be <u>fired only a single time when the trigger is pulled and held, because the user is not typically able to release the trigger rapidly enough so that the sear engages before the bolt or bolt carrier returns to the in-battery position. The disconnector prevents the firearm from either firing multiple rounds on a single pull of the trigger, or allowing the hammer or striker to simply "follow" the bolt as it returns to battery without firing a second round, but leaving the hammer or striker uncocked.*"*</u>

Still images pulled from FRT Full Video animation on Rare Breed Triggers website. Note that images on the left within blue boxes depict a standard AR15-type semiautomatic trigger mechanism. Image on the right within red box depicts the FRT-15 trigger mechanism. ATF highlights added.

Case: 23-1138   Document: 12   Page: 116   Date Filed: 11/17/2023

Case 4:23-cv-00830-O   Document 40-3   Filed 09/08/23   Page 39 of 57   PageID 1112

765040-23-0011
2023-724-ALC
Page 22

## AR-15 Semiautomatic



ATF notes for the reasons outlined in the previous two slides that during the "feeding" portion of the AR15 semiautomatic operating cycle, the trigger is most commonly still being retained to the rear with the hammer retained by the disconnector (top view) than as depicted below.



## FRT-15



Bolt carrier contact "trip" surface" contacts "locking bar" which disengages from trigger.

✓ FIRING
✓ UNLOCKING
✓ EXTRACTING
✓ EJECTING
✓ COCKING
✓ FEEDING
✓ CHAMBERING

With pressure still maintained from the original continuous function (pull) of the trigger, the trigger, which was _momentarily_ kept in the forward position into which it was automatically forced, is now free to fire subsequent shots with continuous pressure from the original function (pull) of the trigger, due to the self-acting or self-regulating mechanism. The "locking bar" performs a timed delay function which is automatically disengaged during the operating cycle of the firearm, rather than a positive disconnect, as does the standard AR15-type disconnector pictured in images at left.

Still images pulled from FRT Full Video animation on Rare Breed Triggers web site. Note that image on the left within blue box depicts standard AR15-type semiautomatic trigger mechanism. Images on the right, within red box depicts the FRT-15 trigger mechanism. ATF highlights added.

Case: 23-11138    Document: 12    Page: 117    Date Filed: 11/17/2023

Case 4:23-cv-00830-O    Document 40-5    Filed 09/08/23    Page 40 of 57    PageID 1113

765040-23-0011
2023-724-ALC
Page 23

## AR15 Semiautomatic



✓ FIRING
✓ UNLOCKING
✓ EXTRACTING
✓ EJECTING
✓ COCKING
✓ FEEDING

## FRT-15



Bolt carrier contact "trip" surface" has contacted "locking bar" which disengages from trigger.



✓ FIRING
✓ UNLOCKING
✓ EXTRACTING
✓ EJECTING
✓ COCKING
✓ FEEDING
✓ CHAMBERING
✓ LOCKING

If pressure applied during the initial function (pull) of the trigger is continuously maintained after firing the first shot (see Wolf Tactical LLC patent excerpt on slide 21) during the operating cycle of the firearm, the standard AR15 does not fire a subsequent shot with the original single function (pull) of the trigger. The shooter is required to both manually release and pull the trigger to fire another shot. Even if the shooter does manage to physically release the trigger during the operating cycle of the firearm to reset the trigger, an additional "pull" is required to fire another shot.

If pressure applied during the initial function (pull) of the trigger is continuously maintained after firing the first shot during the operating cycle of the FRT-15 equipped firearm, the self-acting or self-regulating mechanism will automatically force the trigger forward into the shooters finger thus "resetting" the trigger (with the original function (pull) of the trigger being maintained, subsequent shots are fired each time the momentary timed delay provided by the "locking bar" is removed as it is impacted or "tripped" by a surface present on the required M16-type machinegun bolt carrier designed to preform that function om M16-type machineguns during the firearms operating cycle.

Comparison of semiautomatic AR15 bolt carrier with M16-type machinegun bolt carrier (required for use with FRT-15).

765040-23-0011
2023-724-ALC
Page 24

Case: 23-11138    Document: 12    Page: 118    Date Filed: 11/17/2023
Case 4:23-cv-00830-O    Document 40-5    Filed 09/08/23    Page 41 of 57    PageID 1114



Wolf Tactical LLC Patent Images





AR15 Semiautomatic Bolt Carrier Assembly (Top)

Note that semiautomatic AR15-type bolt carrier (top) lacks a contact surface required for use in M16-type machineguns and firearms equipped with the FRT-15.

M16-type Machinegun Bolt Carrier Assembly (Required with FRT-15)

The FRT-15 requires the use of an M16-type machinegun bolt carrier which incorporates a contact surface designed to "trip" the automatic sear in an M16-type machinegun to effect automatic fire, this same contact surface is required to "trip" the "locking bar" on the FRT-15 mechanism during the operating cycle of the firearm. Wolf Tactical LLC U.S. Patent .: 10,514,223 B1 includes the following in 4, 50 and 55:

*"The bolt carrier assembly 52 used with the embodiments of this invention can be an ordinary (mil-spec) M16-pattern bolt carrier assembly, whether operated by direct impingement or a gas piston system, that has a bottom cut position to engage an auto sear in a fully automatic configuration. The bottom cut creates an engagement surface 54 in the tail portion 56 of the bolt carrier body 58. This is distinct from a modified AR15 bolt carrier that is further cut-away so that engagement with an auto sear is impossible."*

Emphasis in red added by ATF.

Add. 116                ATF0272

# Exhibit 42 Installed in NFC DDM4 (bottom)
# Compared to NFC M4 Machinegun (top)



Both firearms require that an M16-type machinegun bolt carrier be utilized to function as designed. The M16-type machinegun carrier trips both the "locking bar" on the FRT-15 equipped firearm and the automatic sear on the M16-type machinegun to effect automatic fire.

ATF0273

Case: 23-11138   Document: 12   Page: 120   Date Filed: 11/17/2023

Case 4:23-cv-00830-O   Document 49-5   Filed 08/08/23   Page 43 of 57   PageID 1116

765040-23-0011
2023-724-ALC
Page 26



M16-TYPE MACHINEGUN

Hammer

FRT-15

When the trigger is first pulled with the weapon in battery having a cartridge chambered, it causes the sear (located on the front of the trigger), to release the hammer

ATF0274

Still images on the right of the FRT-15 pulled from FRT Full Video animation on Rare Breed Triggers
web site. Note that image on the left within green box depicts a standard M16-type machinegun trigger
mechanism. Image on the right within red box depicts the FRT-15 trigger mechanism. ATF highlights
added.

765040-23-0011
2023-724-ALC
Page 27

Case: 23-11138    Document: 12    Page: 121    Date Filed: 11/17/2023
Case 4:23-cv-00830-O   Document 49-5   Filed 08/08/23   Page 44 of 67   PageID 1177

**M16-TYPE MACHINEGUN**                                          **FRT-15**



View of both the M16-type machinegun (left), and the FRT-15 equipped firearm (right) having the trigger pulled to the rear.
The sear, now clear of the hammer, allows the hammer to fall, striking the firing pin and firing the chambered cartridge.

ATF0275

Still images on the right of the FRT-15 pulled from FRT Full Video animation on Rare Breed Triggers web site. Note that image on the left within green box depicts a standard M16-type machinegun trigger mechanism. Image on the right within red box depicts the FRT-15 trigger mechanism. ATF highlights added.

Case: 23-11138    Document: 12    Page: 122    Date Filed: 11/17/2023

765040-23-0011
2023-724-ALC
Page 28

Case 4:23-cv-00830-O   Document 48-5   Filed 08/08/23   Page 45 of 67   PageID 1118



**M16-TYPE MACHINEGUN**

**FRT-15**

✓ FIRING
✓ UNLOCKING
✓ EXTRACTING
✓ EJECTING

The spent case is drawn out of the chamber, the spring-loaded ejector, acting against the left side of the case head, pushes the spent case out of the ejection port. The M16-type bolt carrier group continues rearward still depressing the hammer.

Still images on the right of the FRT-15 pulled from FRT Full Video animation on Rare Breed Triggers web site. Note that image on the left within green box depicts a standard M16-type machinegun trigger mechanism. Image on the right within red box depicts the FRT-15 trigger mechanism. ATF highlights added.

Case: 23-11138   Document: 12   Page: 123   Date Filed: 11/17/2023

Case 4:23-cv-00830-O   Document 48-5   Filed 08/08/23   Page 40 of 67   PageID 1119

765040-23-0011
2023-724-ALC
Page 29

**M16-TYPE MACHINEGUN**

**FRT-15**





As the M16-type bolt carrier group continues to recoil rearward, it compresses the action spring and cocks the hammer. In a M16-type machinegun, with the selector is rotated to the "automatic" position, it depresses the disconnector thus preventing it from contacting the sear surface of the hammer. When the trigger is pulled, the hammer is released by the sear surface of the front of the trigger that contacts the sear notch on the hammer. When the bolt moves rearward, it pushes the hammer down allowing the automatic sear to engage the automatic sear shelf on the hammer and is the only mechanism holding the hammer in place this time and is effectively timing the hammer to fall once the bolt has moved forward into battery.

In the FRT-15 equipped firearm, as the M16-type bolt carrier group continues rearward to recoil also compressing the action spring, hammer contact with the bolt carrier group pushes down on the upper lobe of the trigger which forces it forward allowing the "locking bar" to momentarily time the trigger by keeping it in place so that the shooter may not override the timing of the automatic functioning of the weapon. Note that it is possible to retain the pressure from the single function (pull) of the trigger during this self-acting or self-regulating phase of the mechanism's operation, as it is with a semiautomatic AR-15, though with different results as the firearm goes into battery on a subsequent cartridge later in the operating cycle which is similar to the M16 machinegun (left).

ATF0277

Case: 23-11138   Document: 12   Page: 124   Date Filed: 11/17/2023

Case 4:23-cv-00830-O   Document 48-5   Filed 08/08/23   Page 47 of 67   PageID 1126

765040-23-0011
2023-724-ALC
Page 30

## M16-TYPE MACHINEGUN



## FRT-15



With pressure still maintained from the original continuous function (pull) of the trigger, the hammer remains in a cocked position, still retained by the automatic sear. The action spring drives the bolt carrier group forward. As the bolt carrier group moves forward, the lugs of the bolt pick up a cartridge from the magazine and feed it into the chamber. As the bolt locking lugs enter the barrel extension, the ejector is compressed against the left side of the cartridge head, and the extractor snaps into the extractor groove on the cartridge. At this time, the "trip" surface on the M16-type bolt carrier interacts with the automatic sear (releasing the automatic sear from the automatic sear shelf of the hammer) to effect automatic fire. The remainder of the feeding cycle remains similar.

With pressure still continuously maintained from the original continuous function (pull) of the trigger. At this time, the trigger is still being held reward but is <u>momentarily</u> kept in the forward position into which it was automatically placed by the self-acting or self-regulating mechanism until the "locking bar" is struck by the "trip" surface on the M16-type bolt carrier that was designed to interact with the automatic sear to effect automatic fire in "machinegun" variants of this operating system and serves no purpose in semiautomatic AR15-type firearms. The remainder of the feeding cycle remains similar. The action spring drives the bolt carrier group forward. As the bolt carrier group moves forward, the lugs of the bolt pick up a cartridge from the magazine and feed it into the chamber. As the bolt locking lugs enter the barrel extension, the ejector is compressed against the left side of the cartridge head, and the extractor snaps into the extractor groove on the cartridge.

ATF0270



(12) **United States Patent**　　　　　(10) **Patent No.:**　　US 10,514,223 B1
Rounds　　　　　　　　　　　　　　　(45) **Date of Patent:**　　　Dec. 24, 2019

(54) **FIREARM TRIGGER MECHANISM**

(71) Applicant: **Wolf Tactical LLC**, Buda, TX (US)

(72) Inventor: **Jeffrey Cooper Rounds**, Buda, TX (US)

(73) Assignee: **Wolf Tactical LLC**, Buda, TX (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **16/143,624**

(22) Filed: **Sep. 27, 2018**

**Related U.S. Application Data**

(60) Provisional application No. 62/565,247, filed on Sep. 29, 2017.

