No. 23-11138

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

NATIONAL ASSOCIATION FOR GUN RIGHTS, INC.; TEXAS GUN RIGHTS, INC.; PATRICK CAREY; JAMES WHEELER; & TRAVIS SPEEGLE,

*Plaintiffs-Appellees,*

*v.*

MERRICK GARLAND, U.S. ATTORNEY GENERAL; UNITED STATES DEPARTMENT OF JUSTICE; STEVEN DETTELBACH, IN HIS OFFICIAL CAPACITY AS DIRECTOR OF THE BUREAU OF ALCOHOL, TOBACCO, FIREARMS, AND EXPLOSIVES; BUREAU OF ALCOHOL, TOBACCO, FIREARMS, AND EXPLOSIVES,

*Defendants-Appellants,*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
CASE NO. 4:23-CV-00830

## APPELLEES' RESPONSE IN OPPOSITION TO APPELLANTS' EMERGENCY MOTION PURSUANT TO CIRCUIT RULE 27.3 FOR STAY PENDING APPEAL

WHITNEY DAVIS
BEN SLEY
Eggleston King Davis, L.L.P.
102 Houston Avenue
Suite 300
Weatherford, TX 76086

GLENN D. BELLAMY
Wood Herron & Evans, L.L.P.
600 Vine Street
Suite 2800
Cincinnati, OH 45202

DAVID WARRINGTON
GARY M. LAWKOWSKI
Dhillon Law Group, Inc.
2121 Eisenhower Avenue, Suite 608
Alexandria, VA 22314

# TABLE OF CONTENTS

TABLE OF CONTENTS.......................................................................... i

TABLE OF AUTHORITIES ................................................................. ii

INTRODUCTION .................................................................................1

LEGAL STANDARD............................................................................3

ARGUMENT .......................................................................................5

   I.   Appellants are Unlikely to Succeed on the Merits ...........................5

      a.   Legal Background of the Regulation of "Machineguns"..........................5

      b.   FRTs Do Not Fire Multiple Rounds with a Single Function of the Trigger ...............................................................................8

      c.   Appellants' Efforts to Elide this Conclusion are Unavailing...................9

         i.   Appellants' "Zip Tie Test" is Irrelevant to the Statutory Definition Provided by Congress ........................................9

         ii.   The Statutory Definition of Machinegun Unambiguously Turns on the Movement of the Trigger, Not a Trigger Finger ...................10

         iii.  The District Court Properly Understood How FRTs Work .............12

  II.  Appellants Will Not Be Irreparably Harmed in the Absence of a Stay .........14

  III. Appellees Will Be Substantially Harmed By a Stay .....................................17

  IV. The Public Interest Favors the Denying Appellants' Stay Request ..............18

  V.  The Scope of the Preliminary Injunction is Proper ........................................19

CONCLUSION ....................................................................................20

# TABLE OF AUTHORITIES

## Cases

*Cargill v. Garland*, 57 F.4th 447 (5th Cir. 2023)................................................ 7, 13

*Freedom from Religion Foundation, Inc. v. Mack*, 4 F.4th 306 (5th Cir. 2021).....15

*Nat'l Ass'n for Gun Rts., Inc. v. Garland*, No. 4:23-CV-00830-O, 2023 WL
6613080 (N.D. Tex. Oct. 7, 2023) ...........................................................1

*Nken v. Holder*, 556 U.S. 418 (2009) .........................................................4

*Plaquemines Parish v. Chevron USA, Inc.*, 84 F.4th 362 (5th Cir. 2023)................3

*State v. Biden*, 10 F.4th 538 (5th Cir. 2021) ................................................4

*Texas v. United States*, 40 F.4th 205 (5th Cir. 2022)................................................4

*United States v. Mirza*, 454 Fed. App'x 249 (5th Cir. 2011) ..................................15

*United States v. Quezda*, 839 Fed. App'x. 913 (5th Cir. 2021)..............................14

*United States v. Stalnaker*, 571 F.3d 428 (5th Cir. 2009).........................................15

*VanDerStock v. Garland*, Case No. 23-10718, 2023 WL 4945360 (5th Cir. Jul. 24,
2023) ..........................................................................................4

