No. 23-11138

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

NATIONAL ASSOCIATION FOR GUN RIGHTS, INC.; TEXAS GUN RIGHTS, INC.; PATRICK CAREY; JAMES WHEELER; & TRAVIS SPEEGLE,
*Plaintiffs-Appellees,*
*v.*
MERRICK GARLAND, U.S. ATTORNEY GENERAL; UNITED STATES DEPARTMENT OF JUSTICE; STEVEN DETTELBACH, IN HIS OFFICIAL CAPACITY AS DIRECTOR OF THE BUREAU OF ALCOHOL, TOBACCO, FIREARMS, AND EXPLOSIVES; BUREAU OF ALCOHOL, TOBACCO, FIREARMS, AND EXPLOSIVES,
*Defendants-Appellants,*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
CASE NO. 4:23-CV-00830

## APPELLEES' ADDENDUM IN OPPOSITION TO APPELLANTS' EMERGENCY MOTION FOR STAY PENDING APPEAL

WHITNEY DAVIS
BENJAMIN SLEY
Eggleston King Davis, L.L.P.
102 Houston Avenue
Suite 300
Weatherford, TX 76086

GLENN D. BELLAMY
Wood Herron & Evans, L.L.P.
600 Vine Street
Suite 2800
Cincinnati, OH 45202

DAVID WARRINGTON
GARY M. LAWKOWSKI
Dhillon Law Group, Inc.
2121 Eisenhower Avenue, Suite 608
Alexandria, VA 22314
Dwarrington@DhillonLaw.com
GLawkowski@DhillonLaw.com

# TABLE OF CONTENTS

Transcript of Preliminary Injunction
 Hearing (Excerpts) (Oct. 2, 2023) (Dkt. 56)……………….………… Add. 1

Opinion and Order on Plaintiffs' Motion
 For Temporary Restraining Order (Aug. 30, 2023) (Dkt. 36)………. Add. 24

Declaration of Mr. James Joseph Ross Wheeler
 (July 28, 2023) (Dkt. 19)………………………….…………… Add. 51

Declaration of Mr. Travis Speegle (July 18, 2023) (Dkt. 19)…………….... Add. 53

Declaration of Mr. Patrick Carey (July 28, 2023) (Dkt. 19)……………….. Add. 55

Declaration of Mr. Ryan J. Flugaur (Oct. 31, 2023) (Dkt. 62-1)………..…. Add. 59

```
1                IN THE UNITED STATES DISTRICT COURT

2              FOR THE NORTHERN DISTRICT OF TEXAS

3                      FORT WORTH DIVISION

4

5   NATIONAL ASSOCIATION FOR  )
    GUN RIGHTS, INC., et al., )
6                             )
         Plaintiffs,          ) CASE NO. 4:23-CV-00830-O
7                             )
    VS.                       ) FORT WORTH, TEXAS
8                             )
    MERRICK GARLAND, et al.,  )
9                             )
         Defendants.          ) OCTOBER 2, 2023
10

11                      VOLUME 1 OF 1
                TRANSCRIPT OF EVIDENTIARY HEARING
12            BEFORE THE HONORABLE REED C. O'CONNOR
                UNITED STATES DISTRICT COURT JUDGE
13

14  A P P E A R A N C E S:

15

16  FOR THE PLAINTIFFS: MR. MICHAEL COLUMBO
                        DHILLON LAW GROUP
17                      177 Post Street, Suite 700
                        San Francisco, CA  94108
18                      Telephone:  415.944.4996

19                      MR. DAVID WARRINGTON
                        MR. GARY LAWKOWSKI
20                      DHILLON LAW GROUP
                        2121 EISENHOWER AVENUE, SUITE 608
21                      Alexandria, VA  22314
                        Telephone:  703.574.1206
22
                        MR. BENJAMIN H.B. SLEY
23                      EGGLESTON KING DAVIS, LLP
                        102 Houston Avenue, Suite 300
24                      Weatherford, TX  76086
                        Telephone:  408.636.3438
25
```

```
 1

 2   A P P E A R A N C E S:

 3

 4   FOR THE DEFENDANTS: MR. MICHAEL CLENDENEN
                        MR. ALEXANDER RESAR
 5                      MS. LAURA BAKST
                        U.S. DEPARTMENT OF JUSTICE
 6                      CIVIL DIVISION, FEDERAL PROGRAMS BRANCH
                        1100 L Street NW, Room 12028
 7                      Washington, D.C.  20005
                        Telephone:  202.305.0693
 8

 9

10            E X H I B I T S

11   PLAINTIFFS' EXHIBITS -

12   A - Video.....................................29

13   B - Video.....................................31

14   C - Video.....................................29

15   DEFENDANTS' EXHIBITS -

16   1 - CV of Anthony Ciravolo.....................52

17   2 - Transcript................................58

18   3 - Cutaway Guns..............................77

19

20

21

22

23

24

25
```

```
1

2   COURT REPORTER:        ZOIE M. WILLIAMS, RMR, RDR, FCRR
                           United States Federal Court Reporter
3                          501 W. 10th Street
                           Fort Worth, Texas  76102
4                          zwilliams.rmr@gmail.com
                           817.850.6630
5

6

7

8        The above styled and numbered cause was reported by

9   computerized stenography and produced by computer.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1
 2                          I N D E X
 3
 4    PLAINTIFFS' WITNESSES:
 5    DANIEL O'KELLY –
 6    Direct Examination by Mr. Columbo..................06
 7    Cross-Examination by Mr. Clendenen.................31
 8    Redirect Examination by Mr. Columbo...............44
 9    Rebuttal Examination by Mr. Columbo..............117
10    Surrebuttal Examination by Mr. Clendenen.........127
11    DEFENDANTS' WITNESSES –
12    ANTHONY CIRAVOLO –
13    Direct Examination by Mr. Resar....................46
14    Cross-Examination by Mr. Columbo...................99
15    Redirect Examination by Mr. Resar................115
16    Reporter's Certificate...........................146
17    Word Index.......................................147
18
19
20
21
22
23
24
25
```

Add. 4

1  go off on their own.  Something has to initiate the firing

2  sequence, and that's where the human element comes in.

3       Q.   So would you then agree that whether or not a

4  device is a machinegun does not determine about the degree

5  of pressure a shooter uses on the trigger?

6       A.   That's correct.  It's based upon what functions

7  the trigger does, not how much pressure the user needs to

8  start those functions.

9       Q.   So I want to just clarify something.  You wrote

10  your report that you were just using in your testimony in

11  about, was it April of this year?

12       A.   Yes, I believe so.

13       Q.   Do you still have your report up there with you?

14       A.   Yes, I do.

15       Q.   Okay.  If you just go to the second page of your

16  report.  Let me know when you get there.

17       A.   Okay.

18       Q.   So just above the section entitled "Findings,"

19  there is a paragraph that begins with the word "finally." Do

20  you see that?

21       A.   Yes.

22       Q.   Is it fair to characterize that paragraph

23  describes the definition of a machinegun as found in 27 CFR

24  478.11, 479.11?

25       A.   Yes, that's correct.

1    Q.   Now, in your direct testimony did I hear you

2   testify that the regulatory definition of a machinegun plays

3   no bearing on your opinion today?

4    A.   That's correct.  My classification is not based on

5   the regulatory definition, but in fact the statutory

6   definition where the single function of the trigger only

7   needs to be done one time.  So that's where the

8   classification is based off of.

9    Q.   Okay.  Now, in that paragraph is it accurate to

10   say that the paragraph quotes the regulatory definition to

11   say a single function of the trigger means a single pull of

12   the trigger and analogous motions?

13    A.   That's correct.

14    Q.   So you are not using that definition for today's

15   purposes?

16    A.   That's correct.  I believe that the single

17   function of the trigger means single pull of the trigger is

18   speaking of how the user interacts with the trigger to cause

19   it to function.

20    Q.   Okay.  So whether a user's pressure on the trigger

21   is constant or not, then is not determinative of whether or

22   not a device is a machinegun?

23    A.   That's correct.

24    THE COURT:  So you would change, if you were

25   writing this today, you would change this paragraph, in that

1  you would say, single function of the trigger is how the

2  shooter would interact with the trigger?  You would delete

3  the word "means" from that?

4        THE WITNESS:  Yes, that's correct.

5        THE COURT:  Okay.

6  (BY MR. COLUMBO:)

7    Q.  I have to skip a few questions.  You threw me a

8  curveball there.

9        So, similarly, a continuous pull of a trigger is

10  not something a statute uses to decide whether or not

11  something is or is not a trigger?

12    A.  That's correct.  The statute speaks of what the

13  function of the trigger is.

14    Q.  In any event, even that phrase "continuous pull of

15  the trigger" is not even in the regulation anyway, right?

16    A.  Correct.

17    Q.  Okay.  So, well, then would you agree with me that

18  your testimony is not that a trigger requires a gun user to

19  lessen their pressure on the trigger and release it in order

20  to fire one shot?

21    A.  I'm sorry, could you state that again?

22    Q.  Well, let's try it a different way.

23        Is it your testimony that a single function of the

24  trigger requires the gun user to lessen their pressure on

25  the trigger and release it in between shots in order to

```
1        Q.   Subsequently, after the locking bar releases the

2   trigger, a user can pull the trigger rearward causing the

3   trigger to release the hammer which hits the firing pin and

4   causes the weapon to fire again, right?

5        A.   Yes, the user can continue to move the trigger

6   rearward.

7        Q.   But for the trigger to release the hammer and for

8   the gun to fire again, that trigger must move rearward?

9        A.   Yes, it must.

10       Q.   And the only force that moves that trigger

11  rearward comes from the user's finger, right?

12       A.   Yes, that's correct.

13       Q.   So just to sum up, for every shot fired by an

14  FRT-15, the trigger must move rearward to release the

15  hammer?

16       A.   Yes, that's correct.

17       Q.   Let's talk about an M16 for a moment.  An M16

18  machinegun has a part called an auto sear, correct?

19       A.   Yes.

20       Q.   After a trigger initially moves and releases the

21  hammer, the auto sear can then repeatedly release the hammer

22  to fire multiple shots without the trigger moving again,

23  correct?

24       A.   Yes, that's correct.

25       Q.   And that's different than an FRT-15, correct,
```

1  where the trigger movement is required for every shot fired?

2       A.   Yes, that's correct.

3       Q.   Indeed, in an FRT-15, the hammer is captured by

4  the trigger sear for each round fired?

5       A.   Yes, that's true.

6       Q.   But an M16, the hammer is not captured by the

7  trigger sear for each round fired?

