No. 23-11138

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

National Association for Gun Rights, Incorporated; Texas Gun Rights, Incorporated;
Patrick Carey; James Wheeler; Travis Speegle,

Plaintiffs-Appellees,

v.

Merrick Garland, U.S. Attorney General; United States Department of Justice; Steven
Dettelbach, in his official capacity as Director of the Bureau of Alcohol, Tobacco,
Firearms and Explosives; Bureau of Alcohol, Tobacco, Firearms, and Explosives,

Defendants-Appellants.

On Appeal from the United States District Court
for the Northern District of Texas
District Court Case No. 4:23-cv-830 (Hon. Reed O'Connor)

**OPENING BRIEF FOR APPELLANTS**

BRIAN M. BOYNTON
  *Principal Deputy Assistant Attorney General*

LEIGHA SIMONTON
  *United States Attorney*

MARK B. STERN
BRAD HINSHELWOOD
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7256*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-7823*

## STATEMENT REGARDING ORAL ARGUMENT

The government respectfully requests oral argument.  The Bureau of Alcohol, Tobacco, Firearms and Explosives has for nearly fifty years consistently determined that certain devices, commonly referred to as "forced reset triggers," qualify as machineguns under federal law.  The district court here held that two such devices likely are not machineguns and issued a preliminary injunction barring enforcement of virtually all federal firearms laws with respect to those devices.  The government believes oral argument would provide substantial assistance to the Court.

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................... iii

INTRODUCTION ................................................................................................ 1

STATEMENT OF JURISDICTION .................................................................... 2

ISSUE PRESENTED .......................................................................................... 3

STATEMENT ...................................................................................................... 3

      A.     Statutory Background .................................................................. 3

      B.     Prior Proceedings ...................................................................... 9

SUMMARY OF ARGUMENT ......................................................................... 12

STANDARD OF REVIEW ............................................................................... 16

ARGUMENT ..................................................................................................... 16

I.      Plaintiffs Lack Standing ........................................................................ 16

II.     The Forced Reset Triggers at Issue Are Machineguns ......................... 19

      A.     These Devices Allow Automatic Fire "by a Single Function of the Trigger" .................................................................................. 20

      B.     The District Court Mistakenly Concluded That a Weapon Cannot Be a Machinegun if Its Trigger Automatically Moves for Each Shot ......................................................................................... 27

III.    The Remaining Equitable Factors Likewise Militate Against a Preliminary Injunction ......................................................................... 32

CONCLUSION .................................................................................................. 45

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

ADDENDUM

# TABLE OF AUTHORITIES

**Cases:**                                                                                          <u>**Page(s)**</u>

*Akins v. United States,*
  312 F. App'x 197 (11th Cir. 2009) .......................................................... 23, 31

*Babbitt v. United Farm Workers Nat'l Union,*
  442 U.S. 289 (1979) ................................................................................ 43

*Blum v. Holder,*
  744 F.3d 790 (1st Cir. 2014) .................................................................. 19

*Cargill v. Garland,*
  57 F.4th 447 (5th Cir.), *cert. granted,*
  144 S. Ct. 374 (2023) ...................................... 2, 10, 15, 22, 27, 28, 29, 30, 31

*Deaver v. Seymour,*
  822 F.2d 66 (D.C. Cir. 1987) .................................................................. 42, 44

*Direct Biologics, LLC v. McQueen,*
  63 F.4th 1015 (5th Cir. 2023) ................................................................ 16

*Douglas v. City of Jeannette,*
  319 U.S. 157 (1943) ................................................................................ 41

*Friends of the Earth, Inc. v. Chevron Chem. Co.,*
  129 F.3d 826 (5th Cir. 1997) .................................................................. 13, 17, 18

*Guedes v. ATF,*
  45 F.4th 306 (D.C. Cir. 2022), *petition for cert. filed,*
  No. 22-1222 (June 14, 2023) .................................................................. 23

*Hunt v. Washington State Apple Advert. Comm'n,*
  432 U.S. 333 (1977) ................................................................................ 13, 17

*McDonald v. City of Chicago,*
  561 U.S. 742 (2010) ................................................................................ 25

*National Rifle Ass'n of Am. v. Magaw,*
  132 F.3d 272 (6th Cir. 1997) .................................................................. 43

*Norwegian Nitrogen Prods. Co. v. United States,*
  288 U.S. 294 (1933) ................................................................................ 26

*Opulent Life Church v. City of Holly Springs,*
  697 F.3d 279 (5th Cir. 2012) ........................................................................ 39

*Staples v. United States,*
  511 U.S. 600 (1994) ...................................................................................... 23

*Steffel v. Thompson,*
  415 U.S. 452 (1974) ...................................................................................... 42

*Stolt-Nielsen, S.A. v. United States,*
  442 F.3d 177 (3d Cir. 2006) .................................................................... 42, 44

*Susan B. Anthony List v. Driehaus,*
  573 U.S. 149 (2014) ............................................................ 18, 19, 40-41, 43

*Town of Chester v. Laroe Estates, Inc.,*
  581 U.S. 433 (2017) ...................................................................................... 41

*United States v. Bishop,*
  926 F.3d 621 (10th Cir. 2019) ...................................................................... 23

*United States v. Camp,*
  343 F.3d 743 (5th Cir. 2003) ............................................................ 21, 22, 30

*United States v. Carter,*
  465 F.3d 658 (6th Cir. 2006) ........................................................................ 22

*United States v. Cox,*
  342 F.2d 167 (5th Cir. 1965) ........................................................................ 41

*United States v. Evans,*
  978 F.2d 1112 (9th Cir. 1992) ...................................................................... 21

*United States v. Fleischli,*
  305 F.3d 643 (7th Cir. 2002) .................................................................... 21, 22

*United States v. Harris,*
  959 F.2d 246 (D.C. Cir. 1992) ...................................................................... 24

*United States v. Jokel,*
  969 F.2d 132 (5th Cir. 1992) .................................................................... 14, 21

*United States v. Kirk,*
  105 F.3d 997 (5th Cir. 1997) ........................................................................ 35

iv

*United States v. Nixon*,
　418 U.S. 683 (1974) ................................................................ 41

*United States v. Olofson*,
　563 F.3d 652 (7th Cir. 2009) ........................................... 21, 23

*United States v. Rare Breed Triggers, LLC,*
　No. 23-cv-369 (NRM) (RML), 2023 WL 5689770
　(E.D.N.Y. Sept. 5, 2023) ..................... 1, 5, 8, 21, 27, 31, 34

*United States v. Smith*,
　700 F.2d 627 (11th Cir. 1983) ................................................ 24

*United States v. Vázquez-Martínez*,
　812 F.3d 18 (1st Cir. 2016) ................................................... 23

*Viasat, Inc. v. FCC*,
　47 F.4th 769 (D.C. Cir. 2022) ............................................... 17

*Winter v. Natural Res. Def. Council, Inc.*,
　555 U.S. 7 (2008) ................................................................... 16

*Younger v. Harris*,
　401 U.S. 37 (1971) ............................................................ 42, 44

*Zimmerman v. City of Austin*,
　881 F.3d 378 (5th Cir. 2018) ................................................. 18

**Statutes:**

Administrative Procedure Act (APA):
　5 U.S.C. § 702 ....................................................................... 43
　5 U.S.C. § 704 ....................................................................... 44
　5 U.S.C. § 705 ....................................................................... 44

Firearms Owners' Protection Act,
　Pub. L. No. 99-308, 100 Stat. 449 (1986) ................................ 4

Gun Control Act of 1968,
　Pub. L. No. 90-618, sec. 201, § 5845(b), 82 Stat. 1213, 1231 ........... 4
　18 U.S.C. § 921(a)(24) ............................................................ 4
　18 U.S.C. § 922(g) ........................................................... 11, 36
　18 U.S.C. § 922(o) .................................................................. 4

18 U.S.C. § 922(o)(2)(B) ............................................................ 4

National Firearms Act of 1934:
26 U.S.C. ch. 53 .................................................................... 3
26 U.S.C. § 5845(b) .................................................. 1, 3, 4, 14, 20, 21, 22

28 U.S.C. § 1292(a)(1) ............................................................. 3

28 U.S.C. § 1331 ................................................................... 2

**Rule:**

Fed. R. App. P. 4(a)(1)(B) ........................................................ 3

**Legislative Materials:**

*Administration of Liquor Taxing Laws: Hearings on H.R. 8001 Before the*
*H. Comm. on Ways & Means*, 74th Cong. 22 (1935).............................25

86 Cong. Rec. 6376 (1940) .................................................. 25, 26

H.R. Rep. No. 73-1780 (1934) ............................................. 3, 24, 34

H.R. Rep. No. 90-1956 (1968).....................................................4

H.R. Rep. No. 99-495 (1986)......................................................4

