No. 23-11138

---

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

---

National Association for Gun Rights, Incorporated; Texas Gun Rights, Incorporated; Patrick Carey; James Wheeler; Travis Speegle,

*Plaintiffs-Appellees,*

v.

Merrick Garland, U.S. Attorney General; United States Department of Justice; Steven Dettelbach, in his official capacity as Director of the Bureau of Alcohol, Tobacco, Firearms and Explosives; Bureau of Alcohol, Tobacco, Firearms, and Explosives,

*Defendants-Appellants.*

---

On Appeal from the United States District Court
for the Northern District of Texas
District Court Case No. 4:23-cv-830 (Hon. Reed O'Connor)

---

## RECORD EXCERPTS

---

BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney General*

LEIGHA SIMONTON
*United States Attorney*

MARK B. STERN
BRAD HINSHELWOOD
*Attorneys, Appellate Staff*
*Civil Division, Room 7256*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-7823*

# TABLE OF CONTENTS

Docket Sheet (ROA.1-15) ....................................................................... Tab A

Notice of Appeal (ROA.1984-85) ..........................................................Tab B

Opinion and Order on Plaintiffs' Motion for
        Preliminary Injunction (ROA.1288-1332)............................... Tab C

# TAB A

APPEAL

# U.S. District Court
# Northern District of Texas (Fort Worth)
# CIVIL DOCKET FOR CASE #: 4:23-cv-00830-O

| | |
|---|---|
| National Association for Gun Rights, Inc. et al v. Garland et al | Date Filed: 08/09/2023 |
| Assigned to: Judge Reed C. O'Connor | Jury Demand: None |
| Case in other court:  United States Court of Appeals 5th Circuit, No. 23-11138 | Nature of Suit: 899 Other Statutes: Administrative Procedure Act/Review or Appeal of Agency Decision |
| Cause: 05:551 Administrative Procedure Act | Jurisdiction: Federal Question |

**Plaintiff**

| | | |
|---|---|---|
| **National Association for Gun Rights Inc** | represented by | **Whitney Aaron Davis** |
| | | Eggleston King Davis, LLP |
| | | 102 Houston Avenue, 3rd Floor |
| | | 3rd Floor |
| | | Weatherford, TX 76086 |
| | | 817-596-4200 |
| | | Email: whit@ekdlaw.com |
| | | *LEAD ATTORNEY* |
| | | *ATTORNEY TO BE NOTICED* |
| | | *Bar Status: Admitted/In Good Standing* |
| | | |
| | | **Benjamin HB Sley** |
| | | Eggleston King Davis LLP |
| | | 102 Houston Ave |
| | | Suite 300 |
| | | Weatherford, TX 76086 |
| | | 408-636-3438 |
| | | Email: ben@ekdlaw.com |
| | | *ATTORNEY TO BE NOTICED* |
| | | *Bar Status: Admitted/In Good Standing* |
| | | |
| | | **David A Warrington** |
| | | Dhillon Law Group Inc |
| | | 2121 Eisenhower Avenue, |
| | | Suite 608 |
| | | Alexandria, VA 22314 |
| | | 703-574-1206 |
| | | Fax: 703-574-1206 |
| | | Email: dwarrington@dhillonlaw.com |
| | | *PRO HAC VICE* |
| | | *ATTORNEY TO BE NOTICED* |
| | | *Bar Status: Not Admitted* |
| | | |
| | | **Gary Lawkowski** |
| | | Dhillon Law Group, Inc. |
| | | 2121 Eisenhower Avenue |
| | | Suite 608 |

Alexandria, VA 22314
703-574-1654
Email: glawkowski@dhillonlaw.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Glenn D Bellamy**
Wood Herron & Evans LLP
600 Vine Street
Suite 2800
Cincinnati, OH 45202
513-241-2324
Fax: 513-241-6234
Email: gbellamy@whe-law.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Jonathan Mark Shaw**
Dhillon Law Group
2121 Eisenhower Ave
Suite 608
Alexandria, VA 22314
240-383-8758
Email: jshaw@dhillonlaw.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Julian E Whitley**
Eggleston King Davis, LLP
102 Houston Avenue
Suite 300
Weatherford, TX 76086
214-717-0980
Email: julian@ekdlaw.com
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Michael A Columbo**
Dhillon Law Group Inc
177 Post Street
Suite 700
San Francisco, CA 94108
415-433-1700
Email: mcolumbo@dhillonlaw.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

<u>**Plaintiff**</u>

**Texas Gun Rights, Inc.**                    represented by

**Whitney Aaron Davis**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Benjamin HB Sley**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**David A Warrington**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Gary Lawkowski**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Glenn D Bellamy**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Jonathan Mark Shaw**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Julian E Whitley**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Michael A Columbo**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Plaintiff**

**Patrick Carey**                    represented by    **Whitney Aaron Davis**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Benjamin HB Sley**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**David A Warrington**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Gary Lawkowski**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Glenn D Bellamy**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Jonathan Mark Shaw**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Julian E Whitley**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Michael A Columbo**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Plaintiff**

**James Wheeler**                    represented by    **Whitney Aaron Davis**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Benjamin HB Sley**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**David A Warrington**

(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Gary Lawkowski**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Glenn D Bellamy**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Jonathan Mark Shaw**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Julian E Whitley**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Michael A Columbo**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Plaintiff**

**Travis Speegle**                          represented by   **Whitney Aaron Davis**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Benjamin HB Sley**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**David A Warrington**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Gary Lawkowski**

(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Glenn D Bellamy**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Jonathan Mark Shaw**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Julian E Whitley**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Michael A Columbo**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

V.

**Defendant**

**Merrick Garland**                      represented by   **Laura Bakst**
*In his official capacity as Attorney General*            United States Department of Justice
*of the United States*                                    Civil Division, Federal Programs Branch
                                                          1100 L Street, N.W.
                                                          Washington, DC 20005
                                                          202-514-3183
                                                          Email: laura.b.bakst@usdoj.gov
                                                          *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*
                                                          *Bar Status: Not Admitted*

                                                          **Michael Patrick Clendenen**
                                                          US Department of Justice
                                                          1100 L Street NW
                                                          Washington, DC 20005
                                                          202-305-0693
                                                          Fax: 202-616-8470
                                                          Email: michael.p.clendenen@usdoj.gov
                                                          *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*
                                                          *Bar Status: Not Admitted*

**Alexander William Resar**
DOJ-Civ
1100 L Street NW
Suite 11208
Washington, DC 20530
202-616-8188
Email: alexander.w.resar@usdoj.gov
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Defendant**

**U.S. Department of Justice**                represented by    **Laura Bakst**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Michael Patrick Clendenen**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Alexander William Resar**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Defendant**

**Steven Dettelbach**                         represented by    **Laura Bakst**
*In his official capacity as Director of the*                    (See above for address)
*Bureau of Alcohol, Tobacco, Firearms and*                       *LEAD ATTORNEY*
*Explosives*                                                     *ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Michael Patrick Clendenen**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Alexander William Resar**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Defendant**

**Bureau of Alcohol, Tobacco, Firearms**      represented by    **Laura Bakst**
**and Explosives**                                               (See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

*Bar Status: Not Admitted*

**Michael Patrick Clendenen**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Alexander William Resar**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

| Date Filed | # | Docket Text |
|---|---|---|
| 08/09/2023 | 1 (p.16) | COMPLAINT against All Defendants filed by National Association for Gun Rights, Inc.. (Filing fee $402; Receipt number ATXNDC-13944328) Plaintiff will submit summons(es) for issuance. In each Notice of Electronic Filing, the judge assignment is indicated, and a link to the Judges Copy Requirements and Judge Specific Requirements is provided. The court reminds the filer that any required copy of this and future documents must be delivered to the judge, in the manner prescribed, within three business days of filing. Unless exempted, attorneys who are not admitted to practice in the Northern District of Texas must seek admission promptly. Forms, instructions, and exemption information may be found at www.txnd.uscourts.gov, or by clicking here: Attorney Information - Bar Membership. If admission requirements are not satisfied within 21 days, the clerk will notify the presiding judge. (Attachments: # 1 (p.16) Cover Sheet, # 2 (p.35) Additional Page(s)) (Davis, Whitney) (Entered: 08/09/2023) |
| 08/09/2023 | 2 (p.35) | CERTIFICATE OF INTERESTED PERSONS/DISCLOSURE STATEMENT by National Association for Gun Rights, Inc.. (Clerk QC note: Affiliate entry indicated). (Davis, Whitney) (Entered: 08/09/2023) |
| 08/09/2023 | 3 (p.37) | Request for Clerk to issue Summons filed by National Association for Gun Rights, Inc.. (Davis, Whitney) (Entered: 08/09/2023) |
| 08/09/2023 | 4 (p.39) | Request for Clerk to issue Summons filed by National Association for Gun Rights, Inc.. (Davis, Whitney) (Entered: 08/09/2023) |
| 08/09/2023 | 5 (p.41) | Request for Clerk to issue Summons filed by National Association for Gun Rights, Inc.. (Davis, Whitney) (Entered: 08/09/2023) |
| 08/09/2023 | 6 (p.43) | Request for Clerk to issue Summons filed by National Association for Gun Rights, Inc.. (Davis, Whitney) (Entered: 08/09/2023) |
| 08/09/2023 | 7 (p.45) | New Case Notes: A filing fee has been paid. File to: Judge O Connor. Pursuant to Misc. Order 6, Plaintiff is provided the Notice of Right to Consent to Proceed Before A U.S. Magistrate Judge. Clerk to provide copy to plaintiff if not received electronically. Attorneys are further reminded that, if necessary, they must comply with Local Rule 83.10(a) within 14 days or risk the possible dismissal of this case without prejudice or without further notice. (sre) (Entered: 08/09/2023) |
| 08/09/2023 | 8 (p.47) | Summons issued as to Bureau of Alcohol, Tobacco, Firearms and Explosives, Steven Dettelbach, Merrick Garland, U.S. Department of Justice, U.S. Attorney, and |

| | | U.S. Attorney General. (sre) (Entered: 08/09/2023) |
|---|---|---|
| 08/09/2023 | 9 (p.71) | Application for Admission Pro Hac Vice with Certificate of Good Standing for Attorney Glenn D. Bellamy (Filing fee $100; Receipt number ATXNDC-13944793) filed by National Association for Gun Rights, Inc. (Attachments: # 1 (p.16) Proposed Order) (Davis, Whitney) (Entered: 08/09/2023) |
| 08/09/2023 | 10 (p.77) | Application for Admission Pro Hac Vice with Certificate of Good Standing for Attorney Jonathan Shaw (Filing fee $100; Receipt number ATXNDC-13944860) filed by National Association for Gun Rights, Inc. (Attachments: # 1 (p.16) Proposed Order) (Davis, Whitney) (Entered: 08/09/2023) |
| 08/09/2023 | 11 (p.83) | Application for Admission Pro Hac Vice with Certificate of Good Standing for Attorney David Alan Warrington (Filing fee $100; Receipt number ATXNDC-13944915) filed by National Association for Gun Rights, Inc. (Attachments: # 1 (p.16) Proposed Order) (Davis, Whitney) (Entered: 08/09/2023) |
| 08/09/2023 | 12 (p.89) | Application for Admission Pro Hac Vice with Certificate of Good Standing for Attorney Gary Lawkowski (Filing fee $100; Receipt number ATXNDC-13944977) filed by National Association for Gun Rights, Inc. (Attachments: # 1 (p.16) Proposed Order) (Davis, Whitney) (Entered: 08/09/2023) |
| 08/09/2023 | 13 (p.95) | ADDITIONAL ATTACHMENTS to 1 (p.16) Complaint,,,, by Plaintiff National Association for Gun Rights, Inc.. (Attachments: # 1 (p.16) Exhibit(s), # 2 (p.35) Exhibit(s), # 3 (p.37) Exhibit(s), # 4 (p.39) Exhibit(s), # 5 (p.41) Exhibit(s), # 6 (p.43) Exhibit(s), # 7 (p.45) Exhibit(s), # 8 (p.47) Exhibit(s), # 9 (p.71) Exhibit(s)) (Davis, Whitney) (Entered: 08/09/2023) |
| 08/10/2023 | 14 (p.319) | NOTICE of Attorney Appearance by Whitney Aaron Davis for Julian Whitley; Benjamin Sley on behalf of National Association for Gun Rights, Inc.. (Davis, Whitney) (Entered: 08/10/2023) |
| 08/10/2023 | 15 (p.321) | NOTICE of Related Case filed by National Association for Gun Rights, Inc. (Davis, Whitney) (Entered: 08/10/2023) |
| 08/10/2023 | 16 (p.324) | Designation of lead counsel Whitney Aaron Davis for Plaintiff National Association for Gun Rights, Inc.. (Davis, Whitney) (Entered: 08/10/2023) |
| 08/14/2023 | 17 (p.326) | MOTION for Temporary Restraining Order filed by Patrick Carey, National Association for Gun Rights, Inc., Travis Speegle, Texas Gun Rights, Inc., James Wheeler (Davis, Whitney) (Entered: 08/14/2023) |
| 08/14/2023 | 18 (p.330) | Brief/Memorandum in Support filed by Patrick Carey, National Association for Gun Rights, Inc., Travis Speegle, Texas Gun Rights, Inc., James Wheeler re 17 (p.326) MOTION for Temporary Restraining Order (Davis, Whitney) (Entered: 08/14/2023) |
| 08/14/2023 | 19 (p.340) | Appendix in Support filed by Patrick Carey, National Association for Gun Rights, Inc., Travis Speegle, Texas Gun Rights, Inc., James Wheeler re 18 (p.330) Brief/Memorandum in Support of Motion, 17 (p.326) MOTION for Temporary Restraining Order (Davis, Whitney) (Entered: 08/14/2023) |
| 08/14/2023 | 20 (p.405) | ORDER deferring ruling on 17 (p.326) Motion for TRO. The Court therefore ORDERS Plaintiffs to confer with Defendants and agree on a briefing schedule to address this motion. The parties are to file a joint notice outlining the agreed briefing schedule no later than August 18, 2023. (Ordered by Judge Reed C. O'Connor on 8/14/2023) (chmb) (Main Document 20 replaced on 8/15/2023) (sre). (Entered: |