(51) **Int. Cl.**
| | |
|---|---|
| *F41A 19/43* | (2006.01) |
| *F41A 19/14* | (2006.01) |
| *F41A 19/10* | (2006.01) |
| *F41A 19/12* | (2006.01) |
| *F41A 17/82* | (2006.01) |

(52) **U.S. Cl.**
CPC ............... *F41A 19/43* (2013.01); *F41A 19/10* (2013.01); *F41A 19/12* (2013.01); *F41A 19/14* (2013.01); *F41A 17/82* (2013.01)

(58) **Field of Classification Search**
CPC .......... F41A 19/10; F41A 19/12; F41A 19/14; F41A 19/43; F41A 17/82
USPC .............. 89/136, 139; 42/69.01, 69.02, 69.03
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

5,704,153 A * 1/1998 Kaminski ............ F41A 17/063
42/117

| | | | |
|---|---|---|---|
| 6,101,918 | A | 8/2000 | Akins |
| 6,722,072 | B1 | 4/2004 | McCormick |
| 7,162,824 | B1 | 1/2007 | McCormick |
| 7,213,359 | B2 | 5/2007 | Beretta |
| 7,293,385 | B2 | 11/2007 | McCormick |
| 7,398,723 | B1 | 7/2008 | Blakley |

(Continued)

FOREIGN PATENT DOCUMENTS

TW　　　　409847 U　　10/2000

*Primary Examiner* — Bret Hayes
(74) *Attorney, Agent, or Firm* — Wood Herron & Evans LLP

(57)　　　　　　**ABSTRACT**

A trigger mechanism for use in a firearm having a receiver with a fire control mechanism pocket, transversely aligned pairs of hammer and trigger pin openings in the pocket, and a bolt carrier that reciprocates and pivotally displaces a hammer when cycled. The trigger mechanism includes a hammer, a trigger member, and a locking bar. The hammer has a sear notch and is mounted in the fire control mechanism pocket to pivot on a transverse hammer pin between set and released positions. The trigger member has a sear and is mounted in the fire control mechanism pocket to pivot on a transverse trigger pin between set and released positions. The trigger member has a surface positioned to be contacted by hammer when the hammer is displaced by cycling of the bolt carrier, the contact causing the trigger member to be forced to the set position. The locking bar is pivotally mounted in a frame and spring biased toward a first position in which it mechanically blocks the trigger member from moving to the release position, and is movable against the spring bias to a second position when contacted by the bolt carrier reaching a substantially in-battery position, allowing the trigger member to be moved by an external force to the released position.

**7 Claims, 4 Drawing Sheets**



## US 10,514,223 B1

Page 2

(56)         **References Cited**

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 8,127,658  B1 | 3/2012 | Cottle |
| 8,820,211  B1 | 9/2014 | Hawbaker |
| 9,021,732  B2 | 5/2015 | Johnson |
| 9,513,076  B2 * | 12/2016 | Kolev ...................... F41A 3/12 |
| 9,568,264  B2 | 2/2017 | Graves |
| 9,816,772  B2 | 11/2017 | Graves |
| 9,939,221  B2 | 4/2018 | Graves |
| 2007/0199435  A1 * | 8/2007 | Hochstrate ................ F41A 3/66 |
| | | 89/191.02 |
| 2016/0010933  A1 | 1/2016 | Bonner |
| 2016/0102933  A1 | 4/2016 | Graves |
| 2017/0219307  A1 * | 8/2017 | Foster .................... F41A 19/06 |
| 2018/0066911  A1 | 3/2018 | Graves |
| 2018/0087860  A1 * | 3/2018 | Sullivan ................. F41A 17/46 |

* cited by examiner

ATF0280

U.S. Patent          Dec. 24, 2019      Sheet 1 of 4          US 10,514,223 B1



**FIG. 1**



**FIG. 2**

ATF0281



**FIG. 3**



**FIG. 4**

ATF0283



FIG. 5

US 10,514,223 B1

**1**

## FIREARM TRIGGER MECHANISM

### RELATED APPLICATIONS

This application claims priority to U.S. Provisional Patent Application No. 62/565,247 filed Sep. 29, 2017, and incorporates the same herein by reference.

### TECHNICAL FIELD

This invention relates to a firearm trigger mechanism. More particularly, it relates to a semiautomatic trigger that is mechanically reset by movement of the hammer when it is reset by the bolt carrier.

### BACKGROUND

In a standard semiautomatic firearm, actuation of the trigger releases a sear, allowing a hammer or striker to fire a chambered ammunition cartridge. Part of the ammunitions propellant force is used to cycle the action, extracting and ejecting a spent cartridge and replacing it with a loaded cartridge. The cycle includes longitudinal reciprocation of a bolt and/or carrier, which also resets the hammer or striker.

A standard semiautomatic trigger mechanism includes a disconnector, which holds the hammer or striker in a cocked position until the trigger member is reset to engage the sear. This allows the firearm to be fired only a single time when the trigger is pulled and held, because the user is not typically able to release the trigger rapidly enough so that the sear engages before the bolt or bolt carrier returns to its in-battery position. The disconnector prevents the firearm from either firing multiple rounds on a single pull of the trigger, or from allowing the hammer or striker to simply "follow" the bolt as it returns to battery without firing a second round, but leaving the hammer or striker uncocked.

For various reasons, shooters desire to increase the rate of semiautomatic fire. Sometimes this is simply for entertainment and the feeling of shooting a machine gun. In the past, users have been known to employ "bump firing" to achieve rapid semiautomatic fire. Bump firing uses the recoil of the semiautomatic firearm to fire shots in rapid succession. The process involves bracing the rifle with the non-trigger hand, loosening the grip of the trigger hand (but leaving the trigger finger in its normal position in front of the trigger), and pushing the rifle forward in order to apply pressure on the trigger from the finger while keeping the trigger finger stationary. When fired with the trigger finger held stationary, the firearm will recoil to the rear and allow the trigger to reset as it normally does. When the non-trigger hand pulls the firearm away from the body and back forward toward the original position, it causes the trigger to be pressed against the stationary finger again, firing another round as the trigger is pushed back.

Other devices have been offered that facilitate the bump fire process. One is shown in U.S. Pat. No. 6,101,918, issued Aug. 15, 2000, to William Akins for a Method and Apparatus for Accelerating the Cyclic Firing Rate of a Semiautomatic Firearm. This device, sold for some time as the Akins Accelerator™, allowed the receiver and action of the firearm to move longitudinally relative to the butt stock and used a spring to assist forward return movement. Other devices, such as that shown in U.S. Pat. No. 8,127,658, issued Mar. 6, 2012, and other patents owned by Slide Fire Solutions provide a replacement stock and handgrip assembly that facilitates bump firing, but without spring assistance.

**2**

Other solutions to increase the rate of semiautomatic fire include pull/release trigger mechanisms. These devices cause one round to be fired when the trigger is pulled and a second round to be fired when the trigger is released. Such a device is shown in U.S. Pat. No. 8,820,211, issued Sep. 2, 2014, entitled Selectable Dual Mode Trigger for Semiautomatic Firearms. A device like this is offered by FosTecH Outdoors, LLC as the ECHO TRIGGER™. Another device, offered by Digital Trigger Technologies, LLC under the name DigiTrigger™, provides a dual mode trigger in which the pull/release operating function is achieved electronically.

The above-described devices either require practice to use reliably, are complex, and/or are expensive to manufacture and install.

Another device for increasing the rate of semiautomatic fire is shown in U.S. Pat. Nos. 9,568,264; 9,816,772; and U.S. Pat. No. 9,939,221, issued to Thomas Allen Graves. The devices shown in these patents forcefully reset the trigger with rigid mechanical contact between the trigger member and the bolt as the action cycles. This invention, however, does not provide a "drop-in" solution for existing popular firearm platforms, like the AR15, AK47 variants, or the Ruger 10/22™. To adapt this invention to an AR-pattern firearm, for example, would require not only a modified fire control mechanism, but also a modified bolt carrier.

### SUMMARY OF INVENTION

The present invention provides a semiautomatic trigger mechanism for increasing rate of fire that can be retrofitted into popular existing firearm platforms. In particular, this invention provides a trigger mechanism that can be used in AR-pattern firearms with an otherwise standard M16-pattern bolt carrier assembly. The present invention is particularly adaptable for construction as a "drop-in" replacement trigger module that only requires insertion of two assembly pins and the safety selector. In the disclosed embodiments, the normal resetting of the hammer, as the bolt or bolt carrier is cycled, causes the trigger to be forcibly reset by contact between the hammer and a surface of the trigger member. Once reset, movement of the trigger is blocked by a locking bar and cannot be pulled until the bolt has returned to battery, thus preventing "hammer follow" behind the bolt or bolt carrier.

Other aspects, features, benefits, and advantages of the present invention will become apparent to a person of skill in the art from the detailed description of various embodiments with reference to the accompanying drawing figures, all of which comprise part of the disclosure.

### BRIEF DESCRIPTION OF THE DRAWINGS

Like reference numerals are used to indicate like parts throughout the various drawing figures; wherein:

FIG. **1** is an isometric view of a drop-in trigger module for an AR-pattern firearm according to one embodiment of the invention;

FIG. **2** is a partially cut-away view thereof;

FIG. **3** is a longitudinal section view showing the module of the embodiment installed in a typical AR15-pattern lower receiver in a cocked and ready to fire status with the bolt and bolt carrier in an in-battery position;

FIG. **4** is a similar view in which the trigger has been pulled and the hammer has fallen against a firing pin; and

FIG. **5** is a similar view showing the bolt carrier in a retracted position, forcing the hammer and trigger into a reset status.

US 10,514,223 B1

3

DETAILED DESCRIPTION

With reference to the drawing figures, this section describes particular embodiments and their detailed construction and operation. Throughout the specification, reference to "one embodiment," "an embodiment," or "some embodiments" means that a particular described feature, structure, or characteristic may be included in at least one embodiment. Thus, appearances of the phrases "in one embodiment," "in an embodiment," or "in some embodiments" in various places throughout this specification are not necessarily all referring to the same embodiment. Furthermore, the described features, structures, and characteristics may be combined in any suitable manner in one or more embodiments. In view of the disclosure herein, those skilled in the art will recognize that the various embodiments can be practiced with other methods, components, materials, or the like. In some instances, well-known structures, materials, or operations are not shown or not described in detail to avoid obscuring aspects of the embodiments.

Referring first to FIGS. **1** and **2**, therein is shown at **10** a "drop-in" trigger module adapted for use in an AR-pattern firearm according to a first embodiment of the present invention. As used herein, "AR-pattern" firearm includes the semiautomatic versions of the AR10 and AR15 firearms and variants thereof of any caliber, including pistol caliber carbines or pistols using a blow-back bolt. While select fire (fully automatic capable) versions of this platform, such as the M16 and M4, are also AR-pattern firearms, this invention only relates to semiautomatic firearm actions. The concepts of this invention may be adaptable to other popular semiautomatics firearm platforms, such as the Ruger 10/22™ or AK-pattern variants.

The module **10** includes a frame or housing **12** that may be sized and shaped to fit within the internal fire control mechanism pocket of an AR-pattern lower receiver. It includes first and second pairs of aligned openings **14**, **16** that are located to receive transverse pins (**40**, **36**, respectively, shown in FIGS. **3-5**) used in a standard AR-pattern trigger mechanism as pivot axes for the hammer and trigger member, respectively. The housing **12** includes left and right sidewalls **20**, **22**, which extend substantially vertically and parallel to one another in a laterally spaced-apart relationship. The sidewalls **20**, **22** may be interconnected at the bottom of the housing **12** at the front by a crossmember **24**.

A hammer **18** of ordinary (MIL-SPEC) AR-pattern shape and construction may be used. The illustrated hammer **18** may be standard in all respects and biased by a typical AR-pattern hammer spring (not shown).