## Statutes

18 U.S.C. § 921 *et. seq*................................................................................5

18 U.S.C. § 921(a)(24)..............................................................................6

18 U.S.C. § 922(o) .....................................................................................6

18 U.S.C. § 924(a)(2)................................................................................6

26 U.S.C. § 5812......................................................................................5

26 U.S.C. § 5845(b)................................................................................6

26 U.S.C. §§ 5801 *et seq.*.....................................................................5

**Other Authorities**

James Madison, J., THE FEDERALIST No. 47 (Clinton Rossiter ed. 1961)...........1

**Regulations**

27 C.F.R § 447.11.................................................................................7

27 C.F.R § 479.11 (2018).....................................................................6, 7

27 C.F.R. § 478.11...............................................................................6, 7

## INTRODUCTION

James Madison warned that "[t]he accumulation of all powers, legislative, executive and judiciary, in the same hands . . . may justly be pronounced the very definition of tyranny." THE FEDERALIST No. 47, at 301 (James Madison) (Clinton Rossiter ed. 1961). The crux of this case is that the executive branch has overstepped by enacting criminal prohibitions that exceed its legislatively granted authority.

This case concerns Appellants' misclassification of certain forced-reset triggers ("FRTs") as "machineguns." On October 2, 2023, the district court held an evidentiary hearing. *Nat'l Ass'n for Gun Rts., Inc. v. Garland*, No. 4:23-CV-00830-O, 2023 WL 6613080, at *5 (N.D. Tex. Oct. 7, 2023). "[T]he hearing made clear that there are no factual disputes regarding how FRTs work." *Id.* Thus, as the district court found, it is undisputed that:

- For each and every round fired, the trigger on a weapon equipped with an FRT moves forward into its reset state and is depressed to release the hammer from its sear surface (Appellants' Addendum to Emergency Motion for Stay to Appeal (Doc. 12) ("Appellants' Add.") 2; Appellees' Addendum in Opposition to Appellants' Emergency Motion for Stay to Appeal ("Appellees' Add.") 18-19, 20, 21, Prelim. Inj. Hr'g. Tr. 21:16-22:17, 109:11-18, 111:7-16);

- The trigger in a firearm equipped with a forced reset trigger must reset after every round that is fired (Appellants' Add. 2-3; Appellees' Add. 8-9, Prelim. Inj. Hr'g. Tr. 111:17-112:24); and

1

- If the shooter attempts to overcome the reset and holds the trigger in a fully depressed position so that the trigger cannot reset, the weapon will malfunction (Appellees' Add. 22, Prelim. Inj. Hr'g. Tr. 113:10-21).

Appellants impermissibly seek to contradict these findings when they now misleadingly assert that, "[w]hen installed in a semi-automatic weapon, these devices allow a shooter to pull and hold the trigger to fire repeatedly . . . ." Based on the facts that it found, the district court correctly concluded that FRT's are not machineguns because they do not fire multiple rounds, automatically with a single *function* of the trigger, as required under the law. Appellants are therefore unlikely to succeed on the merits of their claim.

Appellants offer only conclusory statements that they will be irreparably harmed by the preliminary injunction and have thus effectively waived the argument. Moreover, to the extent that an irreparable harm argument can be inferred from the record, it presupposes that Appellants are correct on the merits, impermissibly ignores or contradicts the factual findings of the district court, and fails to explain how a prohibition on FRTs is causally necessary to take criminals in possession of firearms off the streets. If prohibited persons come into possession of a firearm, they can be arrested for that offense whether or not the preliminary injunction is in place.

The preliminary injunction does, however, have a clear causal relationship to protecting otherwise lawful FRT owners during the pendency of this litigation.

Appellants do not contest in their brief, and thus effectively concede that Appellees would be substantially harmed in the absence of the preliminary injunction. By their own admission, Appellants are actively enforcing their unlawful classification, including pursuing criminal prosecutions against individuals and aggressively seeking to leverage threats of criminal enforcement to seize FRTs from otherwise law-abiding owners. Indeed, in the time since the initial entry of the preliminary injunction, Appellants have sought to seize (or compel the "voluntary surrender") of FRTs from at least ten NAGR members protected by the injunction. Appellees' Add. 59.