8       A.   That's correct.

9       Q.   That means if you load and fire five rounds from

10  an FRT-15, the trigger must move to its most rearward

11  position five times, right?

12       A.   Yes.

13       Q.   Looking at it another way, if you loaded and fired

14  five rounds from an FRT-15, the trigger sear surface must

15  engage the hammer five times, yes?

16       A.   Yes, that's correct.

17       Q.   And the trigger will reset, I guess, four times?

18       A.   Yes, it will.

19       Q.   But if you load and fire five rounds from an M16

20  machinegun while the trigger is held rearward just once,

21  without being released, you can fire all five rounds; is

22  that right?

23       A.   Correct.  In both systems you only have to

24  initiate that sequence one time, but with one pull.

25       Q.   We just talked about the FRT-15.  But in an M16,

1  capable of shooting automatically more than one shot without

2  manual reloading by a single function of the trigger.

3       The statute, as you've heard, does not define

4  function of the trigger, but the Fifth Circuit has

5  repeatedly held that the trigger is the mechanism used to

6  initiate the firing sequence.

7       That's the definition that Mr. Ciravolo applied in

8  his classification report and legally it's from Jokel, it's

9  from Camp, and it's reiterated by the plurality in Cargill.

10      So the relevant function of the trigger, for

11 purposes of the statutory definition of function of the

12 trigger, is the initiation of the firing sequence.

13      An FRT satisfies this statutory definition because

14 the trigger needs to only initiate the firing sequence once

15 for the weapon to continue to shoot automatically until the

16 shooter acts again on the trigger by releasing rearward

17 pressure.

18      You heard that passage Michael read from the

19 Cargill decision in which the Cargill plurality was clear

20 that holding and maintaining pressure on the trigger creates

21 one function of the trigger.  That is how the user engages

22 in one function of the trigger.

23      So once the FRT is subject to constant rearward

24 pressure, just like an M16, it will continue to fire until

25 the user releases that pressure, the firearm exhausts its

1  with our opposition brief a video, and I would just strongly

2  urge your Honor to watch that, if he has not already,

3  because it shows that, when subject to inanimate rearward

4  pressure, without any conscious decision to reengage or to

5  release pressure, the firearm continues to fire with an

6  FRT-15.

7          And again, the fact that this pressure is

8  constant, and rearward does not mean that the trigger is

9  performing more than one function as the Cargill plurality

10  made clear, the act of pulling and holding the trigger is

11  one function.  And that's all that needs to happen in an

12  FRT-15 for it to continue to fire.

13          Unless your Honor has any questions on what I just

14  spoke about --

15          THE COURT:  Just briefly, and I appreciate you

16  getting to the point.

17          My question to you is, is there any factual

18  dispute about how any of these guns work between you and the

19  plaintiff?

20          MR. RESAR:  I don't think so, your Honor.  I think

21  we agree on the way that guns work.  I think the

22  disagreement is on how this statute is applied.

23          THE COURT:  Right.  And even with the Zip-Tie, the

24  trigger for the FRT-15 operates the same with a Zip-Tie as

25  with someone putting their finger on it, as with any other

```
1              MR. RESAR:  Correct.  Exactly.

2              THE COURT:  And then, when you engage that, one

3    round comes out, it's a semiautomatic round?  Multiple

4    rounds cannot come out when you pull it back, it halfway

5    back?

6              And then, if you engage it further, all the way

7    back, then you can have the burst fire of an automatic?

8              MR. RESAR:  Yes, precisely.  That's what

9    Mr. Ciravolo explained.

10             THE COURT:  Okay.  And as it relates to the

11   Cargill decision, the Fifth Circuit concluded or determined,

12   the majority opinion, the controlling opinion concluded that

13   function of the trigger meant action?

14             MR. RESAR:  If I could just push back?  I'm sorry,

15   this may seem like splitting hairs, but that was a

16   plurality, it was eight judges who concluded that.  It was,

17   I believe, a 16-judge en banc.

18             So I think there is some dispute over whether that

19   is controlling or not, but we certainly recognize it is, at

20   a minimum, highly persuasive, and we think this satisfies

21   the definition under that.  I just wanted to note for the

22   record that the U.S.'s position is that is not officially a

23   controlling opinion.

24             THE COURT:  Okay.  Thank you.  For that portion of

25   the opinion, the function they define, that en banc of the
```

1    court defined that function as action, action of the

2    trigger?  Function of the trigger means action of the

3    trigger?

4         MR. RESAR:  I don't think I agree with that, your

5    Honor.  I think it's initiating the firing sequence.

6         THE COURT:  The reason I ask that is because that

7    is, at that first part of the opinion, when the writer is

8    grappling with how to determine that, that portion of the

9    opinion says function means action.

10         MR. RESAR:  Yes, your Honor.

11         THE COURT:  Right?

12         And they're talking about the trigger?

13         MR. RESAR:  Uh-huh.

14         THE COURT:  But you disagree that it would be

15    action of the trigger?

16         MR. RESAR:  Well, let me clarify.  So the trigger

17    is defined as a mechanism that initiates the firing

18    sequence.  So the function of the trigger is the action that

19    the trigger takes to initiate the firing sequence.

20         I don't think that we're disagreeing, or I'm

21    trying to disagree, I'm certainly not.  I think I'm just

22    putting it in slightly different words that are used

23    elsewhere in the opinion.

24         THE COURT:  Got you.  Okay.

25         So for it to be a machinegun then, the FRT-15 will

1    need to automatically expel projectiles with the single

2    pulling of the trigger?

3         MR. RESAR:  With a single, continuous pull.  And

4    that's because the FRT-15-equipped firearm initiates the

5    firing sequence once and the rest of that happens

6    automatically.

7         THE COURT:  Right.  So your view is that, by

8    holding the trigger down, even though it moves, that is a

9    single action of the trigger?  Right?  We don't use pull,

10   right?

11        MR. RESAR:  Correct.  Yes.

12        THE COURT:  According to that portion of the

13   opinion, we don't use pull.  We use action of the trigger.

14        And it is a single action, in your mind, even

15   though the trigger moves back and forth to propel these

16   multiple projectiles out of the firearm?

17        MR. RESAR:  Yes.  Correct, your Honor.  And that

18   comes directly from the language in Cargill that we've read

19   a few times now stating that single rearward pull causes

20   malfunction.

21        THE COURT:  Okay.  Very good.  She's going to

22   address a couple of facts just briefly.

23        MS. BAKST:  Thank you, your Honor.  I will keep

24   this very brief.  I just want to speak about scope of

25   relief.  Plaintiffs here are seeking an extremely broad

1   happens after the shooter has moved the trigger.  In this,

2   they were agreeing with the position of the military court

3   in Alkazahg that's cited in our papers.

4          As to the function of the trigger, the Fifth

5   Circuit held that in a hammer-fired gun, like the AR-15, the

6   trigger's function is to release the hammer as part of a

7   simple mechanical process.

8          Even before Cargill, as early as 1992, the Fifth

9   Circuit described the role of a trigger in a hammer-fired

10  weapon similarly as, "The part of the action of a firearm

11  moved by the finger to release the hammer in firing."

12  That's from United States vs. Jokel at 969 F.2d 132, and pin

13  cite is 134.

14         Accordingly, a single function of the trigger

15  refers to the purpose and action of the trigger and not the

16  user, by contrast.

17         As counsel said, we do agree on how the FRT-15

18  works.  It sounds like, according to Mr. Ciravolo, we all

19  are agreeing that the only standard is what's in the statute

20  itself.

21         But as to the operation of the FRT-15, we've heard

22  testimony today that, one, for every shot fired, an FRT-15

23  trigger must function.  That is, it must move rearwards to

24  perform the function of releasing the hammer.

25         Two, after each shot is fired on an FRT-15

1  injunction that would cover enforcement relating to effort

2  to use virtually anywhere against anyone.

3       This is significantly broader than plaintiffs have

4  asked at the TRO stage.  And if you are, your Honor,

5  inclined to issue an injunction and to issue an injunction

6  broader than just individual plaintiffs, the government

7  would ask that it be limited in two important respects.

8       First, we would ask that it be limited to

9  enforcement against individual owners for possession of

10  forced reset triggers.

11       Plaintiffs here are obligated to demonstrate

12  standing for each relief sought and plaintiffs and members

13  are individual small-scale owners of forced reset trigger

14  devices.

15       So plaintiffs cannot demonstrate standing to the

16  extent the injunction -- sorry, I'm getting over a cold --

17  to the extent the injunction would apply to manufacturers,

18  to sellers, or to entities that give public statements or

19  statements to purchasers regarding the legality of FRTs.  It

20  should be only limited to enforcement against small-scale --

21  or against owners.

22       Second, the government would ask that, if an

23  injunction were to issue broader than individual plaintiffs,

24  it be limited to the Northern District of Texas.  The Fifth

25  Circuit and the Supreme Court have recognized that

1   nationwide injunctions should be used sparingly.

2           And as the Fifth Circuit stated in Louisiana v.

3   Becerra, where there is a substantial question presented and

4   being litigated in multiple forums, there is a benefit to

5   allowing competing views to be aired.  That is the situation

6   here.

7           We have the Aidan Lee decision that found that

8   forced reset triggers are very likely to be machineguns.

9   We've had multiple courts of appeals in other jurisdictions

10  respectfully disagree with the Cargill holding.

11          And so, granting a nationwide injunction here

12  would essentially elevate Cargill to be the law of the land

13  even in those other jurisdictions.

14          Finally, I would just ask that, if the Court is

15  inclined to grant an injunction, that it issue an

16  administrative stay for two weeks to allow the government an

17  opportunity to decide if it should seek a stay while pending

18  an appeal.

19          While I'm happy to answer any questions about

20  standing or about scope of relief, given the time, that is

21  all.  Thank you.

22          THE COURT:  Thank you.

23          Counsel.

24          MR. COLUMBO:  Your Honor, plaintiffs are here

25  today because the ATF has been knocking on the doors of

1    manufacturer?

2         A.   Yes.   The owner of the FRT-15, the Rare Breed

3    Triggers Company.

4         Q.   Did you reach an opinion?

5         A.   I did.

6         Q.   How did you reach that opinion?

7         A.   I traveled to his location, examined the trigger

8    that was outside of the gun, examined the firearm, which had

9    one of the triggers installed on it, test fired it, looked

10   at diagrams and videos, familiarized myself with the way it

11   operates.

12        Q.   And what would you reach as a conclusion?

13        A.   That it is not a machinegun.   Absolutely not.

14        Q.   Is it a semiautomatic automatic trigger?

15        A.   It is just that.

16        Q.   How does an FRT-15 differ from the semiautomatic

17   AR-15 trigger that you just discussed for us?

18        A.   The absolute only difference between the two is

19   that the trigger is reset, forced into a reset position, in

20   a regular AR-15 by a spring.   And in the FRT it's forced

21   into the reset position by the hammer.