*National Firearms Act: Hearings on H.R. 9066 Before the H. Comm. on*
*Ways & Means*, 73d Cong. 40 (1934)............................................24

S. 1970, 76th Cong. 4-5 (1940) ................................................25

**Other Authorities:**

ATF, E-Publication 5320.8, *National Firearms Act Handbook* § 7.2.4.1 (2009).................5

*Bump-Stock-Type Devices*, 83 Fed. Reg. 66,514 (Dec. 26, 2018) ................. 31, 33

*By*, Webster's New International Dictionary (2d ed. 1928) .............................22

*Function*, 4 The Oxford English Dictionary (1933).........................................21-22

Nat'l Ass'n for Gun Rights, *Join National Association for Gun Rights*,
      https://nationalgunrights.org/join/ (last visited Jan. 12, 2024) .........................17, 18

Rev. Rul. XII-38-7035, S.T. 772, 13-2 C.B. 434 (1934) .....................................26

Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of
      Legal Texts* § 66 (2012) ....................................................................................25

Tex. Gun Rights, *Join TXGR Today!*, https://txgunrights.org/join/
      (last visited Jan. 12, 2024) ......................................................................... 17, 18

*Trigger*:
      The American Heritage Dictionary of the English Language (1969) .......................21
      11 The Oxford English Dictionary (1933)...................................................21

11A Charles Alan Wright et al., *Federal Practice and Procedure* § 2948.1 (2d ed. 1995).....39

## INTRODUCTION

Forced reset triggers are devices that replace the standard trigger on an AR-15 or similar firearm. With a forced reset trigger equipped, a shooter can pull the trigger, apply continuous and steady pressure to the trigger, and fire repeatedly while the mechanics of the device automatically repeatedly force the trigger to reset against the shooter's continuous pull.

Since at least 1975, the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) has repeatedly classified devices that operate in this fashion as machineguns because such devices allow a shooter to fire "automatically more than one shot, without manual reloading, by a single function of the trigger." 26 U.S.C. § 5845(b). After a manufacturer made and distributed these devices on a nationwide scale, the government took enforcement action, obtaining a preliminary injunction against further manufacture or distribution by that manufacturer in a suit in the Eastern District of New York. *United States v. Rare Breed Triggers, LLC*, No. 23-cv-369 (NRM) (RML), 2023 WL 5689770 (E.D.N.Y. Sept. 5, 2023). That court issued an injunction after concluding that the government "is likely to succeed on the merits" of its claim that the forced reset triggers at issue here are machineguns. *Id.* at *25.

The district court here upended that decades-old understanding, granting a preliminary injunction barring essentially any enforcement of the firearms laws against the FRT-15 and Wide Open Trigger (WOT), two recent forced-reset

triggers ATF has determined are machineguns.  The district court believed that these devices are not meaningfully distinguishable from the "non-mechanical bump stock" devices this Court held not to be machineguns in *Cargill v. Garland*, 57 F.4th 447 (5th Cir.) (en banc), *cert. granted*, 144 S. Ct. 374 (2023); that ATF had not treated devices like the ones at issue here as machineguns prior to the 2018 rule that classified non-mechanical bump stocks as machineguns; and that other devices an eight-judge plurality of this Court in *Cargill* made clear are machineguns were not comparable to the devices at issue here.

The court was mistaken in all respects.  As noted, ATF's treatment of devices of this type as machineguns long predates the 2018 bump stock rule.  The controlling holding of *Cargill* was that the rule of lenity applied given multiple ambiguities in how the statutory definition of a machinegun applied to non-mechanical bump stocks—a holding that has no bearing on the issue here.  The *Cargill* plurality recognized that a device qualifies as a machinegun if "a shooter using" the weapon "need only pull the trigger once to activate the firing sequence," which the device then maintains "of its own accord."  *Cargill*, 57 F.4th at 462 n.8. That is precisely what happens in the operation of forced reset triggers.

## STATEMENT OF JURISDICTION

Plaintiffs invoked the district court's jurisdiction under 28 U.S.C. § 1331. ROA.96.  The district court granted plaintiffs' motion for a preliminary injunction on

October 7, 2023.  *See* ROA.1288-1332.  The government filed a notice of appeal on

November 6, 2023.  ROA.1984; *see* Fed. R. App. P. 4(a)(1)(B) (60-day time limit).

This Court has jurisdiction under 28 U.S.C. § 1292(a)(1).

**ISSUE PRESENTED**

Whether the district court erred in granting a preliminary injunction barring

enforcement of federal laws regulating machineguns with respect to certain forced

reset triggers known as the FRT-15 and WOT.

**STATEMENT**

**A.    Statutory Background**

**1.**  The National Firearms Act of 1934, 26 U.S.C. ch. 53, was the first major

federal statute to impose requirements on persons possessing or engaged in the

business of selling certain firearms, including machineguns.  As the House Report for

the legislation explained, Congress concluded that "there is no reason why anyone

except a law officer should have a machine gun" and that "[t]he gangster as a law

violator must be deprived of his most dangerous weapon, the machine gun."  H.R.

Rep. No. 73-1780, at 1 (1934).

The Act, in its present form, defines a "machinegun" as "any weapon which

shoots, is designed to shoot, or can be readily restored to shoot, automatically more

than one shot, without manual reloading, by a single function of the trigger."  26

U.S.C. § 5845(b).  The definition also encompasses parts that can be used to convert a

weapon into a machinegun.  A "machinegun" thus includes "the frame or receiver of

3

any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person." *Id.*; *see* Gun Control Act of 1968, Pub. L. No. 90-618, sec. 201, § 5845(b), 82 Stat. 1213, 1231; H.R. Rep. No. 90-1956, at 34 (1968) (Conf. Rep.) (noting that the Gun Control Act expanded the definition of "machinegun," one of the "gangster-type weapons" covered by the National Firearms Act, to include parts).

In 1986, Congress generally barred the sale and possession of new machineguns, making it "unlawful for any person to transfer or possess a machinegun" unless a governmental entity is involved in the transfer or possession. 18 U.S.C. § 922(o).[1]  In enacting the ban, Congress incorporated the definition of "machinegun" provided in the National Firearms Act, *id.* § 921(a)(24), and recognized that the ban would provide "benefits for law enforcement" in light of "the need for more effective protection of law enforcement officers from the proliferation of machine guns."  H.R. Rep. No. 99-495, at 2, 7 (1986); *see* Firearms Owners' Protection Act, Pub. L. No. 99-308, 100 Stat. 449 (1986).

---

[1] Congress excluded from the ban machineguns that were lawfully possessed prior to the effective date of the Firearms Owners' Protection Act (May 19, 1986).  *See* 18 U.S.C. § 922(o)(2)(B).

**2.**  For nearly 50 years, ATF has classified certain devices known as "forced reset triggers" as machineguns.  *See* ATF, E-Publication 5320.8, *National Firearms Act Handbook* § 7.2.4.1 (2009) (noting that ATF encourages manufacturers to submit new devices for "the agency's official position concerning the status of the firearms under Federal firearms laws" before a manufacturer "go[es] to the trouble and expense of producing" the weapon or device).  These devices replace the standard trigger assembly on a semiautomatic rifle and allow the shooter to pull the trigger once (or, more precisely, the curved metal component of the trigger mechanism known as the "trigger shoe"), maintain pressure on the trigger, and fire repeatedly.  As ATF's expert testified at the preliminary injunction hearing, ATF first classified a device that operated on these principles as a machinegun in 1975.  ROA.2184.  ATF reached the same conclusion with a similar device in 1994 and again with other devices in 2004, 2005, 2006, and 2017.  *See* ROA.1992-93; ROA.2006-32 (1975, 1994, and 2006 classifications); *United States v. Rare Breed Triggers, LLC*, No. 23-cv-369 (NRM) (RML), 2023 WL 5689770, at *10, *31 (E.D.N.Y. Sept. 5, 2023) (discussing 2006 classification and noting "obvious parallels" with the devices here).  ATF applied this longstanding understanding in concluding that the specific devices at issue in this suit—the FRT-15 and WOT—are machineguns.  ATF classified the AR1—a predecessor device to the FRT-15—as a machinegun in 2018, and reached the same conclusion about the WOT in 2021.  *See* ROA.948; ROA.966; ROA.1033; ROA.1051-52; ROA.1102.