| | | |
|---|---|---|
| | | 08/14/2023) |
| 08/15/2023 | 21 (p.406) | NOTICE of Attorney Appearance by Michael Patrick Clendenen on behalf of Bureau of Alcohol, Tobacco, Firearms and Explosives, Steven Dettelbach, Merrick Garland, U.S. Department of Justice. (Filer confirms contact info in ECF is current.) (Clendenen, Michael) (Entered: 08/15/2023) |
| 08/15/2023 | 22 (p.408) | MOTION for Injunction *Preliminary* filed by Patrick Carey, National Association for Gun Rights Inc, Travis Speegle, Texas Gun Rights, Inc. with Brief/Memorandum in Support. (Davis, Whitney) (Entered: 08/15/2023) |
| 08/15/2023 | 23 (p.430) | Appendix in Support filed by Patrick Carey, National Association for Gun Rights Inc, Travis Speegle, Texas Gun Rights, Inc., James Wheeler re 22 (p.408) MOTION for Injunction *Preliminary* (Davis, Whitney) (Entered: 08/15/2023) |
| 08/15/2023 | 24 (p.495) | *PROPOSED ORDER* for 22 (p.408) MOTION for Injunction filed by Patrick Carey, National Association for Gun Rights Inc, Travis Speegle, Texas Gun Rights, Inc., James Wheeler (Davis, Whitney) Modified to terminate motion and correct docket text on 8/16/2023 (cea). (Entered: 08/15/2023) |
| 08/18/2023 | 25 (p.497) | NOTICE of *Joint Proposed Briefing Schedule* filed by Bureau of Alcohol, Tobacco, Firearms and Explosives, Steven Dettelbach, Merrick Garland, U.S. Department of Justice (Attachments: # 1 (p.16) Proposed Order) (Clendenen, Michael) Modified on 8/18/2023 (sre). (Entered: 08/18/2023) |
| 08/18/2023 | 26 (p.502) | ORDER: Before the Court is the parties' Joint Proposed Briefing Schedule (ECF No. 25 (p.497) ), filed on August 18, 2023. After due consideration, the Court finds the parties' proposed briefing schedule to be appropriate. Therefore, the Court GRANTS the Joint Proposed Briefing Schedule and ORDERS as follows: 1. Defendants shall file their response to the Motion for a Temporary Restraining Order by August 21, 2023. 2. Plaintiffs shall file their reply in support of the Motion for a Temporary Restraining Order by August 25, 2023. 3. Defendants shall file their response to the Motion for a Preliminary Injunction by September 5, 2023. 4. Plaintiffs shall file their reply in support of the Motion for a Preliminary Injunction by September 19, 2023. (Ordered by Judge Reed C. O'Connor on 8/18/2023) (sre) (Entered: 08/18/2023) |
| 08/20/2023 | 27 | ELECTRONIC ORDER granting 9 (p.71) Application for Admission Pro Hac Vice of Glenn D. Bellamy. Important Reminder: Unless excused for cause, an attorney who is not an ECF user must register within 14 days of the date the attorney appears in a case pursuant to LR 5.1(f) and LCrR 49.2(g). (Ordered by Judge Reed C. O'Connor on 8/20/2023) (chmb) (Entered: 08/20/2023) |
| 08/20/2023 | 28 | ELECTRONIC ORDER granting 10 (p.77) Application for Admission Pro Hac Vice of Jonathan Shaw. Important Reminder: Unless excused for cause, an attorney who is not an ECF user must register within 14 days of the date the attorney appears in a case pursuant to LR 5.1(f) and LCrR 49.2(g). (Ordered by Judge Reed C. O'Connor on 8/20/2023) (chmb) (Entered: 08/20/2023) |
| 08/20/2023 | 29 | ELECTRONIC ORDER granting 11 (p.83) Application for Admission Pro Hac Vice of David Alan Warrington. Important Reminder: Unless excused for cause, an attorney who is not an ECF user must register within 14 days of the date the attorney appears in a case pursuant to LR 5.1(f) and LCrR 49.2(g). (Ordered by Judge Reed C. O'Connor on 8/20/2023) (chmb) (Entered: 08/20/2023) |
| 08/20/2023 | 30 | |

| | | |
|---|---|---|
| | | ELECTRONIC ORDER granting 12 (p.89) Application for Admission Pro Hac Vice of Gary Lawkowski. Important Reminder: Unless excused for cause, an attorney who is not an ECF user must register within 14 days of the date the attorney appears in a case pursuant to LR 5.1(f) and LCrR 49.2(g). (Ordered by Judge Reed C. O'Connor on 8/20/2023) (chmb) (Entered: 08/20/2023) |
| 08/21/2023 | 31 (p.503) | NOTICE of Attorney Appearance by Laura Bakst on behalf of Bureau of Alcohol, Tobacco, Firearms and Explosives, Steven Dettelbach, Merrick Garland, U.S. Department of Justice. (Filer confirms contact info in ECF is current.) (Bakst, Laura) (Entered: 08/21/2023) |
| 08/21/2023 | 32 (p.506) | RESPONSE filed by Bureau of Alcohol, Tobacco, Firearms and Explosives, Steven Dettelbach, Merrick Garland, U.S. Department of Justice re: 17 (p.326) MOTION for Temporary Restraining Order (Clendenen, Michael) (Entered: 08/21/2023) |
| 08/25/2023 | 33 (p.518) | REPLY filed by National Association for Gun Rights Inc re: 17 (p.326) MOTION for Temporary Restraining Order (Whitley, Julian) (Entered: 08/25/2023) |
| 08/25/2023 | 34 (p.529) | Appendix in Support filed by National Association for Gun Rights Inc re 33 (p.518) Reply *to Response to Motion for TRO* (Whitley, Julian) (Entered: 08/25/2023) |
| 08/30/2023 | 35 (p.786) | NOTICE of Attorney Appearance by Alexander William Resar on behalf of Bureau of Alcohol, Tobacco, Firearms and Explosives, Steven Dettelbach, Merrick Garland, U.S. Department of Justice. (Filer confirms contact info in ECF is current.) (Resar, Alexander) (Entered: 08/30/2023) |
| 08/30/2023 | 36 (p.788) | OPINION & ORDER ON PLAINTIFFS' 17 (p.326) MOTION FOR TEMPORARY RESTRAINING ORDER: The Court GRANTS Plaintiffs' Motion for Temporary Restraining Order to preserve the status quo until September 27, 2023 or until such time that the Court rules on Plaintiffs' Motion for Preliminary Injunction (ECF No. 22 (p.408) ). The Court ORDERS that Defendants are ENJOINED from implementing or enforcing against Plaintiffs Carey, Speegle, and Wheeler, in any manner, the ATFs expanded definition of "machinegun" that this Court has determined is likely unlawful. (Ordered by Judge Reed C. O'Connor on 8/30/2023) (bdb) (Entered: 08/30/2023) |
| 08/31/2023 | 37 (p.815) | Joint MOTION to Extend Time filed by Bureau of Alcohol, Tobacco, Firearms and Explosives, Steven Dettelbach, Merrick Garland, U.S. Department of Justice (Attachments: # 1 (p.16) Proposed Order) (Clendenen, Michael) (Entered: 08/31/2023) |
| 08/31/2023 | 38 (p.821) | ORDER: Before the Court is the parties' Joint Motion for Extension of Time (ECF No. 37 (p.815) ), filed on August 31, 2023. After due consideration, the Court finds the parties' proposed modifications to the briefing schedule to be appropriate. Therefore, the Court GRANTS the Joint Motion for Extension and ORDERS as follows: 1. Defendants shall file their response to the Motion for a Preliminary Injunction by September 8, 2023. 2. Plaintiffs shall file their reply in support of the Motion for a Preliminary Injunction by September 22, 2023. 3. By stipulation of the parties, the Court's temporary restraining order entered on August 30, 2023 (ECF No. 36 (p.788) ) shall expire on September 30, 2023 or on the date the Court issues its ruling on the preliminary injunction motion, whichever is earlier. (Ordered by Judge Reed C. O'Connor on 8/31/2023) (sre) (Entered: 08/31/2023) |
| 09/08/2023 | 39 (p.822) | RESPONSE filed by Bureau of Alcohol, Tobacco, Firearms and Explosives, Steven Dettelbach, Merrick Garland, U.S. Department of Justice re: 22 (p.408) MOTION for Injunction *Preliminary* (Resar, Alexander) (Entered: 09/08/2023) |

| | | |
|---|---|---|
| 09/08/2023 | 40 (p.855) | Appendix in Support filed by Bureau of Alcohol, Tobacco, Firearms and Explosives, Steven Dettelbach, Merrick Garland, U.S. Department of Justice re 39 (p.822) Response/Objection *In Opposition To Plaintiffs' Motion For Preliminary Injunction* (Attachments: # 1 (p.16) Appendix Part I, # 2 (p.35) Appendix Part II, # 3 (p.37) Appendix Part III, # 4 (p.39) Appendix Part IV, # 5 (p.41) Appendix Part V, # 6 (p.43) Appendix Part VI) (Resar, Alexander) (Entered: 09/08/2023) |
| 09/08/2023 | 41 (p.1183) | Notice of Manual Filing of Video Exhibits by All Defendants re 39 (p.822) Response/Objection *In Opposition To Plaintiffs' Motion For Preliminary Injunction* (Attachments: # 1 (p.16) Declaration(s) of Daniel Hoffman) (Resar, Alexander) (Entered: 09/08/2023) |
| 09/08/2023 | 42 (p.1187) | ORDER deferring ruling on 22 (p.408) Motion for Injunction and setting hearing. See order for detail. (Ordered by Judge Reed C. O'Connor on 9/8/2023) (Judge Reed C. O'Connor) (Entered: 09/08/2023) |
| 09/11/2023 | | Hearing Modification: Hearing set and reset. Motion Hearing set for 9/25/2023 at 09:00 AM in US Courthouse, Courtroom 2nd Floor, 501 W. 10th St. Fort Worth, TX 76102-3673 before Judge Reed C. O'Connor. (sre) (Entered: 09/11/2023) |
| 09/13/2023 | 43 (p.1188) | MOTION (Joint) to Reschedule Hearing filed by Bureau of Alcohol, Tobacco, Firearms and Explosives, Steven Dettelbach, Merrick Garland, U.S. Department of Justice (Attachments: # 1 (p.16) Proposed Order) (Clendenen, Michael) (Entered: 09/13/2023) |
| 09/14/2023 | 44 (p.1194) | ORDER: Before the Court is the parties' Joint Motion to Reschedule Hearing (ECF No. 43 (p.1188) ), filed on September 13, 2023. After due consideration, the Court finds good cause to grant the motion. Accordingly, it is hereby ORDERED that: 1. The hearing on Plaintiffs' Motion for Preliminary Injunction, previously scheduled for Monday, September 25, 2023 (ECF No. 42 (p.1187) ), shall be reset for Monday, October 2, 2023, at 9:00 a.m. in the Second Floor Courtroom, 501 W. 10th Street, Fort Worth, Texas. 2. By stipulation of the parties, the Court's temporary restraining order entered on August 30, 2023 (ECF No. 36 (p.788) ) shall expire on October 7, 2023 or on the date the Court issues its ruling on the preliminary injunction motion, whichever is earlier. (Ordered by Judge Reed C. O'Connor on 9/14/2023) (sre) (Entered: 09/14/2023) |
| 09/18/2023 | 45 (p.1195) | MOTION Extend Page Limit filed by Patrick Carey, National Association for Gun Rights Inc, Travis Speegle, Texas Gun Rights, Inc., James Wheeler (Attachments: # 1 (p.16) Proposed Order) (Davis, Whitney) (Entered: 09/18/2023) |
| 09/18/2023 | 46 (p.1198) | ORDER: Before the Court is Plaintiffs' Unopposed Motion for Permission to File Reply in Excess of Page Limit (ECF No. 45 (p.1195) ), filed September 18, 2023. Noting the motion is unopposed and finding good cause, the Court GRANTS the motion for leave to file an over-length reply brief. (Ordered by Judge Reed C. O'Connor on 9/18/2023) (sre) (Entered: 09/18/2023) |
| 09/22/2023 | 47 (p.1199) | REPLY filed by Patrick Carey, National Association for Gun Rights Inc, Travis Speegle, Texas Gun Rights, Inc., James Wheeler re: 22 (p.408) MOTION for Injunction *Preliminary* (Attachments: # 1 (p.16) Exhibit(s)) (Davis, Whitney) (Entered: 09/22/2023) |
| 09/27/2023 | 48 (p.1277) | Application for Admission Pro Hac Vice with Certificate of Good Standing for Attorney Michael Columbo (Filing fee $100; Receipt number ATXNDC-14064589) filed by Patrick Carey, National Association for Gun Rights Inc, Travis Speegle, Texas Gun Rights, Inc., James Wheeler (Attachments: # 1 (p.16) Proposed Order) |

| | | (Davis, Whitney) (Entered: 09/27/2023) |
|---|---|---|
| 09/27/2023 | 49 | ELECTRONIC ORDER granting 48 (p.1277) Application for Admission Pro Hac Vice of Michael Columbo. Important Reminder: Unless excused for cause, an attorney who is not an ECF user must register within 14 days of the date the attorney appears in a case pursuant to LR 5.1(f) and LCrR 49.2(g). (Ordered by Judge Reed C. O'Connor on 9/27/2023) (chmb) (Entered: 09/27/2023) |
| 09/29/2023 | 50 (p.1282) | ORDER setting time limits (Ordered by Judge Reed C. O'Connor on 9/29/2023) (Judge Reed C. O'Connor) (Entered: 09/29/2023) |
| 10/02/2023 | 51 | ELECTRONIC Minute Entry for proceedings held before Judge Reed C. O'Connor: Motion Hearing held on 10/2/2023 re 22 (p.408) Motion for Injunction filed by Patrick Carey, Texas Gun Rights, Inc., National Association for Gun Rights Inc, Travis Speegle. Attorney Appearances: Plaintiff - Michael Columbo, Gary Lawkowski, Ben Sley; Defense - Laura Bakst, Michael Clendenen, Alexander Resar. (Court Reporter: Zoie Williams) (Exhibits admitted: Plaintiff A,B,D; Defense 1,2,3 - returned to party) Time in Court - 3:6. (chmb) (Entered: 10/03/2023) |
| 10/06/2023 | 52 (p.1283) | MOTION to Stay *Deadline to Respond to Complaint* filed by Bureau of Alcohol, Tobacco, Firearms and Explosives, Steven Dettelbach, Merrick Garland, U.S. Department of Justice (Attachments: # 1 (p.16) Proposed Order) (Clendenen, Michael) (Entered: 10/06/2023) |
| 10/07/2023 | 53 (p.1288) | ORDER granting 22 (p.408) Motion for Injunction (Ordered by Judge Reed C. O'Connor on 10/7/2023) (Judge Reed C. O'Connor) (Entered: 10/07/2023) |
| 10/08/2023 | 54 (p.1333) | ORDER granting 52 (p.1283) Motion to Stay Answer Deadline. Defendants shall file their answer or other responsive pleading by October 28, 2023. (Ordered by Judge Reed C. O'Connor on 10/8/2023) (chmb) (Entered: 10/08/2023) |
| 10/09/2023 | 55 (p.1334) | ORDER REQUIRING SCHEDULING CONFERENCE AND REPORT FOR CONTENTS OF SCHEDULING ORDER: Proposed Scheduling Order due by 11/6/2023. (Ordered by Judge Reed C. O'Connor on 10/9/2023) (chmb) (Entered: 10/09/2023) |
| 10/10/2023 | 56 (p.2131) | Notice of Filing of Official Electronic Transcript of Motion Hearing Proceedings held on 10.2.23 before Judge Reed C. O'Connor. Court Reporter/Transcriber Zoie Williams, Telephone number 817.850.6630. Parties are notified of their duty to review the transcript. A copy may be purchased from the court reporter or viewed at the clerk's office. If the transcript contains personal identifiers that must be redacted under MO 61, Fed.R.Civ.P. 5.2 or Fed.R.Crim.P. 49.1, or if the transcript contains the name of a minor child victim or a minor child witness that must be redacted under 18 U.S.C. § 3509, file a Redaction Request - Transcript within 21 days. If no action is taken, the entire transcript will be made available through PACER without redaction after 90 calendar days. The clerk will mail a copy of this notice to parties not electronically noticed. (194 pages) Redaction Request due 10/31/2023. Redacted Transcript Deadline set for 11/10/2023. Release of Transcript Restriction set for 1/8/2024. (zow) (Entered: 10/10/2023) |
| 10/20/2023 | 57 (p.1343) | NOTICE of *Compliance* filed by Bureau of Alcohol, Tobacco, Firearms and Explosives, Steven Dettelbach, Merrick Garland, U.S. Department of Justice (Attachments: # 1 (p.16) Exhibit(s)) (Bakst, Laura) (Entered: 10/20/2023) |
| 10/25/2023 | 58 (p.1354) | Unopposed MOTION to Stay *Deadline to Respond to Complaint* filed by Bureau of Alcohol, Tobacco, Firearms and Explosives, Steven Dettelbach, Merrick Garland, |