A modified trigger member **26** may be sized to fit between the sidewalls **20**, **22** of the housing **12** and may include a trigger blade portion **28** that extends downwardly. The trigger blade portion **28** is the part of the trigger member **26** contacted by a user's finger to actuate the trigger mechanism. The trigger blade portion **28** may be curved (shown) or straight, as desired. The trigger member **26** may pivot on a transverse pin **36** (not shown in FIGS. **1** and **2**) that extends through aligned openings **16** in the sidewalls **20**, **22** of the housing **12**. The same pin **36** is aligned and positioned within aligned openings **47** of a lower receiver **50** to assemble the module **10** into a fire control mechanism pocket **49** of the lower receiver **50**, as shown in FIGS. **3-5**, for example. The modified trigger member **26** may have integral first and second contact surfaces **30**, **32**. Some part of the trigger member **26** includes contact surfaces for interaction with the hammer **18** and locking bar **62**. For

4

example, the trigger member **26** can include first and second upwardly extended rear contact surfaces **30**, **32**. The first contact surface **30** is positioned to interact, for example, with a tail portion **44** of the hammer **18** that extends rearwardly from a head part **42** of the hammer **18**. The second contact surface **32** is positioned to interact with a locking bar **62**. The contact surfaces may be integral to a specially formed trigger body or may be a separate insert (shown) that is made to closely fit and mate with a standard AR-pattern trigger member, held in place by the trigger pin **36**, with no lost motion between the parts.

The hammer **18** may include bosses **34** coaxial with a transverse pivot pin opening **38** that receives an assembly/pivot pin **40** (not shown in FIGS. **1** and **2**) through the first set of aligned openings **14** in the housing **12** (and through openings **51** in the firearm receiver, to position the trigger module **10** within the fire control mechanism pocket **49** of the lower receiver **50**, as shown in FIGS. **3-5**). The bosses **34** may fit between the sidewalls **20**, **22** of the housing **12** to laterally position the hammer **18**, or can be received in the openings **14** (if enlarged) so that the hammer **18** stays assembled with the module **10** when the hammer's pivot pin is removed and/or when the module **10** is not installed in a firearm receiver. The hammer **18** includes a head portion **42** and a tail portion **44**. The hammer **18** also includes a sear catch **46** that engages the sear **48** on the trigger member **26**, when cocked. The trigger and hammer pins **36**, **40** provide pivot axes at locations (openings **47**, **51**, shown in FIGS. **3-5**, for example) standard for an AR-pattern fire control mechanism. Although FIGS. **3-5** are a longitudinal section view and only show one of the aligned openings **47**, **51**, it is understood that a typical AR15-pattern lower receiver **50** includes second, corresponding and aligned openings **47**, **51** in the half of the receiver **50** not shown).

Referring now also to FIG. **3**, the trigger module **10** is shown installed in the fire control mechanism pocket **49** of an AR-pattern lower receiver **50**. Other lower receiver parts not important to the present invention are well-known in the art and are omitted from all figures for clarity. As is well-known in the art, the bolt carrier assembly **52** (or blow-back bolt) would be carried by an upper receiver (not shown) and engage the breach of a barrel or barrel extension. As used herein, "bolt carrier" and "bolt carrier assembly" may be used interchangeably and include a blow-back type bolt used in pistol caliber carbine configurations of the AR-platform. The hammer **18** is shown in a cocked position and a bolt carrier assembly **52** is shown in an in-battery position. The sear **48** engages the sear catch **46** of the hammer **18**.

The bolt carrier assembly **52** used with the embodiments of this invention can be an ordinary (mil-spec) M16-pattern bolt carrier assembly, whether operated by direct impingement or a gas piston system, that has a bottom cut position to engage an auto sear in a fully automatic configuration. The bottom cut creates an engagement surface **54** in a tail portion **56** of the bolt carrier body **58**. This is distinct from a modified AR15 bolt carrier that is further cut-away so that engagement with an auto sear is impossible. The semiautomatic AR-pattern safety selector switch **60** may also be standard (MIL-SPEC) in all respects.

The trigger module of the present invention includes a trigger locking bar **62** carried on a frame **66** for pivotal movement on a transverse pivot pin **68**. The frame **66** may be part of the module housing **12**, if configured as a "drop-in" unit. An upper end of the locking bar **62** extends above the upper edge of the housing **12** and lower receiver **50** to be engaged by the engagement surface **54** of the bolt

US 10,514,223 B1

5

carrier body **58** when the bolt carrier assembly **52** is at or near its in-battery position (as shown in FIG. **3**). Contact between the engagement surface **54** and upper end of the locking bar **62** causes the locking bar **62** to pivot into a first position (FIG. **3**) against a biasing spring **70** and allows pivotal movement of the trigger member **26**. If desired, the locking bar **62** may include a rearward extension **64** that serves as a means to limit the extent to which it can pivot toward the blocking position.

Referring now also to FIG. **4**, when the safety selector **60** is in the "fire" position (as shown in all figures), finger pressure pulling rearward against the trigger blade portion **28** causes the trigger member **26** to rotate on the pivot pin **36**, as indicated by arrows. This rotation causes the sear **48** to disengage from the sear catch **46** of the hammer **18**. This release allows the hammer **18** to rotate by spring force (hammer spring omitted for clarity) into contact with the firing pin **72**. Any contact between the rear portion of the trigger member **26** and front surface of the locking bar **62** will simply cause the locking bar **62** to rotate out of the way, as illustrated in FIG. **4**.

Referring now to FIG. **5**, discharging an ammunition cartridge (not shown) causes the action to cycle by moving the bolt carrier assembly **52** rearwardly, as illustrated. The same effect occurs when the action is cycled manually. As in an ordinary AR15-pattern configuration, a lower surface **74** of the bolt carrier body **58** pushes rearwardly against the head portion **42** of the hammer **18**, forcing it to pivot on the hammer pivot/assembly pin **40** against its spring (not shown) toward a reset position. As the rearward movement of the bolt carrier body **58** and pivotal movement of the hammer **18** continues, mechanical interference or contact between a rear surface **74** of the hammer **18** (such as on the tail portion **44**) and a contact surface **30** of the trigger member **26** forces the trigger to pivot (arrows in FIG. **5**) toward and to its reset position. At the same time, as the trigger member **26** is reset, the biasing spring **70** moves the lower end of the locking bar **62** into a second position (FIG. **5**) in which it blocks pivotal movement of the trigger **26**, including by finger pressure applied (or reapplied) to the trigger blade **28**. Thus, as the bolt carrier assembly **52** returns forward, the trigger member **26** is held in its reset position by the locking bar **62** where the hammer sear catch **46** will engage with the sear **48** carried on the trigger member **26** to reset the fire control mechanism. The trigger member **26** cannot be pulled to release the sear/hammer engagement, thus precluding early hammer release or "hammer follow" against the bolt carrier assembly **52** and firing pin **72** as the bolt carrier assembly **52** is returning to battery. A trigger return spring (not shown) of the type used in a standard AR-pattern trigger mechanism may be unnecessary in this case, because the trigger member **26** is forced to return by the hammer **18**, but may be used, if desired.

When the bolt carrier assembly **52** has reached (or nearly reached) its closed, in-battery position (shown in FIG. **3**), the engagement surface **54** of the bolt carrier tail portion **56** contacts and forwardly displaces the upper end of the locking bar **62**, disengaging the second contact surface **32** of the trigger member **26**, allowing the trigger **26** to be pulled a second time. The distance of travel during which there is no interference between the locking bar **62** and second contact surface **32** of the trigger member **26**, allowing the trigger member **26** to be manually displaced, may be about from about 0.10 to 0.31 inch. This prevents early release of the hammer **18** and contact of the hammer against the firing pin **72** before the bolt is completely locked and in-battery.

6

Force applied by the user's trigger finger against the trigger blade portion **28** is incapable of overcoming the mechanical interference and force of the hammer **18** against the contact surface **30** of the trigger member **26**. However, the trigger can immediately be pulled again—only by application of an external force—as soon as the locking bar **62** has been rotated against the spring **70** and out of blocking engagement with the trigger member **26**, as the bolt carrier assembly **52** approaches or reaches its in-battery position. This allows the highest possible standard rate of fire, without risk of hammer-follow, for the semiautomatic action of the firearm.

While various embodiments of the present invention have been described in detail, it should be apparent that modifications and variations thereto are possible, all of which fall within the true spirit and scope of the invention. Therefore, the foregoing is intended only to be illustrative of the principles of the invention. Further, since numerous modifications and changes will readily occur to those skilled in the art, it is not intended to limit the invention to the exact construction and operation shown and described. Accordingly, all suitable modifications and equivalents may be included and considered to fall within the scope of the invention, defined by the following claim or claims.

What is claimed is:

**1**. For a firearm having a receiver with a fire control mechanism pocket, transversely aligned pairs of hammer and trigger pin openings in side walls of the pocket, and a bolt carrier that reciprocates and pivotally displaces a hammer when cycled, a trigger mechanism, comprising:

a hammer having a sear notch and mounted in the fire control mechanism pocket to pivot on a transverse hammer pin between set and released positions;

a trigger member having a sear and mounted in the fire control mechanism pocket to pivot on a transverse trigger pin between set and released positions, the trigger member having a surface positioned to be contacted by the hammer when the hammer is displaced by cycling of the bolt carrier, the contact causing the trigger member to be forced to the set position;

a locking bar pivotally mounted in a frame and spring biased toward a first position in which the locking bar mechanically blocks the trigger member from moving to the released position, and movable against the spring bias to a second position when contacted by the bolt carrier reaching a substantially in-battery position, allowing the trigger member to be moved by an external force to the released position.

**2**. The trigger mechanism of claim **1**, wherein the trigger member has a second surface positioned to be contacted by the locking bar when the locking bar is in the first position.

**3**. The trigger mechanism of claim **1**, wherein the locking bar includes means for limiting the extent to which the locking bar can pivot by the spring bias toward the first position.

**4**. For a firearm having a receiver with a fire control mechanism pocket, assembly pin openings in side walls of the pocket, and a bolt carrier that reciprocates and pivotally displaces a hammer when cycled, a trigger mechanism, comprising:

a housing having transversely aligned pairs of openings for receiving hammer and trigger assembly pins;

a hammer having a sear notch and mounted in the housing to pivot on a transverse axis between set and released positions;

a trigger member having a sear and mounted in the housing to pivot on a transverse axis between set and

US 10,514,223 B1

7

released positions, the trigger member having a surface positioned to be contacted by the hammer when the hammer is displaced by the bolt carrier when cycled, the contact causing the trigger member to be forced to the set position;

a locking bar pivotally mounted in the housing and spring biased toward a first position in which the locking bar mechanically blocks the trigger member from moving to the released position, and movable against the spring bias to a second position when contacted by the bolt carrier reaching a substantially in-battery position in which the trigger member can be moved by an external force to the released position.

**5**. The trigger mechanism of claim **4**, wherein the trigger member has a second surface positioned to be contacted by the locking bar when the locking bar is in the first position.

**6**. The trigger mechanism of claim **4**, wherein the housing's transversely aligned pairs of openings for receiving hammer and trigger assembly pins are aligned with the assembly pin openings in the fire control mechanism pocket of the receiver.

**7**. The trigger mechanism of claim **4**, wherein the locking bar includes means for limiting the extent to which the locking bar can pivot by the spring bias toward the first position.