In short, Appellants have not shown that they will be irreparably harmed by the preliminary injunction, while Appellees will be in its absence. Contrary to Appellants' assertions, the preliminary injunction *does* preserve the status quo by ensuring otherwise lawful FRT owners are not prosecuted or forced into the Hobson's Choice of surrendering their property or risking prosecution. Appellants have not met their "heavy burden" of establishing entitlement to the "extraordinary relief" of a stay pending appeal. *See Plaquemines Parish v. Chevron USA, Inc.*, 84 F.4th 362, 373 (5th Cir. 2023). Their Motion must be denied.

## LEGAL STANDARD

As this Court recently reiterated, "[a] stay pending appeal is 'extraordinary relief' for which defendants bear a 'heavy burden.'" *Plaquemines*, 84 F.4th at 373;

*see also Texas v. United States*, 40 F.4th 205, 215 (5th Cir. 2022) (per curiam) ("[The government's] burden is a substantial one, as a stay is 'an extraordinary remedy." (citations omitted)). "A stay is not a matter of right, even if irreparable injury might otherwise result. It is instead an exercise of judicial discretion, and [t]he propriety of its issue is dependent upon the circumstances of the particular case." *Id*. (quoting *Nken v. Holder*, 556 U.S. 418, 433 (2009)). "In considering whether to exercise its discretion, a court must consider four factors[:] . . . '(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.'" *Id*. (quoting *Nken*, 556 U.S. at 434); *see also VanDerStock v. Garland*, Case No. 23-10718, 2023 WL 4945360 at *1 (5th Cir. Jul. 24, 2023) (per curiam) (applying the same criteria to a request for emergency stay). Of these, "[t]he first two factors . . . are the most critical." *Id*.

Importantly, in view of Appellants' failure to challenge the district court's factual findings, "[t]he district court's findings of fact are reviewed for clear error and its legal conclusion *de novo*." *Texas*, 40 F.4th at 215; *see also State v. Biden*, 10 F.4th 538, 547 (5th Cir. 2021) ("The Government does not challenge *any* of

these findings. [footnote omitted] But even if it did, we would not find any of them

clearly erroneous in light of the record as a whole.").

## ARGUMENT

Appellants do not and cannot satisfy their "heavy burden" to justify the

"extraordinary relief" of a stay pending appeal.  The district court correctly ruled

against Appellants three times on all four of the *Nken* factors. Defendants have

presented no reason for this Court to reverse.

## I.    Appellants are Unlikely to Succeed on the Merits

Appellants have made *no* showing that they are likely to succeed on the

merits, let alone a "strong" showing.

### a.  Legal Background of the Regulation of "Machineguns"

The National Firearms Act of 1934 ("NFA") regulates certain firearms in

interstate commerce. 26 U.S.C. §§ 5801 *et seq.* Among other things, the NFA

criminalized the possession or transfer of certain unregistered firearms while also

prohibiting the registration of firearms otherwise banned by law. 26 U.S.C. §§

5812(a), 5861. In the decades following its enactment, Congress passed the Gun

Control Act of 1968 (the "GCA"), which criminalized the possession of firearms

for certain classes of people. 18 U.S.C. § 921 *et. seq.* The GCA was amended in

1986 by the Hughes Amendment to the 1986 Firearm Owners Protection Act—

colloquially referred to as "the machinegun ban"—to prohibit the possession or

5

transfer of machineguns. 18 U.S.C. § 922(o). With limited exceptions, it is a federal felony today to possess or transfer a machinegun. *Id*. This offense is punishable by up to ten years in federal prison for first-time offenders. 18 U.S.C. § 924(a)(2).

According to both the NFA and GCA, a "machinegun" is statutorily defined as:

> [a]ny weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. The term shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machine gun, and any combination of parts from which a machine gun can be assembled if such parts are in the possession or under the control of a person.

26 U.S.C. § 5845(b) (providing the original statutory definition of "machinegun"); 18 U.S.C. § 921(a)(24) (incorporating the NFA's definition of "machinegun" into the GCA).