22             All AR-15s are forced reset triggers.   In a

23   standard AR-15, it's a spring that forces the trigger to

24   reengage with the hammer.   Whereas, in the FRT-15, the

25   hammer pushes down on the trigger and forces it to pivot

1    back forward into that original position.

2         Q.    So in both an FRT-15 and the traditional AR-15,

3    what needs to happen for the trigger to move rearward enough

4    to release the hammer?

5         A.    The shooter has to make another rearward pull of

6    the trigger enough distance that it disengages from the

7    hammer.

8         Q.    In both devices, does the trigger need to reset in

9    between each shot?

10        A.    It has to.  Mechanical necessity for it to

11   operate.

12        Q.    Because it's necessary to reset to reengage with

13   the hammer?

14        A.    Yes.

15        Q.    Can either an FRT-15 or a traditional AR-15

16   trigger fire a second shot without first resetting?

17        A.    No.

18        Q.    Let's go to Exhibit A to the point where the

19   FRT-15 video is again.  Okay.  Leave it paused at the

20   beginning for a moment.

21             Okay.  So, Mr. O'Kelly, you were describing to us

22   the FRT-15's function.  Do you recognize what is on the

23   screen right now, which is still within Exhibit A?

24        A.    Yes.  This is the same type of diagram, only with

25   an FRT-15 type trigger, rather than the conventional

1    bullet is fired from the gun, right?

2        A.    Yes.

3        Q.    The hammer then returns to be engaged by the

4    trigger sear surface, right?

5        A.    That's only after the user manually reduces

6    pressure.  The mechanism is designed so that the

7    disconnector will capture it and hold it there indefinitely.

8            So the step of it returning to the trigger is only

9    done after the user takes manual action.  The mechanism is

10   not designed to do that.

11       Q.    Okay.  And in an FRT-15 though, the trigger is

12   reset where the trigger reengages the hammer, correct?

13       A.    Yes, the internal mechanism of the system is

14   designed to do that automatically for you.

15       Q.    There comes a point in time when the trigger is

16   held in place, in its forward reset position, by the locking

17   bar, right?

18       A.    Yes.

19       Q.    At that point in time, when the trigger has been

20   forced forward and it's held in place by the locking bar,

21   the user can't pull the trigger rearwards, right?

22       A.    They can pull the trigger rearwards.  They cannot

23   move the trigger rearwards.  I can apply pressure to the

24   trigger and put weight on the trigger, but the trigger will

25   not move.  But, yes, I can pull the trigger at that point.

1    Q.    Subsequently, after the locking bar releases the

2  trigger, a user can pull the trigger rearward causing the

3  trigger to release the hammer which hits the firing pin and

4  causes the weapon to fire again, right?

5    A.    Yes, the user can continue to move the trigger

6  rearward.

7    Q.    But for the trigger to release the hammer and for

8  the gun to fire again, that trigger must move rearward?

9    A.    Yes, it must.

10    Q.    And the only force that moves that trigger

11  rearward comes from the user's finger, right?

12    A.    Yes, that's correct.

13    Q.    So just to sum up, for every shot fired by an

14  FRT-15, the trigger must move rearward to release the

15  hammer?

16    A.    Yes, that's correct.

17    Q.    Let's talk about an M16 for a moment.  An M16

18  machinegun has a part called an auto sear, correct?

19    A.    Yes.

20    Q.    After a trigger initially moves and releases the

21  hammer, the auto sear can then repeatedly release the hammer

22  to fire multiple shots without the trigger moving again,

23  correct?

24    A.    Yes, that's correct.

25    Q.    And that's different than an FRT-15, correct,

1   you hold the trigger rearwards and keep it there, right?

2        A.   Yes.  In an M16, the trigger does not move after

3   it initiates the sequence.

4        Q.   And the trigger doesn't reset?

5        A.   That's correct.

6        Q.   So if you load and fire five rounds from an M16

7   machinegun, the trigger sear surface engages the hammer only

8   once then, right?

9        A.   Yes.

10       Q.   If we take an FRT-15 and we move the trigger to

11   its most rearward position and hold it there and not allow

12   it to move forward to reset, you would agree that it would

13   malfunction, right?

14       A.   Yes, that's correct.  The system is not designed

15   in that manner.  It's designed to move.

16       Q.   And it would only fire one shot then?

17       A.   If you malfunction it?  Yes, it would only fire

18   one shot.

19       Q.   But if you did the same thing with an M16, it

20   would fire all of its rounds, right?

21       A.   That's correct.

22       Q.   Is ease of overcoming the force of a trigger

23   that's being reset, whether by a spring or a mechanism like

24   the FRT-15, is that in the definition of a machinegun in the

25   statute?

1      Q.   And then, just a few years ago, it passed a rule

2  saying that they were machineguns?

3      A.   Correct.

4      Q.   And an ATF FEO testified in a case called Cargill

5  that it was his opinion that bump stocks were, in fact,

6  machineguns?

7      A.   I believe so.

8      Q.   But that the Fifth Circuit disagreed and concluded

9  that they were not?

10      A.   That's correct.

11      Q.   Would you agree that the statutory definition of a

12  machinegun does not define a machinegun based on its rate of

13  fire?

14      A.   That is correct.

15      Q.   Accordingly, can we agree that the rate of fire in

16  an AR-15 equipped with an FRT-15 has no bearing on whether

17  or not it's a machinegun?

18      A.   I agree.

19      Q.   Isn't it also true that, if a gun fires only one

20  shot with each function of a trigger, it is, by definition,

21  not a machinegun, right?

22      A.   That is correct.

23      Q.   Is it fair to say that your conclusion that the

24  FRT-15 is a machinegun depends on the notion that a single

25  function of the trigger means a pull of the trigger?

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | | |
|---|---|---|
| **NATIONAL ASSOCIATION FOR** | § | |
| **GUN RIGHTS, INC.,** *et al.*, | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | **Civil Action No. 4:23-cv-00830-O** |
| **v.** | § | |
| | § | |
| **MERRICK GARLAND,** *et al.*, | § | |
| | § | |
| **Defendants.** | § | |
| | § | |

## OPINION & ORDER ON PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER

Before the Court are Plaintiffs' Motion for Temporary Restraining Order (ECF No. 17), Brief in Support (ECF No. 18), and Appendix (ECF No. 19), filed August 14, 2023; Defendants' Response (ECF No. 32), filed August 21, 2023; and Plaintiffs' Reply (ECF No. 33) and Appendix (ECF No. 34), filed August 25, 2023. Having considered the parties' briefing and applicable law, the Court **GRANTS** Plaintiffs' Motion for Temporary Restraining Order (ECF No. 17) to preserve the status quo until either September 27, 2023 or such time that the Court rules on Plaintiffs' Motion for Preliminary Injunction (ECF No. 22), whichever is earlier. Therefore, the Court **ORDERS** that Defendants—along with their officers, agents, servants, and employees—are **ENJOINED** from implementing or enforcing, in any civil or criminal manner, against Plaintiffs Patrick Carey, Travis Speegle, and James Wheeler the ATF's challenged definition of "machinegun."

## I.    BACKGROUND

The United States Congress delegated to the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") authority to regulate firearms in interstate commerce under the Gun Control

Act of 1986. In a 2018 regulation, the ATF expanded the definition of "machinegun." A few years later, the ATF determined that additional types of firearms qualify as machineguns and are thus illegal to possess or transfer. One of those prohibited firearms is a forced reset trigger. Plaintiffs brought this suit under Administrative Procedure Act ("APA")[1] to challenge the legality of the ATF's broadened definition.[2]

### A. Forced Reset Triggers[3]

A forced reset trigger ("FRT") is a semi-automatic assembly that allows the trigger to reset quicker than it otherwise would using a traditional trigger-return spring. This assembly enables the user to fire the firearm at a quicker rate than with a traditional trigger.

Reviewing the basic mechanism of a firearm is necessary to understand how an FRT works. The function of any trigger is to release the hammer. This occurs when the trigger is pulled back to the point that a "trigger sear" releases the hammer from its retained position. Once released by the trigger, the hammer pivots to contact the firing pin. Once contacted, the firing pin then strikes a chambered ammunition cartridge or "round," which causes the gunpowder in the cartridge to combust. The combustion effect propels the cartridge's bullet out of the barrel of the firearm. Once fired, a standard semi-automatic trigger returns to its "reset" state—ready-to-fire or "set" position—by allowing the firearm to function once again by starting the mechanism anew. In other words, the firearm only fires again by the user pulling the trigger to release the hammer.

An FRT is a device that forcibly returns the trigger to its reset state. FRTs are designed to achieve this by the hammer resetting the trigger when the bolt carrier cycles to the rear. A

---

[1] 5 U.S.C. §§ 701 *et seq.*
[2] Pl.'s Compl., ECF No. 1.
[3] This description of the mechanical workings of FRTs is taken from Plaintiffs' Complaint. Pls. Compl. 6–7, ECF No. 1. Defendants do not dispute these descriptions in their responsive filing opposing the temporary restraining order. Defs.' Resp., ECF No. 32.

2

"locking bar" mechanically locks the trigger in its reset state, preventing the user from moving the trigger rearward to function by releasing the hammer, until the bolt has returned to the in-battery position and the firearm is safe to fire. When firing multiple shots using an FRT, the trigger must still reset after each round is fired and must separately function to release the hammer by moving far enough to the rear in order to fire the next round.

### B. Statutory & Regulatory Background[4]

The National Firearms Act of 1934 ("NFA")[5] regulates certain firearms in interstate commerce. At the time of its proposal, the NFA "was known to many as the 'the Anti-Machine Gun Bill.'" *Cargill v. Garland*, 57 F.4th 447, 450 (5th Cir. 2023), *pet. for cert. filed*, No. 22-976 (2023). Among other things, the NFA criminalized the possession or transfer of certain unregistered firearms while also prohibiting the registration of firearms otherwise prohibited by law. 26 U.S.C. §§ 5812(a), 5861. In the decades following its enactment, the possession or transfer of machineguns was prohibited when Congress enacted the Gun Control Act of 1968 (the "GCA").[6] It is a federal crime today to possess a machinegun.

The GCA provides that it is "unlawful for any person to transfer or possess a machinegun." 18 U.S.C. § 922(o)(1). A "machinegun" is defined by the NFA as

> [a]ny weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. The term shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machine gun, and any combination of parts from which a machine gun can be assembled if such parts are in the possession or under the control of a person.