These triggers alter the operation of semiautomatic rifles in crucial respects. On most semiautomatic rifles, pulling the trigger releases the hammer from the weapon's "sear," causing the hammer to swing and strike the firing pin, which is housed inside the rifle's "bolt carrier." ROA.1092-93. The firing pin strikes the bullet cartridge, which in turn causes ignition of the gunpowder and the bullet to fire. ROA.1093. The gases from this explosion are channeled to force the rifle's bolt carrier rearward. ROA.1094. On an ordinary AR-15-type semiautomatic rifle, the bolt carrier depresses the hammer, eventually forcing it into a position where it is retained by the "disconnector." ROA.1094-97. The bolt carrier then travels forward to its original position, aligning the firing pin to shoot another round. ROA.1098-99. The disconnector holds the hammer in place until the shooter releases the trigger, at which point the hammer again comes to rest on the weapon's sear and the shooter may fire another shot by a subsequent, separate pull on the trigger. ROA.1100.

A weapon equipped with an FRT-15 or WOT, by contrast, has no disconnector. Instead, the rearward travel of the bolt carrier presses the hammer directly onto the trigger sear surface. ROA.1097-98. The bolt carrier also pushes down on the trigger itself, causing it to move forward slightly against the shooter's continuous pull, and also engages a component called the "locking bar," which prevents the trigger from moving rearward and releasing the hammer while the bolt carrier is still traveling (releasing the hammer too early could result in a malfunction,

like a failure to fire or a dangerous "out-of-battery detonation" of the ammunition). ROA.1097-98. As the bolt carrier returns forward, it strikes the locking bar, thus releasing the trigger and firing another shot. ROA.1098-99. Indeed, to enable this action by the bolt carrier, these devices are designed to work with AR-15-type rifles that have been equipped with bolt carriers for M16-type machineguns because those bolt carriers include a "contact surface" central to the automatic firing of those weapons that is otherwise useless on an AR-15-type weapon. That contact surface is similarly used with these devices to "'trip' the 'locking bar' . . . during the operating cycle" and enable repeated fire. ROA.1091.

The practical effect of this cycle of operations is that a shooter can pull the trigger once to fire a shot, maintain steady, continuous pressure on the trigger, and fire repeatedly while the device rapidly pushes the trigger slightly forward against the shooter's continuous pressure. In testing, ATF consistently found that AR15-type rifles equipped with FRT-15s or WOTs fired multiple rounds automatically when the shooter "pulled the trigger and held it to the rear." ROA.966; *accord* ROA.1033; ROA.1050. ATF achieved the same results by using a zip tie to apply continuous pressure to the trigger: in each instance, the weapon fired multiple shots. *See* ROA.946; *see also* ROA.1186. The rate of firing—measured as 933 rounds per minute in one instance—is comparable to the 700-970 rounds per minute fired by an M16-type machinegun. ROA.1051.

7

**3.**  The government has taken enforcement action in recent years against manufacturers who made and distributed these devices notwithstanding ATF's conclusion that they are machineguns.  As particularly relevant here a district court in the Eastern District of New York granted the government a preliminary injunction under the Fraud Injunction Act against the sale of forced reset triggers by Rare Breed Triggers, the maker of the FRT-15 and distributor of the WOT.  *Rare Breed Triggers*, 2023 WL 5689770, at *49-50.  In issuing that injunction, the district court in New York concluded that "the Government is likely to succeed on the merits of its contention that the FRT-15 is an illegal machinegun," *id.* at *25, and that Rare Breed deliberately misled its customers about whether these devices were legal, *id.* at *27-34; *see* ROA.1993-94.

Rare Breed and others distributed thousands of these devices before the New York preliminary injunction issued.  ROA.1994-95.  ATF has consequently undertaken efforts to educate the public and to recover devices already distributed to the public.  ATF has pursued those efforts not by urging prosecution of individual possessors of these devices—some of whom, as noted, may have been deceived into believing these devices are legal—but instead by encouraging or soliciting the voluntary abandonment of the devices.  ROA.1996.  And in prioritizing retrieval efforts given the significant number of devices believed to have been distributed to the public, ATF has prioritized recovery of devices from individuals with criminal

histories, from distributors, and from individuals who have purchased large quantities of forced reset triggers (which may be indicative of plans to distribute).  ROA.1997. To date, the government has not brought any criminal prosecutions against individuals contacted through the retrieval process based solely on possession of an FRT.

### B.    Prior Proceedings

**1.**  Plaintiffs are three individuals and two organizations.  Among the individuals, Patrick Carey asserts that he turned over two FRT-15s to ATF after he was advised that they have been classified as machineguns under federal law, but states that he wishes to purchase such devices in the future.  ROA.97.  James Wheeler states that he personally owns an FRT-15 and that he is co-owner of a firearms business that owns two additional FRT-15s.  ROA.98.  Travis Speegle states that he owns 10 FRTs and intends to purchase more.  ROA.98.

All three individuals are also members of two plaintiff organizations—the National Association for Gun Rights and Texas Gun Rights.  ROA.1274-76.  Other members of those organizations also submitted declarations outlining their possession of these devices.  ROA.1254-55; ROA.1259-60; ROA.1264-65; ROA.1270-71.

**2.**  Plaintiffs urged that ATF's classification of these devices as machineguns is inconsistent with the statutory definition of machinegun and sought a temporary restraining order and a preliminary injunction.  After initially granting a temporary

restraining order as to the individual plaintiffs, the district court issued a preliminary injunction precluding enforcement against the organizational plaintiffs and their members, and any "downstream customers" of commercial members of the organizational plaintiffs, as well as the three individuals.  The court declared that this Court's decision in *Cargill v. Garland*, 57 F.4th 447 (5th Cir.) (en banc), *cert. granted*, 144 S. Ct. 374 (2023), dictated that plaintiffs were likely to succeed on the merits.  The court believed that *Cargill* established a rule that a weapon is not a machinegun if "[f]or each and every round fired, the trigger moves forward into its reset state and is depressed to release the hammer from its sear surface," ROA.1313—or, more succinctly, if "the trigger moves for every shot fired," ROA.1315.  Because "the trigger in an FRT-equipped firearm releases the hammer for every shot," ROA.1315, the district court concluded that these devices are not machineguns.

The district court also believed that the equities favored a preliminary injunction.  The court believed that plaintiffs have "interests in 'lawfully exercising freedoms they have enjoyed for several years'" including possessing these devices, which was "lawful until the ATF said otherwise."  ROA.1324-25.  The court regarded the explanation of the risks to public safety posed by machineguns as "a *non sequitur*" because "FRTs are *not* machineguns."  ROA.1326 (emphasis omitted).

The preliminary injunction bars the government from "[i]nitiating or pursuing criminal prosecutions" or "civil proceedings" for "possessing, selling, or

manufacturing FRTs," or "for representing to the public of potential buyers and sellers that FRTs are not machineguns," based on "the claim that FRTs are machineguns," as well as from "[s]ending 'Notice Letters' or other similar communications stating that FRTs are machineguns"; "[r]equesting 'voluntarily' [sic] surrender of FRTs to the government based on the claim that FRTs are machineguns"; "[d]estroying any previously surrendered or seized FRTs"; or "[o]therwise interfering in the possession, sale, manufacture, transfer, or exchange of FRTs based on the claim that FRTs are machineguns." ROA.1329-30. Those prohibitions extend to the individual plaintiffs and any members of the plaintiff organizations, expressly providing that "manufacturers or sellers who are members of an Organizational Plaintiff may continue to manufacture, sell, exchange, transfer, and/or market FRTs under this injunction," and further immunizing "downstream customers" of commercial sellers covered by the injunction. ROA.1330-31; ROA.1332. The court excluded from the coverage of its injunction parties enjoined by the district court in Rare Breed Triggers, ROA.1330-31, and individuals prohibited from possessing firearms under 18 U.S.C. § 922(g), ROA.1332.

**3.** The government appealed and sought a stay pending appeal from the district court. The district court denied the stay motion, ROA.2117-30, concluding again that "the preliminary injunction broadly maintains the status quo of general non-enforcement against law-abiding citizens" and reiterating its view that because

FRTs are not properly classified as machineguns, concerns that "allowing FRTs to be possessed, distributed, sold, or transferred is uniquely dangerous because of their rate of fire similar to a machinegun has no bearing on the analysis." ROA.2128; ROA.2129.

A divided panel of this Court denied a stay pending appeal in an unpublished order. Judge Haynes would have sent the case "to a merits panel as an expedited appeal" and would have "grant[ed] an administrative stay for a brief period of time deferring the question of the stay pending appeal to the oral argument merits panel which receives this case." Order 2 n.1 (Nov. 30, 2023). The majority stated that in their view, the *Cargill* plurality's interpretation was "persuasive," and under that interpretation the fact "that the FRT trigger must reset means that the weapon does not shoot by a '*single* function of the trigger.'" *Id.* at 4-5. The majority further concluded that the *Cargill* plurality's discussion of mechanical bump stocks—and the analogy between those devices and the FRTs at issue here—did not suffice to make "a strong showing that Defendants are likely to succeed on the merits." *Id.* at 6 (quotation omitted).