| | | |
|---|---|---|
| | | U.S. Department of Justice (Attachments: # 1 (p.16) Proposed Order) (Clendenen, Michael) (Entered: 10/25/2023) |
| 10/25/2023 | 59 (p.1357) | ORDER: Before the Court is Defendants' Motion to Stay Deadline to Respond to Complaint (ECF No. 58 (p.1354) ), filed October 25, 2023. Defendants deadline to answer or otherwise respond to Plaintiffs' Complaint is October 28, 2023. Id. at 1. Defendants seek a stay of this deadline until after the Court issues a decision on the forthcoming cross-motions for summary judgment. Id. at 12. Noting that the motion is unopposed, the Court finds good cause and GRANTS the motion. Therefore, it is hereby ORDERED that Defendants' deadline to answer or otherwise respond to Plaintiff's Complaint is stayed. (Ordered by Judge Reed C. O'Connor on 10/25/2023) (sre) (Entered: 10/25/2023) |
| 11/03/2023 | 60 (p.1358) | MOTION for Summary Judgment filed by Patrick Carey, National Association for Gun Rights Inc, Travis Speegle, Texas Gun Rights, Inc., James Wheeler (Attachments: # 1 (p.16) Proposed Order) (Davis, Whitney) (Entered: 11/03/2023) |
| 11/03/2023 | 61 (p.1365) | Brief/Memorandum in Support filed by Patrick Carey, National Association for Gun Rights Inc, Travis Speegle, Texas Gun Rights, Inc., James Wheeler re 60 (p.1358) MOTION for Summary Judgment (Davis, Whitney) (Entered: 11/03/2023) |
| 11/03/2023 | 62 (p.1404) | Brief/Memorandum in Support filed by Patrick Carey, National Association for Gun Rights Inc, Travis Speegle, Texas Gun Rights, Inc., James Wheeler re 61 (p.1365) Brief/Memorandum in Support of Motion (Attachments: # 1 (p.16) Exhibit(s)) (Davis, Whitney) (Entered: 11/03/2023) |
| 11/06/2023 | 63 (p.1984) | NOTICE OF INTERLOCUTORY APPEAL as to 53 (p.1288) Order on Motion for Injunction to the Fifth Circuit by Bureau of Alcohol, Tobacco, Firearms and Explosives, Steven Dettelbach, Merrick Garland, U.S. Department of Justice. T.O. form to appellant electronically at Transcript Order Form or US Mail as appropriate. Copy of NOA to be sent US Mail to parties not electronically noticed. IMPORTANT ACTION REQUIRED: Provide an electronic copy of any exhibit you offered during a hearing or trial that was admitted into evidence to the clerk of the district court within 14 days of the date of this notice. Copies must be transmitted as PDF attachments through ECF by all ECF Users or delivered to the clerk on a CD by all non-ECF Users. See detailed instructions here. (Exception: This requirement does not apply to a pro se prisoner litigant.) Please note that if original exhibits are in your possession, you must maintain them through final disposition of the case. (Bakst, Laura) (Entered: 11/06/2023) |
| 11/06/2023 | 64 (p.1986) | MOTION to Stay re 53 (p.1288) Order on Motion for Injunction filed by Bureau of Alcohol, Tobacco, Firearms and Explosives, Steven Dettelbach, Merrick Garland, U.S. Department of Justice with Brief/Memorandum in Support. (Attachments: # 1 (p.16) Declaration(s), # 2 (p.35) Memorandum in Support of Motion, # 3 (p.37) Proposed Order) (Bakst, Laura) (Entered: 11/06/2023) |
| 11/06/2023 | 65 (p.2047) | Proposal for contents of scheduling and discovery order *Joint Report re: Contents of Scheduling Order* by Patrick Carey. (Sley, Benjamin) (Entered: 11/06/2023) |
| 11/06/2023 | 66 (p.2052) | ORDER: To expeditiously resolve Defendants Motion to Stay Preliminary Injunction Pending Appeal 64 (p.1986) , Plaintiffs may file a response to Defendants motion on or before November 10, 2023. Defendants may file a reply in support of their motion on or before November 13, 2023. (Ordered by Judge Reed C. O'Connor on 11/6/2023) (chmb) (Entered: 11/06/2023) |
| 11/08/2023 | | |

| | 67 (p.2326) | Electronic Copy of Admitted Hearing or Trial Exhibit(s) re 63 (p.1984) Notice of Appeal,,,, filed by Bureau of Alcohol, Tobacco, Firearms and Explosives, Steven Dettelbach, Merrick Garland, U.S. Department of Justice. Exhibits are available for public inspection at the clerk's office. (Attachments: # 1 (p.16) Defendants' Exhibit Number 1 from Preliminary Injunction Hearing, # 2 (p.35) Defendants' Exhibit Number 2 from Preliminary Injunction Hearing) (Resar, Alexander) (Entered: 11/08/2023) |
|---|---|---|
| 11/08/2023 | 68 (p.2053) | USCA Case Number No. 23-11138 in United States Court of Appeals 5th Circuit for 63 (p.1984) Notice of Appeal, filed by Merrick Garland, U.S. Department of Justice, Steven Dettelbach, Bureau of Alcohol, Tobacco, Firearms and Explosives. (tle) (Entered: 11/08/2023) |
| 11/10/2023 | 69 (p.2057) | RESPONSE filed by Patrick Carey, National Association for Gun Rights Inc, Travis Speegle, Texas Gun Rights, Inc., James Wheeler re: 64 (p.1986) MOTION to Stay re 53 (p.1288) Order on Motion for Injunction (Davis, Whitney) (Entered: 11/10/2023) |
| 11/10/2023 | 70 (p.2075) | Appendix in Support filed by Patrick Carey, National Association for Gun Rights Inc, Travis Speegle, Texas Gun Rights, Inc., James Wheeler re 69 (p.2057) Response/Objection (Davis, Whitney) (Entered: 11/10/2023) |
| 11/13/2023 | 71 (p.2105) | REPLY filed by Bureau of Alcohol, Tobacco, Firearms and Explosives, Steven Dettelbach, Merrick Garland, U.S. Department of Justice re: 64 (p.1986) MOTION to Stay re 53 (p.1288) Order on Motion for Injunction (Bakst, Laura) (Entered: 11/13/2023) |
| 11/13/2023 | 72 (p.2116) | SCHEDULING ORDER: The parties shall submit the administrative record by December 1, 2023. Defendants shall file their cross-motion for summary judgment and response in opposition to Plaintiffs pending cross-motion for summary judgment by December 1, 2023. Plaintiffs shall file their reply in support of their pending cross-motion for summary judgment and opposition to Defendants cross-motion for summary judgment by December 22, 2023. Defendants shall file their reply in support of their cross-motion for summary judgment by January 12, 2024. (Ordered by Judge Reed C. O'Connor on 11/13/2023) (chmb) (Entered: 11/13/2023) |
| 11/16/2023 | 73 (p.2117) | ORDER denying 64 (p.1986) Motion to Stay Pending Appeal. See Order for details. (Ordered by Judge Reed C. O'Connor on 11/16/2023) (chmb) (Entered: 11/16/2023) |

# TAB B

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

NATIONAL ASSOCIATION FOR GUN
RIGHTS, INC., *et al.*,

                Plaintiffs,

     v.

MERRICK GARLAND, IN HIS OFFICIAL
CAPACITY AS ATTORNEY GENERAL
OF THE UNITED STATES, *et al.*,

              Defendants.

Case No. 4:23-cv-00830-O

## NOTICE OF APPEAL

Pursuant to Federal Rule of Appellate Procedure 3(a), all Defendants hereby appeal, to the

U.S. Court of Appeals for the Fifth Circuit, the Court's October 7, 2023 Opinion & Order granting

Plaintiffs' Motion for Preliminary Injunction, ECF No. 53.

23-11138.1984

DATED: November 6, 2023                    Respectfully submitted,

                                           BRIAN M. BOYNTON
                                           Principal Deputy Assistant Attorney General

                                           ALEX HAAS
                                           Branch Director

                                           BRIGHAM J. BOWEN
                                           Assistant Branch Director

                                           /s/ Laura B. Bakst
                                           LAURA B. BAKST
                                           MICHAEL P. CLENDENEN
                                           ALEXANDER W. RESAR
                                           Trial Attorneys
                                           Civil Division, Federal Programs Branch
                                           U.S. Department of Justice
                                           1100 L Street, NW
                                           Washington, DC 20005
                                           Phone:   (202) 514-3183
                                           E-mail:  laura.b.bakst@usdoj.gov

                                           *Counsel for Defendants*


**Certificate of Service**


On November 6, 2023, I electronically submitted the foregoing document with the clerk of

court for the U.S. District Court, Northern District of Texas, using the electronic case filing system

of the court. I hereby certify that I have served all parties electronically or by another manner

authorized by Federal Rule of Civil Procedure 5(b)(2).

                                           /s/ Laura B. Bakst

23-11138.1985

# TAB C

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| NATIONAL ASSOCIATION FOR | § | |
| GUN RIGHTS, INC., *et al.*, | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | Civil Action No. 4:23-cv-00830-O |
| v. | § | |
| | § | |
| MERRICK GARLAND, *et al.*, | § | |
| | § | |
| **Defendants.** | § | |
| | § | |

## OPINION & ORDER ON PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Before the Court are Plaintiffs' Motion for Preliminary Injunction with Brief in Support (ECF No. 22) and Appendix (ECF No. 23), filed August 15, 2023; Defendants' Response (ECF No. 39), Appendix (ECF No. 40), and Notice of Manual Filing of Video Exhibits (ECF No. 41), filed September 8, 2023; and Plaintiffs' Reply (ECF No. 47), filed September 22, 2023. The Court also heard evidence at an oral hearing on October 2, 2023 (ECF No. 51). Having considered the parties' arguments and applicable law, the Court **GRANTS** Plaintiffs' Motion for Preliminary Injunction to preserve the status quo until a final decision on the merits is rendered.

## I.   BACKGROUND[1]

The United States Congress delegated authority to the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") to regulate firearms in interstate commerce under the Gun Control Act of 1986. In a 2018 regulation, the ATF expanded the statutory definition of "machinegun." A few years later, the ATF determined that additional types of firearms qualify as machineguns and are thus illegal to possess or transfer. One of those prohibited firearms is a

---

[1] Unless otherwise indicated, all facts are taken from the Court's August 30, 2023 Opinion & Order that granted a temporary restraining order. *See* Order & Op. on Pls.' Mot. for TRO, ECF No. 36.

forced reset trigger. Alleging incongruence between the statutory definition and the ATF's interpretation, Plaintiffs bring this suit under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701 *et seq.*, to challenge the legality of the ATF's broadened definition.

### A. Forced Reset Triggers

A forced reset trigger ("FRT") is an assembly that allows the trigger of a semi-automatic weapon to reset quicker than it otherwise would using the standard trigger-return spring. Due to the swift trigger reset, a firearm equipped with an FRT enables the user to fire at a faster rate than with a traditional trigger.

Reviewing the basic mechanism of a firearm is necessary to understand how an FRT works. The basic function of any trigger is to release the hammer. This occurs when the trigger is pulled back to the point that a "trigger sear" releases the hammer from its retained position. Once released by the trigger, the hammer pivots to contact the firing pin. Once contacted, the firing pin then strikes a chambered ammunition cartridge or "round," causing gunpowder in the cartridge to combust. The combustion effect propels the cartridge's bullet out of the barrel of the firearm. Once fired, a standard semi-automatic trigger returns to its "reset" state—ready-to-fire or "set" position—by allowing the firearm to function once again by starting the mechanism anew. In other words, the firearm only functions again upon the reset of the trigger to release the hammer.

An FRT is a device that forcibly returns the trigger to its reset state. In the commercialized FRT designs at issue in this litigation, the trigger is forcibly reset by the hammer when the bolt carrier cycles to the rear. A "locking bar" mechanically locks the trigger in its reset state, preventing the user from moving the trigger rearward to function by releasing the hammer, until the bolt has returned to the in-battery position and the firearm is safe to fire. When firing multiple shots using an FRT, the trigger must still reset after each round is fired and must

separately function to release the hammer by moving far enough to the rear in order to fire the next round.

### B. Statutory Background

The National Firearms Act of 1934 ("NFA") regulates certain firearms in interstate commerce. 26 U.S.C. §§ 5801 *et seq.* At the time of its proposal, the NFA "was known to many as the 'the Anti-Machine Gun Bill.'" *Cargill v. Garland*, 57 F.4th 447, 450 (5th Cir. 2023), *pet. for cert. filed*, No. 22-976 (2023). Among other things, the NFA criminalized the possession or transfer of certain unregistered firearms while also prohibiting the registration of firearms otherwise banned by law. 26 U.S.C. §§ 5812(a), 5861. In the decades following its enactment, Congress passed the Gun Control Act of 1968 (the "GCA"), which criminalized the possession of firearms for certain classes of people. 18 U.S.C. § 921 *et. seq.* The GCA was amended in 1986 by the Hughes Amendment to the 1986 Firearm Owners Protection Act—colloquially referred to as "the machinegun ban"—in order to prohibit the possession or transfer of machineguns. 18 U.S.C. § 922(o). With limited exceptions,[2] it is a federal felony today to possess or transfer a machinegun. *Id.* This offense is punishable by up to ten years in federal prison for first-time offenders. 18 U.S.C. § 924(a)(2).

> According to both the NFA and GCA, a "machinegun" is statutorily defined as
>
> [a]ny weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. The term shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machine gun, and any combination of parts from which a machine gun can be assembled if such parts are in the possession or under the control of a person.

---

[2] These exceptions are limited to government actors, as well as machineguns in existence and registered prior to May 19, 1986—the effective date of the statute. 18 U.S.C. § 922(o)(2)(A)–(B).

23-11138.1290

26 U.S.C. § 5845(b) (providing the original statutory definition of "machinegun"); 18 U.S.C. § 921(a)(24) (incorporating the NFA's definition of "machinegun" into the GCA). In other words, a machinegun is a "rifle capable of automatic fire" due to "firing more than one round per trigger-action." *Cargill*, 57 F.4th at 452. Firearms incapable of automatic fire per trigger-action are thus not machineguns. *Id.*

### C. Regulatory Background

For decades, the ATF's regulations mirrored the federal statutory definition of "machinegun." *Compare* 27 C.F.R. §§ 478.11, 479.11 (2017) *with* 26 U.S.C. § 5845(b). This statutory parity was disrupted in 2018 when the ATF broadened the meaning of machinegun in its most recent regulation by re-interpreting the statutory definition to add additional language:

> Any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. The term shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machine gun, and any combination of parts from which a machine gun can be assembled if such parts are in the possession or under the control of a person. *For purposes of this definition, the term "automatically" as it modifies "shoots, is designed to shoot, or can be readily restored to shoot," means functioning as the result of a self-acting or self-regulating mechanism that allows the firing of multiple rounds through a single function of the trigger; and "single function of the trigger" means a single pull of the trigger and analogous motions. The term "machine gun" includes a bump-stock-type device, i.e., a device that allows a semi-automatic firearm to shoot more than one shot with a single pull of the trigger by harnessing the recoil energy of the semi-automatic firearm to which it is affixed so that the trigger resets and continues firing without additional physical manipulation of the trigger by the shooter.*

27 C.F.R § 479.11 (2018) (emphasis added).

Three years after the ATF broadened its interpretation of the statutory definition, agency subdivisions issued reports applying the revised definition of "machinegun" to FRTs. For instance, the Firearms Technology Criminal Branch ("FTCB") issued a Technical Examination

Report on July 15, 2021, which purportedly classified the FRT-15—a version of the FRT—as a machinegun. The FTCB issued a similar report several months later on October 21, 2021 regarding the Wide Open Enterprises "WOT" version of the FRT. Both the WOT and the FRT-15 operate on the same mechanical principles. At the beginning of the next year, the FTCB issued its "Open Letter to All Federal Firearms Licensees" (the "Open Letter") on March 22, 2022. The Open Letter advised that the ATF "recently examined devices commonly known as 'forced reset triggers' (FRTs)" and "determined that *some* of them are 'firearms' and 'machineguns' as defined in the [GCA]." Most important for this case, the Open Letter further explained that "ATF's examination found that *some* FRT devices allow a firearm to automatically expel more than one shot with a single, continuous pull of the trigger" and that "any FRT that allows a firearm to automatically expel more than one shot with a single, continuous pull of the trigger is a 'machinegun.'" One month later, the ATF's Firearms and Ammunition Technology Division ("FATD") issued yet another report on the FRT-15 trigger.