\* \* \* \* \*

8

ATF0288

```
 1              IN THE UNITED STATES DISTRICT COURT

 2            FOR THE NORTHERN DISTRICT OF TEXAS

 3                    FORT WORTH DIVISION

 4

 5   NATIONAL ASSOCIATION FOR  )
     GUN RIGHTS, INC., et al., )
 6                             )
          Plaintiffs,          ) CASE NO. 4:23-CV-00830-O
 7                             )
     VS.                       ) FORT WORTH, TEXAS
 8                             )
     MERRICK GARLAND, et al.,  )
 9                             )
          Defendants.          ) OCTOBER 2, 2023
10

11                      VOLUME 1 OF 1
                 TRANSCRIPT OF EVIDENTIARY HEARING
12              BEFORE THE HONORABLE REED C. O'CONNOR
                 UNITED STATES DISTRICT COURT JUDGE
13

14   A P P E A R A N C E S:

15

16   FOR THE PLAINTIFFS: MR. MICHAEL COLUMBO
                         DHILLON LAW GROUP
17                       177 Post Street, Suite 700
                         San Francisco, CA  94108
18                       Telephone:  415.944.4996

19                       MR. DAVID WARRINGTON
                         MR. GARY LAWKOWSKI
20                       DHILLON LAW GROUP
                         2121 EISENHOWER AVENUE, SUITE 608
21                       Alexandria, VA  22314
                         Telephone:  703.574.1206

22                       MR. BENJAMIN H.B. SLEY
                         EGGLESTON KING DAVIS, LLP
23                       102 Houston Avenue, Suite 300
                         Weatherford, TX  76086
24                       Telephone:  408.636.3438

25
```

```
1

2    A P P E A R A N C E S:

3

4    FOR THE DEFENDANTS: MR. MICHAEL CLENDENEN
                         MR. ALEXANDER RESAR
5                        MS. LAURA BAKST
                         U.S. DEPARTMENT OF JUSTICE
6                        CIVIL DIVISION, FEDERAL PROGRAMS BRANCH
                         1100 L Street NW, Room 12028
7                        Washington, D.C.  20005
                         Telephone:  202.305.0693
8

9

10                    E X H I B I T S

11   PLAINTIFFS' EXHIBITS -

12   A - Video....................................29

13   B - Video....................................31

14   C - Video....................................29

15   DEFENDANTS' EXHIBITS -

16   1 - CV of Anthony Ciravolo.....................52

17   2 - Transcript................................58

18   3 - Cutaway Guns..............................77

19

20

21

22

23

24

25
```

1

2  COURT REPORTER:        ZOIE M. WILLIAMS, RMR, RDR, FCRR
                          United States Federal Court Reporter
3                         501 W. 10th Street
                          Fort Worth, Texas  76102
4                         zwilliams.rmr@gmail.com
                          817.850.6630
5

6

7

8      The above styled and numbered cause was reported by

9  computerized stenography and produced by computer.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    or the host firearm.

2        Q.   Does it require any special skill or experience to

3    install an FRT-15 in a host firearm?

4        A.   No, it doesn't require any special skill.  The

5    only thing you need to be able to do is remove the fire

6    control group which is held in by two pins.

7            I can install one in probably less than three

8    minutes.  I think probably the average person who's never

9    done it before could probably do it in 15 to 20 minutes

10   while following a YouTube video or something.

11       Q.   Turning now to your report.  I have a copy here

12   that's already on the record as CM/ECF 40-5.  I would just

13   like to give you a copy so we can look at some of the things

14   as we go along.  Here's a copy as well.

15           Is the document I have just passed you your

16   classification report?

17       A.   Yes, it is.

18       Q.   And did you reach any conclusions in this report?

19       A.   I did.

20       Q.   What were those conclusions?

21       A.   That the FRT-15 is a machinegun.

22       Q.   And could you explain briefly how you came to that

23   conclusion?

24       A.   Yes, because once the firing sequence is

25   initiated, the weapon will continue to fire automatically

1    based on the internal mechanism of the weapon.

2        Q.    And do you know whether ATF had conducted

3    classification analyses and produced classification reports

4    on similar trigger devices in the past?

5        A.    Yes, they have.

6        Q.    And what do you -- I guess, I said it -- but what

7    do you understand to be similar trigger devices?

8        A.    I would say that similar trigger devices are ones

9    in which they use the mechanical action of the firearm to

10   press the trigger forward against the user, it's rearward

11   pressure.  And they also incorporate some type of timing

12   mechanism to inevitably release the hammer when it's safe

13   for the weapon to fire again.

14       Q.    And did ATF conclude that those similar trigger

15   devices that force the trigger chute forward and contain a

16   timing mechanism to release the hammer were also

17   machineguns?

18       A.    Yes.

19       Q.    When was the first classification of that type of

20   device as a machinegun, that you are aware of?

21       A.    The first one that I know of is from 1975.

22       Q.    Is a binary trigger similar to the forced reset

23   triggers we were just discussing?

24       A.    No, it's not.

25       Q.    Could you explain why that's not the case?

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS

NATIONAL ASSOCIATION FOR
GUN RIGHTS, INC., *et al.,*

Plaintiff,

- v. -

MERRICK GARLAND, *et al.,*

Defendants.

4:23-cv-00830-O

## DECLARATION OF SPECIAL AGENT CRAIG SAIER

I, Craig Saier, have personal knowledge of the following facts set forth below, and if called

as a witness I would testify as follows:

1.      I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and

Explosives (ATF).  I am currently the Assistant Director for the Office of Intelligence Operations

(OIO)[1] within the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), United States

Department of Justice (DOJ), which is responsible for the national collection, analysis, and

dissemination of crime gun intelligence; managing ATF's portfolio of international liaison and

support activities; and managing ATF's Internet Investigations Center.

2.      Prior to being promoted to the role of Assistant Director, I was the Special Agent

in Charge of ATF's Tampa Field Division (TFD).  The TFD covers 58 of the 67 counties in the

State of Florida, and is comprised of 14 combined criminal enforcement and regulatory offices

staffed by approximately 200 personnel.  In my role as the Special Agent in Charge, I was

responsible for oversight of all criminal and regulatory enforcement activities within the TFD,

including the early stages of ATF's investigation of Rare Breed Triggers (RBT) and associated

---

[1] My directorate was previously named the Office of Strategic Information and Intelligence (OSII).

individuals and entities regarding their manufacture and distribution of the FRT-15, and ATF's investigation into the importation and distribution of the Wide Open Trigger (WOT) by Big Daddy Unlimited (BDU) and associated individuals and entities.

3.    The facts set forth in this declaration are based on my personal knowledge; knowledge obtained as a result of my supervisory roles in OIO and TFD; information from other individuals, including ATF Special Agents and intelligence personnel involved in the investigation into the distribution and possession of the FRT-15, WOT, and similar devices; ATF records; and other sources. The information contained in this declaration is a summary and does not incorporate all facts known to me regarding these subjects.

## MACHINEGUNS AND MACHINEGUN CONVERSION DEVICES

4.    In 1934, Congress enacted the National Firearms Act (NFA), 26 U.S.C. § 5801 et. seq., The NFA, regulates "dangerous weapons," H.R. Rep. No. 73-1780, at 1 (1934), that can "be used readily and efficiently by criminals," H.R. Rep. No. 83-1337, at A395 (1954); *see United States v. Thompson/Ctr. Arms Co.*, 504 U.S. 505, 516-17 (1992) (plurality opinion). The NFA was a direct response to Prohibition-era gang violence. The NFA defines firearms narrowly to include machineguns, silencers, short barrel rifles and shotguns, and destructive devices, among others. The NFA imposed registration, approval and background check requirements on the transfer and possession of all NFA firearms. The NFA also imposed making and transfer taxes on these weapons, and required anyone engaging in the business of manufacturing, dealing, or importing NFA firearms to be licensed, maintain records, and pay a Special Occupation Tax.

5.    In 1986, Congress passed the Firearm Owners Protection Act (FOPA), which amended the Gun Control Act of 1968 (GCA) to include 18 U.S.C. § 922(o). Section 922(o) prohibits any person from transferring or possessing a machinegun unless the machinegun was

2

**Add. 139**

lawfully possessed before May 19, 1986, or the transfer or possession of the machinegun is "a transfer to or by, or possession by or under the authority of, the United States or any department or agency thereof of a State, or a department, agency, or political subdivision thereof." 18 U.S.C. § 922(o).

6.      Federal law defines the term "machinegun" as "any weapon which shoots . . . automatically more than one shot, without manual reloading, by a single function of the trigger" and includes a "combination of parts designed and intended for use in converting a weapon into a machinegun." 18 U.S.C. § 921(a)(24); 26 U.S.C. § 5845(b). Accordingly, a combination of parts that convert a semiautomatic weapon to function automatically are properly classified as a "machinegun" under federal law.

7.      A combination of parts that convert a semiautomatic weapon to function automatically is generally referred to as a machinegun conversion device ("MCD").

### THE FRT-15 AND WOT

8.      On September 5, 2023, in *United States v. Rare Breed Triggers, LLC, et al.*, 23-cv-369 (EDNY), the Eastern District of New York granted the United States' Motion for Preliminary Injunction against RBT, finding the Government was likely to prevail on the merits and that the record established that since December 2020, RBT fraudulently induced their customers to buy an illegal product. The court restrained RBT, Rare Breed Firearms, Lawrence DeMonico, Kevin Maxwell, and their agents, officers and employees, and all other persons or entities in active concert or participation with them, from engaging in any sales of the FRT-15, WOT, forced reset triggers or other MCDs.

9.      On October 7, 2023, the Northern District of Texas, in *National Association of Gun Rights, Inc., et al., v. Merrick Garland, et al.,* 4:23-vc-00830 (NDTX) granted a preliminary

injunction to three individual plaintiffs, two organizational plaintiffs, their members, and any "downstream customer" of a commercial member of the organizational plaintiffs, enjoining ATF from taking any enforcement action, criminal or civil, regarding FRT-15s and WOTs. Because of the injunction issued in EDNY, the NDTX injunction does not extend to the "Rare Breed Parties".[2]

10.    Both the FRT-15 and the WOT have been consistently classified as machineguns by ATF as they are MCDs. The FRT-15 and WOT are drop-in trigger systems designed for AR-type weapons. The WOT is a copy of the FRT-15. These triggers are easily installed into an AR-15 and require no special skills or tools.

11.    Individuals are generally prohibited from possessing or distributing MCDs, except under very limited circumstances. *See e.g.,* 18 U.S.C. § 922(o). Firearms equipped with MCDs are a particularly potent public safety threat as they allow for the rapid fire of several hundred rounds of ammunition per minute, often in an indiscriminate and uncontrolled fashion. As MCDs "make guns deadlier, they also make them far less accurate and harder to control for even the most experienced marksmen."[3]

## HISTORICAL PRACTICE OF CLASSIFYING FORCED RESET TRIGGERS AS MACHINEGUNS

12.    ATF has consistently classified devices functionally similar to the FRT-15 and WOT as "machineguns" going back to the 1970s. As ATF Firearms Enforcement Officer Anthony Ciravolo explained at the preliminary injunction hearing, ATF first classified as a machinegun a trigger device operating on these principles in 1975. Hearing Trans. 54:19-21. ATF subsequently

---

[2] *National Association of Gun Rights, Inc., et al., v. Merrick Garland, et al.,* 4:23-vc-00830, Opinion and Order, October 7, 2023, p. 43 (carving out Rare Breed Triggers, LLC, Rare Breed Firearms, LLC, or any of their agents, officers, and employees).

[3] Stephen Montemayor, *Modern-Day Machineguns*, Star Tribune, October 18, 2023, www.startribune.com/guns-switches-turning-more-firearms-into-automatic/600312536.

**Add. 141**

classified as machineguns devices materially similar to the FRT-15 and WOT in 1994, 2004, 2005, 2006, and 2017.  *See, e.g.*, *Rare Breed Triggers*, __ F. Supp. 3d __, 2023 WL 5689770, at *10 (E.D.N.Y. Sept. 5, 2023) (discussing 2006 classification of a device submitted by Hunter Kinetic Innovations).  In total, ATF has classified approximately 17 similar, distinct devices as machineguns.  Examples of such classification letters are attached as Exhibits A – C to this declaration.[4]

13.     In addition, the AR-1, a predecessor device to the FRT-15, was classified by ATF as a machinegun in 2018.  *See* Dkt. No. 40-1 at ATF0081-106.  The AR-1 machinegun classification was known to RBT and its experts before the FRT-15 was marketed and distributed to the public.  *See Rare Breed Triggers*, __ F. Supp. 3d __, 2023 WL 5689770, at *28 ("Having heard witness testimony about the AR-1's and FRT's development and classification, and having reviewed declarations and documentary evidence as to those devices' histories, the Court finds that (1) Defendants were aware of the AR-1 classification as a machinegun, (2) knew that the FRT had a functionally indistinguishable forced-reset trigger that would all but certainly lead the ATF to the same conclusion regarding its illegality, but (3) concealed that information from their customers in marketing the FRT-15 for sale from December 2020 onwards").