For decades, the Bureau of Alcohol, Tobacco, Firearms, and Explosives' ("ATF's") regulations mirrored the federal statutory definition of "machinegun." *Compare* 27 C.F.R. §§ 478.11, 479.11 (2017), *with* 26 U.S.C. § 5845(b). This statutory consistency was disrupted in 2018 when the ATF broadened the meaning of machinegun by re-interpreting the statutory definition to add additional language in its most recent regulation (shown in italics):

Any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. The term shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machine gun, and any combination of parts from which a machine gun can be assembled if such parts are in the possession or under the control of a person. *For purposes of this definition, the term "automatically" as it modifies "shoots, is designed to shoot, or can be readily restored to shoot," means functioning as the result of a self-acting or self-regulating mechanism that allows the firing of multiple rounds through a single function of the trigger; and "single function of the trigger" means a single pull of the trigger and analogous motions. The term "machine gun" includes a bump-stock-type device, i.e., a device that allows a semi-automatic firearm to shoot more than one shot with a single pull of the trigger by harnessing the recoil energy of the semi-automatic firearm to which it is affixed so that the trigger resets and continues firing without additional physical manipulation of the trigger by the shooter.*

27 C.F.R § 479.11 (2018) (emphasis added).[1]

The ATF's 2018 regulation was rejected by this Court in *Cargill v. Garland*, 57 F.4th 447 (5th Cir. 2023) (en banc). In *Cargill*, this Court found that a "machinegun" under the NFA and GCA must be capable of firing multiple rounds by a single function of the trigger and do so automatically. *Id*. at 460. This Court further found that "single function *of the trigger*" is not the same as single function of the shooter's finger or single pull of the trigger. *Id* at 459-60. Thus, this Court was "obliged to conclude that the statutory definition of machinegun

---

[1] ATF's rule change is embodied identically in 27 C.F.R §§ 447.11, 478.11, and 479.11. Section 479.11 is used herein exemplarily and reference to this section should be understood to be inclusive of all.

unambiguously turns on the movement of the trigger and not a trigger finger." *Id*.

at 460.

### b.  FRTs Do Not Fire Multiple Rounds with a Single Function of the Trigger

The district court provided a succinct summary of how FRTs operate:

The basic function of any trigger is to release the hammer. This occurs when the trigger is pulled back to the point that a "trigger sear" releases the hammer from its retained position. Once released by the trigger, the hammer pivots to contact the firing pin. Once contacted, the firing pin then strikes a chambered ammunition cartridge or "round," causing gunpowder in the cartridge to combust. The combustion effect propels the cartridge's bullet out of the barrel of the firearm. Once fired, a standard semi-automatic trigger returns to its "reset" state—ready-to-fire or "set" position—by allowing the firearm to function once again by starting the mechanism anew. In other words, the firearm only functions again upon the reset of the trigger to release the hammer.

An FRT is a device that forcibly returns the trigger to its reset state. In the commercialized FRT designs at issue in this litigation, the trigger is forcibly reset by the hammer when the bolt carrier cycles to the rear. A "locking bar" mechanically locks the trigger in its reset state, preventing the user from moving the trigger rearward to function by releasing the hammer, until the bolt has returned to the in-battery position and the firearm is safe to fire. When firing multiple shots using an FRT, the trigger must still reset after each round is fired and must separately function to release the hammer by moving far enough to the rear in order to fire the next round.

Appellants' Add. 2-3.  Three key facts emerge from this description:

- For each and every round fired, the trigger on a weapon equipped with an FRT moves forward into its reset state and is depressed to release the hammer from its sear surface (Appellants' Add. 2; Appellees' Add. 18-19, 20, 21, Prelim. Inj. Hr'g. Tr. 21:16-22:17, 109:11-18, 111:7-16);

8

- The trigger in a firearm equipped with a forced reset trigger must reset after every round that is fired (Appellants' Add. 2-3; Appellees' Add. 8-9, Prelim. Inj. Hr'g. Tr. 111:17-112:24); and

- If the shooter attempts to overcome the reset and holds the trigger in a fully depressed position so that the trigger cannot reset, the weapon will malfunction (Appellees' Add. 22, Prelim. Inj. Hr'g. Tr. 113:10-21).

These facts were found by the district court on an undisputed record following an evidentiary hearing. In light of these facts, FRTs do not fire multiple rounds automatically by a single function of the trigger and thus are not "machineguns."