---

[4] This description of the regulatory events after 2018 is taken from Plaintiffs' Complaint. Pls. Compl. 9–11, ECF No. 1. Defendants do not dispute these descriptions in their responsive filing opposing the temporary restraining order. Defs.' Resp., ECF No. 32.
[5] 26 U.S.C. §§ 5801 *et seq.*
[6] 18 U.S.C. §§ 921 *et seq.*

Add. 26

26 U.S.C. § 5845(b); *see also* 18 U.S.C. § 921(a)(24) (incorporating the NFA's definition of "machinegun" into the GCA). In other words, a machinegun is a "rifle capable of automatic fire." *Cargill*, 57 F.4th at 452. Firearms incapable of automatic fire are thus not machineguns. *Id.*

For decades, ATF regulations mirrored the federal statutory definition of "machinegun." 27 C.F.R. §§ 478.11, 479.11 (2017). The statutory parity was disrupted in 2018, when the ATF broadened the meaning of machinegun in its most recent regulation by re-interpreting the statutory definition to add additional language:

> Any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. The term shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machine gun, and any combination of parts from which a machine gun can be assembled if such parts are in the possession or under the control of a person. *For purposes of this definition, the term "automatically" as it modifies "shoots, is designed to shoot, or can be readily restored to shoot," means functioning as the result of a self-acting or self-regulating mechanism that allows the firing of multiple rounds through a single function of the trigger; and "single function of the trigger" means a single pull of the trigger and analogous motions. The term "machine gun" includes a bump-stock-type device, i.e., a device that allows a semi-automatic firearm to shoot more than one shot with a single pull of the trigger by harnessing the recoil energy of the semi-automatic firearm to which it is affixed so that the trigger resets and continues firing without additional physical manipulation of the trigger by the shooter.*

27 C.F.R § 479.11 (2018) (emphasis added).

Three years after the ATF broadened its interpretation of the statutory definition, two of the ATF's divisions issued reports regarding FRTs. The Firearms Technology Criminal Branch ("FTCB") issued its Technical Examination Report on July 15, 2021, which purportedly classified the FRT-15—a version of the FRT—as a machinegun.[7] The FTCB issued a similar report several months later on October 21, 2021 regarding the Wide Open Enterprises "WOT"

---

[7] Pls.' Compl. 9–10, ECF No. 1.

version of the FRT.[8] At the beginning of the next year, the FTCB issued its "Open Letter to All Federal Firearms Licensees" (the "Open Letter") on March 22, 2022, advising that the ATF "recently examined devices commonly known as 'forced reset triggers' (FRTs) and has determined that *some* of them are 'firearms' and 'machineguns' as defined in the [GCA]."[9] Most important for this case, the Open Letter further explained that "ATF's examination found that *some* FRT devices allow a firearm to automatically expel more than one shot with a single, continuous pull of the trigger" and that "any FRT that allows a firearm to automatically expel more than one shot with a single, continuous pull of the trigger is a 'machinegun.'"[10] One month later, the ATF's Firearms and Ammunition Technology Division ("FATD") issued yet another report on the FRT-15 trigger.[11]

### C.  The Parties

Plaintiffs comprise of both individuals and organization plaintiffs. Plaintiffs Patrick Carey, Travis Speegle, and James "J.R." Wheeler are three individual citizens located in the Texas–Louisiana area (the "Individual Plaintiffs"). Each Individual Plaintiff has owned, currently owns, and/or plans to own FRTs in the future. Plaintiffs also include two organizations—National Association for Gun Rights, Inc. and Texas Gun Rights, Inc.—with thousands of members in the Northern District of Texas (the "Institutional Plaintiffs").

Plaintiff Carey owned two FRTs prior to receiving a warning notice from the ATF on August 22, 2022.[12] The warning notice informed Plaintiff Carey that "ATF has information that you have acquired one or more [FRTs]," that "[t]hese items have been classified as machineguns that were unlawfully manufactured," that "[p]ossession of these devices is a violation of law due

---

[8] Pls.' Compl. 10, ECF No. 1.
[9] *Id.* (quoting the Open Letter).
[10] *Id.* (quoting the Open Letter).
[11] *Id.*
[12] *Id.*

to their illegal manufacture," and that "*the unlawful receipt and possession of any of these devices is a felony violation of Federal law*."[13] Due to the direct threat of civil and criminal enforcement, Plaintiff Carey surrendered his two FRTs to ATF agents.[14] Plaintiff Wheeler personally owns one FRT and has a 50% ownership stake in a small firearms and ammunition business that owns two additional FRTs.[15] Plaintiff Speegle personally owns ten FRTs.[16] Both Plaintiffs Wheeler and Speegle wish to maintain possession of their FRTs, but fear they are at risk of civil and criminal prosecution for continued possession.[17]

The Individual Plaintiffs' prior or current conduct—possession or transfer of FRTs—is subject to enforcement on account of the ATF's broadened definition of machinegun. Without immediate relief, the Individual Plaintiffs are at risk of civil and criminal prosecution. For that reason, Plaintiffs are suing various government officers and entities—the Attorney General of the United States, the Department of Justice ("DOJ"), the ATF, and the Director of the ATF (collectively, the "Defendants")—over the ATF's broadened definition and implementation of the machinegun regulation.[18] In the instant action, Plaintiffs bring an APA challenge to the validity of Defendants' interpretation of the "machinegun" definition.[19] According to Plaintiffs, this definition is unlawful because "Defendants' interpretation of the law and their specific actions to threaten and potentially initiate enforcement actions against Plaintiffs are thus arbitrary, capricious, and otherwise contrary to law."[20]

To protect the status quo during the pendency of the lawsuit, the Individual Plaintiffs

---

[13] Pls.' Compl. 3, ECF No. 1 (emphasis in original).
[14] *Id.*
[15] *Id.* at 4.
[16] *Id.*
[17] *Id.*
[18] *Id.* at 5, 14–16.
[19] *Id.* at 14–15 (citing 5 U.S.C. § 706(2) as the basis for their declaratory judgment action).
[20] *Id.* at 4.

Add. 29

seek a temporary restraining order ("TRO") enjoining Defendants from enforcing or otherwise implementing the novel definition against the Individual Plaintiffs until the Court is able to rule on the forthcoming preliminary injunction motion. The parties have briefed the issues and the motion is now ripe for the Court's review.

## II.    THRESHOLD ISSUES

Defendants raise two threshold issues: (1) standing and (2) judicial review of pre-enforcement challenges. Before turning to the question of whether a TRO is warranted in this situation, the Court first addresses these issues.

### A.    Standing

Defendants first argue that the Individual Plaintiffs lack standing because there is no credible threat of prosecution.[21] Additionally, Defendants contend that they have no *current* plans to prosecute the Individual Plaintiffs. But this phrasing reveals the implicit threat that the Individual Plaintiffs fear: the Defendants could change their *current* plans at any time by deciding to prosecute. That is why, as the Fifth Circuit makes clear, standing exists here. *See Franciscan All., Inc. v. Becerra*, 47 F.4th 368, 376 (5th Cir. 2022) (emphasizing that "plaintiffs have standing in the face of similar prosecutorial indecision," including when an agency "has not to date evaluated" whether it will pursue enforcement); *see also Zimmerman v. City of Austin*, 881 F.3d 378, 391 (5th Cir. 2018) (explaining that standing in pre-enforcement challenges requires a showing "of an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by statute, . . . as well as credible threat of prosecution"). Defendants do not proffer any Fifth Circuit precedent in support of their particular standing

---

[21] Defs.' Resp. 3–5, ECF No. 32.

argument. Instead, Defendants point to out-of-circuit cases that differ considerably from the Fifth Circuit's jurisprudence on credible threats of prosecution conferring standing.[22]

Applying Fifth Circuit precedent here, the Individual Plaintiffs successfully satisfy standing requirements. There is no dispute that the Individual Plaintiffs "inten[d] to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by statute." *Zimmerman*, 881 F.3d at 391. Each Individual Plaintiff currently possesses—or previously possessed—a newly proscribed FRT. What is disputed is whether engaging in the newly proscribed FRT ownership carries "a credible threat of prosecution." *Id.* Defendants liken Plaintiffs concern to no more "than a general threat of prosecution" that cannot support pre-enforcement relief, particularly because the "ATF has no *current* intention to arrest or bring charges against the Individual Plaintiffs."[23] The Court disagrees and instead finds that a sufficiently credible threat exists to establish standing.

By bringing this action, the Individual Plaintiffs place themselves in potential jeopardy due to acknowledging their possession of FRTs. This is not an imaginary or speculative concern. Indeed, Defendants' recent enforcement activity breathes life into this very fear and the factual record bears this out. Plaintiff Carey has already experienced armed ATF agents arriving at his home to warn that he could face prosecution by not surrendering his FRTs and by purchasing additional FRTs in the future.[24] Plaintiffs also cite to examples of enforcement activity and

---

[22] Defs.' Resp. 4, ECF No. 32 (citing two Sixth Circuit cases and one case from the Eastern District of Kentucky). As Plaintiffs point out in their reply, "[t]hese cases are inapposite." Pls.' Reply 4, ECF No. 33. In fact, as one court pointed out, "[t]he Sixth Circuit's jurisprudence on standing, in particular, the issue of whether there exists a credible threat of prosecution, bears considerable differences from the Fifth." *Am. Coll. of Pediatricians v. Becerra*, No. 1:21-cv-195, 2022 WL 17084365, at *13 (E.D. Tenn. Nov. 18, 2022).
[23] Defs.' Resp. 4, ECF No. 32 (emphasis added).
[24] Decl. of Patrick Carey, Pls.' Br. App'x 5, ECF No. 19.

search warrants carried out against other individual owners of FRTs.[25] Specifically, at least three individuals are currently facing prosecution and there have been sixty-seven ATF seizures to date.[26] Based on this record, Defendants certainly appear to be "chomping at the bit" to seize FRTs.[27] Further evidence of this is Defendants' refusal to disavow prosecuting the Individual Plaintiffs during the pendency of this case—the exact type of "prosecutorial indecision" that the Fifth Circuit has "repeatedly held" as more than enough to "have standing." *Franciscan All., Inc.*, 47 F.4th at 376. Given this flurry of recent enforcement activity—stemming from the same interpretation of the law that proscribes Plaintiffs' conduct here—and Defendants refusal to guarantee that no action will be taken against the Individual Plaintiffs during pending disposition of this action, there is more than a specter of enforcement sufficient to confer standing.

Because Plaintiffs face a credible threat of civil or criminal prosecution for prior and current ownership of FRTs, the Court finds that this constitutes more than a *de minimis* harm to confer standing to seek a TRO.