## SUMMARY OF ARGUMENT

Plaintiffs here challenge ATF's decades-old view that devices that allow a shooter to pull the trigger and maintain pressure while the weapon repeatedly fires are machineguns, even if the device causes the trigger to automatically move against the

shooter's continuous pull. The district court issued a preliminary injunction that for the first time legalized the unfettered manufacture, transfer, and possession of these devices. That injunction was mistaken along every axis of the preliminary injunction inquiry.

**1.** As a threshold matter, plaintiffs lack standing. That is most clearly the case with respect to the injunction's application to members of two organizations that claim to assert the interests of its members in this litigation. Those organizations have offered no evidence or information to demonstrate that they are actually bona fide membership organizations. They have not identified any "indicia of membership," such as "a clearly articulated and understandable membership structure" with members who "elect[] the governing body," nor have they explained how their members direct or control the organization. *Friends of the Earth, Inc. v. Chevron Chem. Co.*, 129 F.3d 826, 829 (5th Cir. 1997) (quotation omitted); *see Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 344-45 (1977). They thus lack standing to pursue relief on behalf of their members. Apart from this most apparent failure to establish standing for the relief ordered by the court, both the organizations and the individual plaintiffs have cited no history of enforcement of the prohibition against law-abiding individual possessors of these devices in the years since these devices came on the market, and thus have failed to demonstrate an imminent threat of civil or criminal enforcement against them.

**2.** On the merits, the district court's conclusion that forced reset triggers are not machineguns rests on its view that a weapon cannot be a machinegun if the trigger moves, no matter how slightly, for each shot fired. That misreads the statutory text. A weapon is a machinegun if it allows the firing of "automatically more than one shot . . . by a single function of the trigger." 26 U.S.C. § 5845(b). As this Court has explained, "a trigger is a mechanism that is used to initiate the firing sequence." *United States v. Jokel*, 969 F.2d 132, 135 (5th Cir. 1992) (per curiam). The relevant question is thus whether a weapon allows the automatic firing of more than one shot after a single function of the trigger. On most weapons, a weapon fires through a shooter's pull on a curved metal lever. And that is the case here: these devices allow a shooter to pull the trigger, maintain continuous pressure on the trigger, and fire repeatedly with no other action by the shooter. In this respect, these weapons are indistinguishable from military M16-type rifles or similar weapons all agree are machineguns, which likewise allow a shooter to pull and hold the trigger to fire repeatedly.

Relying on this Court's decision in *Cargill*, the district court believed that these devices did not operate "by a single function of the trigger" because the mechanics of the device cause the trigger to move slightly against the shooter's continuous pull for each shot fired. That was mistaken. *Cargill* contained no such holding, and the plurality opinion on which the district court relied explained that a device is a

14

machinegun if "a shooter using" the weapon "need only pull the trigger once to activate the firing sequence," which the device then maintains "of its own accord," *Cargill v. Garland*, 57 F.4th 447, 462 n.8 (5th Cir.) (en banc) (plurality op.), *cert. granted*, 144 S. Ct. 374 (2023), even if the trigger moves for each subsequent shot.

**3.**  The other preliminary injunction factors likewise do not support a preliminary injunction.  For nearly 50 years, ATF has treated as machineguns devices that operate on the same principles as the ones here.  There is no dispute that these devices have comparable destructive capacity to an M16 machinegun, and thus pose the same threats to the public as such weapons.  The district court's injunction for the first time permits the unfettered manufacture, transfer, and possession of these devices without any of the background checks or recordkeeping ordinarily required of firearms.  And it does so without accounting for the harms specific to these devices, which have repeatedly been recovered in connection with criminal activity.

Plaintiffs, meanwhile, can demonstrate no irreparable harm that even approaches these harms.  The government has made clear that it has no imminent plans to bring enforcement action against the individual plaintiffs and offered to inform the district court if that changed.  And more generally, the government has repeatedly explained that ATF's enforcement efforts have been focused on large-scale manufacturers or distributors of these devices, not otherwise law-abiding individual possessors.  Plaintiffs have thus identified no harm warranting preliminary relief.  And

15

at the bare minimum, these considerations counsel in favor of narrowing the injunction.

## STANDARD OF REVIEW

"The ultimate decision for or against issuing a preliminary injunction is reviewed under an abuse of discretion standard." *Direct Biologics, LLC v. McQueen*, 63 F.4th 1015, 1020 (5th Cir. 2023). A district court necessarily abuses its discretion if it "relies on erroneous conclusions of law," and "[c]onclusions of law are reviewed *de novo*." *Id.* (quotation omitted). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

## ARGUMENT

## I.    Plaintiffs Lack Standing

The district court entered an injunction that applies to numerous unnamed individuals who purport to be members of the two organizational plaintiffs, the National Association for Gun Rights and Texas Gun Rights. These organizations have failed to demonstrate that they are bona fide membership organizations empowered to seek relief on behalf of their members. They have not identified any "indicia of membership," such as "a clearly articulated and understandable

membership structure" with members who "elect[] the governing body," nor have they explained how their members direct or control the organization. *Friends of the Earth, Inc. v. Chevron Chem. Co.*, 129 F.3d 826, 829 (5th Cir. 1997) (quotation omitted); *see Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 344-45 (1977). By examining whether members actually "guide [the] activities" of an organization that asserts claims on their behalf, *Viasat, Inc. v. FCC*, 47 F.4th 769, 781 (D.C. Cir. 2022), the requirement of a bona fide membership organization not only ensures a proper party for Article III purposes, but also provides important protections for members when an organization purports to press their claims.

The organizations here have provided no information demonstrating their relationship to their purported members, and none of the declarations submitted by members of the organizational plaintiffs describe their relationship to the organization "beyond a bare assertion of membership." *Viasat*, 47 F.4th at 782; *see* ROA.1254; ROA.1259; ROA.1264; ROA.1270; ROA.1274-76. Any individual may apparently join these organizations by making donations through their websites, *see* Nat'l Ass'n for Gun Rights, *Join National Association for Gun Rights*, https://nationalgunrights.org/join/ (last visited Jan. 12, 2024); Tex. Gun Rights, *Join TXGR Today!*, https://txgunrights.org/join/ (last visited Jan. 12, 2024), and neither organization has provided any evidence that its members in fact direct or control the organization. Indeed, neither organization lists voting rights or other powers of

control as benefits of membership, instead emphasizing that members receive newsletters or other alerts and perks such as hats or bags. Nat'l Ass'n for Gun Rights, *supra*; Tex. Gun Rights, *supra*.

The plaintiff organizations are purporting to litigate not on behalf of specific members but instead on behalf of numerous unidentified members who do not apparently control the organization or this litigation and many of whom may not even know about the litigation. In these circumstances, an organizational plaintiff may not purport to litigate on behalf of such unidentified members, including presumably binding those members to any final judgment, without additional evidence establishing that those members in fact direct or control the organization. *Friends of the Earth*, 129 F.3d at 829. An injunction running to "members" of these organizations was thus improper.

Even apart from this error, both the organizational and individual plaintiffs lack standing because they have failed to establish "a credible threat of prosecution," *Zimmerman v. City of Austin*, 881 F.3d 378, 391 (5th Cir. 2018) (quotation omitted), that is "sufficiently imminent," *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014). Because the reasons plaintiffs lack standing substantially overlap with the reasons they have failed to show irreparable harm, we discuss these points in greater detail below. *See infra* pp. 38-39. But the central point is that plaintiffs have shown no threat or track record of criminal or civil enforcement against otherwise law-abiding individual

18

possessors of these devices in the years since these devices came on the market. *See*

*Susan B. Anthony List*, 573 U.S. at 164 ("[P]ast enforcement against the same conduct

is good evidence that the threat of enforcement is not chimerical." (quotation

omitted)); *Blum v. Holder*, 744 F.3d 790, 798 (1st Cir. 2014) ("In assessing the risk of

prosecution as to particular facts, weight must be given to the lack of a history of

enforcement of the challenged statute to like facts[] . . . .").

## II.    The Forced Reset Triggers at Issue Are Machineguns

At issue here are two forced-reset triggers—the FRT-15 and the WOT.  As the

district court correctly observed, there is no factual dispute about how these devices

operate.  ROA.1296.  These devices replace the standard trigger on an AR-15-type

rifle.  When equipped, these devices allow a shooter to pull the trigger, maintain

continuous pressure on the trigger, and fire repeatedly with no other action by the

shooter.

In this respect, these weapons are indistinguishable from military M16-type

rifles or similar weapons all agree are machineguns, which likewise allow a shooter to

pull and hold the trigger to fire repeatedly.  The only mechanical difference is that the

operation of these devices automatically pushes the trigger slightly forward against the

shooter's continuous pull to "forcibly return[] the trigger to its reset state" and

prevent release of the hammer for a fraction of a second while the weapon chambers

a new round.  ROA.1289.  ATF illustrated this process by using a zip tie to apply

19

continuous pressure to the trigger: by using the zip tie to simulate the steady pressure of the shooter's pull, ATF demonstrated that when the device's trigger is "depressed in a rearward state by the zip tie" the weapon will automatically fire repeatedly as the mechanics of the device move the trigger slightly forward against the shooter's continuous pressure for each shot fired.  ROA.1315; ROA.1092-1101.