The ATF's application of its revised definition is not merely contained to agency reports. In fact, ATF and other government actors are actively pursuing civil and criminal enforcement actions against manufacturers, sellers, and owners of FRTs. Specifically, the Department of Justice ("DOJ") has brought several criminal prosecutions against individuals for possessing FRTs—including at least one individual located in the State of Texas.[3] The DOJ has also initiated civil proceedings against at least one company and two individuals for manufacturing

---

[3] *See, e.g.*, Second Superseding Indictment at Count One, *United States v. Bruggeman*, 2:22-cr-185 (S.D. Tex. Nov. 9, 2022) (charging defendant with "knowingly posess[ing] a machinegun, that is, six (6) Rare Breed Triggers FRT-15"); Indictment at Count Two, *United States v. Berrios-Aquino*, 3:22-cr-473 (D.P.R. Apr. 20, 2023) (charging defendant with possession of a machinegun for possessing a Rare Breed FRT-15 trigger); Superseding Indictment at Count One, *United States. v. Augusto*, 3:22-cr-30025 (D. Mass. Sept. 1, 2022) (charging defendant with possession of a machinegun in part for possessing three Rare Breed FRT-15 forced reset triggers and one Tommy Triggers FRT-15-3 MD forced reset trigger).

and selling FRTs.[4] And more proceedings seem inevitable given that the ATF is sending cease-and-desist letters regarding possession of FRTs.[5]

### D. Parties

Plaintiffs comprise of both individuals and organizations. Plaintiffs Patrick Carey, Travis Speegle, and James "J.R." Wheeler are three individual citizens located in the Texas–Louisiana area (the "Individual Plaintiffs"). Each Individual Plaintiff has owned, currently owns, and/or plans to own FRTs in the future. Plaintiffs also include two organizations—National Association for Gun Rights, Inc. ("NAGR") and Texas Gun Rights, Inc. ("TGR")—with thousands of members in the Northern District of Texas (the "Organizational Plaintiffs").

Plaintiff Carey owned two FRTs prior to receiving a warning notice from the ATF on August 22, 2022. The warning notice informed Plaintiff Carey that "ATF has information that you have acquired one or more [FRTs]," that "[t]hese items have been classified as machineguns that were unlawfully manufactured," that "[p]ossession of these devices is a violation of law due to their illegal manufacture," and that "*the unlawful receipt and possession of any of these devices is a felony violation of Federal law*." Due to the direct threat of civil and criminal enforcement, Plaintiff Carey surrendered his two FRTs to ATF agents. Plaintiff Wheeler personally owns one FRT and has a 50% ownership stake in a small firearms and ammunition business that owns two additional FRTs. Plaintiff Speegle personally owns ten FRTs. Both Plaintiffs Wheeler and Speegle wish to maintain possession of their FRTs, but fear they are at risk of civil and criminal prosecution for continued possession. The Individual Plaintiffs' prior or current conduct—possession or transfer of FRTs—is subject to enforcement on account of the

---

[4] *See, e.g.*, Complaint, *United States v. Rare Breed Triggers, LLC, et al.*, No. 1:23-cv-00369-NRM-RML, 2023 WL 5689770 (E.D.N.Y. Jan. 19, 2023) (seeking injunctive relief to enjoin a commercial entities and related individuals from marketing FRT-15s as lawful weapons despite the ATF's contrary interpretation that FRTs are machineguns).

[5] *See, e.g.*, Pls.' App'x 5, 7–8, ECF No. 23 (cease-and-desist letter to Plaintiff Patrick Carey).

ATF's broadened definition of machinegun.

In addition to the Individual Plaintiffs, other unnamed members of the Organizational Plaintiffs are also subject to enforcement under the ATF's broadened definition of machinegun. Formed in 2000, NAGR is a Virginia non-profit organization with its headquarters in Loveland, Colorado.[6] NAGR's purpose is to "preserve and defend the Second Amendment rights of gun owners."[7] It represents over 3,000 members in the Northern District of Texas alone.[8] Certain members of NAGR either already own FRTs or wish to acquire them but for the challenged ATF definition.[9] Since this case was filed, at least three new NAGR members have reported receiving warning letters from the ATF regarding their FRTs.[10]

Similarly, TGR is another non-profit corporation representing unnamed members in this lawsuit.[11] Its mission is "to protect the Second Amendment rights of its members, including protecting the liberty of individuals to defend themselves, their families, and their property without having to first ask government for permission."[12] Headquartered in Hudson Oaks, Texas, TGR represents over 14,000 members residing in the Northern District of Texas alone.[13] Among these members are those who own FRTs or wish to acquire them but for the challenged ATF definition.[14]

Without immediate relief, Plaintiffs fear civil and criminal prosecution. For those reasons, among others, Plaintiffs are suing various government officers and entities—the

---

[6] Pls.' Compl. 2, ECF No. 1.
[7] *Id.*
[8] *Id.*
[9] *Id.*
[10] Pls.' Reply in Support of Mot. for Prelim. Inj. 20 (describing declarations of Ryan Flugaur, Chris McNutt, and John Kordenbrock); *see also* Pls.' Reply App'x 94, ECF No. 48 (Declaration of Ryan Flugaur); *id.* at 85–93, 95–98, 101–04 (Declarations of other NAGR Members).
[11] Pls.' Compl. 2–3.
[12] *Id.*
[13] *Id.*
[14] *Id.* at 3.

Attorney General of the United States, the DOJ, the ATF, and the Director of the ATF (collectively, the "Defendants")—over the ATF's newly broadened definition and implementation of the machinegun regulation. In the instant action, Plaintiffs bring an APA challenge to the validity of Defendants' interpretation of the "machinegun" definition. According to Plaintiffs, this definition is unlawful because "Defendants' interpretation of the law and their specific actions to threaten and potentially initiate enforcement actions against Plaintiffs are thus arbitrary, capricious, and otherwise contrary to law." To protect the status quo during the pendency of the lawsuit, Plaintiffs seek a preliminary injunction enjoining Defendants from enforcing or otherwise implementing the novel definition until the Court is able to rule on the merits.[15] Such relief is available under the Court's inherent equitable powers and pursuant to statutory authorization under 5 U.S.C. § 705.

### E.  Temporary Restraining Order

On August 30, 2023, this Court granted a temporary restraining order ("TRO") to the Individual Plaintiffs only.[16] Finding that the ATF's expanded definition of "machinegun" is likely unlawful, the TRO enjoined Defendants from implementing or enforcing, in any civil or criminal manner, the definition against the Individual Plaintiffs.[17] The TRO was narrow in scope, limiting temporary injunctive relief to current and former possession of FRTs by the Individual Plaintiffs.[18] The TRO was extended once by the Court for good cause to avoid a gap between the temporary relief afforded to the Individual Plaintiffs and any subsequent preliminary injunction the Court may award.[19] The parties subsequently agreed to extend the TRO on two occasions.[20]

---

[15] Pls.' Mot. for Prelim Inj. 1–2, ECF No. 22.
[16] Order & Op. on Pls.' Mot. for TRO, ECF No. 36.
[17] *Id.* at 27.
[18] *Id.* at 25.
[19] *Id.* at 26.

The TRO expires after October 7, 2023.[21]

### F.  Eastern District of New York's Preliminary Injunction

Shortly after the Court granted the TRO to the Individual Plaintiffs,[22] a federal district court in the Eastern District of New York granted a preliminary injunction in favor of Defendants in a similar lawsuit involving the ATF's definition as applied to FRTs (the "E.D.N.Y. Lawsuit" and "E.D.N.Y. Decision"). *United States v. Rare Breed Triggers, LLC*, No. 23-cv-369 (NRM) (RML), 2023 WL 5689770 (E.D.N.Y. Sept. 5, 2023). The E.D.N.Y. Lawsuit enjoined two commercial entities—Rare Breed Triggers, LLC and Rare Breed Firearms, along with their agents, officers, and employees—from "engaging in any sales of [various FRTs] and other machinegun conversion devices." *Id.* at *50.

### G.  Evidentiary Hearing[23]

On October 2, 2023, the Court held an evidentiary hearing.[24] As with the E.D.N.Y. Lawsuit, each party was permitted an expert witness to testify about the mechanics of FRTs.[25] Notably, the hearing made clear that there are no factual disputes regarding how FRTs work.[26] Instead, the hearing confirmed that the parties' dispute centers entirely on whether FRTs qualify as machineguns under the statutory definition. Plaintiffs' expert, Daniel O'Kelly, testified that FRTs *do not* exhibit the attributes of a machinegun. Defendants' expert, Anthony Ciravolo,

---

[20] Joint Mot. for Extension of Time 1–2, ECF No. 37 (extending the TRO by three days); Joint Mot. to Reschedule Hrg. 1–2, ECF No. 43 (extending the TRO by one week).
[21] Order, ECF No. 44.
[22] Order & Op. on Pls.' Mot. for TRO, ECF No. 36.
[23] The hearing transcript will be forthcoming at a later date.
[24] *See* Electronic Minute Entry, ECF No. 51 (describing the Court's hearing held on October 2, 2023). Just like the E.D.N.Y. Lawsuit, this Court heard expert testimony regarding how FRTs function. *See* Defs.' Opp. to Mot. for Prelim. Inj. 24 (referencing the evidentiary hearing held in the E.D.N.Y. Lawsuit); *see also United States v. Rare Breed Triggers, LLC*, No. 23-cv-369 (NRM) (RML), 2023 WL 5689770, at *8 (E.D.N.Y. Sept. 5, 2023) (referencing the evidentiary hearing held on August 1–2, 2023).
[25] *See* Order, ECF No. 51 (setting time limits and scope of expert testimony).
[26] Even without the October 2, 2023 hearing, Defendants' briefing makes clear that they agree to the basic facts of how the FRT device works. *See* Defs.' Opp. to Mot. for Prelim. Inj. X, ECF No. 39.

testified that FRTs *do* exhibit the attributes of a machinegun. This live testimony mirrored the positions these same experts proffered during the two-day hearing in the E.D.N.Y. Lawsuit.[27] Having heard the live testimony and briefing on the issues, Plaintiffs' Motion for Preliminary Injunction is now ripe for the Court's review.

## II.    THRESHOLD ISSUES

Defendants renew the same threshold issue initially raised at the TRO stage: standing and the veracity of pre-enforcement challenges.[28] Before turning to the question of whether a preliminary injunction is warranted in this situation, the Court first addresses these threshold issues.

### A.    Individual Standing

Nothing in Defendants' renewed standing challenge contradicts the operative facts the Court relied upon when granting the TRO.[29] Yet Defendants once again argue that the Plaintiffs lack standing because there is no credible threat of prosecution and there are no *current* plans to prosecute the Plaintiffs.[30] But this phrasing reveals the implicit threat that the Plaintiffs fear: the Defendants could change their *current* plans at any time by deciding to prosecute. That is why, as the Fifth Circuit makes clear, standing exists here. *See Franciscan All., Inc. v. Becerra*, 47 F.4th 368, 376 (5th Cir. 2022) (emphasizing that "plaintiffs have standing in the face of similar prosecutorial indecision," including when an agency "has not to date evaluated" whether it will pursue enforcement); *see also Zimmerman v. City of Austin*, 881 F.3d 378, 391 (5th Cir. 2018) (explaining that standing in pre-enforcement challenges requires a showing "of an intention to

---

[27] *See generally* Transcript of Hearing, *United States v. Rare Breed Triggers, LLC* (E.D.N.Y. Sept. 5, 2023) (No. 23-cv-369 (NRM) (RML)), 2023 WL 5689770.

[28] Defs.' Opp. to Pls.' Mot. for Prelim. Inj. 10–15, 20–22, ECF No. 39.

[29] *See* Order & Op. on Pls.' Mot. for TRO 7–9, ECF No. 36 (finding that the Individual Plaintiffs successfully established standing).

[30] Defs.' Opp. to Pls.' Mot. for Prelim. Inj. 12, ECF No. 39.

engage in a course of conduct arguably affected with a constitutional interest, but proscribed by statute, . . . as well as credible threat of prosecution").

Defendants disagree that they are engaging in "prosecution indecision" comparable to the government in *Franciscan Alliance*.[31] In that case, the government "repeatedly refused to disavow enforcement [of the rule at issue] against" the plaintiff and further represented that it had "not to date evaluated whether it will" do so," effectively "conced[ing] that it may." *Franciscan All.*, 47 F.4th at 376. But this is precisely the same course that Defendants have followed in this case. No amount of "unequivocal" statements regarding "no current intention[s] to arrest or bring charges against the Individual Plaintiffs" can change the fact that Defendants have refused and *continue* their refusal to disavow prosecution until after the Court rules on the merits.[32] And whether or not Defendants vow to "notify this Court prior to issuing any . . . warning notice or taking other enforcement action" likewise does not show that Defendants have "determined [their] position."[33] All that Defendants have determined to do is provide an empty guarantee *today* to those who may become subject to enforcement tomorrow. This "unequivocal . . . guarantee" falls short of a disavowal of enforcement during the litigation, which demonstrates that Defendants "concede that [they] may" and have not sufficiently "determined [their] position" such that a credible threat of enforcement would no longer exist. *Franciscan All.*, 47 F.4th at 376. To the contrary, credible threats of enforcement continue to loom over Plaintiffs such that there is standing.[34]

---

[31] *Id.*

[32] *Id.*

[33] *Id.*

[34] Notably, it seems that the Fifth Circuit finds the government's refusal to fully disavow enforcement during litigation instructive. *See* Request for Supplemental Briefing at 1, *VanDerStok v. Garland*, No. 23-10718 (requesting the government answer whether it "intend[s] to enforce ATF's Final Rule pending appeal with respect to the parties in this case?").

Applying Fifth Circuit precedent here, the Individual Plaintiffs successfully satisfy standing requirements. There is no dispute that the Individual Plaintiffs "inten[d] to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by statute." *Zimmerman*, 881 F.3d at 391. Each Individual Plaintiff currently possesses—or previously possessed—a newly proscribed FRT. What is disputed is whether engaging in the newly proscribed FRT ownership carries "a credible threat of prosecution." *Id.* Defendants liken the Plaintiffs' concern to no more "than a general threat of prosecution" that cannot support pre-enforcement relief, particularly because the "ATF has no *current* intention to arrest or bring charges against the Individual Plaintiffs."[35] The Court disagrees and instead finds that a sufficiently credible threat exists to establish standing.