**RECENT PROLIFERATION OF FORCED RESET TRIGGERS**

14.     In April 2021, a website selling Rare Breed Triggers, model FRT-15, came to the attention of ATF's Internet Investigations Center.  Concerned that this was a machinegun, ATF purchased the model FRT-15 for examination by ATF's Firearms Technology Criminal Branch

---

[4] ATF has not classified all so-called forced reset trigger devices as machineguns.  One such device, the 3MR, was submitted to ATF for classification in 2013.  Importantly, this trigger system incorporated into its design a disconnector which prevents the weapon from continuing to fire until the shooter releases the trigger and initiates a subsequent firing sequence.  For this device, the shooter must release the trigger for the disconnect to reset, and then pull the trigger for the firearm to fire a subsequent round.

5

**Add. 142**

(FTCB). The examination revealed that the FRT-15 was a combination of parts, designed and intended for use in converting a weapon into a machinegun and, as such, was a machinegun. The device was marked with "Rare Breed Triggers U.S. Pat. 10514223," the same patent number of the AR-1 which ATF previously determined to be a machinegun. Based on the FTCB examination, ATF's Tampa Field Division issued a letter dated July 26, 2021, to RBT demanding it "[c]ease and desist all manufacture and transfer of the Rare Breed Trigger FRT-15."

15.    In issuing its preliminary injunction, the EDNY Court concluded that the government was likely to succeed in showing that RBT did not comply and instead proliferated an illicit market for these MCDs (the FRT-15, WOTs, and similar devices) through a conspiracy to defraud the United States and a scheme to defraud its customers. *See Rare Breed Triggers*, __ F. Supp. 3d __, 2023 WL 5689770 at *27, *46.

16.    As discussed above, ATF has long classified devices that operate like the FRT-15 and WOT as machineguns. As a result, such devices generally were not commercially available to the general public in the nearly fifty years since ATF first examined such a device.

17.    As the EDNY court explained, however, RBT began manufacturing and selling these devices to the public without seeking ATF's opinion with respect to the FRT-15, despite knowing that ATF had previously classified materially similar devices as machineguns, including the AR1 device on which the FRT-15 was based. *See Rare Breed Triggers*, __ F. Supp. 3d __, 2023 WL 5689770, at *28.

18.    Between approximately November 28, 2022, and January 16, 2023, the government has evidence that RBT shipped approximately 3,461 packages containing a suspected total of 7,700 WOTs to forty-seven states and U.S. territories. These packages represent only a fraction of the number of MCDs suspected to have been sold or distributed by RBT. It is estimated that RBT has

distributed at least 100,000 FRT-15s to almost every State, and it is known that RBT distributed FRT-15s to third-party sellers who distributed FRT-15s to every State.

19.    The WOT was distributed by a company called Wide Open Enterprises (WOE) which is associated with BDU.  It is not known by ATF how many WOTs were distributed by WOE and BDU, though between September 8, 2021, and March 21, 2022, WOE shipped packages to approximately 6,130 unique recipients.  BDU was also, for a period of time, the sole distributor of the FRT-15.  It is not known by ATF how many FRT-15s were distributed by BDU.  It is also not known by ATF if WOE is continuing to distribute WOTs.  While certain sellers may distribute these devices overtly, ATF has determined that some on-line sellers may do so in a manner intended to evade detection by law enforcement.  Further, even where a seller does so overtly, it may not be readily determinable how many such MCDs are available for distribution; whether the devices constitute a finite stock; or whether the seller is capable of replenishment.  ATF is aware for instance, that RBT continues to possess several thousand WOTs at locations which it has thus far refused to disclose.

20.    To put the number of these devices distributed in perspective, the combined manufacture, importation, and distribution of the FRT-15 and the WOT from 2020 through 2023 likely exceeds the number of all lawfully manufactured and imported machineguns in that same period.  For example, in 2020, only 16,161 machineguns were manufactured domestically by federally licensed firearms manufacturers, and only 3,445 were lawfully imported into the United States.[5]  Indeed, excluding those registered to law enforcement agencies, there are less than 40,000 lawfully registered pre-1986 machineguns in the United States in total.  Unlike those lawfully registered machineguns, FRT-15s and WOTs are not registered, their transfer and current

---

[5] *National Firearms Commerce and Trafficking Assessment: Firearms in Commerce – Volume One*, Part 1, p. 26-27, App'x 1, p. 196, May 5, 2022.

possession cannot be tracked, and these devices are sold without background checks or identity

verification.

21.    Other third-party sellers have also distributed the FRT-15 and the WOT.  In fact,

these devices are currently advertised on the secondary online marketplace.  Indeed, a large portion

of RBT's customer base was its dealer network to whom RBT sold the FRT-15s for the purpose

of resale.  This spawned a secondary market for the FRT-15, WOT, and similar devices, which the

preliminary injunction envisions continuing as to individuals or companies covered by the

injunction.  Further, other companies developed copycat devices that function in the same way as

the FRT-15 and WOT.   It is not known by ATF how many such devices are in the marketplace,

what their market share is, or whether those entities are covered by the injunction.  However, it is

known that these devices are distributed without background checks, recordkeeping, registration,

or identity verification common with firearms, which enables acquisition by persons prohibited

under 18 U.S.C. § 922(g) or relevant state law.

### THE FRT-15 AND WOT ARE SUBJECT TO ACTIVE RETRIEVAL EFFORTS

22.    When machineguns are improperly distributed to the public, ATF must take steps

to actively retrieve the devices, or encourage and solicit the voluntary destruction or abandonment

of the devices.  This is done to protect the public, to protect law enforcement, and to mitigate the

risk of unlawful possession by an unaware or misinformed recipient.  This final consideration is

especially important here, where the EDNY Court found it likely that RBT committed fraud by

telling customers that the FRT-15 was a lawful product.

23.    The devices sold by RBT, WOE/BDU, and a third-party seller are the subject of an

active retrieval effort by ATF, which is being coordinated by the ATF Tampa Field Division.  They

have been the subject of prior retrieval efforts of other third-party sellers as well.  The current

retrieval efforts are directed towards approximately 8,849 unique purchasers who represent only a fraction of the recipients of such devices.

24.     Retrievals are prioritized based on multiple factors, including, but not limited to, whether the recipient's criminal history requires heightened review, or the person has received multiple devices indicative of further re-selling or trafficking.  Retrievals are resource intensive. ATF must individually assess each recipient to determine the individual's criminal history or association with criminal activity.  This is necessary both to prioritize the retrievals based on public safety, as well as to ensure appropriate levels of officer safety for ATF personnel and our law enforcement partners.   ATF estimates that each individual retrieval requires a combined expenditure of 16 to 24 man-hours, split between intelligence professionals engaged in analysis, and Special Agents engaged in the retrieval and associated investigatory work.  ATF has expended thousands of man hours on these retrieval efforts nationally.

25.     Retrieval difficulty is compounded by several factors.  First, the volume of retrievals—which continue to represent only a fraction of the FRT-15s and WOTs in the marketplace—makes the process further resource intensive.  Second, the FRT-15 and WOT are readily moveable and easily distributed illicitly.  Transfers and re-transfers make the retrieval process exponentially more difficult because Agents are left to attempt to ascertain the ultimate recipient through chains of subsequent distributions, which, as noted, are generally conducted without records.  These chains of distribution—applicable equally to resellers and in more limited circumstances end-customers—require further analysis of subsequent recipients, where they can be identified, to further assess and prioritize the retrieval process.  Third, ATF is a very small Federal agency, with approximately 2,600 ATF Special Agents nationwide.  ATF's primary mission is to investigate the most violent firearms offenders and investigate interstate and

international firearms trafficking.  Hundreds of thousands of firearms are recovered and traced in the United States each year, any one of which is the potential source or part of a federal investigation.  Engaging in retrievals—a necessary law enforcement function—nonetheless saps resources away from ATF to focus on the core mission of investigating and disrupting violent crime.

26.  Because of the logistical hurdles in conducting retrievals, as explained above, ATF conducts them sparingly, but two factors warrant such action here, the danger to the public of these rapid-fire devices and the fact that machineguns are illegal to possess in all situations.  Unlike other NFA firearms and GCA firearms, there is no way or manner in which to legally possess them.

27.  The preliminary injunction here compounds these difficulties.  As discussed, any retrieval of these devices is extremely time-consuming and complex.  The injunction specifically contemplates further sale and distribution of these devices during the pendency of this litigation— including sales to individuals who are not members of the plaintiff associations.  Each subsequent sale of a device currently held by a distributor would increase the number of such devices that must be retrieved from members of the general public if ATF's longstanding treatment of these devices as machineguns is ultimately upheld.  Each transfer of these devices also makes it more difficult and time-consuming to undertake a retrieval and increases the likelihood that the device will never be recovered if ATF ultimately prevails, because these devices are bought, sold, and distributed outside of the background check and registration requirements generally applicable to firearms.  Indeed, there has already been a YouTube video posted encouraging people to buy and sell the FRT-15 and to those who have turned in these devices during the recall to demand them

back     from     ATF.     See     https://youtu.be/IeUWgzkTxo8?feature=shared
(https://youtu.be/IeUWgzkTxo8?feature=shared).

28.    Retrievals of these devices can also be particularly dangerous to law enforcement because ATF prioritizes retrievals from individuals who meet certain risk factors.   These individuals are likely to be armed, and sometimes may be dangerous.  Threats to law enforcement associated with the retrieval of FRT-15s or WOTs have already been documented.   Declaration of ATF Special Agent Cheryl Harrell, *United States v. Rare Breed Triggers, LLC, et al.*, E.D.N.Y 23-cv-369 (ECF No. 56, Exhibit C).

29.    The fact that the RBT Parties are not covered by the injunction does not ameliorate this risk.  Third parties sell these and similar devices.  As of the date of this declaration, there are FRTs (specifically the WOT) for sale on the secondary market from non-manufacturing vendors. A quick internet search revealed numerous sale listings from various sites for the RBT and similar devices. These are marketed on numerous platforms to include traditional vendor websites and do not require much to complete a purchase and have shipped to your location.

30.    In addition, manufacturing of these devices may increase as a result of the injunction here, putting further strain on retrieval efforts and increasing risks to the public even if ATF's view is ultimately upheld.  It is difficult to quantify the numbers of these devices currently being manufactured or imported because ATF's longstanding classification of these devices as machineguns, its retrieval efforts, and the civil lawsuit brought against Rare Breed Trigger in the Eastern District of New York may make manufacturers unlikely to do so overtly.  But insofar as the Court's injunction specifically contemplates that manufacturing of these devices by members of the associations at the time the injunction issued would be permissible, there is a serious prospect that such manufacturing will occur.

31.     ATF would not generally be informed about such manufacturing or distribution, but this prospect is not hypothetical.  After this court's injunction, for example, ATF was contacted by an attorney representing the subject of a previous cease-and-desist letter related to the distribution of the FRT-15, who acquired the devices from RBT for the purpose of further distribution.  The attorney advised ATF that the subject individual intended to resume distribution of the WOT and intended to manufacture the FRT-15 with the authorization of RBT.  The subject individual is a convicted felon prohibited under 18 U.S.C. § 922(g)(1).  Counsel for this individual subsequently advised that the individual does not intend to distribute WOTs or manufacture FRT-15s, but this exchange highlights the inherent risk that additional devices will be manufactured and distributed under the court's injunction.