### c. Appellants' Efforts to Elide this Conclusion are Unavailing

In a concerning display inconsistent with their duty of candor to this Court, Appellants make several arguments to avoid these basic facts. They fail. Although Appellants fail to acknowledge—much less show to be clearly erroneous—the district court's findings, their factual arguments were rejected by the district court. None of them meet Appellants' "heavy burden" to make a "strong showing" of likely success on the merits.

### i.    Appellants' "Zip Tie Test" is Irrelevant to the Statutory Definition Provided by Congress

Appellants claim "[i]n testing, ATF consistently found that AR15-type rifles equipped with FRT-15s or WOTs fired multiple rounds automatically when the shooter 'pulled the trigger and held it to the rear. [citations omitted] ATF achieved the same results by using a zip tie to apply continuous pressure to the trigger; in each instance, the weapon fired multiple shots." Appellants' Motion Pursuant to

Circuit Rule 27.3 for Stay Pending Appeal (Doc. 11) ("Appellants' Mot.") at 7. But

Appellants fail to inform this Court that the district court directly rejected this

factual assertion:

> In a machinegun, the trigger must be held in its rearmost position for the gun to fire automatically. The machinegun's trigger does not reset in between each shot. *But in an FRT-equipped firearm, the trigger must still reset in between each shot—even when depressed in a rearward state by the zip tie.* Defendants' zip tie does not appear to hold the FRT trigger still in its most rearward position. *If it did, the weapon would malfunction and not fire subsequent shots. Instead, the elasticity in the zip tie allows for sufficient movement to allow for a trigger reset.* All this test establishes is that the trigger need not move to its most rearward position. It can still reset from sufficient rearward pressure and forward movement propelled by the stretched zip tie. In other words, the zip tie test does not demonstrate that a single function of the trigger does not occur for each shot since the trigger's operative function is the reset of the hammer—not how the user or a zip tip pulls the trigger. The zip tie test is irrelevant to the statutory definition provided by Congress and as interpreted by *Cargill*.

Appellants' Add. 28-29 (emphasis added).  Appellants make no effort to show that

the district court's factual finding was clearly erroneous, yet implicitly ask this

Court to base a stay on an asserted fact expressly rejected below.  Their lack of

candor and disregard for the applicable standard of review dooms their effort.

### ii.     The Statutory Definition of Machinegun Unambiguously Turns on the Movement of the Trigger, Not a Trigger Finger

Appellants claim "[t]here is no dispute that when a shooter replaces the

standard trigger on an AR15-type rifle with an FRT-15 or WOT, the weapon will

fire repeatedly from a single continuous pull on the trigger."  Appellants' Mot. at

10.  Again, as shown above, the district court expressly rejected this factual claim on the undisputed evidence adduced at the hearing.  *See* p. 8, above.

Appellants' claim also ignores this Court's holding in *Cargill.*  Appellants spill much ink rehashing their position that single function of the trigger means single pull of the trigger. *See, e.g.*, Appellants' Mot. at 12.  But that argument is foreclosed by *Cargill.*  The government made the same argument in *Cargill*, "contend[ing] that 'single function of the trigger' means 'a single pull of the trigger and analogous movements.'" 57 F.4th at 459. And this Court flatly rejected it, stating "that argument fails on its face." *Id*.  This Court went on to find it was "obliged to conclude that the statutory definition of machinegun unambiguously turns on the movement of the trigger and not a trigger finger." *Id*. at 460.

At certain points, Appellants state that the language on which the district court relied "reflected the views of a plurality of the Court, not a holding." Appellants' Mot. at 13 n.1. Appellants appear to believe that this assertion undercuts the district court's opinion.  Not so: Appellants would lose this case on the merits under the reasoning of the *Cargill* concurrence as well.  Judge Ho's concurrence concludes that the phrase "function of the trigger" is ambiguous as to whether "single function of the trigger" is "from the weapon's perspective or the shooters" and that this ambiguity presents "a textbook case for lenity." *Cargill*, 57 F.4th at 477 (Ho, J. concurring in part and concurring in judgment).  The same

11

logic would apply to this case for the same reasons. This Court should reject Appellants' attempt to relitigate *Cargill* through this Court's emergency docket.