### B.  Pre-Enforcement Challenges

Defendants next call into question the veracity of pre-enforcement judicial review of laws carrying criminal penalties. According to Defendants, such review encroaches on the prosecutorial discretion that properly rests with the executive branch.[28] Based on this, Defendants contend that granting a TRO enjoining civil and criminal prosecution violates constitutional separation-of-powers principles.[29] Although the basic contours of Defendants' contentions are true, separation of powers does not mean pre-enforcement judicial review of laws

---

[25] Pls.' Compl. 11, ECF No. 1; Pls.' Br. 2, ECF No. 18.
[26] Pls.' Reply 2, 5, 9 n.3, ECF No. 33. In their reply brief, Plaintiffs reference the ATF's Official Notification showing multiple seizures of FRTs. Pls.' Reply App'x 66, ECF No. 34.
[27] Decl. of Michael Columbo, Pls.' Br. App'x 9, ECF No. 19.
[28] Defs.' Resp. 6–8, ECF No. 32.
[29] *Id.* at 6.

carrying criminal penalties is never allowed. *See Babbitt v. Farm Workers*, 442 U.S. 289, 298 (1979) (emphasizing that a plaintiff facing "a credible threat of prosecution . . . should not be required to await and undergo a criminal prosecution as the sole means of seeking relief") (internal quotation marks omitted)); *see also Nat'l Rifle Ass'n of Am. v. Magaw*, 132 F.3d 272, 279 (6th Cir. 1997) ("Although in regard to criminal statutes, courts are wary of . . . intervening prior to prosecution and foreshortening the prosecutor's action, courts have allowed pre-enforcement review of a statute with criminal penalties.").

On top of that, courts have even more authority to review challenges to agency actions. The APA specifically provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action" is "entitled to judicial review thereof." 5 U.S.C. § 702. And the APA expressly provides that criminal proceedings are *included* in such review. *Id.* § 703. It is also notable that the APA empowers courts with even greater authority to "hold unlawful and set aside agency action, findings, and conclusions found to be" unlawful. *Id.* § 706. This is a marked increase of judicial authority over executive branch actions.[30] *See id.* § 705 (authorizing the "reviewing court" to "issue all necessary and appropriate process . . . to preserve status or rights" from "irreparable injury" caused by agency action).

In line with longstanding precedent and the APA's express authorization, Plaintiffs bring a facial challenge to the lawfulness of Defendants prosecuting *anyone* for FRT possession. At no point do Plaintiffs challenge Defendants' discretion to prosecute certain individuals but not others. If Defendants lack the ability to prosecute anyone, there is no prosecutorial discretion to even exercise in the first place. That the challenged regulation carries the potential for criminal penalties does not insulate Defendants from pre-enforcement judicial review.

---

[30] *See generally* Jonathan F. Mitchell, *The Writ-of-Erasure Fallacy*, 104 VA. L. REV. 933, 1012–17 (2018) (explaining that, although the power of judicial review is not akin to an executive veto, the APA expressly grants courts additional authority to review agency action).

Moreover, Defendants aver that certain safeguards also weigh in favor of no pre-enforcement intervention by the judicial branch. To allay any concerns about potential abuses by executive officials insulated from judicial review, Defendants note that "federal criminal procedure provides a host of opportunities to test the lawfulness of the government's exercise of prosecutorial authority."[31] However, this line of argument runs afoul of multiple Supreme Court decisions. *See, e.g.*, *Steffel v. Thompson*, 415 U.S. 452, 459 (1974) ("[I]t is not necessary that [a plaintiff] first expose himself to actual arrest or prosecution to be entitled to challenge a statute that he claims deters the exercise of his constitutional rights."); *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) ("When an individual is subject to such a threat [of enforcement of a law], an actual arrest, prosecution, or other enforcement action is not a prerequisite to challenging the law."). And that is to say nothing of the potential harm that such insulation from pre-enforcement judicial review would likely cause individuals subject to prosecution. Without access to courts to bring pre-enforcement challenges, vulnerable citizens may surrender the ability to promptly challenge unlawful executive branch actions. This cannot be.

Alexander Hamilton stressed the importance of judicial review over the other branches of government: "There is no position which depends on clearer principles, than that every act of a delegated authority, contrary to the tenor of the commission under which it is exercised, is void." THE FEDERALIST NO. 78 (Alexander Hamilton) (emphasis added). This check is an essential component of constitutional separation-of-powers principles for the judicial branch of government to oblige another branch to control itself. And this remains just as important today as it was at the Founding. Not only would Defendants have this Court ignore decades of Supreme

---

[31] Defs.' Resp. 6, ECF No. 32.

Add. 34

Court precedent and the plain text of the APA, they would also have this Court twist the foundational value of separation of powers into something it is not. The Court declines the invitation. Instead, the Court finds that it possesses both constitutional and statutory authority to review pre-enforcement challenges to agency action with criminal consequences.

*     *     *     *

Having considered Defendants' threshold issues and finding no bars to the Court's authority to afford equitable relief to the Individual Plaintiffs, the Court proceeds with its analysis of the requested TRO.

## III.    LEGAL STANDARDS

The decision to grant or deny injunctive relief is committed to the district court's discretion. *See Miss. Power & Light Co. v. United Gas Pipe Line*, 760 F.2d 618, 621 (5th Cir. 1985). "A [temporary restraining order] is simply a highly accelerated and temporary form of preliminary injunctive relief, which requires that the party seeking such relief establish the same four elements for obtaining a preliminary injunction." *Greer's Ranch Café v. Guzman*, 540 F.Supp.3d 638, 644–45 (N.D. Tex. 2021) (O'Connor, J.) (cleaned up). To establish entitlement to any form of injunctive relief, the movant must demonstrate: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable harm; (3) that the balance of hardships weighs in its favor; and (4) that the issuance of the preliminary injunction will not disserve the public interest. *Daniels Health Servs., L.L.C. v. Vascular Health Scis., L.L.C.*, 710 F.3d 579, 582 (5th Cir. 2013). The last two factors merge when the government is the opposing party. *Nken v. Holder*, 556 U.S. 418, 435 (2009). As the movant, it is the party seeking relief who bears the burden of proving all four elements of the requested injunctive relief. *Nichols v. Alcatel USA, Inc.*, 532 F.3d 364, 372 (5th Cir. 2008); *Miss. Power & Light Co.*, 760 F.2d at 621.

Upon determining that a party is entitled to injunctive relief, a court must also decide the appropriate scope of that prospective injunction. "[T]he scope of injunctive relief is dictated by the extent of the violation established[.]" *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). And because it is considered an extraordinary remedy, an injunction or TRO "should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 756 (1994) (cleaned up). Thus, an injunction or TRO must "redress the plaintiff's particular injury," and no more. *Gill v. Whitford*, 138 S. Ct. 1916, 1934 (2018) (citation omitted).

## IV.    ANALYSIS

### A.  Substantial Likelihood of Success on the Merits

To show a substantial likelihood of success on the merits, Plaintiffs need not show they are entitled to summary judgment on their claim, but must instead present a prima facie case. *Daniels Health Servs.*, 710 F.3d at 582. Plaintiffs have met that burden at this stage with respect to their claim that the expanded definition of machinegun exceeds the scope of ATF's statutory authority. Therefore, Plaintiffs have satisfied "arguably the most important" of the four factors. *Tesfamichael v. Gonzales*, 411 F.3d 169, 176 (5th Cir. 2005).

The Administrative Procedure Act ("APA") instructs courts to "hold unlawful and set aside agency action . . . found to be . . . in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(C). Plaintiffs contend that the ATF's regulation broadening the machinegun definition is an arbitrary and capricious expansion of the agency's authority.[32] Plaintiffs are likely correct.

---

[32] Pls.' Compl. 15, ECF No. 1.

The Fifth Circuit's recent analysis of the exact statutory language at issue here shows that Plaintiffs are very likely to succeed on the merits. *See Cargill*, 57 F.4th at 463 (explaining that the National Firearms Act unambiguously "requires that a machinegun be capable of firing automatically once the *trigger* performs a single function"). According to the en banc Fifth Circuit, a weapon that qualifies as a machinegun must be capable of (1) firing multiple rounds by a single function of the trigger and (2) do so automatically. *Id.* at 460. The definition of machinegun "utilizes a grammatical construction that ties the definition to the movement of the trigger itself, and not the movement of a trigger finger" such that "the statutory definition of machinegun unambiguously turns on the movement of the trigger and not a trigger finger." *Id.* Because FRTs do not enable a weapon to automatically fire multiple rounds with a single function of the trigger itself, the Court finds that FRTs most likely are not machineguns under *Cargill*'s reasoning.

Similar to the government in *Cargill*, the Defendants here "offer[] nothing to overcome this plain reading" of the statutory language. *Id.* When the ATF revised its definition of machinegun to state that a "single function of the trigger" is the same thing as "a single pull of the trigger and analogous motion," its definition conflicts with the definition provided by the statute. 27 C.F.R. § 479.11 (2018). By comparison, the statutory definition does not define "machineguns" "according to how quickly they fire." *Cargill*, 57 F.4th at 464. To qualify as a machinegun under the statute, a weapon must only be capable of firing automatically once the trigger itself performs a single function. *Id.* at 460, 465. And where an agency regulation contradicts the statute, not only is that regulation likely arbitrary and capricious, but the statute governs. *Id.* at 458–60. Because of this contradiction, the ATF's broadened definition is likely unlawful.

Defendants offer almost no rebuttal to the holding of *Cargill* controlling here. In fact, their response is relegated to a single footnote. This lone footnote contains the conclusory statement that Plaintiffs "have not carried their burden of demonstrating a substantial likelihood of success on the merits of their claim.[33] All that Defendants offer to support the conclusion that "Plaintiffs are incorrect" is a reference to *Guedes v. ATF*—a case from the District of Columbia Circuit that disagrees with *Cargill* on the conclusion that bump stocks are not machineguns.[34] 45 F.4th 306, 319 (D.C. Cir. 2022). Beyond this reference, Defendants provide no analysis showing why the Court should vary from Fifth Circuit precedent to accept the reasoning in *Guedes*. Instead, Defendants promise that their future briefing at the preliminary injunction stage will set out to explain why *Guedes*—and not *Cargill*—controls here.

Whether or not Defendants will successfully make this showing in future briefing is an issue the Court will address once that argument is fully briefed. But for purposes of what is before the Court now, Defendants have offered no support for their conclusion that Plaintiffs are unlikely to succeed on the merits. More importantly, the Fifth Circuit has held that placement of the responsive argument in a perfunctory footnote may constitute waiver by inadequate briefing. *See United States v. Thames*, 214 F.3d 608, 611 n.3 (5th Cir. 2000) (citing *L&A Contracting Co. v. S. Concrete Servs., Inc.*, 17 F.3d 106, 113 (5th Cir. 1994)).