Because the operation of these devices is not in dispute, the district court correctly recognized that the parties' dispute turned entirely on "whether FRTs qualify as machineguns under the statutory definition."  ROA.1384-85.  Under federal law, a machinegun is a weapon that fires "automatically more than one shot, without manual reloading, by a single function of the trigger."  26 U.S.C. § 5845(b).  Here, no one doubts that these devices operate "automatically" or that they operate "without manual reloading."  The only question is thus whether these devices operate "by a single function of the trigger."

## A.    These Devices Allow Automatic Fire "by a Single Function of the Trigger"

These devices meet that component of the definition because a single function of the trigger—here accomplished by a shooter's pull on the trigger—initiates an automatic firing sequence.  As noted, there is no dispute that when a shooter replaces the standard trigger on an AR-15-type rifle with an FRT-15 or WOT, the shooter can pull the trigger once and automatically fire repeatedly.  For nearly 50 years, ATF has classified as machineguns devices that operate on these same or similar principles to

20

the devices at issue here—first in 1975, and again in 1994, 2004, 2005, 2006, and 2017. *See* ROA.1992-93; ROA.2006-32 (1975, 1994, and 2006 classifications); *United States v. Rare Breed Triggers, LLC*, No. 23-cv-369 (NRM) (RML), 2023 WL 5689770, at *10 (E.D.N.Y. Sept. 5, 2023) (discussing 2006 classification). That longstanding view follows from the text of the machinegun statute and accords with its purposes and legislative history, and the district court erred in concluding otherwise.

For decades, ATF and its predecessors have recognized that a firearm shoots more than one shot "by a single function of the trigger," 26 U.S.C. § 5845(b), if a single action by the shooter, such as pulling a trigger, flipping a switch, or pushing a button, initiates the firing of multiple shots. In general, a "trigger" is a mechanism, such as a "movable catch or lever," that "sets some force or mechanism in action." 11 The Oxford English Dictionary 357 (1933); *see* The American Heritage Dictionary of the English Language 1371 (1969) ("device used to release or activate a mechanism"). More specifically, as this Court and others have explained, "a trigger is a mechanism that is used to initiate the firing sequence." *United States v. Jokel*, 969 F.2d 132, 135 (5th Cir. 1992) (per curiam); *accord United States v. Olofson*, 563 F.3d 652, 657 (7th Cir. 2009); *United States v. Camp*, 343 F.3d 743, 745 (5th Cir. 2003); *United States v. Fleischli*, 305 F.3d 643, 655 (7th Cir. 2002); *United States v. Evans*, 978 F.2d 1112, 1113 n.2 (9th Cir. 1992). And the "function" of an object is "the mode of action by which it fulfills its purpose." 4 The Oxford English Dictionary, *supra*, at

21

602. The term "single function of the trigger" thus means a single initiation of the firing sequence by some act of the shooter.

On most firearms—including those equipped with the devices at issue here—a weapon shoots more than one shot "by a single function of the trigger," 26 U.S.C. 5845(b), if it fires multiple rounds after the shooter pulls the trigger once. The "trigger" of a typical firearm is a small, curved metal lever. And such triggers ordinarily function through a shooter's pull. The term "function of the trigger" accordingly includes a pull of the trigger—along with a host of other actions, including pressing a button, *see Fleischli*, 305 F.3d at 655, flipping a switch, *Camp*, 343 F.3d at 745, or releasing a bolt, *United States v. Carter*, 465 F.3d 658, 662 (6th Cir. 2006) (per curiam). Indeed, a plurality of this Court recently explained the point in similar terms: on a machinegun, "the act of pulling and holding the trigger is one function, and that function produces more than one shot." *Cargill v. Garland*, 57 F.4th 447, 463 (5th Cir.) (en banc) (plurality op.), *cert. granted*, 144 S. Ct. 374 (2023). That same result occurs with a firearm equipped with an FRT-15 or WOT.

The full context of the statutory definition confirms this understanding. The statute asks whether a firearm shoots "automatically more than one shot . . . by a single function of the trigger." 26 U.S.C. 5845(b). The preposition "by" means "through the means of" or "in consequence of," and it indicates "that which is instrumental." Webster's New International Dictionary (2d ed. 1928). As relevant

22

here, the initial function of the trigger is the means of initiating a continuous cycle of firing multiple shots. *See Guedes v. ATF*, 45 F.4th 306, 316 (D.C. Cir. 2022), *petition for cert. filed*, No. 22-1222 (June 14, 2023). It makes no statutory difference that, once the shooter has activated the device with a single pull of the trigger, the device automates the movements of the trigger rather than or in addition to the movement of the weapon's internal components.

Courts have routinely discussed and applied the phrase "by a single function of the trigger" in precisely this common-sense fashion. In summarizing the scope of the machinegun statute, the Supreme Court has explained that the definition encompasses at least a weapon where "once its trigger is depressed, the weapon will automatically continue to fire until its trigger is released or the ammunition is exhausted." *Staples v. United States*, 511 U.S. 600, 602 n.1 (1994). Similarly, as the Eleventh Circuit explained, "[t]he plain language of the statute defines a machinegun as any part or device that allows a gunman to pull the trigger once and thereby discharge the firearm repeatedly." *Akins v. United States*, 312 F. App'x 197, 201 (11th Cir. 2009) (per curiam); *accord, e.g., Olofson*, 563 F.3d at 658-59 (holding that a weapon modified to allow a shooter to "exhaust[] a twenty-round magazine with one continuous depression of the trigger" was a machinegun); *United States v. Vázquez-Martínez*, 812 F.3d 18, 21 (1st Cir. 2016); *United States v. Bishop*, 926 F.3d 621, 624 (10th Cir. 2019);

*United States v. Smith*, 700 F.2d 627, 630 n.3 (11th Cir. 1983); *United States v. Harris*, 959 F.2d 246, 257 (D.C. Cir. 1992) (per curiam).

The legislative history and early executive practice further confirm this understanding. The House Report accompanying the bill enacted as the NFA described the statute as containing "the usual definition of machine gun as a weapon designed to shoot more than one shot without reloading and by a single pull of the trigger." H.R. Rep. No. 73-1780, at 2. The then-president of the National Rifle Association explained that "[t]he distinguishing feature of a machine gun is that by a single pull of the trigger the gun continues to fire as long as there is any ammunition," and that any weapon "which is capable of firing more than one shot by a single pull of the trigger, a single function of the trigger, is properly regarded, in my opinion, as a machine gun." *National Firearms Act: Hearings on H.R. 9066 Before the H. Comm. on Ways & Means*, 73d Cong. 40 (1934) (statement of Karl T. Frederick, President, National Rifle Association of America). And in explaining why a standard pistol issued by the U.S. Army would not qualify under the proposed definition, he observed that the pistol did not discharge "a stream of bullets with a single pull," that "with a single pull of the trigger only one shot is fired," and that "[y]ou must release the trigger and pull it again for the second shot to be fired." *Id.* at 41.

These materials are relevant not just as legislative history, but also as powerful evidence of the contemporaneous understanding of the phrase "function of the

24

trigger." Like other sources, "[s]tatements by legislators" and others involved in the legislative process can "demonstrate the manner in which the public used or understood a particular word or phrase." *McDonald v. City of Chicago*, 561 U.S. 742, 828 (2010) (Thomas, J., concurring in part and concurring in the judgment); *see* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* § 66, at 388 (2012). The same is true of the repeated use of "function of the trigger" and "pull of the trigger" interchangeably by members of Congress in the years immediately after enactment of the National Firearms Act. In a 1935 hearing, for example, Representative John Dingell Sr. asked rhetorically, "Is there not a definition . . . in the National Firearms Act as to manual manipulation by a single pull of the trigger? . . . In the [semiautomatic] pistol there is the individual manual pull of the trigger for every shot fired, the recoil being utilized for reloading; whereas in the case of the automatic machine gun, the weapon fires continuously, loading, extracting the spent shell, and firing until the trigger is released." *Administration of Liquor Taxing Laws: Hearings on H.R. 8001 Before the H. Comm. on Ways & Means*, 74th Cong. 22 (1935). And in 1940, Senator Robert LaFollette proposed a bill that borrowed the "single function of the trigger" language from the National Firearms Act. S. 1970, 76th Cong. 4-5 (1940). He repeatedly explained in a debate that the language would cover "weapons which when the trigger is once pulled continue to shoot until the magazine is emptied." 86 Cong. Rec. 6376 (1940); *see id.* ("one pull of the trigger, if the trigger is held down,

empties the entire load"); *id.* ("empty themselves upon one pull of the trigger"); *id.* ("empty their magazines upon one pull of the trigger").