By bringing this action, the Individual Plaintiffs place themselves in potential jeopardy due to acknowledging their possession of FRTs. *See Mock v. Garland*, No. 4:23-CV-00095-O, 2023 WL 6457920, at *8 (N.D. Tex. Oct. 2, 2023) (noting that the plaintiffs, by bringing their lawsuit, necessarily provided sensitive information to the ATF regarding their regulatory noncompliance and facilitating potential future prosecution based on that information). Despite Defendants' rejection of this reality, this is not an imaginary or speculative concern. In fact, Defendants' recent enforcement activity continues to breathe life into this very fear and the factual record bears this out. Plaintiff Carey has already experienced armed ATF agents arriving at his home to warn that he could face prosecution by not surrendering his FRTs and by purchasing additional FRTs in the future.[36] Plaintiffs also cite to examples of enforcement activity and search warrants carried out against other individual owners of FRTs, including new

---

[35] Defs.' Opp.. to Pls. Mot. for Prelim. Inj. 12, 14, ECF No. 39 (emphasis added).
[36] Decl. of Patrick Carey, Pls.' Br. App'x 5, ECF No. 19.

examples since the filing of this lawsuit.[37] Specifically, at least three individuals are currently facing prosecution and there have been sixty-seven ATF seizures to date.[38]

Based on this record, Defendants certainly appear to be "chomping at the bit" to seize FRTs.[39] Further evidence of this is Defendants' refusal to disavow prosecuting the Individual Plaintiffs during the pendency of this case—the exact type of "prosecutorial indecision" that the Fifth Circuit has "repeatedly held" as more than enough to "have standing." *Franciscan All., Inc.*, 47 F.4th at 376. Given this flurry of recent enforcement activity—stemming from the same interpretation of the law that proscribes Plaintiffs' conduct here—and Defendants refusal to guarantee that no action will be taken against the Individual Plaintiffs during pending disposition of this action, there is more than a specter of enforcement sufficient to confer standing.

Consequently, because the Individual Plaintiffs face a credible threat of civil or criminal prosecution for prior and current ownership of FRTs, the Court finds that this constitutes more than a *de minimis* harm to confer standing to seek a preliminary injunction.

### B.  Associational Standing

The Court most also determine whether there is associational standing. When an organization seeks a preliminary injunction on behalf of its members, it must establish associational standing. *Hunt v. Wash. St. Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). Defendants argue that the Organizational Plaintiffs lack associational standing.[40] The associational standing doctrine permits a traditional membership organization "to invoke the

---

[37] Pls.' Compl. 11, ECF No. 1; Pls.' Br. in Support of Mot. for TRO 2, ECF No. 18; Pls.' Reply in Support of Mot. for Prelim. Inj. 20 (describing declarations of Ryan Flugaur, Chris McNutt, and John Kordenbrock). *see also* Pls.' Reply App'x 94, ECF No. 48 (Declaration of Ryan Flugaur); *id.* at 85–93, 95–98, 101–04 (Declarations of other NAGR Members).
[38] Pls.' Reply in Support of Mot. for TRO 2, 5, 9 n.3, ECF No. 33. Plaintiffs previously referenced at the TRO stage the ATF's Official Notification showing multiple seizures of FRTs. Pls.' Reply App'x 66, ECF No. 34.
[39] Decl. of Michael Columbo, Pls.' Br. App'x 9, ECF No. 19.
[40] Defs.' Opp. to Pls. Mot. for Prelim. Inj. 10–11, ECF No. 39.

court's [injunctive or declaratory] remedial powers on behalf of its members." *Warth v. Seldin*, 422 U.S. 490, 515 (1975). To do so, the organization must satisfy a three-prong *Hunt* test by showing that "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 143 S. Ct. 2141, 2157 (2023) (quoting *Hunt*, 432 U.S. at 343). Finally, the Fifth Circuit has explained that "[w]here the policy remains non-moribund, . . . that the policy causes self-censorship among those who are subject to it" shows that "there is standing." *Speech First, Inc. v. Fenves*, 979 F.3d 319, 336–37 (5th Cir. 2020).

Here, the Organizational Plaintiffs satisfy the three-prong *Hunt* test. First, NAGR and TGR both seek relief on behalf of their members.[41] Among these members are the Individual Plaintiffs,[42] who have standing to sue for the reasons stated above. Moreover, at least three other NAGR members have received warning letters for their FRT possession, including a member within the Northern District of Texas.[43] It is well established that a plaintiff does not need to "expose himself to liability before bringing suit." *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128–29 (2007). "The plaintiff's own action (or inaction) in failing to violate the law eliminates the imminent threat of prosecution, but nonetheless does not eliminate Article III jurisdiction." *Id.* at 129. Thus, each Individual Plaintiff's prior or current possession of FRTs gives rise to a credible threat of civil or criminal prosecution that establishes standing to sue in their own right, satisfying prong one of the *Hunt* test.

---

[41] Pls.' Compl. 2–4, ECF No. 1.
[42] Pls.' Reply in Support of Mot. for Prelim. Inj. 19, ECF No. 47 (stating that the Individual Plaintiffs are members of both Organizational Plaintiffs).
[43] *Id.* at 24; *see also* Pls.' Reply App'x 94, ECF No. 48 (Declaration of Ryan Flugaur); *id.* at 85–93, 95–98, 101–04 (Declarations of other NAGR Members).

Second, NAGR and TGR share similar organizational purposes that are clearly germane to this lawsuit challenging Defendants' asserted authority to classify and regulate FRTs as machineguns. NAGR's mission is "to preserve and defend the Second Amendment rights of gun owners."[44] Likewise, TGR's mission is "to protect the Second Amendment rights of its members, including protecting the liberty of individuals to defend themselves, their families, and their property without having to first ask government for permission and to push back on firearms-related licensing requirements."[45] And, third, because NAGR and TGR seek injunctive relief, there is no need for all of their individual members to participate in the lawsuit.

Having satisfied all three prongs of the *Hunt* test, the Court finds that the Organizational Plaintiffs demonstrate associational standing and may pursue relief on behalf of their members. Moreover, given that the record at this stage shows that ATF's enforcement policy "remains non-moribund" and is "caus[ing] self-censorship among those who are subject to it," the Court is satisfied that "there is standing." *Speech First, Inc. v. Fenves*, 979 F.3d 319, 336–37 (5th Cir. 2020).

### C.  Pre-Enforcement Challenges

Defendants once again call into question the veracity of pre-enforcement judicial review of laws carrying criminal penalties. According to Defendants, such review would "ride roughshod across constitutional limitations on the judiciary's equitable powers to enjoin hypothetical future law enforcement action."[46] As the Court previously explained, the basic contours of Defendants' pre-enforcement contentions are true.[47] But it still remains that separation of powers does not preclude pre-enforcement judicial review of laws carrying

---

[44] Pls.' Compl. 2, ECF No. 1.
[45] *Id.* at 2–3.
[46] Defs.' Opp. to Pls. Mot. for Prelim. Inj. 21, ECF No. 39.
[47] Op. & Order 9, ECF No. 36.

23-11138.1302

criminal penalties. *See Babbitt v. Farm Workers*, 442 U.S. 289, 298 (1979) (emphasizing that a plaintiff facing "a credible threat of prosecution . . . should not be required to await and undergo a criminal prosecution as the sole means of seeking relief") (internal quotation marks omitted)); *see also Nat'l Rifle Ass'n of Am. v. Magaw*, 132 F.3d 272, 279 (6th Cir. 1997) ("Although in regard to criminal statutes, courts are wary of . . . intervening prior to prosecution and foreshortening the prosecutor's action, courts have allowed pre-enforcement review of a statute with criminal penalties.").

To begin, Defendants do not retract from their previous averments that certain safeguards weigh in favor of no pre-enforcement intervention by the judicial branch.[48] As this Court previously explained, "this line of argument runs afoul of multiple Supreme Court decisions."[49] *See, e.g.*, *Steffel v. Thompson*, 415 U.S. 452, 459 (1974) ("[I]t is not necessary that [a plaintiff] first expose himself to actual arrest or prosecution to be entitled to challenge a statute that he claims deters the exercise of his constitutional rights."); *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) ("When an individual is subject to such a threat [of enforcement of a law], an actual arrest, prosecution, or other enforcement action is not a prerequisite to challenging the law."). And that is to say nothing of the potential harm that such insulation from pre-enforcement judicial review would likely cause individuals subject to prosecution. Without access to courts to bring pre-enforcement challenges, vulnerable citizens may surrender the ability to promptly challenge unlawful executive branch actions. This cannot be.

---

[48] *See, e.g.,* Defs.' Resp. 6, ECF No. 32 (suggesting that "federal criminal procedure provides a host of opportunities to test the lawfulness of the government's exercise of prosecutorial authority").
[49] Op. & Order 11, ECF No. 36.

Defendants now concede that a narrow exception exists, but only for "those cases in which the very act of filing an indictment may chill *constitutional rights*."[50] But Defendants offer little support for this bold proposition. In fact, Defendants only point to a single out-of-circuit case that directly shores up their position.[51] According to the Third Circuit in *Stolt-Nielsen v. United States*, the district court lacked the authority to enjoin executive branch officials from filing an indictment because the plaintiffs had access to a federal forum post-indictment. 442 F.3d 177, 187 (3d Cir. 2006) as amended (May 16, 2006). The Third Circuit only recognized the narrow exception for chilled constitutional rights. *Id.* To be sure, *Stolt-Nielsen* contains broad language consistent with Defendants' position that pre-enforcement review of future enforcement is only available where constitutional rights are at stake. But a comparison with the issue in this case renders that language unpersuasive. In *Stolt-Nielsen*, the plaintiff sued to enforce a conditional leniency agreement that the government purported to revoke as a consequence of plaintiff's behavior. *Id.* at 179–80. This was a fundamentally individualized determination rather than a review of a generally applicable administrative action. This distinction is key.

Under the APA, federal courts have the authority to review challenges to agency actions on a pre-enforcement basis. These challenges include an endless variety of agency actions that are "otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Notably, such judicial review of agency actions "contrary to constitutional right, power, privilege, or immunity; . . . [or] in excess of statutory jurisdiction, authority, or limitations," *id.* § 706(2)(B)–(C), is cumulative under the arbitrary and capriciousness standard, which "governs review of *all* proceedings that are subject to challenge under the APA." *Menkes v. DHS*, 637 F.3d 319, 330 (D.C. Cir. 2011)

---

[50] Defs.' Opp. to Pls. Mot. for Prelim. Inj. 20, ECF No. 39 (citing *Stolt-Nielsen, S.A. v. United States*, 442 F.3d 177 (3d Cir. 2006), as amended (May 16, 2006)).
[51] *Id.*

(citing *Consumers Union of U.S.., Inc. v. FTC*, 801 F.2d 417, 422 (D.C. Cir. 1986)). Thus, "[i]n

*all* cases" of judicial review under § 706, "agency action must be set aside if the action was

'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law' or if the

action failed to meet statutory, procedural, or constitutional requirements." *Citizens to Preserve*

*Overton Park, Inc. v. Volpe*, 401 U.S. 402, 413–414 (1971) (citing 5 U.S.C. § 706(2)(A), (B),

(C), (D)) (emphasis added). This is also consistent with the Supreme Court's emphasis that the

APA's "'generous review provisions' must be given a 'hospitable' interpretation." *Abbott Lab'ys*

*v. Gardner*, 387 U.S. 136, 140 (1967) (quoting *Shaughnessy v. Pedreiro*, 349 U.S. 48, 51

(1955)).

Even so, Defendants still reject this broad statutory authorization of judicial review,

arguing that "the APA's general conferral of authority to review certain agency actions and to

grant interim relief has no bearing on whether the particular equitable remedy sought here is

available."[52] Once again, this bold statement lacks any direct support. Not only that, Defendants'

interpretation also runs counter to the text of the APA itself. The APA's text refers to

"mandatory or injunctive decree[s]" issued thereunder. 5 U.S.C. § 702. The import of this text is

that injunctive relief is available under the APA without any express limitation precluding the

availability of such relief on a pre-enforcement basis. Moreover, the text of § 702 makes clear

that "[a] person suffering a legal wrong because of agency action, or adversely affected or

aggrieved by agency action" is "entitled to judicial review thereof." *Id.* And the APA expressly

provides that criminal proceedings are *included* in such review. *Id.* § 703. This ability to obtain

an appropriate remedy is not contingent on the person being subject to existing enforcement. To

the contrary, the APA recognizes judicial authority to "issue all necessary and appropriate

---

[52] *Id.*

18

process . . . to preserve status or rights" from "irreparable injury" caused by agency action.[53] *Id.*
§ 705. Indeed, the APA's explicit textual entitlement would be undermined by an interpretation
that § 702 confers no right to obtain meaningful equitable relief on a pre-enforcement basis when
wronged by agency action. Provided that the claim is justiciable, the APA's broad entitlement to
judicial review is not limited in the way Defendants portray.

Based on the text, the APA empowers courts with specific authority to "hold unlawful
and set aside agency action, findings, and conclusions found to be" unlawful without subjecting
that authority only to post-enforcement situations. *Id.* § 706. This is the only reading of the text
that gives "a 'hospitable' interpretation" to the APA's "'generous review provisions.'" *Abbott
Lab'ys*, 387 U.S. at 140 (quoting *Shaughnessy*, 349 U.S. at 51). It also tracks with the important
purpose the APA serves. *See Franciscan Alliance*, 47 F.4th at 378 ("[A]n agency 'literally has no
power to act . . . unless and until Congress authorizes it to do so by statute.'" (quoting *Fed.
Election Comm'n v. Cruz*, 142 S. Ct. 1638, 1649 (2022)).

James Madison warned that "[t]he accumulation of all powers, legislative, executive and
judiciary, in the same hands . . . may justly be pronounced the very definition of tyranny." THE
FEDERALIST NO. 47, at 301 (James Madison) (Clinton Rossiter ed. 1961). The crux of this case is
that the executive branch has improperly usurped legislative authority by enacting criminal
prohibitions that are beyond the scope of its legislatively granted authority. Now, Defendants
seek to arrogate unto themselves the judicial authority as well by placing their actions beyond the
reach of pre-enforcement judicial review. This is not and cannot be.

To be sure, the constitutional check of judicial review is an essential component of
separation-of-powers principles to oblige another branch to control itself. *See* THE FEDERALIST

---

[53] *See generally* Jonathan F. Mitchell, *The Writ-of-Erasure Fallacy*, 104 VA. L. REV. 933, 1012–17
(2018) (explaining that, although the power of judicial review is not akin to an executive veto, the APA
expressly grants courts additional authority to review agency action).

No. 78, at 380 (Alexander Hamilton) (Dover ed., 2014) ("There is no position which depends on clearer principles, than that every act of a delegated authority, contrary to the tenor of the commission under which it is exercised, is void."). And this remains just as important today as it was at the Founding. Not only would Defendants have this Court ignore decades of Supreme Court precedent and the APA's plain textual authorization of judicial review, they would also have this Court twist the foundational value of separation of powers into something it is not. The Court declines this invitation for the second time. Instead, the Court finds that it possesses both constitutional and statutory authority to review pre-enforcement challenges to agency action with criminal consequences and does so here.

*       *       *       *       *

Accordingly, finding no bar to the authority to afford equitable relief to Plaintiffs, the Court proceeds with its analysis of the requested preliminary injunction.