## THESE DEVICES POSE A RISK TO THE PUBLIC AND LAW ENFORCEMENT

32.     The continued availability of these devices puts the public at risk.  ATF has identified the FRT-15 and WOT being used in or associated with criminal activity.  This is particularly alarming because an AR-type firearm equipped with an FRT-15 or WOT is capable of maintaining a rate of fire similar to the rate of fire of a commercially manufactured M16 machinegun.  For instance, in ATF testing, a commercially manufactured M16-type M-4 machinegun had an average rate of fire of 870.4 rounds per minute, while an AR-15 semi-automatic firearm converted with a WOT had an average rate of fire of 933 rounds per minute.  Importantly, both the FRT-15 and WOT allow a shooter to maintain this rate of fire irrespective of the shooter's training, skill, or stamina.

33.     The precise number of incidents of firearms recovered and found to be equipped with an FRT-15, WOT, or similar device is likely underreported.  The inclusion of such a device would not ordinarily be captured during the firearms tracing process, and many state and local law

enforcement agencies may not be well-informed to ascertain whether a recovered AR-type firearm has been retrofitted with a drop-in trigger device such as the FRT-15 or WOT.  Many of these triggers can be installed on AR-type rifles without any visible modification to the firearm.  Even when such devices are identified, the law enforcement agency may not capture that information in a way in which the true scope of recoveries can be properly assessed by ATF.

34.    ATF has nevertheless encountered such devices in numerous criminal settings.  For example, in the Tampa Field Division, I am aware that in July of 2021, an eight-time convicted felon on state probation was found, during the execution of a federal search warrant, to be in possession of 22 firearms, including 15 ghost guns and a non-serialized and unregistered short-barreled rifle, 2,000 rounds of ammunition, narcotics, and drug paraphernalia.   The short-barreled rifle was equipped with an FRT-15.  Similarly, in January 2023, ATF Special Agents assigned to the Charlotte Field Division recovered an AR-type firearm equipped with a WOT during the execution of a federal search warrant as part of an investigation into an armed narcotics trafficker.  Through ballistic evidence, this AR-type firearm was determined to have been involved in seven separate shootings, including a drive-by shooting targeting a home and a shooting directed at an unmarked police vehicle.  While it cannot be confirmed that the WOT was equipped in the firearm at the time of the shootings, a witness to one of the shootings reported hearing automatic gun fire, and the number of .223 and .556 shell casings recovered during some of the shootings was indicative of someone firing an automatic weapon, including seventy casings at one shooting and forty-two at another.   In another drive-by shooting involving the same firearm, audio of the shooting demonstrated that the shooter fired 14 shots in less than two seconds.

35.    From January of 2021 through October, 23, 2023, the ATF Firearms and Ammunition Technology Division conducted approximately seventy-one criminal examinations

of these types of devices as a part of multiple criminal cases, involving a variety of criminal conduct.  For instance, aside from examinations directly related to the manufacture or importation of the FRT-15 or WOT (there have been approximately seven (7) such examinations) and similar devices, these devices and similar devices have been examined in connection with dozens of investigations related to National Firearms Act violations (apart from possession of an FRT-15 or WOT), firearms trafficking, illegal firearms manufacturing (apart from the manufacture or importation of an FRT-15 or WOT), narcotics trafficking, gang investigations, possession of firearms by felons and other prohibited individuals, at least one shooting (involving the suspected illicit discharge of 60 rounds of ammunition), and other criminal activity.

36.    There is additional evidence that these devices are being acquired by individuals who are prohibited from receiving or possessing firearms under 18 U.S.C. § 922(g).  ATF has initially determined that RBT, between approximately November 28, 2022, and January 16, 2023, shipped WOTs to approximately 13 such individuals. WOE and BDU, between approximately September 8, 2021, and March 21, 2022, shipped WOTs to at least 45 such individuals.  The third-party seller distributed FRT-15s to at least five such individuals between approximately March 17, 2021 through August 22, 2021.  Because of the secondary market and other third-party sellers, and because ATF has assessed only a limited number of sales by RBT and WOR/BDU, it is highly likely that this represents only a small portion of the individuals prohibited under 18 U.S.C. § 922(g) that have an FRT-15 or WOT.  Although the Court excluded from its preliminary injunction individuals prohibited under 18 U.S.C. § 922(g), these devices are sold without background checks or identity verification.  Accordingly, the continued distribution of the FRT-15 and WOT will invariably result in their acquisition by these very individuals, as we have already seen.  The continued distribution of these devices will also result in harm to the public because individuals

14

**Add. 151**

intent on using them to facilitate criminal activity will similarly be able to easily acquire them, and ATF will have limited ability to disrupt or interdict the acquisition or distribution.

37.     FRT-15 and WOTs may be associated with other types of criminal activities outside of criminal use, possession, or domestic distribution.  For instance, because the FRT-15 and WOT are classified as machineguns under the NFA and GCA, they are subject to stringent importation restrictions under 26 U.S.C. § 5844 and 18 U.S.C. § 922(l).  The Arms Export Control Act (AECA), 22 U.S.C. § 2778, also requires an individual to obtain approval prior to the importation of a defense article as enumerated on the United States Munitions Import List (USMIL). The FRT-15 and WOT are Category 1 defense articles on the USMIL as a component and part of a firearm. *See* 27 C.F.R. Part 447.  It is believed that all WOTs were unlawfully imported from outside the United States.  Similarly, WOTs have been interdicted during at least one attempted illicit exportation.

38.     Additionally, there are ongoing prosecutions in which defendants have been indicted for their possession of the FRT-15, WOT, or both.  These include prosecutions in the Southern District of Texas, the District of Puerto Rico, and the District of Massachusetts.  Some of these defendants were charged with other criminal offenses, which underscores that that these devices are not being distributed solely to law-abiding citizens.

39.     The continued availability of these devices creates other risks to the public.  As stated earlier, a weapon with an FRT-15 or WOT fires 800 to 900 rounds per minute.  Also as stated earlier, it is not obvious by looking at a semi-automatic weapon equipped with an FRT-15 that such weapon will fire automatically, making them extremely dangerous for those who may acquire a firearm equipped with such trigger and may have no idea what they are possessing and have absolutely no skill or ability to handle a weapon with that rate of fire.

**Add. 152**

40.     In addition, as discussed, law enforcement and members of the public may not be aware that a recovered or possessed firearm is equipped with such a device.  This presents a risk to law enforcement officers who encounter firearms equipped with FRT-15 and WOT triggers and the general public who may not understand what they possess.

41.     More broadly, the threats to the public as a result of these devices are not theoretical.  There is a national, escalating trend of MCDs being used in the commission of violent crimes or being recovered from individuals and criminal organizations.  One national media outlet has reported that "[i]ncidents of machine gun fire have exploded by about 1,400% from 2019 through [2021]," with acoustic sensors in 130 U.S. cities detecting "roughly 5,600 incidents of automatic weapons fire" in 2021.[6]  Between 2017 and 2021, ATF recovered 5,454 MCDs, a 570% percent increase as compared to 2012-2016.[7]

42.     This trend continues.  ATF has determined that as of October 11, 2023, there has been an approximately 44% increase in the number of MCDs recovered by law enforcement as compared to recoveries of MCDs in 2022.  As of the same date, for 2023, the state with highest number of recoveries is Texas.  Further, during the same time-period, there has been an approximately 400% increase in firearm traces involving an MCD in which the trace was also associated with a crime of violence.  The crimes of violence involving MCDs include homicides, aggravated assaults, robberies, car jackings, and the murder of a police officer.

43.     The preliminary injunction will allow for the continued proliferation of these devices.  The risk of their illicit misuse will only increase, both as a result of their continued

---

[6] Scott Glaver and Curt Devine, *A Device that can Turn a Semi-Automatic Weapon into a Machine Gun in Moments is Wreaking Havoc on American Streets*, CNN, August 30, 2022, www.cnn.com/2022/08/30/us/automatic-machine-gun-fire-invs/index.html
[7] *National Firearms Commerce and Trafficking Assessment: Crime Guns – Volume Two, Part VII, p. 4*, January 11, 2023, www.atf.gov/firearms/docs/report/nfcta-volume-ii-part-vii-recommendations (NFCTA Vol. 2).

**Add. 153**

distribution but also because of the prevention of law enforcement action to remove these devices from the marketplace.

Pursuant to 28 U.S.C. § 1746, I hereby declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed on November 6th , 2023.

By:  _____

Craig Saier
Assistant Director, OIO

**Add. 154**

# EXHIBIT A

Case: 23-11138   Document: 12   Page: 158   Date Filed: 11/17/2023

NOV 14 1975

T:T:F:EMO



Dear

This refers to your letter of September 19, 1975, in which you submitted, for classification under the Gun Control Act of 1968, a United States Patent Application covering a modification to a semiautomatic firearm which would permit bursts of automatic fire which can be varied from one round per second to the maximum cyclic rate of the particular weapon.

After study of your Patent Application we are in agreement with your statement in the abstract of disclosure that the modification permits semiautomatic and automatic operation. Further, we agree with your statement contained in claim 4 of the application, that while continuous finger pressure is maintained on the trigger the weapon will fire continuously. Based on your statements and an examination of the submitted Patent Application, a firearm modified according to your design would be classified as a machinegun as that term is defined in Section 5845(b), Chapter 53, Title 26, United States Code. In order to manufacture or modify a firearm utilizing your design feature, the appropriate special occupational taxes and manufacturing fee would be required prior to manufacturing the weapons for resale. If you intend to manufacture or modify a firearm for your own use, a $200.00 making tax must be paid prior to the manufacture or modification of a weapon.

We trust that the foregoing has been responsive to your inquiry. If we can be of further assistance, please contact us.

Sincerely yours,

(Signed) Thurman W. Darr

cc: LEGAL
    Mr. Keathley
    Rep. ~~Gunde~~
    Gude

Enclosure

for A. Atley Peterson
Assistant Director.

cc: Regional Director
    Mid-Atlantic

EMOwen:1se 10/28/75

| CODE | INITIATOR | REVIEWER | REVIEWER | REVIEWER | REVIEWER | REVIEWER | REVIEWER |
|---|---|---|---|---|---|---|---|
| | T:T:T | T:T:F | T:T | C | | CC | T |
| SUR-NAME | Owen | Framer | Darr | Keathley | Williams | Hang | Darr |
| DATE | 10/28/75 | 10/30/75 | 10/31 | 11-4-75 | 11-14-75 | 11/4/75 | 11/19/75 |

ATF FORM 92 (9-72)

Add. 156

CORRESPONDENCE APPROVAL AND CLEARANCE   DEPARTMENT OF THE TREASURY   BUREAU OF ALCOHOL, TOBACCO AND FIREARMS

Case: 23-11138    Document: 12    Page: 159    Date Filed: 11/17/2023

Secretary of the Treasury
Washington D.C.                                19 September 1975

Dear Sir,
    I have invented a new type of firearm described in this patent.

The Army has shown some serious interest in the concept, and it

would be very unwise to have extra copies of this document shipped

in the US Mail there for please have your agency make a deturmination

of the disposition of this concept (semi-automatic or machinegun)

and return the document to me.

    Make copies of only those passages and drawings needed for your

records.

    I will on request come to the offices in Washington D.C. and pick-up

the material with a letter of disposition.    The subject is very

important so please have your officers be most concise and site

referances if needed.

                                   Sincerely Yours.



Case: 23-11138   Document: 12   Page: 160   Date Filed: 11/17/2023



Statement of
Robert J. Scroggie, Firearms Enforcement Officer
Bureau of Alcohol, Tobacco and Firearms
made at
Washington, D.C., on March 26, 1975

On February 20, 1975, ███████████████ who gave his
address as ████████████
appeared in my office with a Valmet M62/S, 7.62X39mm caliber
weapon, identified by the Serial Number 147341.

At that time, ███████████ requested that his firearm be
examined and classified under the provisions of the Gun Control Act
of 1968, stating that he had redesigned the lock system of this
semiautomatic civilian model of the Finnish Model 62 Assault Rifle.
He further stated that his redesign would permit the firearm to
achieve what he termed "quick-fire." A term meaning, as he explained,
that the trigger would be forced forward by the rearward movement
of the bolt during the extraction and ejection phases of the firing
cycle.