### iii.    The District Court Properly Understood How FRTs Work

Appellants' claim that "[t]he district court misunderstood the nature of the devices at issue here" because the court purportedly "believed that these devices are not meaningfully distinguishable from the bump stocks at issue in *Cargill*." Appellants' Mot. at 13. This assertion is flat wrong and, in any event, is a far cry from a showing of clear error by the district court. The district court did not base its holding on an analogy to non-mechanical bump stocks. It spent five pages independently examining the facts of how FRTs operate and applied the law to those facts. *See* Appellants' Add. 26-31.

Appellants further seek to analogize FRTs to mechanical bump stocks, such as the Akins Accelerator. Appellants' Mot. at 14-15. To support this point, Appellants engage in yet another stunning lack of candor with this Court by stringing together sentence fragments that are separated by *eight pages* in *Cargill* to create new material facts found nowhere in the Court's actual opinion. Appellants claim "[t]his Court explained that its concerns regarding the application of the term 'single function of the trigger' to non-mechanical bump stocks 'would not apply to the Akins Accelerator' because 'a shooter using an Akins Accelerator need only pull the trigger once to activate the firing sequence' and the device then

'maintained the bump fire of its own accord,' *Cargill*, 57 F.4th at **462 n.8**, with no need 'to maintain pressure on the barrel and trigger ledge in order to maintain this firing sequence,' *id.* at **454**." Appellants' Mot. at 14-15 (bold underlining supplied).  This grossly mischaracterizes *Cargill*.

First, as the district court noted, this Court *did not* determine that mechanical bump stocks are machineguns; it "merely recognized that the only issue before it was whether non-mechanical bump stocks were machineguns, and that the outcome may differ for a mechanical bump stock depending on how it worked." Appellants' Add. 25; *see Cargill*, 57 F.4th at 462 ("[T]he case *might* well be different if we were considered a semiautomatic weapon equipped with a mechanical bump stock . . .. But we are not considering that case." (emphasis added)).

Second, as this Court explained, the reason that the classification of mechanical bump stocks may differ from the classification of non-mechanical bump stocks is because the *legal trigger* may be different. To wit, this Court stated "[i]t could be the case that *a switch activating a mechanical bump* stock would be the legal trigger." *Cargill*, 57 F.4th at 462 (emphasis added).  The potential distinction is *not* how what Appellants call the "trigger shoe" interacts with the shooter's finger; it's whether the "trigger shoe" is actually the operative trigger. Thus, Appellants are engaged in a deceptive game of definitional three-card monte

when they claim that "the trigger moves to release the hammer for each shot fired" for the Akins Accelerator, Appellants' Mot. at 2, because the operative question is whether the "trigger shoe" (what people colloquially think of as the trigger) is actually the "legal trigger" on such a device.

FRTs are not mechanical bump stocks. Now on their fourth round of briefing on these questions, Appellants have yet to argue that there is an external switch associated with an FRT that is the "legal" trigger. On an FRT, the "trigger" is the device that releases the hammer. That device functions once for each and every round fired. FRTs are not machineguns.

## II.     Appellants Will Not Be Irreparably Harmed in the Absence of a Stay

As a preliminary matter, outside of two conclusory statements in their introduction, Appellants have failed to brief irreparable harm. *See* Appellants' Mot. at 1, 2.[2] These conclusory statements are inadequate to carry Appellants' "heavy burden" in this case and serve to effectively waive the argument. *See United States v. Quezda*, 839 Fed. App'x. 913, 914 (5th Cir. 2021) (per curiam)

---

[2] Instead, Appellants attempt to shift the burden to Appellees, claiming "[b]ecause ATF has no immediate plans to take any action with respect to the three named individual plaintiffs, [Appellees] have not carried their burden of demonstrating irreparable injury requiring relief pending resolution of their claims." Appellants' Mot. at 22. This misapprehends the current procedural posture of this case. The district court found that Appellees *met* their burden and granted a preliminary injunction. *Appellants* now bear the "heavy burden" of justifying a stay of that injunction, by showing that the district court's factual finding was clearly erroneous, which they have not even tried to do.