Because Plaintiffs point to binding Fifth Circuit precedent that appears squarely dispositive of the issue in this case, the Court finds that Plaintiffs have carried their burden at this stage as to this factor and are entitled to a TRO. Defendants' brief response—if not waived—is nothing more than a conclusory rebuttal in a footnote.[35] Therefore, for the reasons discussed, the Court finds that Plaintiffs have demonstrated a strong likelihood of success on the merits of their

---

[33] Defs.' Resp. 9 n.1, ECF No. 32.
[34] *Id.*
[35] *Id.*

Add. 38

APA claim. It is substantially likely that the ATF's regulation containing a broadened definition of "machinegun" exceeds the scope of its authority under the GCA.

### B.  Substantial Threat of Irreparable Harm

In the Fifth Circuit, it is "well-established" that a harm is considered "irreparable only 'if it cannot be undone through monetary remedies.'" *Dennis Melancon, Inc. v. City of New Orleans*, 703 F.3d 262, 279 (5th Cir. 2012) (quoting *Interox Am. v. PPG Indus., Inc.*, 736 F.2d 194, 202 (5th Cir.1984)). A showing of economic loss is usually insufficient to establish irreparable harm because damages are typically recoverable at the conclusion of litigation. *Janvey v. Alguire*, 647 F.3d 585, 599–601 (5th Cir. 2011). However, where costs are not recoverable because the government-defendant enjoys sovereign immunity from monetary damages, irreparable harm is generally satisfied. *Wages & White Lion Invs., L.L.C. v. FDA*, 16 F.4th 1130, 1142 (5th Cir. 2021) (citing *Texas v. EPA*, 829 F.3d 405, 433 (5th Cir. 2016)). Likewise, "complying with [an agency order] later held invalid almost *always* produces the irreparable harm of nonrecoverable compliance costs." *Id.* For harms that are non-pecuniary, the alleged irreparable injury must also be concrete—"speculative injury is not sufficient" and "there must be more than an unfounded fear on the part of the applicant." *Daniels Health Servs.*, 710 F.3d at 585 (quoting *Holland Am. Ins. Co. v. Succession of Roy*, 777 F.2d 992, 997 (5th Cir. 1985)). So long as "'the threatened harm is more than de minimis, it is not so much the magnitude but the irreparability that counts for purposes of a preliminary injunction.'" *Enter. Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana*, 762 F.2d 464, 472 (5th Cir. 1985) (citing *Canal Auth. v. Callaway*, 489 F.2d 567, 572 (5th Cir. 1974)).

Without a TRO, Plaintiffs allege that they are suffering, and will continue to suffer, irreparable harms. The identified harms take the form of unrecoverable compliance costs and

non-pecuniary injuries, such as credible threats of prosecution and deprivations of ownership and constitutional rights. Defendants contest Plaintiffs' alleged injuries on grounds that "there is no substantial threat of injury, irreparable or otherwise, *at this time*."[36] According to Defendants, Plaintiffs do no more than claim that they will "suffer irreparable injury based on the hypothetical consequences of a hypothetical criminal prosecution or other enforcement action."[37] The Court disagrees and instead finds that Plaintiffs have carried their burden to show that irreparable harms exist at this stage.

      i.   <u>Credible Threat of Prosecution</u>

First, Plaintiffs face a credible threat of criminal prosecution. As explained earlier in this Opinion, Plaintiffs place themselves in potential jeopardy by bringing this challenge to the ATF's regulation of FRTs. Defendants' recent enforcement activity validates those fears. Armed FBI agents visited Plaintiff Carey at his home, prompting him to surrender his FRTs to avoid prosecution.[38] Other individual FRT owners have experienced similar enforcement activities, such as seizures and search warrants.[39] And Defendants are presently prosecuting at least three individuals.[40] The Individual Plaintiffs and these other FRT owners share an important commonality: they are all engaging in conduct proscribed by the ATF's interpretation of "machinegun." Combined with the amount of recent enforcement activity and Defendants refusal to disavow taking any action against the Individual Plaintiffs during this lawsuit, the Court agrees that a credible threat of prosecution exists.

---

[36] Defs.' Resp. 8, ECF No. 32.
[37] *Id.*
[38] Pls.' Compl. 3, ECF No. 1.
[39] *Id.* at 11–12.
[40] Pls.' Reply 5, 9 n.2, ECF No. 33.

Finding that Plaintiffs face a credible threat of civil or criminal prosecution for prior and current ownership of FRTs, the Court further finds that this constitutes more than a *de minimis* harm justifying the need for equitable protection.

    ii.   <u>Compliance Costs</u>

Second, Plaintiffs risk potential compliance costs. These costs stem from the Hobson's choice the Individual Plaintiffs face: continue to exercise ownership and constitutional rights while risking federal prosecution *or* forfeit those rights to avoid civil and criminal consequences. Without immediate relief, the Individual Plaintiffs will continue to suffer under the illusion that an actual choice exists due to Defendants' refusal to disavow prosecution during this lawsuit.

Compliance with an impermissible or illegal interpretation of the law carries the potential for economic costs. *Texas v. EPA*, 829 F.3d at 433 ("Indeed, 'complying with a regulation later held invalid almost always produces the irreparable harm of nonrecoverable compliance costs.'" (citation omitted)). Threats that lead to an individual surrendering FRTs—as was the case for Plaintiff Carey—often lack compensation after the fact for the deprived use and enjoyment of the surrendered weapons (assuming the weapons are even returned). *See VanDerStok v. Garland*, 625 F.Supp.3d 570, 584 (N.D. Tex. Sept. 2, 2022) (explaining that "compliance costs are 'likely unrecoverable,' usually 'because federal agencies generally enjoy sovereign immunity for any monetary damages'") (quoting *Texas v. EPA*, 829 F.3d at 433)). Because Defendants in this case are entitled to sovereign immunity, and therefore not liable for damages, any economic injuries to the Individual Plaintiffs likely cannot be recovered.

Likewise, compliance can also cause non-pecuniary harms and need not be financial in nature. Even "alleged" deprivations of constitutional or procedural rights may justify injunctive relief. *See, e.g.*, *Opulent Life Church v. City of Holly Springs, Miss.*, 697 F.3d 279, 294–97 (5th

Cir. 2012) (finding irreparable harm where plaintiffs "alleged" violations of constitutional rights on grounds that "[t]he loss of [constitutional] freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury") (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)); *see also Louisiana v. Horseracing Integrity & Safety Auth. Inc.*, 617 F. Supp. 3d 478, 500 (W.D. La. July 26, 2022) (finding irreparable harm where plaintiffs alleged the government exceeded its statutory authority and violated the APA).

Plaintiffs' Complaint alleges that deprivations of both their constitutional and ownership rights hang in the balance. For instance, Plaintiffs' use and enjoyment of FRTs is "chilled . . . by virtue of Defendants' impermissible interpretation of law."[41] Defendants do not address this point and simply reiterate that "ATF has no plans to seize Plaintiffs' property in the *immediate future*."[42] But therein lies the problem. Plaintiffs face potential pressure to comply with a regulation that is likely unlawful due to ATF's arbitrary and capricious interpretation of "machineguns." The Court is unpersuaded by Defendants' argument that there are "no plans to seize Plaintiffs' property in the immediate future."[43] Without disavowing that these plans will not change during this lawsuit, Plaintiffs face endemic uncertainty and pressure to comply with Defendants' interpretation of the definition to avoid prosecution.

Simply put, Plaintiffs face irreparable injury in whichever course they choose—suffer injury by complying with a regulation they allege Defendants lack the authority to enforce *or* risk civil and criminal enforcement by not complying. For this reason, and because Defendants' contrary arguments overlook clear Fifth Circuit precedent identifying compliance costs as irreparable harms, the Court is satisfied that Plaintiffs' alleged injuries are based on a credible threat of prosecution, placing them in immediate danger of irreparable injury.

---

[41] Pls.' Reply 7, ECF No. 33.

[42] Defs.' Resp. 8, ECF No. 32 (emphasis added).

[43] *Id.*

Add. 42

Accordingly, the Court finds that the Individual Plaintiffs have demonstrated a substantial threat of irreparable harm at this stage and are entitled to a TRO.

### C. Balance of Hardships and the Public Interest

The final factor the Court must weigh is the balance of the equities and the public interest, which "merge" when the Government is a party. *Nken*, 556 U.S. at 435. A court must "pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). At the same time, a court must weigh any purported injuries the enjoined party may experience against the strong likelihood that they will not succeed on the merits. *See Freedom From Religion Found., Inc. v. Mack*, 4 F.4th 306, 316 (5th Cir. 2021) (explaining that "any injury to [the enjoined party] is outweighed by [a] strong likelihood of success on the merits" by the requesting party).

Both parties offer interests that the Court now weighs. On one side, the Individual Plaintiffs assert interests in "lawfully exercising freedoms they have enjoyed for several years."[44] As law-abiding citizens, this includes the ability possess firearms that are not machineguns.[45] Absent protection from a TRO, the Individual Plaintiffs contend that they would suffer compliance costs from any civil and criminal enforcement actions, in addition to experiencing a chilling effect on the exercise of their freedoms going forward.[46] On the other side, Defendants argue that their interests in avoiding confusion, retaining prosecutorial discretion, and protecting public safety tilt the equitable scale in their direction.[47] Weighing these interests, the Court finds that, on balance, the equities favor the Individual Plaintiffs at this stage. The Court will address each of Defendants' arguments in turn.

---

[44] Pls.' Br. 8, ECF No. 18.
[45] *Id.*
[46] *Id.*
[47] Defs.' Resp. 6, 9–10, ECF No. 32.