The Executive Branch understood the language in the same way. Shortly after enactment of the National Firearms Act, the Department of the Treasury explained: "A semiautomatic pistol or an autoloading pistol when converted into a weapon which shoots automatically, that is, one capable of discharging the entire capacity of its magazine with one pull of the trigger, ceases to be a pistol and becomes a 'machine gun.'" Rev. Rul. XII-38-7035, S.T. 772, 13-2 C.B. 434 (1934). That "contemporaneous construction" of the statute provides strong evidence of its meaning. *Norwegian Nitrogen Prods. Co. v. United States*, 288 U.S. 294, 315 (1933).

The devices at issue here are plainly encompassed by that shared understanding. A single function of the trigger—accomplished by a pull—causes the weapon to fire until the shooter releases his pull. That is no different from an M16-type machinegun or other weapon no one doubts is a machinegun. That these devices have been engineered so that the trigger moves for each shot during the automatic cycle does not change the critical fact that a single function of the trigger leads to "automatically more than one shot." As the *Rare Breed Triggers* court observed, "if the shooter pulls the trigger one time, the repetitive mechanism in the FRT-15 is entirely self-executing until the shooter releases the trigger, notwithstanding the fact that the trigger mechanically pushes against the shooter's finger throughout

the process." 2023 WL 5689770, at *22. Such a device undoubtedly "operates

'automatically' within the ordinary understanding of that word," *id.*, after a single

function of the trigger.

### B. The District Court Mistakenly Concluded That a Weapon Cannot Be a Machinegun if Its Trigger Automatically Moves for Each Shot

The district court rejected this longstanding consensus. The district court

believed that these devices are not meaningfully distinguishable from the "non-

mechanical bump stock" devices this Court held not to be machineguns in *Cargill*, 57

F.4th 447; that ATF had not treated devices like the ones at issue here as machineguns

prior to the 2018 rule that classified non-mechanical bump stocks as machineguns;

and that other devices an eight-judge plurality of this Court in *Cargill* made clear are

machineguns were not comparable to the devices at issue here. The court was

mistaken in all respects.

Relying on the plurality's statements that the statute looks to "the movement of

the trigger and not a trigger finger," and to "whether more than one shot is fired each

time the trigger acts," *Cargill*, 57 F.4th at 460, 461, the district court read *Cargill* to

establish a rule that a weapon is not a machinegun if "[f]or each and every round

fired, the trigger moves forward into its reset state and is depressed to release the

hammer from its sear surface," ROA.1313—in other words, if "the trigger moves for

every shot fired," ROA.1315. Because "the trigger in an FRT-equipped firearm

releases the hammer for every shot," ROA.1315, the district court concluded that these devices are not machineguns.

The district court erred in its treatment of *Cargill* in several respects. As an initial matter, the district court treated as binding portions of an opinion interpreting the phrase "single function of the trigger" that reflected only a plurality joined by eight of the Court's 16 members. *See Cargill*, 57 F.4th at 449 n.* (explaining that only eight of 16 judges joined the portions of the lead opinion setting out the interpretation of the statute); *see also id.* at 476-77 nn.1-2 (Ho., J., concurring in part and concurring in the judgment) (discussing reasoning of "the plurality"); Order 4 & n.2 (Nov. 30, 2023) (discussing "plurality" opinion). The only portion of any opinion that garnered a majority of the Court was Section V of Judge Elrod's opinion, which discusses application of the rule of lenity. *See Cargill*, 57 F.4th at 449 n.*. That holding has no bearing here: *Cargill* invoked the rule of lenity based on two separate perceived ambiguities in the statute as applied to non-mechanical bump stocks— whether those devices operated "by a single function of the trigger" and whether they operated "automatically." *Id.* at 470. No such combination of ambiguities applies here.

The district court also derived principles from the plurality opinion that would be inconsistent with other aspects of the plurality's own reasoning. *Cargill* concerned the ATF regulation that addressed "non-mechanical bump stocks." Those devices

replace the stock on an ordinary semiautomatic rifle and allow the gun to slide back and forth in the device between shots from the combination of the recoil of each shot and the shooter's forward pressure on the barrel of the weapon, repeatedly forcing the trigger against the shooter's finger (which remained stationary on the device's "trigger ledge"). 57 F.4th at 453-54 (plurality op.). It was critical to the plurality's analysis that a shooter using a non-mechanical bump stock could not simply pull the trigger and have the weapon fire repeatedly, but must also "maintain manual, forward pressure on the barrel and manual, backward pressure on the trigger ledge." *Id.* at 463.

The plurality also stated, however, that this analysis was inapplicable to an Akins Accelerator, a type of mechanical bump stock. *Cargill*, 57 F.4th at 462 n.8. With those devices, after the shooter initially pulled the trigger, a spring in the device repeatedly forced the trigger against the shooter's finger to fire subsequent shots. *Id.* at 454. There is thus no doubt that on a firearm equipped with an Akins Accelerator, the trigger moves for each shot fired. Yet the plurality stated that "[u]nlike non-mechanical bump stocks, a shooter using an Akins Accelerator need only pull the trigger once to activate the firing sequence. The mechanical bump stock then maintained the bump fire of its own accord. Precisely for that reason, our decision today would not apply to an Akins Accelerator." *Id.* at 462 n.8 (citation omitted). The plurality thus rejected suggestions that its reasoning would conflict with the Eleventh Circuit's decision in *Akins*, which had upheld ATF's classification of the

Akins Accelerator as a machinegun. In the plurality's view, the Eleventh Circuit's decision reinforced the conclusion that non-mechanical bump stocks were not machineguns, while leaving mechanical bump stocks unaffected. *Id.*

The district court's reading of the *Cargill* plurality cannot be reconciled with its discussion of the Akins Accelerator and the Eleventh Circuit's decision. The district court dismissed the relevance of the Akins Accelerator and similar devices by suggesting that the triggers on weapons equipped with those devices do not "perform the same mechanical function as any normal trigger by releasing the hammer prior to each shot." ROA.1317. That is simply mistaken. The *Cargill* plurality recognized that some devices, when attached to an otherwise semiautomatic rifle, have a switch or other mechanism that initiates the firing sequence and thus becomes the "trigger" for statutory purposes. *See Camp*, 343 F.3d at 744 (addressing device that used a switch to activate a motorized fishing reel placed within the trigger guard that then repeatedly pulled and released the weapon's original trigger); *Cargill*, 57 F.4th at 462 (stating that the switch became the "legally relevant trigger"). The *Cargill* plurality observed that such reasoning could apply to an Akins Accelerator or other mechanical bump stock if there were a "switch activating" the mechanism, because the switch might become "the legal trigger." *Cargill*, 57 F.4th at 462.

The plurality was aware, however, that the Akins Accelerator did not have such a mechanism. Neither ATF, the *Cargill* plurality, nor the Eleventh Circuit in *Akins*

30

ever suggested that the Akins Accelerator had any trigger other than the rifle trigger pulled by the shooter. *See Cargill*, 57 F.4th at 454 (explaining how mechanical bump stocks operate with no reference to an alternative trigger); *Akins*, 312 F. App'x at 198; *Bump-Stock-Type Devices*, 83 Fed. Reg. 66,514, 66,517 (Dec. 26, 2018). And as the *Cargill* plurality recognized, for every shot from a weapon equipped with an Akins Accelerator, the spring action of the device must force the weapon's trigger against the shooter's finger to release the hammer. *Cargill*, 57 F.4th at 454. The Akins Accelerator thus operated no differently from an FRT-15 or WOT with respect to whether the trigger moved for each shot fired. The salient point with all three devices is that the shooter need only "pull the trigger once to activate the firing sequence" which the device then "maintain[s] . . . of its own accord." *Id.* at 462 n.8; *see Rare Breed Triggers*, 2023 WL 5689770, at *23 (explaining that the *Cargill* plurality "provides further grounds to find that the FRT-15 is a machinegun").

The district court's reasoning would not only legalize the Akins Accelerator, but would upend nearly five decades of consistent ATF practice with respect to devices that operate like the FRT-15 and WOT. Indeed, it would mean that an existing machinegun would no longer qualify under the statute if it were modified so that its trigger moved in conjunction with each shot fired. For example, an inventor might build two boxes, each of which continuously fires bullets after the operator presses and releases a button. On one box, the button would remain motionless after

31

being pressed.  On the second box, the button would oscillate up and down (without any further input from the shooter) each time the box fires a shot.  The shooter would take precisely the same action to operate each box—press a button—and the result in each case would be the same—continuous automatic fire.  The district court's reading, however, would confer different legal status on the two boxes.  On its view, the first box would be a machinegun, but the second box would not because its button—that is, its trigger—moves up and down with each shot.  There is no basis for concluding that Congress intended this arbitrary result.