## III.    LEGAL STANDARDS

The decision to grant or deny injunctive relief is committed to the district court's discretion. *See Miss. Power & Light Co. v. United Gas Pipe Line*, 760 F.2d 618, 621 (5th Cir. 1985). To establish entitlement to injunctive relief, the movant must demonstrate: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable harm; (3) that the balance of hardships weighs in its favor; and (4) that the issuance of the preliminary injunction will not disserve the public interest. *Daniels Health Servs., L.L.C. v. Vascular Health Scis., L.L.C.*, 710 F.3d 579, 582 (5th Cir. 2013). The last two factors merge when the government is the opposing party. *Nken v. Holder*, 556 U.S. 418, 435 (2009). As the movant, it is the party seeking relief who bears the burden of proving all four elements of the requested injunctive relief. *Nichols v. Alcatel USA, Inc.*, 532 F.3d 364, 372 (5th Cir. 2008); *Miss. Power & Light Co.*,

20

760 F.2d at 621.

Upon determining that a party is entitled to injunctive relief, a court must also decide the appropriate scope of that prospective injunction. "[T]he scope of injunctive relief is dictated by the extent of the violation established[.]" *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). And because it is considered an extraordinary remedy, an injunction "should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 756 (1994) (cleaned up). Thus, an injunction must "redress the plaintiff's particular injury," and no more. *Gill v. Whitford*, 138 S. Ct. 1916, 1934 (2018) (citation omitted).

## IV. ANALYSIS

### A. Substantial Likelihood of Success on the Merits[54]

Plaintiffs are likely to succeed on the merits. To show a substantial likelihood of success on the merits, Plaintiffs need not show they are entitled to summary judgment on their claim, but must instead present a prima facie case. *Daniels Health Servs.*, 710 F.3d at 582. The Administrative Procedure Act ("APA") instructs courts to "hold unlawful and set aside agency action . . . found to be . . . in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(C). Judicial review of agency actions "contrary to constitutional right, power, privilege, or immunity" or "in excess of statutory jurisdiction, authority, or limitations," *id.* § 706(2)(B)–(C), are cumulative under the arbitrary and capriciousness standard, which "governs review of *all* proceedings that are subject to challenge under the APA." *Menkes v. DHS*, 637 F.3d 319, 330 (D.C. Cir. 2011) (citing *Consumers Union of U.S.., Inc. v. FTC*, 801 F.2d 417, 422 (D.C. Cir. 1986)). Thus, "[i]n *all* cases" of judicial review under Section 706, "agency action must be set

---

[54] The Court's discussion of facts concerning the mechanical operation of FRTs is drawn from (1) the pleadings, (2) the October 2, 2023 hearing, and (3) the E.D.N.Y. Lawsuit.

aside if the action was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law' or if the action failed to meet statutory, procedural, *or* constitutional requirements." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 413–414 (1971) (citing 5 U.S.C. § 706(2)(A)–(D)) (emphases added).

Here, Plaintiffs contend that the ATF's regulation broadening the machinegun definition is an arbitrary and capricious expansion of the agency's authority.[55] Plaintiffs are likely correct. Accordingly, the Court concludes that Plaintiffs have carried their burden at this stage to show that the expanded definition of machinegun likely exceeds the scope of ATF's statutory authority. Therefore, Plaintiffs have satisfied "arguably the most important" of the four factors. *Tesfamichael v. Gonzales*, 411 F.3d 169, 176 (5th Cir. 2005).

### i. Statutory Interpretation in *Cargill v. Garland*[56]

The Court does not begin its statutory analysis with a blank slate. Rather, the Court is bound by the Fifth Circuit's recent analysis in *Cargill v. Garland* concerning the exact statutory language at issue here. According to the en banc Fifth Circuit, a weapon that qualifies as a machinegun under the NFA and GCA must be capable of (1) firing multiple rounds by a single function of the trigger and (2) do so automatically. *Id.* at 460. In other words, the NFA unambiguously "requires that a machinegun be capable of firing automatically once the *trigger* performs a single function." *Cargill*, 57 F.4th at 463. The definition of machinegun "utilizes a

---

[55] Pls.' Compl. 15, ECF No. 1.
[56] *Cargill* also discussed the relevance of deference under *Chevron USA, Inc. v. Nat. Res. Def. Council*. 57 F.4th at 456–57 (citing 267 U.S. 837 (1984)). The Court recognizes that the ATF does not receive interpretive deference under *Chevron*. This is primarily due to the Step Zero command that interpretive rules—which the ATF's broadened machinegun definition appears to be—are not eligible for *Chevron* deference. *United States v. Mead Corp.*, 533 U.S. 218, 232 (2001). But even assuming otherwise, *Chevron* deference would still not apply for at least two reasons. First, the Court finds the statutory definition to be unambiguous. *See, e.g.*, *Western Refining Southwest, Inc. v. FERC*, 636 F.3d 719, 727 (5th Cir. 2011) ("[If] the statute's text is unambiguous, we need not proceed to Step Two of *Chevron*."). Additionally, "[t]he Supreme Court has never held that the Government's reading of a criminal statute is entitled to any deference." *Cargill*, 57 F.4th at 466–67 (cleaned up).

grammatical construction that ties the definition to the movement of the trigger itself, and not the movement of a trigger finger" such that "the statutory definition of machinegun unambiguously turns on the movement of the trigger and not a trigger finger." *Id. Cargill* explained that the definition is solely concerned with the mechanical operation of the trigger rather than the actions of the user. *Id.* at 460. Based on this, *Cargill* rejected the ATF's regulatory interpretation of "machinegun" because it exceeded the agency's statutory authority in violation of the APA. *Id.* at 472–73.

*Cargill* emphatically rejected the ATF's interpretation of machinegun set forth in section 479.11. *Id.* at 460. As *Cargill* explained, the ATF's expanded definition was aimed at criminalizing the manufacture, sale, and possession of "bump stocks" following the tragic Las Vegas shooting. *Id.* at 450. Similar to FRTs, a bump stock is an accessory that attaches to a semi-automatic weapon to increase the rate of fire. *Id.* at 453. By harnessing the firearm's natural recoil to quickly reengage the trigger, a skilled shooter utilizing this "bump firing" technique can rapidly fire multiple rounds. *Id.* at 454. Yet despite this increase in firing speed, *Cargill* determined that bump stocks are not machineguns because the device did not meet both elements of the statutory definition: (1) capable of firing multiple rounds by a single function of the trigger and (2) operate automatically. *Id.* at 462, 462 n.9 (citation omitted) (emphasizing that the conclusions regarding each element are "independent, alternative holdings").

As the Fifth Circuit's statutory interpretation makes clear, a "single function of the trigger" means what it says: a single function of the *trigger*. It does not mean a single pull by the shooter. *Id.* at 459. In fact, the word "pull" is not found anywhere in the statutory definition. The only place "pull" exists is in the ATF's broadened regulatory definition interpreting the statute. *See* 27 C.F.R § 479.11 (2018) ("'[S]ingle function of the trigger' means a single pull of the

23

trigger[.]"). But according to *Cargill*, "[t]he statutory definition of machinegun unambiguously turns on the movement of the trigger and not a trigger finger." *Cargill*, 57 F.4th at 460. Indeed, the statute does not say "by a single pull of the trigger finger." Nor does it say "by single function of the trigger finger." *Cargill* refused to read words into the statute. *Id.* at 460. Rather, the best reading of the definition is that after the shooter initiates the trigger's relevant function by some action—such as pulling the trigger or some other action by the user—it is the follow-on action of the trigger acting out its mechanical purpose that informs the operative "function." *Id.* Based on this reasoning, the Court cannot accept Defendants' suggestion that "function" is synonymous with "pull."[57] To do so would directly contradict *Cargill*'s holding. The E.D.N.Y. Decision likewise concluded that "function" and "pull" are synonymous. But, once again, *Cargill* controls since decisions from the Fifth Circuit—not the Eastern District of New York—are binding on this Court.

---

[57] Defs.' Opp. to Pls.' Mot. for Prelim. Inj. 3, ECF No. 39 (quoting *Staples v. United States*, 511 U.S. 600, 602 n.1 (1994)). Although *Staples* uses the same terms as Defendants—"release" and "pull" of the trigger—in a footnote discussing the characteristics of a machinegun, the Court determines that the holding in *Staples* is not applicable to these facts. First, *Staples* involved a different context than the one before this Court. *Id.* The Supreme Court addressed the government's burden of proof regarding a *mens rea* question about an individual's knowledge that he possessed an unregistered machinegun. *Id.* at 604–05. Not only was a specific semi-automatic accessory like an FRT or bump stock not before the Court, but the footnote in *Staples* only unpacks the meanings of "automatic" and "fully automatic." *Id.* at 602, 602 n.1. That is because the statutory definition at issue in the instant case was not before the *Staples* Court, making an analysis of *both* required statutory elements—(1) automatic and (2) single function of the trigger—unnecessary. The Supreme Court did not—and did not need to—address how "single function of the trigger" modifies "automatically" in order to answer the question before it. However, this question regarding the interplay of the two required elements was directly addressed in *Cargill*. Therefore, the footnote containing the terms "release" and "pull" in *Staples* does not constitute a binding holding of the Supreme Court. *See Webster v. Fall*, 266 U.S. 507, 511 (1924) ("Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents."); *see also District of Columbia v. Heller*, 554 U.S. 570, 625 n.25 (2008) (refusing to follow statement in previous decision characterized as "dictum" because "the point was not at issue and was not argued"); *Brecht v. Abrahamson*, 507 U.S. 619, 631 (1993) ("[S]ince we have never squarely addressed the issue, and have at most assumed [it], we are free to address the issue on the merits.").

Even if "automatically" refers to a single pull of the trigger, the statutory definition does not endorse a reading of automatic in isolation from the single function of the trigger. Rather, *Cargill* explained that "the phrase 'by a single function of the trigger' modifies the adverb 'automatically.'" *Id.* at 463. That is because "automatically" cannot be read in isolation. *Id.* (citing *Guedes v. ATF*, 920 F.3d 1, 43 (D.C. Cir. 2019) (Henderson, J., concurring in part and dissenting in part)). Instead, "automatically" is understood as limited by the "single function of the trigger" clause. *Id.* On its own, "automatically" simply means that firing "maintain[s] if all a shooter does it initially pull the trigger." *Id.* at 463. But *Cargill* explains that this alone is insufficient to qualify as a machinegun.

Moreover, Defendants read too much into *Cargill*'s discussion of mechanical versus non-mechanical bump stocks. Defendants contend that *Cargill* recognized that the outcome would have been different if the device before it were a mechanical bump stock that only required the shooter to pull the trigger once to activate the firing sequence and thereafter maintain bump fire on its own accord.[58] This is an inaccurate reading of *Cargill*. The Fifth Circuit merely recognized that the only issue before it was whether non-mechanical bump stocks were machineguns, and that the outcome may differ for a mechanical bump stock depending on how it worked. *Cargill*, 57 F.4th at 462 ("[T]he case *might* well be different if we were considering a semiautomatic weapon equipped with a mechanical bump stock." (emphasis added)). While "[i]t could be the case that a switch activating a mechanical bump stock would be the legal trigger," *Cargill* acknowledged that it was "not considering that case." *Id.* Certainly, this was the situation in other cases where some additional device functionally replaced the traditional trigger and converted the weapon into a machinegun. *Id.* (referencing a switch-operated mechanical bump stock and a

---

[58] Defs. Opp. to Pls.' Mot. for Prelim. Inj. 7–8, ECF No. 39.

switch-operated electric motor add-on). That a "trigger activator" pushes the trigger towards its reset position does not mean it becomes the new trigger. *Id.* at 462 (citing *United States v. Camp*, 343 F.3d 743, 745 (5th Cir. 2003)).

      ii.  <u>Application of *Cargill* to FRTs</u>

Applying *Cargill*'s holding here, FRTs do not fire multiple rounds with a single function of the trigger and do not qualify as machineguns. For each and every round fired, the trigger moves forward into its reset state and is depressed to release the hammer from its sear surface. Because the operative mechanical function of the trigger is to release the hammer, that the trigger of an FRT-equipped firearm functions for each shot fired disqualifies it as a machinegun under the current statutory definition. Moreover, if all the shooter does is initially pull the trigger, the FRT-equipped firearm will only fire one round. And if the shooter attempts to reset and hold the trigger in a fully depressed position so that the trigger cannot reset, the weapon will malfunction.

By characterizing a "single function of the trigger" as a "single constant rearward pull of the trigger," Defendants seek to transform the required statutory focus away from the objective trigger mechanics to the subjective actions of the gun user instead.[59] This is incorrect and is the same rewriting of the statute Defendants already attempted with bump stocks before *Cargill* emphatically rejected it. *Cargill*, 57 F.4th at 460 ("The statute does not care what human input is required to activate the trigger—it cares only whether more than one shot is fired each time the trigger acts."). Under *Cargill*, the Court cannot look to the shooter's actions in deciding whether FRTs are machineguns. Indeed, the "notion that the definition turns on the actions of an unnamed shooter is inconsistent with both the [definition's] grammatical and statutory contexts." *Id.* at 461.

---

[59] *Id.* at 8.

In light of *Cargill*, the critical consideration is how the trigger mechanically functions. And that function is the "follow-on action where the trigger acts out its mechanical design or purposes" *after* the shooter has initiated it by some action. *Id.* at 460. *Cargill* leaves no doubt that this required "action" is in relation to the function of the trigger itself, which is defined purely mechanically under the statute rather than an action taken by the user. *See id.* at 461 ("Congress did not use words describing the shooter's perspective of the weapon's rate of fire. . . . Instead, it made up an entirely new phrase—by single function of the trigger—that specifically pertains to the mechanics of a firearm."). Whether prudent or not, "Congress defined the term 'machinegun' by reference to the trigger's mechanics." *Id.* In a hammer-fired gun like those an FRT enhances, the trigger's function is still to release the hammer as part of a "simple mechanical process." *See id.* at 459 (explaining that "the trigger disengages the hammer from the sear" starts the "process" that "happens every single time one bullet is fired"). This definition is consistent with prior Fifth Circuit precedent. *See, e.g.*, *United States v. Jokel*, 969 F.2d 132, 134 (5th Cir. 1992) (concluding that the role of the trigger is "the part of the action of a firearm moved by the finger *to release the hammer* . . . in firing") (emphasis added)). Defendants attempt to characterize *Jokel* as describing the trigger's "function" as the "mechanism . . . used to initiate the firing sequence."[60] Although it is true that the trigger initiates this firing sequence, *Cargill* makes clear that the operative function is the release and reset of the hammer as part of certain functions in the firing sequence that must recur before each round is fired. *Cargill*, 57 F.4th at 447 (quoting *Jokel*, 969 F.2d at 135).

---

[60] *Id.* at 9–10. (cleaned up).

The parties agree that the trigger in an FRT-equipped firearm releases the hammer for every shot.[61] By contrast, the auto sear in a fully automatic gun takes over to retain and release the hammer for all subsequent shots so that its trigger functions only once in a string of automatic fire. *See Cargill*, 57 F.4th at 454 (contrasting the auto sear of a "fully automatic gun" with a bump stock). Although an FRT-equipped firearm contains a locking bar that prevents a subsequent trigger function until the weapon is safe to fire again, this is not the same as an auto sear. But unlike an auto sear, the locking bar prevents firing until it is safe to do so again after unlocking the trigger. Unlike a fully automatic weapon's auto sear, the FRT's locking bar does not alter the basic mechanical process where the trigger moves for every shot fired. Whether that movement occurs by the shooter "apply[ing] forward pressure to the weapon's forebody in order to maintain the shooting mechanism" for bump stocks, *id.* at 454, or by the hammer maintaining the shooting mechanism for FRTs, the fact remains that the trigger resets the hammer each time before the next shot can be fired. *Cargill* explains that this is a separate function of the trigger. *Id.* at 459. Like bump stocks, FRTs do not enable a weapon to automatically fire multiple rounds with a single function of the trigger itself.