A preliminary physical examination of the firearm disclosed
that major modifications had been made to the lock mechanism and
lock well. The modifications are depicted in the accompanying
drawing, which were submitted by ███████████

After my cursory examination was completed, I took the weapon
to the Northern Virginia Police Academy Firing Range on March 10,
1975. There I loaded the weapon with a magazine containing three
cartridges. I charged the weapon by retracting the bolt handle
and releasing it. The bolt ran forward stripping the top round
out of the magazine and chambering it. I then pulled the trigger
and the cartridge in the chamber and the two cartridges remaining
in the magazine were fired in a single burst. I reloaded the weapon
with a magazine containing three more cartridges, charged the weapon
and again fired a burst of three rounds.

On March 20, 1975, a meeting was held between Messrs. Dessler
and Wachter of the Office of the Chief Counsel and Messrs. Westenberger,
Scroggie and Owen of the Firearms Technology Branch, concerning the
status of this firearm. Mr. Dessler concluded that, if ███████████

Case: 23-11138   Document: 12   Page: 161   Date Filed: 11/17/2023

Case: 23-11138   Document: 12   Page: 162   Date Filed: 11/17/2023

- 2 -

was not a person prohibited from possessing a firearm by Title VII, it might be permissible for him to make application to make and pay the $200.00 making tax and thereby register the firearm in question. The final determination would only be made subsequent to the results of Special Agent Gerlands investigation.

During the early afternoon of March 20, 1975, I received a telephone call from ████████ He asked me if I had had a chance to test his weapon. I told him I had, and that it was found that his weapon was a machinegun. He answered that it was not intended to be a machinegun and further, he was going to contact Representative Gilbert Gude of Maryland and have the statutory definition of machinegun changed. I told him that that was his perogative, however, I would write him a letter confirming our findings. Later in the afternoon, I received another call from ████████ He stated that it was not necessary for me to write a letter to him as he did not wish to embarrass the Bureau. I told him that it would not embarrass this Bureau and that I would be happy to write the classification letter.

On Monday, March 24, 1975, I was called to court in Baltimore, Maryland. I returned to Washington on March 26, 1975, I found that Special Agent Gerland had picked up the weapon and removed it from the Bureau Headquarters before I had had an opportunity to complete my examination.

Robert J. Scroggie
Firearms Enforcement Officer

**Add. 160**

| | | | DEPARTMENT OF THE TREASURY | | | | | | | DATE PREPARED |
|---|---|---|---|---|---|---|---|---|---|---|

BUREAU OF ALCOHOL, TOBACCO & FIREARMS

## TRANSFER/RECEIPT OF PERSONAL PROPERTY

DATE PREPARED: 2/20/75
NO.

| ITEM NO. | LOC CODE | B/N CODE | BASIC NOMENCLATURE DESCRIPTION | SERIAL NUMBER | TYPE CODE | SIZE CODE | REP'L CODE | COMP YEAR | QUANT | UNIT COST Dollars | Cts |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Valmet M62 semiautomatic rifle caliber 7.62X39mm | 147341 | | | | | 1 | | |
| | | | temporarily transferred to ATF Firearms Technology Branch for the purpose of test and evaluation | | | | | | | | |
| | | | received from: ███████ | | | | | | | | |

| ORIGINAL DOCUMENT NO. | GOVERNMENT BILL OF LADING NO. | SHIPPED VIA | DATE SHIPPED |
|---|---|---|---|
| | | | |

☐ TRANSFER-(TRANSACTION CODES 50, 55)      ☐ LOAN ███

| OFFICE CODE | OFFICE DESCRIPTION | OFFICE CODE | OFFICE DESCRIPTION |
|---|---|---|---|
| FROM ███████ | | TO: T.T.F: | Firearms Technology Branch |

| SIGNATURE OF LOSING/SHIPPING OFFICER | DATE | SIGNATURE OF GAINING/RECEIVING OFFICER | DATE |
|---|---|---|---|
| *Inskip* | 2/20/75 | Edward M. Owen Jr. | 2/20/75 |

ATF Form 86 (8-73)

DEPARTMENT OF THE TREASURY
BUREAU OF ALCOHOL, TOBACCO & FIREARMS

## TRANSFER/RECEIPT OF PERSONAL PROPERTY

| DATE PREPARED |
|---|
| NO. |

| ITEM NO. | LOC CODE | B/N CODE | BASIC NOMENCLATURE DESCRIPTION | SERIAL NUMBER | TYPE CODE | SIZE CODE | REP'L CODE | COMP YEAR | QUANT | UNIT COST Dollars | Cts |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Valmet M62 semiautomatic rifle #147341 <br><br><br> for seizure | #147341 | | | | | 1 | | |

| ORIGINAL DOCUMENT NO. | GOVERNMENT BILL OF LADING NO. | SHIPPED VIA | DATE SHIPPED |
|---|---|---|---|
| | | | |

☑ TRANSFER—(TRANSACTION CODES 50, 55)     ☐ LOAN

| OFFICE CODE | OFFICE DESCRIPTION | OFFICE CODE | OFFICE DESCRIPTION |
|---|---|---|---|
| FROM: TTF | Firearms Technology Branch Bureau Headquarters | TO: | Bureau of ATF ( Washington D.C. Falls Church, Va.  Field Office) |

| SIGNATURE OF LOSING/SHIPPING OFFICER | DATE | SIGNATURE OF GAINING/RECEIVING OFFICER | DATE |
|---|---|---|---|
| Edward M. Owen  Firearms Enforcement Officer | 3/24/75 | | 3/24/75 |

ATF Form 85 (8-73)



Dept of the Treasury
Bureau of Alcohol, Tobacco and Firearms
Washington, D.C.
20226

Dear Sir.
   I have a rifle system which fires once for each
time the trigger is pulled.   However, many persons
do not fully understand that this is a single funtion
of the trigger for each bullet fires.   Please,
give me a letter pertaining to the rapid-fire
system as applied to the m62 Valmet rifle.


     Thank You

     Sincerely Yours



1/3

Contrast of machinegun to rapid-fire system

TRIGGER:

Machinegun-the trigger is returned by a spring when the trigger is released.

Rapid fire-the trigger is returned each time the bolt comes to the rear.   The trigger is forced foreward by the action of the camming surface on the bolt carrier strikeing the surface of a plate: this movement is carried downwards to the trigger forceing it foreward into an engaged position.

Damper:

Machinegun- the hammer damper is used every time the system fires more than one round in a burst to retard the fall of the hammer until the bolt is closed. 

Rapid fire- the trigger damper is used only to prevent the trigger form being pulled untill the bolt is safely closed.   After the bolt is closed the trigger may be pulled again.

Note 1.   No removal of parts can cause the system to opperate automatically.

Note 2.   No addition of automatic trigger sear can cause the system to opperate automatically.

Note 3.   No addition of automatic disconnector (hammer damper) can cause the system to opperate in an automatically.   The addition of a the standard AK-47 hammer damper would bend the pin and jam the system so that it would have to be disassembled by cutting.   This is to discourage the missuse of the system!

2/3

Case: 23-11138   Document: 12   Page: 166   Date Filed: 11/17/2023



RAPID-FIRE RIFLE SYSTEM

Figure 62.  Position of parts with operating rod in extreme rear position,
and the striker plate forcing the trigger foreward so that the disconnector disengages.
1 - hammer; 2 - bolt, 3 - firing pin; 4 - operating rod; 5 - return
spring; 6 - gas piston; 7 - gas cylinder; 8 - magazine; 9 - magazine
catch; 10    trigger damper    ; 11 - trigger and hammer spring;
12 - trigger; 13 - rounds. 14-striker plate; 15-disconnector.

Date Filed: 11/17/2023   Page: 168   Document: 12   Case: 23-11138

Dear Sir,

The reason I backed
out of the court case
~~with~~ are:

1  The treasury had me
set up so if I lost the
appeal I would be held
for trial by the court.

2  This operation relieved
the ATF of liability
for the arrest.

3  The judge does not
have to accept the
common use of English
in court.

4  The treasury could
judge shop.

RECEIVED
ATF.

SEP 23 1975

TECHNICAL SERVICES DIVISION

# EXHIBIT B



**DEPARTMENT OF THE TREASURY**
BUREAU OF ALCOHOL, TOBACCO AND FIREARMS
WASHINGTON, D.C. 20226

LE:F:TE:RLB
3311.4

APR 2 6 1994



Dear ▮▮▮▮▮

This refers to your letter of April 12, 1994, in which
you request that we reconsider our recent determination
on a certain trigger attachment device which you
submitted for classification.

As defined in Title 26 United States Code (U.S.C.),
Chapter 53, Section 5845(b), of the National Firearms
Act (NFA), the term "machinegun" means any weapon which
shoots, is designed to shoot, or can be readily
restored to shoot automatically more than one shot,
without manual reloading, by a single function of the
trigger.  The term shall also include the frame or
receiver of any such weapon, any part designed and
intended solely and exclusively, or combination of
parts designed and intended, for use in converting a
weapon into a machinegun, and any combination of parts
from which a machinegun can be assembled if such parts
are in the possession or under the control of a person.

The sample device which you submitted was examined by
technicians, which are assigned to this office.  It was
determined that the device is powered by the firearm's
operating rod or handle and it incorporates a design
which substitutes the trigger (i.e. trigger shoe) of
the device for the trigger of the weapon.  The sample
device was attached to a Ruger, Mini-14, semiautomatic
rifle, which when test fired, was capable of firing
automatically more than one shot by a single function
of the trigger.  This condition was consistently
reproduced.

As a result of the test firing conducted and because of
the design of the device, it is determined and affirmed
that the sample device is a combination of parts which
are designed and intended for use in converting a
weapon into a machinegun; therefore, it is a
"machinegun" as that term is defined above.

-2-

In the second-half of your letter you request
information necessary for you to obtain a license which
would allow you to manufacture weapons which are
subject to the NFA.  For information regarding the
appropriate licensing, you will need to contact the
following office:

   Bureau of Alcohol, Tobacco and Firearms
   Firearms and Explosive Licensing Center
    Post Office Box 2994
    Atlanta, Georgia  30301

For additional information concerning NFA requirements,
contact the following office:

   Bureau of Alcohol, Tobacco and Firearms
    Chief, NFA Branch, Room 5300
   650 Massachusetts Avenue, NW.
    Washington, DC  20226

ATF F Form 7 and Form 5630.7 are enclosed for your
convenience.

The sample device which you previously submitted will
continue to be retained by this office pending your
decision as to its disposition.

We regret that we are unable to respond more favorably
at the present time.  If you have further questions
concerning this matter, please contact us.

     Sincerely yours,

     Edward M. Owen, Jr.
   Chief, Firearms Technology Branch

Enclosures

April 12, 1994


Mr. Edward M. Owen, Jr.
Department of the Treasury
Bureau of Alcohol, Tobacco and Firearms
650 Massachusetts Avenue, NW
Washington DC  20226


Dear Mr. Owen:

This is in response to your letter of April 4, 1994, that
provided NFA classification action I requested on a sub-
mitted trigger device.  Your letter advised that in your
opinion the device submitted is a NFA machine gun.  The
sole reason stated for that decision was; "Test firing
disclosed that when the sample device was attached, the
ATF test weapon would fire a two-shot burst, without
manual reloading, by a single function of the trigger."
Because the device was primarily designed to not do
what you describe as having occurred, I would like for
you to reconsider the classification or at least your
stated basis.

To elaborate I offer the following rational:  I can
easily understand how you might have reached your conclu-
sion.  I designed this device to allow (but not cause) a
person to fire a semi-automatic weapon very rapidly.  It
truly mimics the effect of a machine gun but, I believe,
not its function.  Being somewhat familiar with the stat-
utory machine gun definition, I carefully tried to ensure
it could not be classified as one.  The operating princi-
ple of this device is probably very different than any
you may have encountered before, and it is also the basis
for my pending patent application.