14

(claim waived where appellant "failed to cite analogous cases, point to specific portions of the record, or explain his argument beyond a handful of conclusory and nonspecific statements."); *United States v. Mirza*, 454 Fed. App'x 249, 256 n. 6 (5th Cir. 2011) (per curiam) ("Because these arguments are presented in a conclusory fashion, we will not consider them"); *United States v. Stalnaker*, 571 F.3d 428, 440-41 (5th Cir. 2009) (undeveloped arguments that lacked citations to relevant law were waived for inadequate briefing).  Given that irreparable harm is one of the two "most critical" factors in evaluating a request for a stay pending appeal, Appellants' failure to properly brief the issue is fatal to their Motion.

Even if not waived, the collection of assertions in Appellants' Motion is insufficient to sustain their burden.  First, as this Court has previously noted, "any injury to [the enjoined party] is outweighed by [a] strong likelihood of success on the merits" by Appellants.  *Freedom from Religion Foundation, Inc. v. Mack*, 4 F.4th 306, 316 (5th Cir. 2021).  The district court concluded that Appellees are likely to succeed on the merits three times in three different procedural postures.  *See, e.g.*, Appellants' Add. 51 ("The Court has already concluded *twice* that Plaintiffs—not Defendants—are likely to succeed on the merits. Defendants offer nothing to compel a different conclusion . . .. [T]he Court finds that Defendants, who bear the burden, fail to demonstrate a likelihood of success on the merits, let alone the 'strong' showing required for such 'extraordinary relief' as a stay

pending appeal are likely to succeed on the merits.").   As shown above nothing in Appellants' Motion supports an alternative conclusion.  It is not unduly burdensome for the Government to be required to follow the law.

Second, as a factual matter, the district court concluded "[t]here is nothing in the record actually showing that Defendants will be completely unable to later contact individuals suspected of transferring or selling FRTs during the preliminary injunction and trace the movements of those FRTs based on that information. All Defendants have shown is that these retrievals will be more difficult." Appellants' Add. 52.  Appellants do not even deign to address this finding in their Motion, let alone show that it is clearly erroneous. This factual finding effectively compels the conclusion that Appellants' retrieval efforts will not be *irreparably* harmed by the preliminary injunction, even if they are ultimately successful in this litigation.

Third, Appellants suggest that the prohibition on FRTs is somehow linked to criminal activity, including a suggestion that "[t]here is also significant evidence that these dangerous devices are ending up in the hands of convicted felons otherwise prohibited from possessing firearms." *See* Appellants' Mot. at 18. However, as the district court found, "this concern exists with *any* firearm—not just FRTs." Appellants' Add. 52.  FRTs only work with a preexisting firearm, which, by definition, prohibited persons cannot legally possess. If Appellants are

16

concerned with prohibited persons acquiring FRTs for use with preexisting firearms, they already possess authority to arrest that person now. *See* Appellants' Add. 52. Ultimately, Appellants' unsupported bluster about links between FRTs and criminal activity is "sound and fury signifying nothing" because Appellants can arrest those same people today for their criminal activity, regardless of whether they can also tack on a charge relating to possession of an FRT. It is not a showing that the district court clearly erred in its contrary finding.

## III.    Appellees Will Be Substantially Harmed By a Stay

The preliminary injunction has no effect on Appellants' ability to take dangerous criminals off the streets. It has a big effect on their ability to interfere with the rights of otherwise law-abiding individuals to continue to possess and enjoy their property without fear of prosecution. *See generally* Appellants' Add. 52 ("More importantly, this Court is not persuaded that Defendants should be allowed to restrict the rights of law-abiding citizens simply because some criminal somewhere might break the law.").

The district court found twice, in slightly different contexts, that Appellees face a substantial risk of irreparable harm if Appellants are not enjoined from engaging in enforcement activities. *See* Appellees' Add. 39-43; Appellants' Add. 31-37. As a factual matter, the district court found Appellees "face the very real potential to experience harm if an injunction is not granted. These harms include a

credible threat of civil or criminal prosecution should Defendants change their mind, compliance costs, and a chilling of constitutional and ownership rights." Appellants' Add. 41.

Appellants did not even *address* these findings—let alone show that they are clearly erroneous—and have thus effectively conceded through waiver that Appellees would be substantially harmed by a stay.