Add. 43

Defendants first recycle their threshold arguments to insist that the equities weigh against a TRO in this case. According to Defendants, because the "Individual Plaintiffs' asserted injuries are hypothetical, and principles of equity do not permit injunctions against criminal prosecutions," a TRO that "block[s] the initiation of actions that ATF has no present intent to pursue would simply cause confusion."[48] The Court is not persuaded. If anything, it seems that the ATF's incongruent definition and refusal to disavow prosecution of the Individual Plaintiffs during the pendency of this lawsuit jointly form the source of any confusion. Moreover, the Court has already rejected Defendants' threshold arguments. Plaintiffs have standing due to credible threats of prosecution against them. And the concern that pre-enforcement judicial intervention in this case would strip the Defendants' of their prosecutorial discretion is similarly misplaced. The Court has already found that the Plaintiffs are facially attacking the lawfulness of Defendants' ability to prosecute *anyone* for FRT possession under the ATF's expanded definition. There is no present attack on prosecutorial discretion because no such discretion can even exist if the ATF's definition of "machinegun" does not hold. Combined with the Court's determination that Plaintiffs are very

---

[48] Defs.' Resp. 9, ECF. No. 32. Defendants cite to two cases in support of this point: *Christoforu v. United States*, 842 F. Supp. 1453, 1456 (S.D. Fla. 1994), and *Younger v. Harris*, 401 U.S. 37, 46 (1971). From the Court's reading of these cases, they are inapposite. To begin with, *Christoforu* advised that courts should "not grant equitable relief when [a] preemptive civil suit is filed *for the purpose of* terminating a pending criminal action." 842 F. Supp. at 1455 (emphasis added). But the parties have identified no pending criminal actions against the Individual Plaintiffs and there is no evidence that the injunctive relief is sought *for the purpose of* terminating or otherwise impeding a criminal action. Furthermore, *Younger*'s abstention doctrine, as cited by Defendants, applies to the power of federal courts to enjoin *ongoing state prosecutions*. 401 U.S. at 43–46. This carries significantly different considerations than pre-enforcement judicial review of a federal criminal law. But even if *Younger*'s holding applies to federal prosecutions, the Supreme Court recognized that "the threat to the plaintiff's federally protected rights" is precisely the type of irreparable injury that equitable relief is designed to prevent. *Id.* at 46. In contrast, the cost of criminal prosecution to the accused party is not an "irreparable" injury. *Id.* at 44–46. The reason for differentiating between these types of harms is due to the importance of avoiding duplicative legal proceedings. *Id.* at 42–44. When the alleged injury from a criminal prosecution is merely "the cost, anxiety, and inconvenience of having to defend," the initiation of civil proceedings seeking equitable relief would be duplicative since the issues are capable of resolution via the criminal action. *Id.* at 44–46. But where important "federally protected rights" are in jeopardy, equitable relief is proper when those rights cannot be sufficiently protected in "a single criminal prosecution." *Id.* at 46. Therefore, the Court finds that *Christoforu* and *Younger* do not bar equitable relief in this case.

likely to succeed on the their APA claim that this expanded definition violates the law, Defendants' asserted interests do not tip the equitable scale in their favor.

Defendants next assert their primary argument as to why the balance of equities favors them: "[p]ublic safety would be jeopardized by the injunction."[49] According to Defendants, enjoining the ATF from taking future action regarding FRTs "imposes harms that outweigh any possible harms to the Individual Plaintiffs, who could defend against such actions in the usual course."[50] These harms to Defendants are grounded in their "strong and continuing interest in being able to enforce [the] laws restricting the possession and sale of deadly machine guns."[51] Defendants do not dispute that the Individual Plaintiffs are law-abiding citizens who wish to engage in the lawful conduct of possessing specific firearms—conduct that was lawful until the ATF said otherwise. Instead, Defendants argue that Plaintiffs "provide no explanation for why the government's general public safety concerns would apply any less readily to them than other individuals who possess deadly machineguns."[52] But it is actually Defendants who lack an explanation—not Plaintiffs. The fact that Plaintiffs assert they are "law-abiding citizens" who "have possessed [FRTs] without incident"[53] differentiates them from individuals who "create public health hazards" and "carry out . . . large-scale attack[s]."[54] Plaintiffs' assertion supplies more substance than Defendants' deflection.

Yet perhaps most damaging to Defendants are their irreconcilable positions. On the one hand, Defendants generally argue that possession of FRTs by anyone—including possession by *these* three individuals (who have no criminal history)—poses a threat to public safety. But, on

---

[49] Defs.' Resp. 10, ECF No. 32.
[50] *Id.* (citing *Proctor v. Dist. of Columbia*, 310 F. Supp. 3d 107, 117 (D.D.C. 2018) (finding public safety justified balancing the equities in favor of the government)).
[51] *Id.*
[52] *Id.*
[53] Pls.' Reply 9, ECF No. 33.
[54] Defs.' Resp. 10, ECF No. 32.

Add. 45

the other hand, Defendants aver that they have no *current* plans to enforce the ATF Rule against these individuals based on the *historic* practice of enforcing their interpretation against large sellers only. Even if Defendants' representation is true that they have only prosecuted large sellers in the past, how can they now claim that the threat to public safety is so grave *because of individual ownership* by these specific law-abiding citizens at the same time there are no current plans to prosecute these individuals?

The Court is unable to reconcile this contradiction. Taking Defendants' representation that there are no current plans to prosecute as true, this dissonance here suggests a lack of substance underlying the proffered public safety concern. Defendants offer no argument specifically showing how public safety would be harmed by the Court granting the narrow TRO—at most twenty-eight days—to enjoin enforcement actions for possession (and not some other unlawful use of the FRT) by *these* Individual Plaintiffs. Because Defendants have no current plans to prosecute, the Court concludes that they must not seriously object to the issuance of a TRO memorializing the status quo: no prosecution for prior or current FRT possession by these three individuals. Thus, the Court finds that Defendants would experience little, if any, harm by issuance of a narrow TRO.

In contrast, the Individual Plaintiffs face the very real potential to experience harms if the TRO is not granted. These harms include a credible threat of civil or criminal prosecution, compliance costs, and a chilling of ownership and constitutional rights. On balance, the equities and public interest weigh in favor of Plaintiffs.[55] And any injury to Defendants is further

---

[55] The Court has previously noted that there is also an interest in ensuring that the Government adheres to its constitutional and statutory obligations. *Polymer80, Inc. v. Garland*, 4:23-cv-00029-O, 2023 WL 3605430, at *11 (N.D. Tex. Mar. 19, 2023). Indeed, there is undoubtedly "an overriding public interest [in] . . . an agency's faithful adherence to its statutory mandate." *Jacksonville Port Auth. v. Adams*, 556 F.2d 52, 59 (D.C. Cir. 1977). And "[t]he public interest is served when administrative agencies comply

outweighed by Plaintiffs' strong likelihood of success on the merits of its APA statutory interpretation claim. *Mack*, 4 F.4th at 316.

*    *    *    *

In sum, Plaintiffs have successfully demonstrated to the Court that they are entitled to a TRO. Having considered the arguments, evidence, and law, the Court holds that the relevant factors weigh in favor of **GRANTING** the TRO. Accordingly, the Court temporarily **ENJOINS** Defendants—along with their officers, agents, servants, and employees—from initiating criminal or civil enforcement actions against Plaintiffs Carey, Speegle, and Wheeler, in any manner, based on their current or prior possession of one or more FRTs. Further, the Court temporarily **ENJOINS** Defendants—along with their officers, agents, servants, and employees—from requesting that Plaintiffs Carey, Speegle, and/or Wheeler surrender, voluntarily or involuntarily, any FRTs in their possession.

### C.  Scope of the Temporary Restraining Order

Having determined the Individual Plaintiffs carried their burden showing that equitable relief is warranted in this situation, the Court must next decide how to provide those parties with complete relief. When ordering equitable relief, the Court is obligated to state "specifically" and "in reasonable detail . . . the act or acts restrained or required" under the injunction. FED. R. CIV. P. 65(d)(1)(b)–(c). In keeping with that obligation, the Court will tailor the scope of the temporary restraining order with careful attention to avoid upsetting the balance of the competing interests. Thus, the Court enjoins Defendants from implementing or enforcing the ATF's expanded definition of "machinegun"—that proscribes FRT possession—against these

---

with their obligations under the APA." *N. Mariana Islands v. United States*, 686 F. Supp. 2d 7, 21 (D.D.C. 2009).

Individual Plaintiffs. This relief should alleviate Plaintiffs' demonstrable injuries without unnecessarily burdening Defendants.

Crucially, this Court's temporary injunctive relief does not offer blanket immunity to the Individual Plaintiffs from prosecution for all firearm-related offenses. The implications of this TRO's narrow scope bear further explanation. This TRO protects only the Individual Plaintiffs from civil or criminal enforcement of the challenged rule during the life of the TRO. Other unnamed individual members of the Institutional Plaintiffs are *not* covered under this TRO. Additionally, this TRO only covers the current or prior possession of FRTs by the Individual Plaintiffs. This TRO does *not* cover any future purchases by the Individual Plaintiffs of FRTs after the date of his order. Importantly, the Plaintiffs may still be prosecuted for violating otherwise lawful provisions of the NFA and GCA, as well as other lawful firearms regulations. Accordingly, the Court finds that the aforementioned limitations appropriately narrow the scope of this extraordinary relief in order to maintain the status quo without overly burdening Defendants.

### D.  Timing of the Temporary Restraining Order

Normally, a TRO remains in place for a maximum of fourteen days. Fed. R. Civ. P. 65(b). The Federal Rules of Civil Procedure provide the option to extend a TRO an additional fourteen days for good cause shown. *Id.* at 65(b)(2). The wording of Rule 65 does not foreclose the Court extending the TRO prior to receiving a subsequent renewal request from the party seeking the TRO. *See id.* ("The order expires at the time after entry—not to exceed 14 days— that the court sets, unless before that time *the court, for good cause, extends it* for a like period or the adverse party consents to a longer extension.") (emphasis added)). Other courts have done the same in similar circumstances. *See, e.g.*, *State of Maine v. Fri*, 483 F.2d 439, 441 (1st Cir.

1973) ("[A]s long as the hearing on the preliminary injunction is held expeditiously within the appropriate time frame, the district court should be able to extend the restraining order while it prepares its decision."); *Fernandez-Roque v. Smith*, 671 F.2d 426, 431 (11th Cir. 1982) ("A district court possesses inherent powers of equity sufficient to enable it to preserve the status quo until [other pending legal questions] can be resolved.").[56]

Plaintiffs request that the TRO remain in place until such time that the Court can rule on their imminent preliminary injunction motion.[57] The Court construes this as a request for an extension and finds good cause to extend the TRO an additional fourteen days. Without this extension, the TRO would otherwise expire six days prior to when the Plaintiffs' impending Motion for Preliminary Injunction ripens. And this would occur despite no change in the very circumstances justifying the TRO. Not only will this extension protect the status quo by ensuring that there is not a short gap between the temporary relief granted by this Order and any further injunctive relief that may be granted in the near future, it will also conserve finite judicial resources spent on addressing subsequent renewal requests.