III.    **The Remaining Equitable Factors Likewise Militate Against a Preliminary Injunction**

As discussed, plaintiffs are not likely to succeed on the merits.  The other equitable factors, however, likewise decisively counsel against the district court's preliminary injunction.

**A.**  The district court framed its injunction as "preserv[ing] the status quo until a final decision on the merits is rendered."  ROA.1331.  The district court's conception of the "status quo," however, was based on a plainly mistaken assessment of the status of the devices at issue here.  The district court believed that ATF's treatment of FRT-15s and WOTs as machineguns flowed from its 2018 bump stock rulemaking.  Thus, in the district court's telling, the 2018 bump stock rule "broadened the meaning of machinegun" under ATF regulations, and "[t]hree years after," ATF began to "apply[] the revised definition of 'machinegun' to FRTs."  ROA.1291; *see also*

ROA.1288-89 (stating that treatment of these devices was a result of 2018

rulemaking); ROA.1325 (stating that this conduct "was lawful until the ATF said

otherwise"); ROA.1291-92 (stating that the "broadened" definition was applied to

these devices); ROA.1295 (referring to "broadened" and "expanded definition of

'machinegun'"); ROA.1309 (same); ROA.1310 (same); ROA.1331 (same).  The district

court thus apparently believed its injunction would restore a pre-rule status quo under

which these devices were not regarded as machineguns, expressing concern about the

"potential pressure [on plaintiffs] to comply with a regulation that is likely unlawful

due to ATF's arbitrary and capricious interpretation of 'machineguns.'"  ROA.1323;

*see also* ROA.1293-94 (describing plaintiffs as "subject to enforcement on account of

the ATF's broadened definition of machinegun").

That premise was plainly mistaken.  As discussed, ATF's classification of the

FRT-15 and WOT is fully consistent with its treatment of other devices of this type in

1975, 1994, 2004, 2005, 2006, and 2017 before addressing the specific devices at issue

in this suit beginning in 2018.[2]  *See* ROA.1992-93; ROA.2006-32 (1975, 1994, and

2006 classifications).  That pre-existing practice was crucial to the district court's

conclusion in *Rare Breed Triggers* that the manufacturer of the FRT-15 likely did not act

---

[2] In fact, ATF's classification of the AR1 forced reset trigger—the device that
became the FRT-15—issued in August 2018.  ROA.936.  The bump stock rule was
not issued until four months later, in December 2018, and did not take effect for 90
days thereafter.  *See* 83 Fed. Reg. 66,514.  The classification of the AR1 could not have
relied on a rule that did not yet exist.

in good faith in telling customers that possession of the FRT-15 was legal. *See Rare Breed Triggers*, 2023 WL 5689770, at *27-34. And ATF's expert gave uncontradicted testimony before the district judge in this case both that devices of this type have been classified as machineguns since 1975, ROA.2184, and that his own examination of the FRT-15 and determination that it was a machinegun did not depend on the 2018 bump stock rule, ROA.2223.

As this illustrates, the 2018 bump stock rule did not alter ATF's treatment of forced reset trigger devices, and plaintiffs are no more or less subject to a possible enforcement action now than manufacturers, distributors, or possessors of similar devices in the past five decades. The injunction nevertheless permits plaintiffs for the first time to manufacture, distribute, and acquire devices long classified as machineguns. Properly framed, then, the question was whether a preliminary injunction should issue that would convert these devices from machineguns into legal and unregulated firearms accessories that may be possessed and sold without the background checks or recordkeeping otherwise required of firearms before a final ruling from any court concluding that the longstanding treatment of these devices was mistaken.

That shift in treatment works substantial harms to public safety and to the public interest. Machineguns are highly regulated precisely because of their unique destructive capacity. *See, e.g.*, H.R. Rep. No. 73-1780, at 1 (stating that "there is no

34

reason why anyone except a law officer should have a machine gun" and that "[t]he gangster as a law violator must be deprived of his most dangerous weapon, the machine gun"); *United States v. Kirk*, 105 F.3d 997, 1000-02 (5th Cir. 1997) (opinion of Higginbotham, J.) (observing that "[m]achine guns possess a firepower that outstrips any other kind of gun" and documenting unique risks posed by machineguns). And no one here disputes that these devices are every bit as destructive as machineguns. It is undisputed, for example, that weapons equipped with these devices fire at a rate functionally indistinguishable from M16-type machineguns—approximately 900 rounds per minute. *See, e.g.*, ROA.1051. The district court's dismissal of this fact as "a *non sequitur*" because "FRTs are *not* machineguns," ROA.1326, fails to grapple with the actual risks posed by these devices and the corresponding threat to the public interest from cavalierly authorizing their unlimited distribution.

The district court also gave short shrift to evidence of the particular risk posed by these devices and to the costs the preliminary injunction would impose. To the best of the government's knowledge, Rare Breed Triggers alone likely distributed over 100,000 of these devices nationwide in roughly two years, while other manufacturers distributed a significant number of similar devices, such as the WOT. ROA.1994-95. Such widespread devices inevitably form part of criminal activity. Since January 2021, ATF has "conducted approximately seventy-one criminal examinations of these types of devices as a part of multiple criminal cases," including dozens of investigations of

35

criminal conduct independent of the possession, manufacture, or distribution of these devices. ROA.2001-02. In addition, these devices are at issue in multiple pending criminal prosecutions in other districts, including for criminal defendants who face multiple other charges. ROA.2003. There is also significant evidence that these dangerous devices are ending up in the hands of convicted felons otherwise prohibited from possessing firearms. Even with ATF's limited data on sales of these devices, the agency has identified at least 63 instances in which these devices were transferred to individuals prohibited from possessing firearms under 18 U.S.C. § 922(g) from three different sources in a span of just three to six months. ROA.2002.

These statistics understate the prevalence of these devices in crime. These devices "can be installed on AR-type rifles without any visible modification to the firearm," such that state and local law enforcement may not be aware that a weapon they have recovered has been equipped with a device. ROA.2001. Even when such devices are identified, the law enforcement agency may not capture that information in a way that allows ATF to properly assess the true scope of recoveries. For example, the ordinary firearm tracing process undertaken when a law enforcement agency submits a tracing request to ATF would not capture whether the weapon being traced was equipped with an FRT. ROA.2000. Given the nationwide surge in the use of machinegun conversion devices generally, and a documented increase in instances of automatic fire recorded by ShotSpotter systems, there is every reason to

believe that these devices will increasingly be used in criminal activity.  ROA.2004.

Indeed, ATF has determined that as of October 11, 2023, there has been an

approximately 44% increase in the number of machinegun conversion devices

recovered by law enforcement as compared to recoveries in 2022.  ROA.2004.  As of

the same date, for 2023, the state with the highest number of recoveries is Texas.

ROA.2004.  Further, during the same time-period, there has been an approximately

400% increase in firearm traces involving such weapons in which the trace was also

associated with a crime of violence.  ROA.2004.

 In addition, the district court ignored the harms generated by the manufacture

and transfer of these devices without any of the background check or recordkeeping

requirements ordinarily applicable to firearms.  Because of the lack of such measures,

there can be no assurance that these devices will be kept out of the hands of

convicted felons or other prohibited persons.  Moreover, as the number of devices in

circulation and the number of transfers without recordkeeping increases, so do the

odds that the devices will never be recovered even if the government ultimately

prevails in this litigation.  ROA.1998.  And the attempt to recover the devices would

entail ATF's substantial expenditure of resources at the expense of other law

enforcement efforts, including ATF's "core mission of investigating and disrupting

violent crime."  ROA.1998.

**B.**  Against these harms to the public, plaintiffs can muster little in the way of irreparable harm.  The individual plaintiffs face no prospect of imminent enforcement, whether civil or criminal.  The government specifically represented that it has no imminent plans to bring enforcement action (such as a criminal prosecution) against the individual plaintiffs, and promised to inform the district court if that changed.  The government has further explained that ATF has prioritized recovery of devices from individuals with criminal histories, from distributors, and from individuals who have purchased large quantities of forced reset triggers (which may be indicative of plans to distribute).  The government has repeatedly explained that ATF's limited resources and enforcement priorities have been focused on large-scale manufacturers and sellers of FRTs, not individual otherwise law-abiding owners like plaintiffs, *see* ROA.97-99.  These plaintiffs thus cannot demonstrate irreparable injury from any threatened or impending prosecution or other enforcement action.