This is even true in Defendants' video of the zip-tie test, which purports to show that FRTs fire with "a single constant depression of the trigger."[62] In a machinegun, the trigger must be held in its rearmost position for the gun to fire automatically. The machinegun's trigger does not reset in between each shot. But in an FRT-equipped firearm, the trigger *must* still reset in between each shot—even when depressed in a rearward state by the zip tie. Defendants' zip tie

---

[61] *See id.* at 9 ("[T]he FRT uses the firing sequence to automatically reset itself along with the locking bar to lock and then automatically time the re-release of the hammer so that as soon as the bolt locks into battery the next round will automatically be fired."). Moreover, both parties confirmed at the October 2, 2023 hearing that there is no disagreement as to how FRTs function.

[62] Defs. Opp. to Pls.' Mot. for Prelim. Inj. 5-6, ECF No 39; Defs.' Notice of Manual Filing of Video Ex., ECF No. 41.

does not appear to hold the FRT trigger still in its most rearward position. If it did, the weapon would malfunction and not fire subsequent shots. Instead, the elasticity in the zip tie allows for sufficient movement to allow for a trigger reset. All this test establishes is that the trigger need not move to its most rearward position. It can still reset from sufficient rearward pressure and forward movement propelled by the stretched zip tie. In other words, the zip tie test does not demonstrate that a single function of the trigger does not occur for each shot since the trigger's operative function is the reset of the hammer—not how the user or a zip tip pulls the trigger. The zip tie test is irrelevant to the statutory definition provided by Congress and as interpreted by *Cargill*.

Even without the aid of expert testimony during the October 2, 2023 hearing—which revealed that there are no relevant fact issues regarding the mechanics of FRTs—Defendants' efforts to distinguish *Cargill* are unavailing. Similar to the government in *Cargill*, the Defendants here cannot "overcome this plain reading" of the statutory language. *Id.* When the ATF revised its interpretation of machinegun to define a "single function of the trigger" as the same thing as "a single pull of the trigger and analogous motion," its definition conflicted with the definition provided by the controlling statutes. 27 C.F.R. § 479.11 (2018). And where an agency regulation contradicts the statute, not only is that regulation likely arbitrary and capricious, but the statute governs. *Id.* at 458–60. Because of this contradiction, the ATF's broadened definition is likely unlawful.

Furthermore, unlike a switch-activated device that takes over as the legal trigger of the weapon, FRTs do not alter the basic operation the trigger: the trigger must still move sufficiently rearward for each shot based on external manual input from the shooter. This, in turn, activates the trigger's function—releasing and resetting the hammer—which occurs before each

subsequent shot and is not set in motion by a switch. Unlike Defendants' comparison to the Akins Accelerator and electronic motor devices,[63] triggers in FRT-equipped firearms perform the same mechanical function as any normal trigger by releasing the hammer prior to each shot.

The closest Defendants come to analogizing FRTs to machineguns is by pointing to two similarities that FRTs and machineguns share: (1) the comparable rates of fire and (2) the absence of a disconnector.[64] But these arguments are foreclosed by the statutory definition and *Cargill*. The statutory definition does not define machineguns "according to how quickly they fire." *Cargill*, 57 F.4th at 464. Nor does it identify the absence of a disconnector as the dispositive characteristic. *See id.* at 460 (declining to "read words into the statute"). Instead, a weapon need only be capable of firing automatically once the trigger itself performs a single function to qualify as a machinegun under the statute. *Id.* at 460, 465. If Congress wants to amend the statutory definition in the future to define machineguns based on rate of fire or absence of a disconnector, it knows how to do so. Until such time, a comparable—and even identical—rate of fire and absence of a disconnector have no bearing on whether a firearm is a machinegun. Therefore, these comparators do not alter the Court's determination that FRTs most likely are not machineguns.

*      *      *      *      *

Because Plaintiffs point to binding Fifth Circuit precedent that is squarely dispositive of the issue in this case, the Court concludes that Plaintiffs have demonstrated, at this stage, a strong likelihood of success on the merits. That is, the ATF's regulation is likely an arbitrary and capricious interpretation of the statutory definition of "machinegun" that exceeds the scope of the agency's authority under 5 U.S.C. § 706. When such a determination is made, § 705

---

[63] Defs.' Opp. to Pls.' Mot. for Prelim. Inj. 7, 9–10, ECF No. 39.
[64] *Id.* at 4, 4 n.3, 9.

authorizes injunctive relief. And that relief should mirror the final remedy that would be proper for such a finding: the "agency action must be set aside if the action was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law' or if the action failed to meet statutory, procedural, *or* constitutional requirements." *Citizens to Preserve Overton Park*, 401 U.S. at 413–414 (1971) (citing 5 U.S.C. § 706(2)(A)–(D)). Therefore, for the reasons discussed, the Court concludes that Plaintiffs have carried their burden and are entitled to an injunction setting aside the ATF's machinegun definition as applied to them.

### B. Substantial Threat of Irreparable Harm

In the Fifth Circuit, it is "well-established" that a harm is considered "irreparable only 'if it cannot be undone through monetary remedies.'" *Dennis Melancon, Inc. v. City of New Orleans*, 703 F.3d 262, 279 (5th Cir. 2012) (quoting *Interox Am. v. PPG Indus., Inc.*, 736 F.2d 194, 202 (5th Cir.1984)). A showing of economic loss is usually insufficient to establish irreparable harm because damages are typically recoverable at the conclusion of litigation. *Janvey v. Alguire*, 647 F.3d 585, 599–601 (5th Cir. 2011). However, where costs are not recoverable because the government-defendant enjoys sovereign immunity from monetary damages, irreparable harm is generally satisfied. *Wages & White Lion Invs., L.L.C. v. FDA*, 16 F.4th 1130, 1142 (5th Cir. 2021) (citing *Texas v. EPA*, 829 F.3d 405, 433 (5th Cir. 2016)).

Likewise, "complying with [an agency order] later held invalid almost *always* produces the irreparable harm of nonrecoverable compliance costs." *Id.* For harms that are non-pecuniary, the alleged irreparable injury must also be concrete—"speculative injury is not sufficient" and "there must be more than an unfounded fear on the part of the applicant." *Daniels Health Servs.*, 710 F.3d at 585 (quoting *Holland Am. Ins. Co. v. Succession of Roy*, 777 F.2d 992, 997 (5th Cir. 1985)). So long as "'the threatened harm is more than de minimis, it is not so much the

magnitude but the irreparability that counts for purposes of a preliminary injunction.'" *Enter. Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana*, 762 F.2d 464, 472 (5th Cir. 1985) (citing *Canal Auth. v. Callaway*, 489 F.2d 567, 572 (5th Cir. 1974)).

Without injunctive relief, Plaintiffs allege that they are suffering, and will continue to suffer, irreparable harms in at least two ways.[65] These identified harms take the form of (i) unrecoverable compliance costs that are more than *de minimis* and (ii) non-pecuniary injuries, such as credible threats of criminal prosecution and civil liability and deprivations of ownership and constitutional rights.[66] Defendants contest Plaintiffs' alleged injuries on grounds that there is no substantial threat of injury, irreparable or otherwise, *at this time*.[67] According to Defendants, Plaintiffs waited too long to bring this lawsuit and do so based on a record "devoid of any evidence of criminal enforcement action against a small-scale owner of a FRT device who is otherwise law-abiding."[68] The Court disagrees that these arguments militate against issuing an injunction. Instead, the Court concludes that Plaintiffs have carried their burden to show that irreparable harms exist at this stage.

i. Credible Threat of Prosecution

First, Plaintiffs face a credible threat of criminal prosecution. As explained at the TRO stage, Plaintiffs place themselves in potential jeopardy by bringing this challenge to the ATF's regulation of FRTs.[69] *Mock*, 2023 WL 6457920, at *8. Defendants' recent enforcement activity only validates those fears. Armed federal agents visited Plaintiff Carey at his home, prompting

---

[65] Pls.' Mot. for Prelim. Inj. 12–15, ECF. No. 22.
[66] *Id.*
[67] Defs.' Resp. to Pls.' Mot. for TRO 8, ECF No. 32; Defs.' Opp. to Pls.' Mot. for Prelim. Inj. 15–18, ECF No. 39.
[68] *Id.* at 16.
[69] Op. & Order, ECF No. 36.

him to surrender his FRTs to avoid prosecution.[70] Other individual FRT owners have experienced similar enforcement activities, such as seizures and search warrants.[71] And as early as the TRO stage, Defendants were prosecuting at least three individuals.[72] Plaintiffs and these other FRT owners share an important commonality: they are all engaging in conduct proscribed by the ATF's interpretation of "machinegun." That the ATF has primarily targeted large sellers and distributors[73] does not obviate the existence of real, non-moribund enforcement threats individual FRT owners also face. Combined with the amount of recent enforcement activity and Defendants repeated refusals to disavow taking any action against Plaintiffs during this lawsuit, the Court agrees that a credible threat of prosecution exists.

Additionally, Defendants argue that "[t]he lengthy delay between ATF's determination and Plaintiff's action . . . demonstrates a lack of irreparable harm."[74] But there are at least two problems with this argument. First, Defendants ignore that the case they rely on—*Opulent Life Church v. City of Holy Springs*—considered and *rejected* the lengthy delay argument. 697 F.3d 279, 297 (5th Cir. 2012). Indeed, the Fifth Circuit explained that a court must consider the particular facts before it. *Id.* (concluding that, "[w]hether frivolous or not," the argument that plaintiff's "'long litigation delay' suggests it is not suffering irreparable harm" is "unconvincing on these facts"). Second, the Fifth Circuit emphasized that "[t]he loss of [constitutionally protected] freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Id.* at 295 (cleaned up). This is true even if the right at issue is statutory. *See id.* ("This principle applies with equal force to the violation of RLUIPA rights because RLUIPA enforces First Amendment freedoms.").

---

[70] Pls.' Compl. 3, ECF No. 1.
[71] *Id.* at 11–12.
[72] Pls.' Reply in Support of Mot. for TRO 5, 9 n.2, ECF No. 33.
[73] Defs.' Opp. to Pls.' Mot. for Prelim. Inj. 13, ECF No. 39.
[74] *Id.* at 16.

Reviewing the facts at issue in this case, the regularity of enforcement activity concerning FRTs—including against small-scale targets—and Defendants' refusal to disavow enforcement while this litigation is pending weighs in favor of finding any delays "unconvincing on these facts." *Id.* Additionally, the APA statutorily broadly protects against agency action "contrary to constitutional right, power, privilege, or immunity" or "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(B)–(C). Given that these protections are cumulative under § 706(A)'s arbitrary and capriciousness standard "govern[ing] review of *all* proceedings that are subject to challenge under the APA," *Menkes*, 637 F.3d at 330), Defendants' use of *Opulent Life Church* here is unavailing.

Finding that Plaintiffs face a credible threat of civil or criminal prosecution for possession of FRTs, the Court concludes—just as it did at the TRO stage—that this constitutes more than a *de minimis* harm justifying the need for equitable protection until a full decision on the merits is rendered. Plaintiffs need not wait for Defendants to bring an actual prosecution to vindicate their rights.

### ii. Economic Compliance Costs

Second, Plaintiffs risk pecuniary compliance costs. These costs stem from the Hobson's choice Plaintiffs still face: continue to exercise ownership and constitutionally protected freedoms while risking federal prosecution *or* forfeit those freedoms to avoid civil and criminal consequences. Without immediate relief, Plaintiffs will continue to suffer under the illusion that an actual choice exists due to Defendants' refusal to disavow prosecution during this lawsuit.

Compliance with an impermissible or illegal interpretation of the law carries the potential for economic costs. *Texas v. EPA*, 829 F.3d at 433 ("Indeed, 'complying with a regulation later held invalid almost always produces the irreparable harm of nonrecoverable compliance costs.'"

(citation omitted)). Threats that lead to an individual surrendering FRTs—as was the case for Plaintiff Carey—often lack compensation after the fact for the deprived use and enjoyment of the surrendered weapons (assuming the weapons are even returned). *See VanDerStok v. Garland*, 625 F.Supp.3d 570, 584 (N.D. Tex. Sept. 2, 2022) (explaining that "compliance costs are 'likely unrecoverable,' usually 'because federal agencies generally enjoy sovereign immunity for any monetary damages'") (quoting *Texas v. EPA*, 829 F.3d at 433)). Because Defendants in this case are entitled to sovereign immunity, and therefore not liable for damages, any economic injuries to Plaintiffs likely cannot be recovered.

Likewise, compliance can also cause non-pecuniary harms and need not be financial in nature. Even "alleged" deprivations of constitutional or procedural rights may justify injunctive relief. *See, e.g.*, *Opulent Life Church*, 697 F.3d at 294–97 (finding irreparable harm where plaintiffs "alleged" violations of constitutional rights on grounds that "[t]he loss of [constitutional] freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury") (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)); *see also Louisiana v. Horseracing Integrity & Safety Auth. Inc.*, 617 F. Supp. 3d 478, 500 (W.D. La. July 26, 2022) (finding irreparable harm where plaintiffs alleged the government exceeded its statutory authority and violated the APA).

Plaintiffs' Complaint alleges that deprivations of both their constitutional and ownership rights hang in the balance. For instance, Plaintiffs' use and enjoyment of FRTs is "chilled . . . by virtue of Defendants' impermissible interpretation of law."[75] Defendants did not sufficiently address this point at the TRO stage and once again fail to do so at this stage. According to Defendants, "there is no irreparable harm from a hypothetical seizure of Plaintiffs' property"

---

[75] Pls.' Reply in Support of Mot. for TRO 7, ECF No. 33.

since "[a]ny seized property could be returned via a forfeiture action or some other proceeding."[76] But this argument completely ignores that any seizure or surrender under duress would deprive Plaintiffs of the use and enjoyment of their property. *See VanDerStok*, 625 F. Supp at 584. And, relatedly, Defendants' enforcement activity also chills Plaintiffs from purchasing—and therefore exercising the use and enjoyment of—additional FRTs which the Court preliminarily determines are lawful weapons.[77] The empty guarantee Defendants reiterate—that "ATF has no plans to seize Plaintiffs' property in the *immediate future*"— provides little, if any, reassurance.[78]

But therein lies the problem. Plaintiffs face potential pressure to comply with a regulation that is likely unlawful due to ATF's arbitrary and capricious interpretation of "machineguns." The Court is unpersuaded by Defendants' continued assertion that there are no current plans to seize Plaintiffs' property in the immediate future.[79] As explained above, without disavowing that these plans will not change during this lawsuit, Plaintiffs face endemic uncertainty and pressure to comply with Defendants' interpretation of the definition to avoid prosecution. Such uncertainty and pressure chill constitutional and ownership rights. A plaintiff's purported choice to comply—or else—with a government dictate adequately establishes irreparable harm when it leads to the chilling of rights, such as giving up property or refraining from purchasing additional FRTs under duress.

Simply put, Plaintiffs face irreparable injury in whichever course they choose—suffer injury by complying with a regulation they allege Defendants lack the authority to enforce *or* risk civil and criminal enforcement by not complying. For this reason, and because Defendants'

---

[76] Defs.' Opp. to Pls.' Mot. for Prelim. Inj. 17, ECF No. 39.
[77] Pls.' Mot. for Prelim. Inj. 15, ECF No. 22.
[78] Defs.' Resp. to Pls.' Mot. for TRO 8, ECF No. 32 (emphasis added); *see also* Defs.' Opp. to Pls.' Mot for Prelim. Inj. 12, ECF No. 39.
[79] *Id.*

contrary arguments overlook clear Fifth Circuit precedent identifying compliance costs as irreparable harms, the Court is satisfied that Plaintiffs' alleged injuries are based on a credible threat of prosecution, placing them in immediate danger of irreparable injury.