In operation, as I described in my submission letter
attachment, the sole function of the device is to return
the trigger finger forward to the ready to fire position,
and to restrain the trigger finger in that position until
such time that the weapons action is closed and locked.
At this time in the firing cycle the trigger will be in
its full forward position, and the mechanism will unres-
train the trigger bar/shoe.  The trigger may now be pull-
ed to the rear by manual operation to fire the weapon.
There must be a manual rearward pull exerted on the trigger
to fire each and every shot, and without it none will be
fired.

The function of the weapon is identical with or without
the device attached.  Physical manipulation of the attach-
ed device, as I described in my submission letter attach-
ment, can substantiate what I have described here.  The
device is merely a "gate" or "timing mechanism" that
allows the trigger to be operated, only after the earliest
moment that such action can fire the weapon.  When the de-
vice is operating it does no more than to prevent the op-
erator from pulling the trigger when it would not fire
the weapon.  Single shots may still be fired.  From this
description you can see why I must take exception to your
description of a two-shot burst with a single function
of the trigger.  It would be virtually impossible for any
person to hold the trigger in the rearward position.  If
it was done, the gun would cease to fire until the spent
casing would be ejected and a new round chambered.

The device does allow rapid semi-automatic firing that
could theoretically approach automatic rates of fire.
So does the approved "Hellfire" device, and several
others.  In any event, a high speed camera would demon-
strate a distinctly separate manual trigger pull must,
and does, precede each and every firing of the weapon,
(as it does in any normal semi-automatic weapon).  I do
appreciate that there is a great emotionalism surrounding
firearms at this time, but as I understand the statutes
there is no reference to a maximum allowable rate of fire.

I would like to hold in abeyance my decision regarding
disposition of the submitted sample device for the time
being.  I will, however, respond in plenty of time to
avoid causing your office to begin forfeiture proceedings
as you advised in your letter.

At your earliest convenience, please forward the forms
necessary for me to obtain a NFA firearms (and other
firearms) manufacturing license, along with whatever other
pertinent information that may be available.

At the time I received your letter of classification I
possessed two operable prototypes, and some miscellaneous
components that did not function.  For your information;
I have cut the two protypes, rendering them unusable for
any purpose.  They could only be made to operate if recon-
structed by welding, and if the dimensions necessary are
known.  No functional assemblies can be created from the
remaining components, because they never did work.

Please consider this request for classification reconsid-
eration of the submitted sample.  If you still consider
the device to be a machine gun by statute, I would like
to enter into some discussion with you on how I might
redesign this device to obtain non-NFA classification.

Thank you very much for your attention and responsiveness
to my requests.  Please advise me if I can be of any help
in this matter.  I will certainly comply with any direction
you may provide, to assure I do not violate any laws.
If I may, I will continue to seek your guidance in the
future.


Sincerely,

Case 4:23-cv-00830-O   Document 64-1   Filed 11/06/23   Page 38 of 45   PageID 2207

# EXHIBIT C

U.S. Department of Justice

Bureau of Alcohol, Tobacco,
Firearms and Explosives

Martinsburg, WV   25401          903050:MCP
www.atf.gov                      3311/2006-578

**APR 2 7 2006**



Dear

This refers to your correspondence, including accompanying illustrations, and to a firearm
sample, which were submitted to the Bureau of Alcohol, Tobacco, Firearms and Explosives
(ATF), Firearms Technology Branch (FTB), and received March 30, 2006.

You submitted the firearm sample to us on behalf of ▇▇▇▇▇▇▇ Hunter Kinetic
Innovations in Buckley, Washington.

Specifically, ▇▇▇▇▇ has requested a classification of a submitted Ruger, Model 10/22, .22
caliber semiautomatic rifle, serial number 121-56665, with installed Hunter Kinetic Innovations
trigger device. This is the second submission of this particular firearm and device. Because FTB
could not render a determination regarding the classification of the submission during the initial
examination in 2005 due to the firearm's malfunctioning, it was returned to ▇▇▇▇▇▇ in
Aloha, Oregon.

The currently submitted firearm is a Ruger 10/22 semiautomatic rifle with a newly design firing
mechanism. The firing mechanism is designed to function as follows, when the trigger is pulled:

- The hammer falls, thereby firing a shot.
- The hammer is recocked when the bolt comes to the rear.
- The trigger is forced (rotated) to the cocked (forward) position when the bolt comes to
  the rear; this is accomplished when the bolt actually contacts and pushes down on the top
  of the trigger.
- When the bolt travels forward, it contacts the trigger stop.
- The forward pressure of the bolt against the trigger stop pushes the latter forward, thereby
  unlocking the trigger.
- The continuous steady pressure on the trigger from the trigger pull causes the trigger to
  travel rearward and release the cocked hammer, causing a continuation of firing.
- When the firing finger is physically removed from the trigger, the weapon ceases firing.
  If the steady pressure of the trigger pull is not released, the weapon will continue to fire
  until the magazine is empty or a malfunction occurs.

-2-

▆▆▆▆▆▆▆▆▆▆

As defined in the National Firearms Act (NFA), 26 U.S.C. Section 5845(b), the term "machinegun" means—

*...any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. The term shall also include the frame or receiver of any such weapon, <u>any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun,</u> and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person.*

Our Branch test fired your submitted firearm with a variety of .22 long rifle caliber ammunition and found that it functioned consistently with CCI Stinger brand ammunition.

Based upon a careful review of your submitted sample and plans, including illustrations, FTB has determined that the submitted firearm is a "machinegun," being capable of firing automatically with a single function of the trigger.

Specifically, the trigger device, being a combination of parts designed and intended for use in converting a Ruger 10/22 semiautomatic rifle into a machinegun, is a "machinegun" as defined in 26 U.S.C. 5845(b).

Our Branch reached this finding because it is evident that from the moment of the application of trigger pressure—and as long as rearward pressure is applied to the trigger—the firearm continues to fire until the firing finger is removed; this firing takes place regardless of the rearward bolt travel that pushes the trigger forward into the cocked position.

The shooter does not pull and release the trigger; therefore, FTB has determined this to be one single pull of the trigger which allows the rifle to continue to fire. Upon removing pressure on the trigger, the rifle ceases firing. Pressure is applied on the trigger and the rifle fires; unless the pressure from the trigger finger is removed, the rifle will continue to fire.

We have received your ATF Form 2, *Notice of Firearms Manufactured or Imported*, dated April 20, 2006, with regard to this particular firearm.

To facilitate return of the submitted sample, please provide our Branch with the appropriate billable FedEx or similar account number within 60 days of receipt of this letter.

-3-

We trust that the foregoing has been responsive to your request for an evaluation.

If we can be of any further assistance, please contact us.

Sincerely yours,

Sterling Nixon
Chief, Firearms Technology Branch

Enclosure

Case 4:23-cv-00830-O   Document 64-1   Filed 11/06/23   Page 42 of 45   PageID 2211



U. S. Department of Justice
Bureau of Alcohol, Tobacco, Firearms and Explosives

**Correspondence Approval and Clearance**

903050:MCP
3311/2006-578



Dear ▮▮▮▮▮▮

This refers to your correspondence, including accompanying illustrations, and to a firearm sample, which were submitted to the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), Firearms Technology Branch (FTB), and received March 30, 2006.

You submitted the firearm sample to us on behalf of ▮▮▮▮▮▮▮▮▮▮ Hunter Kinetic Innovations in Buckley, Washington.

Specifically, Mr. ▮▮▮ has requested a classification of a submitted Ruger, Model 10/22, .22 caliber semiautomatic rifle, serial number 121-56665, with installed Hunter Kinetic Innovations trigger device. This is the second submission of this particular firearm and device. Because FTB could not render a determination regarding the classification of the submission during the initial examination in 2005 due to the firearm's malfunctioning, it was returned to ▮▮▮▮▮▮ in Aloha, Oregon.

The currently submitted firearm is a Ruger 10/22 semiautomatic rifle with a newly design firing mechanism. The firing mechanism is designed to function as follows, when the trigger is pulled:

- The hammer falls, thereby firing a shot.
- The hammer is recocked when the bolt comes to the rear.
- The trigger is forced (rotated) to the cocked (forward) position when the bolt comes to the rear; this is accomplished when the bolt actually contacts and pushes down on the top of the trigger.
- When the bolt travels forward, it contacts the trigger stop.
- The forward pressure of the bolt against the trigger stop pushes the latter forward, thereby unlocking the trigger.
- The continuous steady pressure on the trigger from the trigger pull causes the trigger to travel rearward and release the cocked hammer, causing a continuation of firing.
- When the firing finger is physically removed from the trigger, the weapon ceases firing. If the steady pressure of the trigger pull is not released, the weapon will continue to fire until the magazine is empty or a malfunction occurs.

| Code | Initiator | Reviewer | Reviewer | Reviewer | Reviewer | Reviewer | Reviewer |
|------|-----------|----------|----------|----------|----------|----------|----------|
| | 903050 | 903050 | 903050 | 903050 | | | |
| Surname | Powell | MMitte | Usave | Nixon | | | |
| Date | 4-24-06 | 4-24-06 | 4-26-06 | 4/26/06 | | | |

U. S. Department of Justice

Bureau of Alcohol, Tobacco, Firearms and Explosives

**Correspondence Approval and Clearance**

-2-



As defined in the National Firearms Act (NFA), 26 U.S.C. Section 5845(b), the term
"machinegun" means—

*...any weapon which shoots, is designed to shoot, or can be readily restored to shoot,
automatically more than one shot, without manual reloading, by a single function of the trigger.
The term shall also include the frame or receiver of any such weapon, <u>any part designed and
intended solely and exclusively, or combination of parts designed and intended, for use in
converting a weapon into a machinegun,</u> and any combination of parts from which a
machinegun can be assembled if such parts are in the possession or under the control of a
person.*

Our Branch test fired your submitted firearm with a variety of .22 long rifle caliber ammunition
and found that it functioned consistently with CCI Stinger brand ammunition.

Based upon a careful review of your submitted sample and plans, including illustrations, FTB
has determined that the submitted firearm is a "machinegun," being capable of firing
automatically with a single function of the trigger.

Specifically, the trigger device, being a combination of parts designed and intended for use in
converting a Ruger 10/22 semiautomatic rifle into a machinegun, is a "machinegun" as defined
in 26 U.S.C. 5845(b).

Our Branch reached this finding because it is evident that from the moment of the application of
trigger pressure—and as long as rearward pressure is applied to the trigger—the firearm
continues to fire until the firing finger is removed; this firing takes place regardless of the
rearward bolt travel that pushes the trigger forward into the cocked position.

The shooter does not pull and release the trigger; therefore, FTB has determined this to be one
single pull of the trigger which allows the rifle to continue to fire. Upon removing pressure on
the trigger, the rifle ceases firing. Pressure is applied on the trigger and the rifle fires; unless the
pressure from the trigger finger is removed, the rifle will continue to fire.

We have received your ATF Form 2, *Notice of Firearms Manufactured or Imported*, dated April
20, 2006, with regard to this particular firearm.

To facilitate return of the submitted sample, please provide our Branch with the appropriate
billable FedEx or similar account number within 60 days of receipt of this letter.

| Code | Initiator<br>903050 | Reviewer<br>903050 | Reviewer<br>903050 | Reviewer<br>903050 | Reviewer | Reviewer | Reviewer |
|---|---|---|---|---|---|---|---|
| Surname | | | | | | | |
| Date | | | | | | | |

**Add. 180**

ATF Form 9310. 3A
Revised May 2004

U. S. Department of Justice

Bureau of Alcohol, Tobacco, Firearms and Explosives

## Correspondence Approval and Clearance

-3-

We trust that the foregoing has been responsive to your request for an evaluation.

If we can be of any further assistance, please contact us.

Sincerely yours,

Sterling Nixon
Chief, Firearms Technology Branch

Enclosure

| Code | Initiator 903050 | Reviewer 903050 | Reviewer 903050 | Reviewer 903050 | Reviewer | Reviewer | Reviewer |
|---|---|---|---|---|---|---|---|
| Surname | | | | | | | |
| Date | | | | | | | |

**Add. 181**

ATF Form 9310. 3A
Revised May 2004