Instead, Appellants blithely claim that the district court "mistakenly assumed that the 2018 bump stock rule marked the first time that ATF had determined that a forced reset trigger device was a machinegun" and that this "error crucially infected the court's assessment of the balance of harms." Appellants' Mot. at 16. This conclusion belied by the district court's actual words. The district court directly addressed this argument in its Order denying a stay pending appeal, stating "the fact that Defendants have likely acted in violation of the law for years does not make the action any less unlawful." Appellants' Add. 7. The status quo the district court was preserving is one where individuals who currently own FRTs are not visited by armed ATF agents demanding that they surrender their property or risk criminal charges.

## IV.    The Public Interest Favors the Denying Appellants' Stay Request

In its proper context, the public interest militates against a stay. First, there is not and cannot be a public interest in enforcing an illegal interpretation of the

law.  Second, Appellees will be substantially harmed by Appellants' aggressive enforcement of their unlawful classification.  Appellants, in contrast, will not be irreparably harmed.  In granting its preliminary injunction, the district court noted "Defendants provide no specific causal arguments for how the public would be harmed by an injunction."  Appellants' Add. 39.  They still have failed to do so, continuing to offer conclusory claims about "public safety" that are not supported by the facts in the record—as the district court expressly found—and rely on the question-begging premise that FRTs are machineguns.

## V.    The Scope of the Preliminary Injunction is Proper

Appellants seek to limit the preliminary injunction to just the three named individual plaintiffs.  Appellants' Mot. at 21.  This request ignores that the National Association for Gun Rights and Texas Gun Rights *are* named associational plaintiffs.  They are full parties to this case.  They—and their members—should not be treated as second class citizens or sacrificed on the altar of Appellants' administrative convenience. The district court has already found that the associational plaintiffs have standing to bring this case on behalf of their members.  Their members are harmed by Appellants' unlawful actions.  They should be protected by the preliminary injunction.

Appellants also seek to limit the preliminary injunction to mere "possession."  Appellants' Mot. at 21. Appellants' argument ignores that not

everyone already owns an FRT. All of the individual Plaintiffs have represented that they would like to purchase additional FRTs. *See* Appellees' Add. 55-58 (Declaration of Patrick Carey); 51-52 (Declaration of J.R. Wheeler); 53-54 (Declaration of Travis Speegle). Similarly, members of the associational plaintiffs intend to acquire FRTs but for Appellants' unlawful classification. In order to use and enjoy FRTs, these plaintiffs must be able to legally acquire one. Moreover, both the individual and the associational plaintiffs include persons who sell gun parts, such as FRTs. A narrower injunction would not protect their ability to engage in lawful commerce. The preliminary injunction appropriately protects more than just "mere possession."

## CONCLUSION

Appellants have failed to meet their "heavy burden" to justify the "extraordinary relief" they request. To the contrary, all four *Nken* factors weigh against them. Appellants' Motion should be denied.

Date: November 22, 2023          Respectfully submitted,

/s/Gary M. Lawkowski
Gary M. Lawkowski (VA Bar No. 82329)
David A. Warrington (VA Bar No. 72293)
DHILLON LAW GROUP, INC.
2121 Eisenhower Avenue, Suite 608
Alexandria, VA 22314
Telephone: (703) 748-2266
glawkowski@dhillonlaw.com
dwarrington@dhillonlaw.com

Whitney A. Davis (TX Bar No. 24084843)
Ben Sley (TX Bar No. 18500300)
EGGLESTON KING DAVIS, LLP
102 Houston Avenue, Suite 300
Weatherford, TX 76086
Telephone: (703) 748-2266
whit@ekdlaw.com
ben@ekdlaw.com

Glenn Bellamy (OH Bar No. 0070321)
WOOD HERRON & EVANS LLP
600 Vine Street, Suite 2800
Cincinnati, OH 45202
Telephone: 513-707-0243
gbellamy@whe-law.com

## **Certificate of Compliance**

This Opposition complies with Federal Rule of Appellate Procedure 27(d)(2)(A) because it contains 5,033 words.  This Opposition complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 27(d)(1)(E) and 32(a)(5)-(6) because it was prepared using Microsoft Word in Times New Roman 14-point font, a proportional typeface.

/s/Gary M. Lawkowski
Gary M. Lawkowski