Because the parties' agreed schedule for the preliminary injunction briefing comes ripe on September 19, 2023,[58] the Court will extend the TRO for one additional fourteen-day period. Therefore, the TRO will either expire twenty-eight days from the date of this order, on September 27, 2023, *or* on the date the Court issues its ruling on the forthcoming preliminary injunction motion, whichever is earlier.

---

[56] For other examples, see *Women's Med. Prof'l Corp v. Taft*, 199 F.R.D. 597, 598 (S.D. Ohio 2000) (extending a TRO sua sponte); *Long Island R.R. Co. v. Int'l Ass'n of Machinists & Aerospace Workers*, 709 F. Supp. 376, 377 (S.D.N.Y. 1989) (discussing the prior sua sponte extension of the TRO in order to preserve the status quo pending the ruling on the preliminary injunction); *Hous. Study Grp. v. Kemp*, 739 F. Supp 633, 635 n.4 (D.C.C 1990) (discussing the prior sua sponte extension of the TRO to "afford the parties adequate time to complete briefing.").

[57] Pls.' Br. 1, ECF No. 22.

[58] Joint Proposed Briefing Schedule, ECF No. 25.

## V.     CONCLUSION

For the foregoing reasons, the Court **GRANTS** Plaintiffs' Motion for Temporary Restraining Order (ECF No. 17) to preserve the status quo until September 27, 2023 or until such time that the Court rules on Plaintiffs' Motion for Preliminary Injunction (ECF No. 22). The Court **ORDERS** that Defendants—along with their officers, agents, servants, and employees—are **ENJOINED** from implementing or enforcing against Plaintiffs Carey, Speegle, and Wheeler, in any manner, the ATF's expanded definition of "machinegun" that this Court has determined is likely unlawful. Further, the Court waives the security requirement of Federal Rule of Civil Procedure 65(c).[59] *See Kaepa, Inc. v. Achilles Corp.*, 76 F.3d 624, 628 (5th Cir. 1996) (holding that the district court has discretion to waive the security requirement).

**SO ORDERED** this **30th day** of **August, 2023**.

Reed O'Connor
**UNITED STATES DISTRICT JUDGE**

---

[59] Because neither party raises the security requirement in Rule 65(c), no security is ordered. *See* FED. R. CIV. P. 65(c).

.

## DECLARATION OF MR. JAMES JOSEPH ROSS WHEELER

1. My name is James Joseph Ross ("J.R.") Wheeler. I reside in Crandall, Texas.

2. I am a U.S. citizen. I have never been charged with or convicted of a felony. I am able to legally purchase and possess firearms.

3. I also have a Federal Firearms License and am the 50% owner of a small business selling firearms and ammunition.

4. I am aware that the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") has claimed that forced reset triggers qualify as "machineguns."

5. In the past, I have owned and sold forced reset triggers.

6. In my experience, I would place the pre-installation and tuned value of a forced reset trigger at approximately $425.

7. I intend to continue to buy and sell forced reset triggers. However, I am chilled from doing so by the government's interpretation of "machinegun," and am not willing to risk civil or criminal prosecution for doing so.

8. In addition, I currently personally own 1 forced reset trigger. My business has 2 forced reset triggers in its inventory.

9. I would like to continue to own and possess forced reset triggers. However, I am concerned that by doing so, I place myself at risk of having my property seized by the federal government.

10. If I am not able to obtain judicial relief, I will be forced to surrender 3 forced reset triggers, valued at approximately $1,275 to the ATF.

Pursuant to 28 U.S.C. § 1746, I hereby declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed on July 28, 2023.

By:

Mr. James Joseph Ross Wheeler

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**_____ DIVISION**

| | |
|---|---|
| NATIONAL ASSOCIATION FOR GUN RIGHTS, INC., ET AL., ) ) ) | Case No. _____ |
| Plaintiffs, ) | |
| v. ) ) | |
| MERRICK GARLAND, ) IN HIS OFFICIAL CAPACITY AS ) ATTORNEY GENERAL ) OF THE UNITED STATES, ET AL, ) ) | |
| Defendants. ) | |

## DECLARATION OF MR. TRAVIS SPEEGLE

1. My name is Travis Speegle. I reside in Austin, Texas.

2. I am a U.S. citizen. I have never been charged with or convicted of a felony. I am able to legally purchase and possess firearms.

3. I am aware that the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") has claimed that forced reset triggers qualify as "machineguns."

4. I currently own 10.

5. I would like to continue to own, possess, and enjoy the use of my forced reset triggers. However, I am concerned that by doing so, I place myself at risk of having my property seized by the federal government.

6. If I am not able to obtain judicial relief, I will be forced to surrender 10 forced reset triggers, valued at approximately $4,000.00 to the ATF.

7. In addition, I intend to purchase additional forced reset triggers. I am currently unable to do so due to the ATF's interpretation, which places myself and anyone who sells a forced reset trigger to me at risk of civil and/or criminal prosecution.

Pursuant to 28 U.S.C. § 1746, I hereby declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed on July 18, 2023.

By: _____
Mr. Travis Speegle

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
_____ **DIVISION**

NATIONAL ASSOCIATION FOR GUN )
RIGHTS, INC., ET AL., )
                                             )    Case No. _____
              Plaintiffs, )
                                             )
    v. )
                                             )
MERRICK GARLAND, )
IN HIS OFFICIAL CAPACITY AS )
ATTORNEY GENERAL )
OF THE UNITED STATES, ET AL, )
                                             )
              Defendants. )
_____ )

## DECLARATION OF MR. PATRICK CAREY

1.  My name is Patrick J. Carey.  I reside in Zachary, Louisiana.

2.  I am a U.S. citizen.  I have never been charged with or convicted of a felony.  I am able
    to legally purchase and possess firearms.

3.  Prior to August 22, 2022, I purchased and owned two "FRT-15—Rarebreed Trigger."

4.  The purchase price for each FRT-15 was $ 300/450 .

5.  On August 22, 2022, agents from the Bureau of Alcohol, Tobacco, Firearms, and
    Explosives ("ATF") visited my house.  They provided me with a letter asserting that that
    "ATF has information that you have acquired one or more Forced/Hard Reset Trigger
    (FRT) devices," that "[t]hese items have been classified as machineguns that were
    unlawfully manufactured.  Possession of these devices is a violation of law due to their
    illegal manufacture," and that "*the unlawful receipt and possession of any of these
    devices is a felony violation of Federal law*" (emphasis in the original).   A true and
    correct copy of this letter is attached to this Declaration.

6. In response to the ATF's assertion that the continued possession of a forced reset trigger is a felony violation of federal law, and in fear of civil or criminal prosecution, I surrendered two FRT-15 forced reset triggers to the ATF. A true and correct copy of the "Consent to Forfeiture or Destruction of Property and Waiver of Notice" form is attached to this Declaration.

7. I did not want to get rid of my FRT-15 forced reset triggers. I would like to own forced reset triggers. I would like to purchase new forced reset triggers. But for the ATF's threat of federal prosecution, I would purchase new forced reset triggers.

Pursuant to 28 U.S.C. § 1746, I hereby declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed on July __28__, 2023.

By: _____
     Mr. Patrick J. Carey

985-287-2773 Local Donna
Ind ops —
I OI



**U.S. Department of Justice**

Bureau of Alcohol, Tobacco,
Firearms and Explosives

*[Baton Rouge] Field Division*

*[Date]8-22-22*

www.atf.gov

TO: Patrick Carey
5016 Knight Drive
Zachary, LA

## WARNING NOTICE

## YOU MAY BE IN VIOLATION OF FEDERAL LAW

The Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) is responsible for enforcing Federal firearms laws. ATF has information that you have acquired one or more Forced/Hard Reset Trigger (FRT) devices *[Insert exact description of purchased item(s) if available]* from Gunbroker.com account "RifleRemedy2000". These items have been classified as machineguns that were unlawfully manufactured. Possession of these devices is a violation of law due to their illegal manufacture. As such, due to their illegal manufacture, the registration of these devices in the National Firearms Registration and Transfer Record (NFRTR) is also a violation of law.

*This letter officially notifies you that the unlawful receipt and possession of any of these devices is a felony violation of Federal law and devices that are unlawfully received or possessed are subject to seizure and forfeiture by the Federal government. Continued possession of any of the devices could result in prosecution for criminal violations of Federal law as well as potential State criminal violations. Any future purchase or possession of such devices may subject you to prosecution as well.*

The National Firearms Act (NFA), Title 26 U.S.C. Section 5845(b), defines the term "machinegun" as:

> "…any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. The term shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person."

1

The Gun Control Act of 1968 (GCA), as amended, Title 18 U.S.C. Section 922(o), prohibits an individual from possessing or transferring any machinegun not lawfully possessed prior to May 19, 1986. Federal regulation at Title 27 C.F.R. Section 479.105(c) generally permits qualified importers or manufacturers to manufacture or import machineguns after May 19, 1986, for sale or distribution to the government. However, it has been determined that these FRT machineguns, at least one of which is in your possession, were not lawfully manufactured pursuant to this regulation. Therefore, it is not lawful for you to possess the FRT machinegun(s).

Immediately contact your local ATF office at [*phone number*] within 30 days of receipt of this letter to coordinate the abandonment of any, and all, of the FRT machinegun(s) described above.

Thank you for your prompt attention to this matter.

Sincerely yours,


[*J. Hutchison*]
Special Agent
Bureau of Alcohol, Tobacco, Firearms and Explosives
[Baton Rouge] Field Division

2

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | | |
|---|---|---|
| NATIONAL ASSOCIATION FOR GUN RIGHTS, INC., ET AL., | ) ) ) | |
| Plaintiffs, | ) ) | Case No. 4:23-cv-00830-O |
| v. | ) ) | |
| MERRICK GARLAND, IN HIS OFFICIAL CAPACITY AS ATTORNEY GENERAL OF THE UNITED STATES, ET AL, | ) ) ) ) ) ) | |
| Defendants. | ) ) | |

## DECLARATION OF RYAN J. FLUGAUR

I, Ryan J. Flugaur, pursuant to 28 U.S.C. § 1746, declare as follows:

1.      I am over 18 years of age, of sound mind, and otherwise competent to make this Declaration. The evidence set out in this Declaration is based on my personal knowledge.

2.      I am employed as the vice president of the Plaintiff in this action, the National Association for Gun Rights, Inc (the "NAGR"). I am familiar with NAGR's records.

3.      From the date the preliminary injunction was issued by Judge Reed O'Connor of the United States District Court for the Northern District of Texas, until the present date, NAGR has been made aware by 10 of its members that they were contacted by the ATF in attempts to have those NAGR members surrender their FRT-15s.

## VERIFICATION

I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 31, 2023

Ryan J. Flugaur