The district court suggested that the government's lack of imminent plans to prosecute the individual plaintiffs made public safety concerns irrelevant.  ROA.1326-27.  But that reasoning gets matters backwards.  Because the government has no immediate plans to take any action with respect to the three named individual plaintiffs, they have not carried their burden of demonstrating irreparable injury requiring relief pending resolution of their claims.  And the fact that the government has prioritized how to spend its limited resources given the scale of the problem is

hardly evidence that dangerous devices are not dangerous. In any event, the injunction applies not only to the named plaintiffs but extends as well to unknown members of the two plaintiff organizations, which each claim to include thousands of unnamed members in the Northern District of Texas alone, and commercial members' downstream customers. The injunction thus precludes enforcement of the law with respect to thousands of individuals and entities about whom neither the district court nor the government has any information.

That lack of imminent injury is reflected in plaintiffs' lengthy delay in bringing suit. ATF classified the FRT-15 as a machinegun in July 2021, over two years before this lawsuit was brought. *See* ROA.962-67. No individual plaintiff alleges that he has been subject to any enforcement action in the meantime. One individual plaintiff received a letter from ATF advising him of that classification over a year before this suit was brought. ROA.97. The lengthy delay demonstrates a lack of irreparable harm. *See Opulent Life Church v. City of Holly Springs*, 697 F.3d 279, 297 (5th Cir. 2012) ("A long delay by plaintiff after learning of the threatened harm may be taken as an indication that the harm would not be serious enough to justify a preliminary injunction." (quoting 11A Charles Alan Wright et al., *Federal Practice and Procedure* § 2948.1 (2d ed. 1995))). The same points apply to the organizational plaintiffs, which claim to seek relief only on behalf of their otherwise law-abiding members. *See* ROA.427.

As noted above, *see supra* pp. 18-19, these points undermine even assertions that these plaintiffs have standing. But at a minimum, they underscore that these plaintiffs cannot demonstrate the sort of irreparable harm that would make a preliminary injunction appropriate.

**C.** At a minimum, these considerations support narrowing the injunction in multiple respects.

**1.** For one, as discussed above, *see supra* pp. 16-18, the plaintiff organizations have failed to demonstrate standing, and thus are not entitled to injunctive relief. Any injunctive relief should therefore be limited to the named individual plaintiffs.

**2.** In addition, the injunction should be narrowed as it applies beyond possession and permits the continued manufacture, distribution, and transfer of these devices, which will open the door to widespread distribution of deadly weapons. Indeed, insofar as plaintiffs and the district court have focused on ATF's efforts to secure voluntary relinquishment or destruction of these devices, an injunction limited to possession would fully resolve such concerns. Plaintiffs have not expressed any intent to transfer or manufacture these devices, and no plaintiff or declarant has identified any possible enforcement action or warnings received related to anything other than possession. Here, too, plaintiffs would lack standing to seek relief reaching conduct they have no apparent intention of engaging in, as they by definition face no prospect of enforcement against that conduct. *See Susan B. Anthony List*, 573 U.S. at

40

159; *Town of Chester v. Laroe Estates, Inc.*, 581 U.S. 433, 439 (2017). And as noted, recovering forced-reset triggers is already a time-consuming and difficult endeavor, and further transfers only increase those difficulties, which may lead many devices to become practically untraceable and unrecoverable even if the government ultimately prevails in this litigation. Narrowing the injunction to possession would address the alleged harms plaintiffs have identified while also promoting the public interest. And such an injunction would more accurately track the mistaken status quo the district court purported to be preserving based on "FRT possession or ownership." ROA.1327.

**3.** Finally, the injunction should be narrowed so that it does not apply to criminal prosecutions. "It is a familiar rule that courts of equity do not ordinarily restrain criminal prosecutions." *Douglas v. City of Jeannette (Pennsylvania)*, 319 U.S. 157, 163 (1943). This Court, too, has recognized that "as an incident of the constitutional separation of powers, . . . courts are not to interfere with the free exercise of the discretionary powers of the attorneys of the United States in their control over criminal prosecutions." *United States v. Cox*, 342 F.2d 167, 171 (5th Cir. 1965) (en banc). That limitation reflects the respective constitutional roles of the judiciary and the Executive Branch, as "the Executive Branch has exclusive authority and absolute discretion to decide whether to prosecute a case." *United States v. Nixon*, 418 U.S. 683, 693 (1974). And it reflects the rule that "the cost, anxiety, and inconvenience of

41

having to defend against a single criminal prosecution" is not an injury "considered 'irreparable' in the special legal sense of that term." *Younger v. Harris*, 401 U.S. 37, 46 (1971).

Courts have thus consistently declined to enjoin federal criminal prosecutions. *See, e.g.*, *Stolt-Nielsen, S.A. v. United States*, 442 F.3d 177, 183 (3d Cir. 2006), as amended (May 16, 2006) (reversing injunction against indictment predicated on prior immunity agreement); *Deaver v. Seymour*, 822 F.2d 66, 68-71 (D.C. Cir. 1987) (holding that a putative defendant who asserted that appointment of the Independent Counsel was unconstitutional could not obtain pre-indictment injunctive relief). Indeed, to the extent courts have enjoined criminal proceedings at all, it has only been where a party has asserted *constitutional* claims where the exercise of certain constitutional rights would be chilled, most commonly in the First Amendment context. *See Stolt-Nielsen*, 442 F.3d at 183; *Deaver*, 822 F.2d at 69. Plaintiffs here, however, do not bring a constitutional challenge, and cannot assert any chill to constitutional rights that could possibly qualify for such an exception.

The district court cited no case in which a court of appeals or the Supreme Court has endorsed an injunction remotely like the one it issued here. It cited (ROA.1302-03) several cases that sought only declaratory—not injunctive—relief, and even then in the context of constitutional claims. *See Steffel v. Thompson*, 415 U.S. 452, 458-59 (1974) (addressing whether declaratory judgment would be appropriate in case

42

with no remaining claim for injunctive relief); *National Rifle Ass'n of Am. v. Magaw*, 132 F.3d 272, 279 (6th Cir. 1997) (discussing pre-enforcement review "under the Declaratory Judgment Act"). Other cases addressed standing, not the appropriate remedy, and in any event involved First Amendment claims against state statutes. *Susan B. Anthony List*, 573 U.S. at 158 (discussing requirements for demonstrating an Article III injury in context of First Amendment claim); *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298-304 (1979) (same). None of these cases involved issuance of a preliminary injunction against a federal criminal prosecution based on the assertion that the prosecution would be based on a mistaken reading of the relevant statute.

The district court believed that the Administrative Procedure Act (APA) empowered it to enjoin criminal prosecutions. ROA.1304-06. That was plainly mistaken. The APA's grant of authority to review agency action expressly does not "affect[] other limitations on judicial review or the power or duty of the court to dismiss any action or deny relief on any other appropriate legal or equitable ground." 5 U.S.C. § 702. As just discussed, the rule against enjoining criminal prosecutions is one such well-established "equitable ground" for denying relief, predating the APA itself. It is thus unsurprising that the district court could not identify a single case in the nearly 80 years since the enactment of the APA that enjoins a federal criminal prosecution in circumstances comparable to those here. The other provisions of the

APA on which the district court relied likewise do not displace this background rule. They instead recognize that challenges to agency action may be raised as a defense in a criminal proceeding, *id.* § 704, and recognize that in some circumstances courts may issue temporary relief "to prevent irreparable injury," *id.* § 705. Those provisions simply underscore that injunctive relief is not available to prevent a prosecution, insofar as they demonstrate the lack of irreparable injury from a criminal prosecution and the availability of an adequate remedy at law in the event a prosecution occurs. *See Younger*, 401 U.S. at 46; *Stolt-Nielsen*, 442 F.3d at 187; *Deaver*, 882 F.2d at 69.

# CONCLUSION

For the foregoing reasons, the judgment of the district court should be reversed.

Respectfully submitted,

BRIAN M. BOYNTON
*Acting Assistant Attorney General*

LEIGHA SIMONTON
*United States Attorney*

MARK B. STERN

*s/ Brad Hinshelwood*
BRAD HINSHELWOOD
*Attorneys, Appellate Staff*
*Civil Division, Room 7256*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-7823*
*bradley.a.hinshelwood@usdoj.gov*

January 2024

## CERTIFICATE OF SERVICE

I hereby certify that on January 16, 2024, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system.  Service will be accomplished by the appellate CM/ECF system.


*s/ Brad Hinshelwood*
Brad Hinshelwood

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 10,742 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Microsoft Word 2016 in Garamond 14-point font, a proportionally spaced typeface.

*s/ Brad Hinshelwood*

Brad Hinshelwood

**ADDENDUM**

## TABLE OF CONTENTS

26 U.S.C. § 5845(b) ...................................................................................................................A1

**26 U.S.C. § 5845(b)**

**§ 5845. Definitions**

   **(b) Machinegun.**--The term "machinegun" means any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. The term shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person.