*    *    *    *    *

Accordingly, the Court concludes that Plaintiffs have demonstrated a substantial threat of irreparable harm at this stage and are entitled to injunctive relief.

### C.  Balance of Hardships and the Public Interest

The final factor the Court must weigh is the balance of the equities and the public interest, which "merge" when the Government is a party. *Nken*, 556 U.S. at 435. A court must "pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). At the same time, a court must weigh any purported injuries the enjoined party may experience against the strong likelihood that they will not succeed on the merits. *See Freedom From Religion Found., Inc. v. Mack*, 4 F.4th 306, 316 (5th Cir. 2021) (explaining that "any injury to [the enjoined party] is outweighed by [a] strong likelihood of success on the merits" by the requesting party).

Both parties offer interests that the Court now weighs. On one side, Plaintiffs assert interests in "lawfully exercising freedoms they have enjoyed for several years."[80] As law-abiding citizens, this includes the ability possess firearms that are not machineguns.[81] Absent protection from an injunction, Plaintiffs contend that they would suffer compliance costs from any civil and criminal enforcement actions, in addition to experiencing a chilling effect on the exercise of their freedoms going forward.[82] On the other side, Defendants reiterate that their interests in retaining

---

[80] Pls.' Mot. for Prelim. Inj. 16, ECF No. 22.
[81] *Id.* at 12–16.
[82] *Id.*

37

prosecutorial discretion and protecting public safety tilt the equitable scale in their direction.[83] Weighing these interests, the Court finds that, on balance, the equities favor Plaintiffs just as they did at the TRO stage.

Defendants' primary argument as to why the balance of the equities favors them is that "public safety would undoubtedly be jeopardized by removing restrictions on the manufacturing, sale, and possession of these deadly devices."[84] An injunction "would cripple the government's ability to take virtually any enforcement action with regard to a FRT device anywhere in the United States."[85] This particular harm to Defendants is purportedly grounded in their "strong and continuing interest in being able to enforce [the] laws restricting the possession and sale of machineguns where the circumstances warrant action in the government's law enforcement discretion."[86] And given this interest, Defendants fear that "[a] broad injunction would undermine ATF's ability to respond in real time to serious future threats implicating FRTs."[87] But Defendants do not dispute that Plaintiffs are law-abiding citizens who wish to engage in the lawful conduct of possessing specific firearms—conduct that was lawful until the ATF said otherwise. Instead, Defendants argue that "[e]ven if . . . presently true" that Plaintiffs "are law-abiding and will not misuse their weapons," Plaintiffs "cannot guarantee that will inevitably be the case and that their ownership of such devices will not, in the future, create public safety risks that would warrant action by the government."[88]

Yet just as the government cannot prosecute based on what a person *might* do, the government similarly cannot seriously argue there is a threat to public safety based on what a

---

[83] Defs.' Opp. to Mot. for Prelim. Inj. 18–22, ECF No. 39; Defs.' Resp. to Mot. for TRO 6, 9–10, ECF No. 32.
[84] *Id.* at 18.
[85] *Id.*
[86] *Id.* at 19.
[87] *Id.*
[88] *Id.*

person *might* do without some justification. Just as our system presumes a criminal defendant is innocent until proven guilty, Plaintiffs do not need to "guarantee they will not in the future violate other gun laws."[89] Their record as law-abiding citizens who have possessed FRTs already without incident differentiates them from individuals who create the very public safety risks Defendants fear. That is why NAGR, for instance, "avers that it only seeks to vindicate the rights of its members who are lawfully able to possess firearms in this matter."[90]

Notably, Defendants provide no specific causal arguments explaining how the public would be harmed by an injunction. Such arguments would point to facts connecting the public safety interest to FRTs generally and Plaintiffs specifically. Despite citing concerns about mass shootings in earlier briefing, Defendants fail to identify a tragic incident that involved an FRT.[91] Instead, Defendants offer nothing more than conclusory assertions about "public safety." And these assertions are grounded entirely in the conclusion the FRTs are machineguns. Defendants supply no independent reasons showing a threat to public safety. Given that the Court has already concluded Plaintiffs are likely to succeed on the merits that FRTs are *not* machineguns, that machineguns are a threat to public safety is a *non sequitur*. Without more, all Defendants have left to stand on is a vague assertion of "public safety." Such a general public safety concern simply cannot serve as justification for enforcement of an illegal interpretation of a criminal statute.

Yet perhaps most damaging to Defendants are their irreconcilable positions. On the one hand, Defendants generally argue that possession of FRTs by anyone—including possession by *these* Plaintiffs (who have no criminal history)—poses a threat to public safety. But, on the other hand, Defendants aver that they have no *current* plans to enforce the ATF Rule against these

---

[89] *Id.*
[90] Pls.' Mot. for Prelim. Inj. 16, ECF No. 22.
[91] Defs. Resp. to Mot. for TRO 10, ECF No. 32.

Plaintiffs due to the *historic* enforcement practices targeting large sellers. Even if Defendants'
representation is true that they have primarily prosecuted large sellers in the past, how can they
now claim that the threat to public safety is so grave because of ownership *by these specific law-
abiding Plaintiffs* at the same time there are no current plans to prosecute any of them?
Moreover, if the only targets of Defendants' enforcement actions are against are those who
violate *other gun laws*, then the prohibition on FRTs does nothing to protect the public. It
follows, then, that FRT ownership is neither a necessary nor sufficient condition for protecting
public safety. Rather, FRT ownership merely gives rise to an extra charge that Defendants tack
on *after* first determining that a given individual is a danger for other reasons (that is, violating
other gun laws). This is hardly sufficient to sway the balance of harms in Defendants' favor.

The Court is unable to reconcile these contradictions. Taking Defendants' continued
representation that they have no current plans to prosecute as true, this dissonance suggests a
lack of substance underlying the proffered public safety concern. Defendants offer no argument
specifically linking how public safety would be harmed by the Court granting an injunction to
enjoin enforcement actions for ownership (and not some other unlawful use of the FRT) with
*these* Plaintiffs. And if Defendants indeed have no current plans to prosecute, the Court
concludes that they should not seriously object to the issuance of an injunction memorializing the
status quo: no prosecution for FRT possession or ownership by these Plaintiffs because no
concrete threat to public safety exists.[92] Thus, the Court finds that Defendants would experience
little, if any, harm by issuance of an injunction during the pendency of this litigation.

---

[92] Defendants argue that the status quo is instead the "classify[cation] of FRTs as machineguns for years."
Defs.' Opp. to Mot. for Prelim. Inj. 15, ECF No. 39. The Court disagrees with this characterization.
Although true that FRTs have been classified by the ATF as machineguns since at least July 2021,
Defendants' statements regarding no enforcement plans against these Plaintiffs constitutes the operable
status quo. This is supported by Defendants' assertions that they have focused enforcement actions
against large-scale manufacturers and distributors. *Id.* at 13, 19.

In contrast, Plaintiffs face the very real potential to experience harm if an injunction is not granted. These harms include a credible threat of civil or criminal prosecution should Defendants change their mind, compliance costs, and a chilling of constitutional and ownership rights. Defendants contentions that Plaintiffs asserted injuries are hypothetical and that any they would have an opportunity to challenge future injuries once any enforcement action occurs falls flat.[93] On balance, the equities and public interest weigh in favor of Plaintiffs.[94] Defendants have not identified any concrete harms to counterbalance the real harms facing Plaintiffs. And any injury to Defendants is further outweighed by Plaintiffs' strong likelihood of success on the merits of its APA statutory interpretation claim. *Mack*, 4 F.4th at 316. Notably, this injury is further mitigated by the Court's cabining of injunctive relief to only the parties in this lawsuit.[95]

*     *     *     *     *

In sum, Plaintiffs have successfully demonstrated to the Court that they are entitled to injunctive relief. Having considered the arguments, evidence, and law, the Court holds that the relevant factors weigh in favor of **GRANTING** the preliminary injunction.

## V.     SCOPE OF THE INJUNCTION

Having determined that Plaintiffs carried their burden showing that an injunction is warranted in this situation, the Court must next decide how to provide those parties with

---

[93] *See* Defs. Opp. to Pls.' Mot. for Prelim. Inj. 18, ECF No. 39.

[94] The Court previously noted that there is also an interest in ensuring that the government adheres to its constitutional and statutory obligations. *Polymer80, Inc. v. Garland*, 4:23-cv-00029-O, 2023 WL 3605430, at *11 (N.D. Tex. Mar. 19, 2023). Indeed, there is undoubtedly "an overriding public interest [in] . . . an agency's faithful adherence to its statutory mandate." *Jacksonville Port Auth. v. Adams*, 556 F.2d 52, 59 (D.C. Cir. 1977). And "[t]he public interest is served when administrative agencies comply with their obligations under the APA." *N. Mariana Islands v. United States*, 686 F. Supp. 2d 7, 21 (D.D.C. 2009).

[95] Defendants contend that the "calculus" at this stage is "radically different where Plaintiffs seek an injunction broader than at the TRO stage." Defs.' Opp. to Mot. for Prelim. Inj. 19, ECF No. 39. This is because the injunctions Plaintiffs seek "ask[s] the Court to enjoin not only enforcement actions related to *their possession* of FRTS, but *all* potential enforcement actions against anyone." *Id.* However, this concern fails to materialize in light of the Court's injunction just to these Plaintiffs.

appropriate relief. When ordering equitable relief, the Court is obligated to state "specifically" and "in reasonable detail . . . the act or acts restrained or required" under the injunction. FED. R. CIV. P. 65(d)(1)(b)–(c). The scope of injunctive relief is "dictated by the extent of the violation established." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). An injunction "should be crafted to provide 'complete relief to the plaintiffs.'" *Mock v. Garland*, F.4th 563, 587 (5th Cir. 2023) (quoting *Yamasaki*, 442 U.S. at 702). At the same time, the injunction "should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Madsen*, 512 U.S. at 765 (cleaned up). And it must be tailored to "redress the plaintiff's particular injury." *Gill*, 138 S. Ct. at 1934 (citation omitted). Under appropriate circumstances, however, the demand for "complete" relief may necessitate that injunctive redress benefit many claimants of a common legal right in order to prevent "more confusion" and "multiplicity of suits" in the courts. *Mock*, 75 F.4th at 587 (quoting *Feds for Med. Freedom*, 63 F.4th at 388).

In keeping with these obligations, the Court tailors the scope of the injunction with careful attention fully redress the violation established and to also avoid upsetting the competing interests. Thus, the Court **ENJOINS** Defendants from the following actions against the Individual Plaintiffs and their immediate families, the Organizational Plaintiffs and their members, and the downstream customers of any commercial member of an Organizational Plaintiff:

    **(1)**    Initiating or pursuing criminal prosecutions for possession of FRTs;

    **(2)**    Initiating or pursuing civil proceedings for possessing, selling, or manufacturing FRTs based on the claim that FRTs are machineguns;

    **(3)**    Initiating or pursuing criminal prosecutions for representing to the public of potential buyers and sellers that FRTs are not machineguns;

    **(4)**    Initiating or pursuing civil actions for representing to the public of potential buyers and sellers that FRTs are not machineguns;

23-11138.1329

**(5)**     Sending "Notice Letters" or other similar communications stating that FRTs are machineguns;

**(6)**     Requesting "voluntarily" surrender of FRTs to the government based on the claim that FRTs are machineguns;

**(7)**     Destroying any previously surrendered or seized FRTs; and

**(8)**     Otherwise interfering in the possession, sale, manufacture, transfer, or exchange of FRTs based on the claim that FRTs are machineguns.

The implications of this preliminary injunction's scope bear further explanation. First, the Court declines Plaintiffs' invitation to extend the scope of the injunctive relief nationwide based on recent Fifth Circuit guidance. *See Mock*, 75 F.4th at 587. As such, this injunction covers only the parties in this lawsuit. These parties are protected from civil or criminal enforcement of the challenged rule until the Court renders a final decision on the merits. Parties beyond this lawsuit are *not* covered. Crucially, this Court's award of injunctive relief does not offer Plaintiffs blanket immunity from prosecution for all firearm-related offenses. Plaintiffs may still be prosecuted for violating otherwise lawful provisions of the NFA and GCA, as well as other lawful firearms regulations. This relief should alleviate Plaintiffs' demonstrable injuries without unnecessarily burdening Defendants.

Finally, respect for coordinate courts also guides the scope of the relief awarded here. *See W. Gulf Mar. Ass'n v. ILA Deep Sea Loc. 24*, 751 F.2d 721, 729 (5th Cir. 1985) (holding that district courts should "avoid rulings which may trench upon the authority of sister courts"). Although this Court reaches a different conclusion than the E.D.N.Y. Decision, Fifth Circuit precedent is clear regarding overlapping decisions from coordinate courts. To the extent that Rare Breed Triggers, LLC, Rare Breed Firearms, LLC, or any of their agents, officers, and employees (the "Rare Breed Parties") are members of any Organizational Plaintiff, the Court's injunction is further narrowed by carving out the Rare Breed Parties. Other manufacturers or

sellers who are members of an Organizational Plaintiff may continue to manufacture, sell, exchange, transfer, and/or market FRTs under this injunction. With these limitations in place, the Court finds that the aforementioned relief appropriately narrows the scope of this extraordinary remedy in order to maintain the status quo without overly burdening Defendants and without trenching upon the E.D.N.Y. Decision.

## VI.    CONCLUSION

For the foregoing reasons, the Court **GRANTS** Plaintiffs' Motion for Preliminary Injunction (ECF No. 22) to preserve the status quo until a final decision on the merits is rendered. The Court **ORDERS** that Defendants—along with their respective officers, agents, servants, and employees—are hereby **ENJOINED** from implementing or enforcing against the parties in this lawsuit, in any civil or criminal manner described below, the ATF's expanded definition of "machinegun" that this Court has determined is likely unlawful:

    **(1)**    Initiating or pursuing criminal prosecutions for possession of FRTs;

    **(2)**    Initiating or pursuing civil proceedings for possessing, selling, or manufacturing FRTs based on the claim that FRTs are machineguns;

    **(3)**    Initiating or pursuing criminal prosecutions for representing to the public of potential buyers and sellers that FRTs are not machineguns;

    **(4)**    Initiating or pursuing civil actions for representing to the public of potential buyers and sellers that FRTs are not machineguns;

    **(5)**    Sending "Notice Letters" or other similar communications stating that FRTs are machineguns;

    **(6)**    Requesting "voluntarily" surrender of FRTs to the government based on the claim that FRTs are machineguns;

    **(7)**    Destroying any previously surrendered or seized FRTs; and

    **(8)**    Otherwise interfering in the possession, sale, manufacture, transfer, or exchange of FRTs based on the claim that FRTs are machineguns.

This injunction covers the Individual Plaintiffs and their families, the Organizational Plaintiffs and their members, and the downstream customers of any commercial member of an Organizational Plaintiff. Furthermore, this injunctive relief shall not extend to any individual prohibited from possessing firearms under 18 U.S.C. § 922(g). For those parties covered by this injunction, the relief shall take effect immediately and remain in effect pending the final disposition of this lawsuit. *See* 5 U.S.C. § 705. Finally, the Court waives the security requirement of Federal Rule of Civil Procedure 65(c).[96] *See Kaepa, Inc. v. Achilles Corp.*, 76 F.3d 624, 628 (5th Cir. 1996) (holding that the district court has discretion to waive the security requirement).

**SO ORDERED** this **7th day** of **October, 2023**.


_____
Reed O'Connor
**UNITED STATES DISTRICT JUDGE**

---

[96] Because neither party raises the security requirement in Rule 65(c), no security is ordered. *See* FED. R. CIV. P. 65(c).

23-11138.1332