No. 23-11138

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

_____

NATIONAL ASSOCIATION FOR GUN RIGHTS, INC.; TEXAS GUN RIGHTS, INC.; PATRICK CAREY; JAMES WHEELER; & TRAVIS SPEEGLE,

*Plaintiffs-Appellees,*

*v.*

MERRICK GARLAND, U.S. ATTORNEY GENERAL; UNITED STATES DEPARTMENT OF JUSTICE; STEVEN DETTELBACH, IN HIS OFFICIAL CAPACITY AS DIRECTOR OF THE BUREAU OF ALCOHOL, TOBACCO, FIREARMS, AND EXPLOSIVES; BUREAU OF ALCOHOL, TOBACCO, FIREARMS, AND EXPLOSIVES,

*Defendants-Appellants,*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
CASE NO. 4:23-CV-00830

_____

## APPELLEES' BRIEF

_____

WHITNEY DAVIS
Eggleston King Davis, L.L.P.
102 Houston Avenue
Suite 300
Weatherford, TX 76086

GLENN D. BELLAMY
Wood Herron & Evans, L.L.P.
600 Vine Street
Suite 2800
Cincinnati, OH 45202

DAVID WARRINGTON
GARY M. LAWKOWSKI
Dhillon Law Group, Inc.
2121 Eisenhower Avenue, Suite 608
Alexandria, VA 22314

# CERTIFICATE OF INTERESTED PERSONS

Appellees certify that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal:

**Plaintiffs/Appellees**

1. National Association for Gun Rights, Inc. and its members, including, without limitation: Rare Breed Triggers, LLC; Lawrence DeMonico; Cole Leleux; and Kevin Maxwell.
2. Texas Gun Rights, Inc. and its members;
3. Patrick Carey;
4. James Wheeler;
5. Travis Speegle.

**Counsel for Plaintiffs/Appellees**

WHITNEY DAVIS
JULIAN E. WHITLEY
Eggleston King Davis, L.L.P.
102 Houston Avenue
Suite 300
Weatherford, TX 76086

BENJAMIN SLAY

DAVID WARRINGTON
GARY M. LAWKOWSKI
JONATHAN M. SHAW
Dhillon Law Group, Inc.
2121 Eisenhower Avenue, Suite 608
Alexandria, VA 22314

MICHAEL A. COLUMBO
Dhillon Law Group, Inc.

i

177 Post Street
Suite 700
San Francisco, CA 94108

GLENN D. BELLAMY
Wood Herron & Evans, L.L.P.
600 Vine Street
Suite 2800
Cincinnati, OH 45202

*s/David A. Warrington*
David A. Warrington

## STATEMENT REGARDING ORAL ARGUMENT

Appellees respectfully join in Appellants' request for oral argument.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS .......................................................... i

STATEMENT REGARDING ORAL ARGUMENT ............................................. iii

TABLE OF CONTENTS................................................................................ iv

TABLE OF AUTHORITIES .......................................................................... vi

INTRODUCTION ........................................................................................1

SUMMARY OF ARGUMENT ........................................................................3

STANDARD OF REVIEW ............................................................................8

ARGUMENT ...............................................................................................8

    I.   Appellees Have Standing.................................................................8

        A.  The Individual Appellees Face a Credible Threat of Prosecution ...........8

        B.  The Associational Appellees Have Standing .........................................12

    II.  Appellees Are Likely to Succeed on the Merits Because Forced Reset
        Triggers Are Not Machineguns ......................................................17

        A.  How Triggers Operate ...........................................................................17

        B.  FRTs Do Not Fire Multiple Rounds with a Single Function of the
            Trigger ....................................................................................................18

            i.   "Single Function of the Trigger" is Not "Single Pull of the
                Trigger" .........................................................................................21

            ii.  Appellants' "Zip-Tie" Test Is Irrelevant to the Statutory
                Definition Provided by Congress .....................................................23

            iii.  FRTs Are Distinguishable from Mechanical Bump Stocks Like
                the Akins Accelerator ......................................................................24

      *iv.*  Appellants' Approach to the Definition of "Machinegun" Has Repeatedly Changed ........................................................................26

  B.  If the Statute is Ambiguous, the Rule of Lenity Applies ........................29

III. The District Court Correctly Found that Appellees Face a Significant Risk of Irreparable Harm .................................................................................33

IV. The Balance of Hardships and the Public Interest Support the Preliminary Injunction ..................................................................................38

V. There is No Reason to Narrow the Preliminary Injunction ............................44

  A.  The Preliminary Injunction Appropriately Provided Relief to Members of the Associational Appellees ..................................................44

  B.  Extending the Preliminary Injunction Beyond Possession is Necessary to Provide Full Relief to Appellees .......................................44

  C.  Appellants' Argument Against Enjoining Criminal Prosecutions Would Allow the Government to Arrest and Prosecute Citizens for Actions that Are Not Crimes ..................................................................46

CONCLUSION ...........................................................................................................48

CERTIFICATE OF SERVICE ..................................................................................50

CERTIFICATE OF COMPLIANCE .........................................................................51

# TABLE OF AUTHORITIES

## Cases

*Abbott Laboratories v. Gardner*,
　387 U.S. 136 (1967) ............................................................48

*Bell v. United States*,
　349 U.S. 81 (1955) ..............................................................30

*Bevis v. City of Naperville, Illinois*,
　657 F. Supp. 3d 1052 (N.D. Ill. 2023) ................................14

*Canal Auth. v. Callaway*,
　489 F.2d 567 (5th Cir. 1974) ..............................................33

*Cargill v. Garland*,
　57 F.4th 447 (5th Cir.), *cert. granted*, 144 S. Ct. 374 (2023) ...................... passim

*Casas v. Aduddell*,
　404 Fed. Appx. 879 (5th Cir. 2010) ....................................40

*Deaver v. Seymour*,
　822 F.2d 66 (D.C. Cir. 1987) ..............................................46

*Elrod v. Burns*,
　427 U.S. 347 (1976) ............................................................37

*Enter. Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana*,
　762 F.2d 464 (5th Cir. 1985) ..............................................33

*Epic Systems Corp. v. Lewis*,
　584 U.S. 497 (2018) ............................................................22

*Fed. Election Comm'n v. Cruz*,
　596 U.S. 289 (2022) ............................................................47

*Ford v. Potter*,
　354 Fed. App'x 28 (5th Cir. 2009) ......................................40

*Franciscan Alliance, Inc. v. Becerra*,
   47 F.4th 368 (5th Cir. 2022) ...................................................... 3, 11, 47

*Hodgson v. First Fed. Sav.& L. Ass'n of Broward Cty.*,
   455 F.2d 818 (5th Cir. 1972) ...................................................... 39

*Hunt v. Washington State Apple Advertising Comm'n*,
   432 U.S. 333 (1977) ...................................................................... 12

*In re Gabriella A.*,
   319 Conn. 775 (2015) .....................................................................6

*Jacksonville Port Auth. v. Adams*,
   556 F.2d 52 (D.C. Cir. 1977) ...................................................... 40

*Kirshner v. Uniden Corp.*,
   842 F.2d 1074 (9th Cir. 1988) ..................................................... 40

*League of Women Voters of United States v. Newby*,
   838 F.3d 1 (D.C. Cir. 2016) ......................................................... 39

*Louisiana v. Biden*,
   45 F.4th 841 (5th Cir. 2022) ..........................................................8

*Magwood v. Patterson*,
   561 U.S. 320 (2010) ...................................................................... 22

*Midwest Fence Corp. v. United States Dep't of Transp.*,
   840 F.3d 932 (7th Cir. 2016) ....................................................... 40

*Missouri v. Biden*,
   83 F.4th 350 (5th Cir.), *cert. granted*, 144 S. Ct. 7 (2023) ...................8

*Mock v. Garland*,
   75 F.4th 563 (5th Cir. 2023) ....................................................... 44

*Nat'l Assoc. for Gun Rights v. Grisham*,
   No. 1:23-cv-00771-DHU-LF, 2023 WL 5951940 (D.N.M. Sept. 13, 2023) ....... 14

*Nat'l Press Photographers Ass'n v. McCraw*,
   90 F.4th 770 (5th Cir. 2024) ..........................................................9

*Nat'l Ass'n for Gun Rts., Inc. v. Garland*,
  No. 4:23-CV-00830-O, 2023 WL 6613080 (N.D. Tex. Oct. 7, 2023) ................... 1

*O.A. v. Trump*,
  404 F. Supp. 3d 109 (D.D.C. 2019) ...................................................... 47

*Opulent Life Church v. City of Holy Springs,*
  697 F.3d 279 (5th Cir. 2012) ............................................................. 37

*Shaughnessy v. Pedreiro*,
  349 U.S. 48 (1955) .......................................................................... 48

*Speech First, Inc. v. Fenves*,
  979 F.3d 319 (5th Cir. 2020) .......................................................... 9, 10

*Stolt-Nielsen, S.A. v. United States*,
  442 F.3d 177 (3d Cir. 2006) .............................................................. 46

*Students for Fair Admissions, Inc. v. President and Fellows of Harvard College,*
  600 U.S. 181 (2023) ............................................................... 4, 12, 15

*Susan B. Anthony List v. Driehaus*,
  573 U.S. 149 (2014) .......................................................................... 9

*Texas Gun Rights, Inc. v. Bureau of Alcohol, Tobacco, Firearms and Explosives*,
  No. 4:23-cv-00578-O, 2023 WL 8352316 (N.D. Tex. Oct. 4, 2023) ................... 14

*Texas v. Biden*,
  10 F.4th 538 (5th Cir. 2021) ............................................................. 39

*Texas v. EPA*,
  829 F.3d 405 (5th Cir. 2016) ............................................................. 33

*Theriot v. Parish of Jefferson*,
  185 F.3d 477 (5th Cir.1999) .............................................................. 40

*U.S. v. Augusto*,
  3:22-cr-30025 (D. Mass. Sept. 1, 2022) ................................................ 10

*U.S. v. Berrios-Aquino*,
  3:22-cr-473 (D.P.R. Apr. 20, 2023) ..................................................... 10

*U.S. v. Bruggeman*,
  2:22-CR-185 (S.D. Tex. Nov. 9, 2022) ..............................................10

*U.S. v. Santos*,
  553 US 507 (2008)...............................................................................29

*United States v. Rare Breed Triggers, LLC*, et al.,
  No. 23-cv-369 (NRM) (RML), 2023 WL 5689770 (E.D.N.Y. Aug. 1, 2023).....28

*United States v. Wiltberger*,
  5 Wheat. 76 (1820) .............................................................................29

*Vanderstok v. Garland*,
  625 F. Supp.3d 570 (N.D. Tex. 2022) ........................................ 33, 34

*Viasat, Inc. v. FCC*,
  47 F.4th 769 (D.C. Cir. 2022)............................................................15

*Wages and White Lion Investments, L.L.C. v. United States*,
  16 F.4th 1130 (5th Cir. 2021) .................................................... 33, 39

*Watson v. Rhode Island Ins. Co.*,
  196 F.2d 254 (5th Cir. 1952) .............................................................41

*Zimmerman v. City of Austin*,
  881 F. 3d 378 (5th Cir. 2022) ..............................................................9

**Statutes**

26 U.S.C. § 5845(b) .............................................................................22

5 U.S.C. § 702 ......................................................................................48

**Regulations**

27 C.F.R. § 479.11 ....................................................................... 27, 28

*Final Rule: Bump-Stock-Type Devices,* Bureau of Alcohol, Tobacco, Firearms, and
  Explosives, 83 Fed. Reg. 66,514 (2018)..............................................26

## INTRODUCTION

The crux of this case is that the executive branch has overstepped by enacting criminal prohibitions that exceed its legislatively granted authority.

This case concerns Appellants' misclassification of certain forced-reset triggers ("FRTs") as "machineguns." An FRT is a device that forcibly returns a firearm's trigger to its reset state. ROA.1289. On October 2, 2023, the district court held an evidentiary hearing. *Nat'l Ass'n for Gun Rts., Inc. v. Garland*, No. 4:23-CV-00830-O, 2023 WL 6613080, at *5 (N.D. Tex. Oct. 7, 2023). "[T]he hearing made clear that there are no factual disputes regarding how FRTs work." *Id.* Thus, as the district court found, it is undisputed that:

- For each and every round fired, the trigger on a weapon equipped with an FRT moves forward into its reset state and is depressed to release the hammer from its sear surface. ROA.1289-1290, 2151:16-1252:17, 2239:11-18, 2241:7-16.

- The trigger in a firearm equipped with a forced reset trigger must reset after every round that is fired. ROA.1289-1290, 2241:17-2242:24.

- If the shooter attempts to overcome the reset and holds the trigger in a fully depressed position so that the trigger cannot reset, the weapon will malfunction. ROA.2243:10-21.

Based on these factual findings, the district court concluded that Appellees were likely to succeed on the merits of their claim.

In response to Appellants' request for an emergency stay, this Court ruled "[u]nder the *Cargill* plurality's reasoning … that the FRT trigger must reset means that the weapon does not shoot by a '*single* function of the trigger' and is thus not a

machinegun…. [Appellants] do not grapple with these undisputed factual findings by the district court to argue otherwise." Unpublished Order Denying Appellants' Motion to Stay the District Court's Preliminary Injunction Pending Appeal (Nov. 30, 2023) ("Emergency Stay Order") at 5.

They still do not. Rather than address the facts as found, Appellants claim that they have "repeatedly classified devices that operate in this fashion as machineguns" and seek to effectively discard *Cargill*'s focus on the mechanical functions of the trigger. Opening Brief for Appellants (Jan.16, 2024) ("Opening Br.") at 1. This misses the mark. Misapplying the law for a long time does not make Appellants' interpretation correct. The statute does and must override any inaccurate interpretation, particularly where, as here, the Appellants' misapplication of law has potential criminal consequences.

Over the past 20 years, ATF has repeatedly flip-flopped in its interpretation of the phrase "single function of the trigger." Indeed, in this case alone, Appellants have advanced at least *six* different interpretations of this key phrase. This is hardly a consistent history entitled to any persuasive impact.

The district court correctly applied the law to the facts. It did not abuse its discretion. The preliminary injunction should be affirmed.

## SUMMARY OF ARGUMENT

**1.** Appellees have standing.  There is no doubt that Appellees Carey, Wheeler, and Speegle ("Individual Appellees") either are currently engaging, or have expressed a concrete intention to engage, in conduct that is prohibited by Appellants' erroneous interpretation of law.  Appellees Wheeler and Speegle currently own FRTs, and Appellees Carey, Wheeler, and Speegle have all expressed an intention to purchase additional FRTs.  Appellants' interpretation is far from moribund: they continue to actively pursue enforcement actions, including civil and criminal enforcement actions.  And Appellants have not disavowed an intent to enforce their interpretation against Appellees.  Indeed, Appellants have pointedly refused to do so, stating only that they do not have an "imminent" intention to pursue enforcement against the three Individual Appellees and will provide "notice" to the court if their "imminent" intention changes.  This is at best the same sort of "prosecutorial indecision" this Court previously found sufficient to establish standing.  *See Franciscan Alliance, Inc. v. Becerra*, 47 F.4th 368, 376 (5th Cir. 2022).

All three individual Appellees are members of the National Association for Gun Rights ("NAGR") and Texas Gun Rights ("TGR") (collectively, "Associational Appellees"). NAGR and TGR are both traditional membership organizations. "Where … an organization has identified members and represents them in good faith, our cases do not require further scrutiny into how the organization operates."

*Students for Fair Admissions, Inc. v. President and Fellows of Harvard College*, 600 U.S. 181, 201 (2023) ("*SFFA*"). "The indicia of membership analysis" cited by Appellants "has no applicability in these cases." *Id*. Associational Appellees have stated that they are membership organizations and that their members own and would purchase additional FRTs. This is sufficient to establish standing.

**2.** The district court did not abuse its discretion. Rather, it correctly concluded Appellees are likely to succeed on the merits of their claim. The law defines "machinegun" as a firearm that fires multiple rounds "automatically" by a "single function of the trigger." The trigger in a firearm equipped with an FRT "functions" for each and every round fired. It moves for every round fired. It resets after every round is fired. If a shooter attempts to fire an FRT as one would fire an automatic M16 by forcefully holding the trigger at its rearmost position and not allowing it to move forward, the weapon will malfunction, not expel multiple rounds. Thus, the district court correctly concluded Appellees are likely to succeed on the merits of their claim.

Rather than contending with the facts and the law as they are, Appellants seek to effectively rewrite the statute to focus on an alleged "continuous pull" of the trigger. But this approach was directly and decisively rejected by the "persuasive" interpretation of the *Cargill* plurality. Emergency Stay Order at 4. "The statutory definition of machinegun utilizes a grammatical construction that ties the definition

4

to the movement of the trigger itself, and not the movement of a trigger finger." *Cargill v. Garland*, 57 F.4th 447, 460 (5th Cir.), *cert. granted*, 144 S. Ct. 374 (2023). Statutory "context confirms that the statute must be read from the mechanical perspective." *Id* at 461. This Court is "bound to apply that definition as written," not as Appellants might wish it to be. *Id*. And as written, FRTs are not machineguns.

Appellants seek to analogize FRTs to mechanical bump stocks, which Appellants claim are machineguns even under the plurality's opinion in *Cargill*. This overstates what this Court said in *Cargill*. This Court explicitly declined to rule on whether mechanical bump stocks are machineguns, instead noting that while they might be, the question was not before the Court. Moreover, mechanical bump stocks are distinguishable from FRTs. Mechanical bump stocks contain an internal spring that assists in actuating the trigger. FRTs do not. As with a nonmechanical bump stock, an external force must be applied by the user to cause the trigger to function (*i.e.*, actuate the trigger) each time a shot is fired.

Appellants place great emphasis on their purported long history of classifying FRT-type devices as machineguns. But this history is misleading. It ignores that Appellants have repeatedly flip-flopped on the definition of "single function of the trigger" over the past two and a half decades. Appellants determined that mechanical bump stocks—the very devices they now seek to analogize to FRTs—were *not* machineguns before later changing course. Appellants determined that non-

5

Case: 23-11138 Document: 59 Page: 16 Date Filed: 03/15/2024

mechanical bump stocks were not machineguns before, again, later changing course. Even during the course of this litigation, Appellants have offered at least *six* different definitions of the term "single function of the trigger." This game of definitional Calvinball[1] is anything but a consistent, longstanding interpretation entitled to any deference or persuasive weight.

Finally, "[i]f the statutory definition of machinegun is indeed ambiguous—not unambiguous, as the *Cargill* plurality concluded—then the rule of lenity means that ambiguity should be resolved in Plaintiffs' favor." Emergency Stay Order at 5-6. This is true even if one portion of the definition is at issue or ambiguous. *Cargill* does not require a statute to have *multiple* grievously ambiguous provisions for the rule of lenity to apply.

**3.** The district court also did not abuse its discretion when it (correctly) found that Appellees face irreparable harm in the absence of a preliminary injunction. Contrary to Appellants' claims, Appellees face a credible threat of prosecution. This presents Appellees with the Hobson's choice of either surrendering their property or risking criminal and civil prosecution. In addition, Appellees face unrecoverable

---

[1]*See In re Gabriella A.*, 319 Conn. 775, 807 n.10 (2015) (Robinson, J., dissenting) (describing Calvinball, from the comic strip "Calvin and Hobbs," as "the game that can never be played with the same rule twice," a game where "any player can change the rules at any point in the game, the score is kept without any logic or consistency, and penalties are given in any way deemed fit.").

6

economic costs associated with compliance with Appellants' inaccurate interpretation of the law and would be deprived of the use and enjoyment of FRTs but for the preliminary injunction.

**4.** Appellants offer little to offset these findings of irreparable harm. Appellants have no public interest in enforcing an illegal interpretation of law. In addition, Appellants' public interest claims are unsupported. Appellants' own representations show that the FRT ban does little independent work in protecting public safety. Appellants represent that their enforcement efforts are focused on large scale manufacturers and persons prohibited from owning firearms. But FRTs require a preexisting firearm to operate—preexisting firearms that prohibited persons are, by definition, already banned from owning. The FRT ban is not necessary to take such persons off the streets—they are already breaking other gun laws. Finally, Appellants' own statistics do not support their public safety argument. Rather, Appellants rely heavily on unsupported speculation to bolster remarkably low instances of confirmed involvement of FRTs in criminal activity.[2] The balance of equities favors the preliminary injunction.

**5.** There is also no reason to modify the district court's injunction. The Associational Appellees are not second-class parties in this case. The preliminary

---

[2] As explained below, this material was not before the district court when the preliminary injunction motion was decided and should be disregarded or stricken. *See infra* at 40.

injunction appropriately provides their members protection. In addition, one cannot possess an FRT unless he or she is able to acquire one. Appellees plainly indicated their desire to purchase FRTs, which can only be done legally if the manufacture and transfer of FRTs is also permitted. Finally, Appellants' efforts to exclude criminal prosecutions from the scope of the preliminary injunction would create the absurd result whereby Appellants may continue to threaten and pursue criminal prosecutions under an interpretation of law that has been functionally vacated. This is not and cannot be correct.

## STANDARD OF REVIEW

This Court "review[s] a preliminary injunction for abuse of discretion, reviewing findings of fact for clear error and conclusions of law *de novo*." *Missouri v. Biden*, 83 F.4th 350, 366 (5th Cir.), *cert. granted*, 144 S. Ct. 7 (2023) (quoting *Louisiana v. Biden*, 45 F.4th 841, 845 (5th Cir. 2022)).

## ARGUMENT

### I.    Appellees Have Standing

### A. The Individual Appellees Face a Credible Threat of Prosecution

A "plaintiff has suffered an injury in fact if he (1) has an 'intention to engage in a course of conduct arguably affected with a constitutional interest,' (2) his intended future conduct is 'arguably ... proscribed by [the policy in question],' and (3) 'the threat of future enforcement of the [challenged policies] is substantial.'"

*Nat'l Press Photographers Ass'n v. McCraw*, 90 F.4th 770, 782 (5th Cir. 2024) (alterations in original) (quoting *Speech First, Inc. v. Fenves*, 979 F.3d 319, 330 (5th Cir. 2020)); *see also Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 161-64 (2014).

Appellants do not and cannot dispute that, under their view of the law, the Individual Appellees' current and desired activity is proscribed and could be criminally prosecuted. The district court found "no dispute" that the Individual Appellees intend to engage in a course of conduct that is proscribed by Appellants' interpretation. ROA.1299 (citing *Zimmerman v. City of Austin*, 881 F. 3d 378, 391 (5th Cir. 2022)). Appellees Wheeler and Speagle currently own FRTs that Appellants claim are illegal. ROA.119, 120. All of the Individual Appellees would acquire additional FRTs but for Appellants' erroneous interpretation of law. ROA.115, 118, 120.

Instead, Appellants claim that the Individual Appellees lack a credible threat of prosecution. This argument is foreclosed by the facts. Appellants' own aggressive enforcement posture confirms that the threat of future enforcement is substantial. Armed agents went to Appellee Carey's house and expressly warned him that he could be prosecuted if he did not surrender his forced reset triggers or if he purchased additional forced reset triggers. *See* ROA.114-115. Appellants have brought and are continuing to pursue criminal charges against multiple individuals for possessing an

9

FRT, including in Texas.[3] Appellants have sent and are continuing to send "warning letters" threatening suspected FRT owners with criminal prosecution if they do not surrender their property. *See* ROA.1300 n.37.[4] And Appellants' own Opening Brief makes clear that they are continuing to enforce their erroneous interpretation by "*prioritizing* recovery of devices from individuals with criminal histories, from distributors, and from individuals who have purchased large quantities of forced reset triggers." Opening Br. at 47 (emphasis added). Appellants' policy is anything but moribund. *See generally Speech First*, 979 F.3d at 336-37 ("Where the policy remains non-moribund, the claim is that the policy causes self-censorship among

---

[3] *See* ROA.1918, Second Superseding Indictment at Count One, *U.S. v. Bruggeman*, 2:22-CR-185 (S.D. Tex. Nov. 9, 2022) (charging defendant with "knowingly posess[ing] a machinegun, that is, six (6) Rare Breed Triggers FRT-15"); ROA.1921-1922, Superseding Indictment at Count Two, *U.S. v. Berrios-Aquino*, 3:22-cr-473 (D.P.R. Apr. 20, 2023) (charging defendant with possession of a machinegun for possessing a Rare Breed FRT-15 trigger); ROA.1924-1925, Superseding Indictment at Count One, *U.S. v. Augusto*, 3:22-cr-30025 (D. Mass. Sept. 1, 2022) (charging defendant with possession of a machinegun in part for possessing three Rare Breed FRT15 forced reset triggers and one Tommy Triggers FRT-15-3 MD forced reset trigger).

[4] Citing Pls.' Compl. 11, ROA.26; Pls.' Br. in Support of Mot. for TRO 2, ROA.331; Pls.' Reply in Support of Mot. for Prelim. Inj. (describing declarations of Ryan Flugaur, Chris McNutt, and John Kordenbrock), ROA.1222; Declaration of Ryan Flugaur, ROA.1263; Declarations of other NAGR Members, ROA 1254-1262, 1264-1267, 1270-1273.

those who are subject to it, and the students' speech is arguably regulated by the policy, there is standing.").

Appellants claim all of this enforcement activity is not enough because they "specifically represented that [they] have no imminent plans to bring enforcement actions (such as a criminal prosecution) against the individual plaintiffs, and promised to inform the district court if that changed." Opening Br. at 47. This ethereal promise is not enough under *Franciscan Alliance, Inc. v. Becerra*, which declared that this Court has "repeatedly held that plaintiffs have standing in the face of … prosecutorial indecision." 47 F.4th at 376. Appellants do not say they will not *ever* prosecute the Individual Appellees, or even that they will not prosecute the Individual Appellees *during the course of this litigation*. They merely claim they do not intend to initiate prosecutions *today*—an intention that, by their own formulation, could change tomorrow with mere "notice" to the court.

As the district court found, this is "the exact type of 'prosecutorial indecision' that [this Court] has 'repeatedly held' as more than enough to 'have standing.'" ROA.1520 (quoting *Franciscan Alliance*, 47 F.4th at 376).

This Court previously found that "[t]he district court's reasoning was apt," thus "[s]uffice it to say that we agree that, absent a preliminary injunction, [Appellees] face a credible threat of civil or criminal prosecution for what is likely a lawful activity." Emergency Stay Order at 7. The district court and this Court

previously were correct. The Individual Appellees face a credible threat of prosecution and have standing.

## B. The Associational Appellees Have Standing

An organization has representational standing when it establishes: "'(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim nor the relief requested requires the participation of individual members in the lawsuit.'" *SFFA*, 600 U.S. at 199 (quoting *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977)). These factors are generally known as the *Hunt* factors.

All three Individual Appellees consider themselves to be members of the Associational Appellees and are viewed as such by the organizations. *See* ROA.1521 (citing Pl. Reply in Support of Mot. For Prelim. Inj., ROA.1221); *see also* Supplemental Declaration of Patrick Carey, ROA.1275; Supplemental Declaration of Travis Speegle, ROA.1276; Supplemental Declaration of J.R. Wheeler, ROA.1274; Declaration of Ryan Flugaur, ROA.1263.[5] For the reasons set forth above, the Individual Appellees have standing. In addition, at least three other

---

[5] In subsequent filings, Appellants have confirmed that at least one Individual Appellant was a NAGR member before the Complaint in this matter was filed. *See* Pl. Reply Apex, *National Association for Gun Rights, et al. v. Garland, et al.*, Case No. 4:23-cv-00830 (N.D. Tex. Nov. 3, 2023) (ECF No. 85).

members of the National Association for Gun Rights received "warning" letters from Appellants threatening criminal prosecutions if they do not turn in suspected FRTs. ROA.1521 (citing Pl. Reply in Support of Mot. For Prelim. Inj., ROA.1226; Declaration of Ryan Flugaur, ROA.1263; Declarations of other NAGR Members, ROA 1254-1262, 1264-1267, 1270-1273). The Associational Appellees' members would (and do) otherwise have standing to sue in their own right.

As the district court found, the Associational Appellees' "organizational purposes [] are clearly germane to this lawsuit challenging [Appellants's] asserted authority to classify and regulate FRTs as machineguns." ROA.1522. NAGR was formed "to preserve and defend the Second Amendment Rights of gun owners." ROA.17, ¶ 4. TGR's "mission is to protect the Second Amendment rights of its members, including protecting the liberty of individuals to defend themselves, their families, and their property, without having to first ask the government for permission and to push back on firearms-related licensing requirements." ROA.17-18, ¶ 5.

Finally, as the district court found, "because NAGR and TGR seek injunctive relief, there is not need for all of their individual members to participate in this lawsuit." ROA.1522. Thus, the Associational Appellees satisfy all three of the *Hunt* factors.

In response, Appellants advance two arguments: (1) that the Associational Appellees have failed to establish a credible threat of prosecution; and (2) that the Associational Appellees "have failed to establish they are bona fide membership organizations." Opening Br. at 16.

As set forth above, Appellants' active and aggressive enforcement posture, including their pointed refusal to disavow enforcement against either the Individual Appellees or the Association Appellees' members establishes a credible threat of prosecution.

Appellants' second argument fares little better. NAGR and TGR's ability to bring lawsuits on behalf of their members is well recognized in courts throughout the country. *See e.g., Texas Gun Rights, Inc. v. Bureau of Alcohol, Tobacco, Firearms and Explosives*, No. 4:23-cv-00578-O, 2023 WL 8352316, at *2 (N.D. Tex. Oct. 4, 2023) (finding the National Association for Gun Rights and Texas Gun Rights have associational standing to bring suit on behalf of their members); *Nat'l Assoc. for Gun Rights v. Grisham*, No. 1:23-cv-00771-DHU-LF, 2023 WL 5951940, at *2 (D.N.M. Sept. 13, 2023) (describing NAGR as an organizational plaintiff bringing suit on behalf of its members); *Bevis v. City of Naperville, Illinois*, 657 F. Supp. 3d 1052, 1061 (N.D. Ill. 2023) (finding associational standing).

The Associational Appellees are and have claimed to be traditional membership organizations. *See, e.g.*, ROA.17, ¶ 4 ("NAGR has over 3,000 members

in the Northern District of Texas"); ROA.17-18, ¶ 5. (TGR "has over 14,000 members in the Northern District of Texas.").   The Individual Appellees have confirmed that they are members of the Associational Appellees. *See* ROA.1221; *see also* Supplemental Declaration of Patrick Carey, ROA.1275; Supplemental Declaration of Travis Speegle, ROA.1276; Supplemental Declaration of J.R. Wheeler, ROA.1274; Declaration of Ryan Flugaur, ROA.1263. Neither Associational Appellee is "a state agency that concededly has no members," such as the plaintiff in *Hunt*. *SFFA*, 600 U.S. at 201.

Appellants are applying the wrong legal standard by looking for "indicia of membership." *See* Opening Br. at 16. "Where … an organization has identified members and represents them in good faith, our cases do not require further scrutiny into how the organization operates."   *SFFA*, 600 U.S. at 201. "The indicia of membership analysis …  has no applicability in these cases." *Id*.  There is no need to delve further into how Associational Appellees operate nor any additional burden on them to "provide[] information demonstrating [their] relationship to their purported members" nor vice versa. *See* Opening Br. at 17.  They are traditional membership organizations for whom no additional information is necessary.

In light of *SFFA*, Appellants' reliance on *Viasat, Inc. v. FCC* is misplaced.  47 F.4th 769 (D.C. Cir. 2022).  First, *Viasat* is an out-of-circuit decision that has not been cited in a reported decision by this Court.  Second, *Viasat* concerned review of

a Federal Communications Commission order by the D.C. Circuit. FCC decisions are directly appealable to the Circuit Court, thus the D.C. Circuit in *Viasat* was the first Article III court to review the agency's action and was acting as a finder of fact in the first instance on questions of standing. And third, *Viasat* was decided before *SFFA*. To the extent there is any conflict between the two, *SFFA* controls.

Finally, Appellants' efforts to create a heightened evidentiary burden for associational standing is particularly inappropriate at this stage in this litigation. Appellants did not contest Associational Appellees' status as membership organizations at either the Temporary Restraining Order or Preliminary Injunction phases of this litigation. *See* Response to PI, ROA.838-389. Appellees had no reason to further develop the factual record regarding indicia of membership at the trial court level at these stages because the issue was neither raised nor considered by the district court. As a result, any question of association should be judged on the standard of facial review.

Appellants cannot prevail on that standard. Appellees plainly pled that they are membership organizations and acting on behalf of their members and the district court treated them as such. *See, e.g.*, ROA.17-18, ¶¶ 4-5. The Associational Appellees have standing.

II.    **Appellees Are Likely to Succeed on the Merits Because Forced Reset Triggers Are Not Machineguns**

A. **How Triggers Operate**

Although there are many methods by which a trigger can initiate a firing sequence, the most common and well known is through the release of a hammer. ROA.1316-1317, ROA.2145:17-19 (ATF expert stating the function of an AR-15's trigger "is to release the hammer"). For example, in a semi-automatic trigger, a "trigger sear" interconnects with a notch of the hammer to retain the hammer in place. *See* ROA.1289. When a shooter is ready to fire, the shooter pulls the trigger rearward, thus shifting the trigger sear away from the hammer notch, releasing the hammer and allowing it to fall forward to strike the firing pin. *See* ROA.1289. This results in a discharge of the cartridge and the subsequent rearward travel of the "bolt carrier" through the force of that discharge. *See* ROA.1289.

In a standard semi-automatic firearm, the rearward travel of the bolt carrier depresses the hammer back down where a "disconnector" catches the top of the hammer and prevents the hammer from following the bolt carrier and falling forward again. *See* ROA.2252:11-16. The disconnector continues to hold the hammer fully rearward, preventing an additional discharge, until the trigger is allowed to be moved to its reset position by the trigger-return spring. *See* ROA.1289. Once the trigger is allowed to move forward, the trigger sear reengages the hammer as the disconnector releases the hammer, and the firing sequence is completed. *See* ROA.1289. This

17

reengagement between the trigger sear and the hammer resets the firing sequence and prepares the weapon to be fired again. Put another way, one shot is fired per function of the trigger. *See* ROA.1289.

In the case of an automatic trigger, or "machinegun" under Section 5845(b), the above sequence is significantly different when these weapons are set to automatic fire. *See* ROA.1315. Although the sequence begins with the shooter moving the trigger rearward to release the hammer from the trigger sear, it is not necessary for the trigger to reset before the hammer can fall forward again. ROA.1315. Instead, after the first shot is fired, a component called an "auto-sear" takes over the function of retaining and releasing the hammer and begins performing these actions automatically, causing the weapon to fire repeatedly without any subsequent involvement of the trigger until either (1) the ammunition is spent, (2) the firearm malfunctions, or (3) the shooter releases the trigger and thus allows the trigger sear to reengage the hammer. ROA.1315. In this scenario, although there is still only one function of the trigger, multiple shots are (or can be) fired before the trigger reengages the hammer and the sequence is completed. ROA.1315.

## B. FRTs Do Not Fire Multiple Rounds with a Single Function of the Trigger

An FRT is a device that forcibly returns the trigger to its reset state. ROA.1289. In a firearm fitted with an FRT, the process begins the same way as with a traditional semi-automatic trigger: the shooter actuates the trigger, the trigger sear

18

disengages, and the hammer falls forward to strike the firing pin, discharging a shot and causing the bolt carrier group to travel rearward. ROA.1289, 1315. With an FRT, as the bolt carrier group travels rearward and pushes against the hammer, the hammer is in turn pushed into the top of the trigger and forcibly pivots it forward to its reset position, causing it to retain the hammer again.  Unlike the above-described process for a traditional semi-automatic trigger, an FRT has an additional safety mechanism, known as a "locking bar." *See* ROA.1289-1290. As the district court found, it is undisputed that "a 'locking bar' mechanically locks the trigger in its reset state, preventing the user from moving the trigger rearward to function by releasing the hammer, until the bolt has returned to the in-battery position and the firearm is safe to fire. ROA.1289. When firing multiple shots using an FRT, the trigger must still reset after each round is fired and must separately function to release the hammer by moving far enough to the rear in order to fire the next round." ROA.1289-1290.

   Three key undisputed facts emerge from the record in this case:

- For each and every round fired, the trigger on a weapon equipped with an FRT moves forward into its reset state and is depressed to release the hammer from its sear surface. ROA.1289-1290, 2151:16-1252:17, 2239:11-18, 2241:7-16.

- The trigger in a firearm equipped with a forced reset trigger must reset after every round that is fired. ROA.1289-1290, 2241:17-2242:24.

- If the shooter attempts to overcome the reset and holds the trigger in a fully depressed position so that the trigger cannot reset, the weapon will malfunction. ROA.2243:10-21.

These facts were found by the district court on an undisputed record following an evidentiary hearing. On these undisputed facts, the district court held that Appellees are likely to prevail on the merits of this case.

Appellants claim, without citation, that "no one doubts that [FRTs] operate 'automatically' …" and "there is no dispute that when a shooter replaces the standard trigger on an AR-15-type rifle with an FRT-5 or WOT, the shooter can pull the trigger once and automatically fire repeatedly." Opening Br. at 20.  On their face, these statements are wrong because Appellants *do* dispute them.  But they are also wrong because they conflate the firing sequence with shooter input. Moreover, contrary to Appellants' suggestion and as the district court found, it is undisputed that (a) if the shooter attempts to overcome the reset and holds the trigger in a fully depressed position so that the trigger cannot reset, the weapon will malfunction (ROA.2243:10-21) and (b) the only force that moves the trigger rearward comes from the user's finger, not an "automatic" process (ROA.2241:10-12).

The district court is correct.  As this Court ruled in rejecting Appellants' Motion for an Emergency Stay, "[a]lthough not binding, the *Cargill* plurality's interpretation of the statutory definition of 'machinegun' is nonetheless persuasive." Emergency Stay Order at 4.  And "[u]nder the *Cargill* plurality's reasoning … that the FRT trigger must reset means that the weapon does not shoot by a '*single* function of the trigger' and thus is not a machinegun." *Id*. at 5.

20

### i.      "Single Function of the Trigger" is Not "Single Pull of the Trigger"

Rather than address the facts found by the district court and the law as set forth by this Court in *Cargill*, Appellants seek to blithely cast aside the "persuasive" opinion of the plurality in *Cargill* and effectively redefine "single function of the trigger" as coextensive with "single pull of the trigger." For example, Appellants refer to the shooters' "continuous pressure," "continuous pull," "single pull of the trigger," or "pull[ing] the trigger once" more than two dozen times in their Opening Brief.   For Appellants, shooter input is determinative of whether FRTs are machineguns.

The *Cargill* plurality squarely rejected this focus on shooter input. The *Cargill* plurality found "[t]he problem with [defining single function of the trigger to be a single pull from the perspective of the shooter] is that it is based on words that do not exist in the statute." *Cargill*, 57 F.4th at 459-60.  "The statutory definition of machinegun utilizes a grammatical construction that ties the definition to the movement of the trigger itself, and not the movement of a trigger finger." *Cargill*, 57 F.4th at 460.

"The Government offer[ed] nothing to overcome this plain reading" in *Cargill* and fares no better here. Appellants principally focus on the legislative history of the National Firearms Act and contemporaneous statements to bolster their claim that

the "contemporaneous understanding" of "single function" was really "single pull" of the trigger. *See* Opening Br. at 24-26.

As the Supreme Court has emphasized, "legislative history is not the law," *Epic Systems Corp. v. Lewis*, 584 U.S. 497, 523 (2018), and courts "cannot replace the actual text with speculation as to Congress' intent." *Magwood v. Patterson*, 561 U.S. 320, 334 (2010). The text "tells us that Congress knew how to write a definition that explicitly turns on the action of a shooter rather than the action of a trigger, but chose not to do so here." *Cargill*, 57 F.4th at 461. For example, "[i]mmediately following the definition of machinegun provided in 26 U.S.C. § 5845(b), Congress defined the term 'rifle' to mean a weapon designed 'to use the energy of the explosive in a fixed cartridge to fire only a single projectile through a rifled bore *for each single pull of the trigger*'" and "next defines 'shotgun' to mean a weapon designed 'to use the energy of the explosive in a fixed shotgun shell to fire through a smooth bore either a number of projectiles (ball shot) or a single projectile *for each pull of the trigger*.'" *Id*. (citations omitted).

This Court is "bound to apply [the definition of machinegun] as written," not as Appellants might prefer it had been written. *Id*. "Continuous pull" or "continuous pressure" is not the test. Under the National Firearms Act as it is—not as Appellants might wish it to be—FRTs are not machineguns.

22

### ii.    Appellants' "Zip-Tie" Test Is Irrelevant to the Statutory Definition Provided by Congress

Consistent with their focus on shooter input, Appellants again reference their infamous "zip tie" test.  *See* Opening Br. at 19-20.  But both the district court and this Court rejected the validity of this exercise.  To wit, the district court found:

> In a machinegun, the trigger must be held in its rearmost position for the gun to fire automatically. The machinegun's trigger does not reset in between each shot. *But in an FRT-equipped firearm, the trigger must still reset in between each shot—even when depressed in a rearward state by the zip tie.* Defendants' zip tie does not appear to hold the FRT trigger still in its most rearward position. *If it did, the weapon would malfunction and not fire subsequent shots. Instead, the elasticity in the zip tie allows for sufficient movement to allow for a trigger reset.* All this test establishes is that the trigger need not move to its most rearward position. It can still reset from sufficient rearward pressure and forward movement propelled by the stretched zip tie. In other words, the zip tie test does not demonstrate that a single function of the trigger does not occur for each shot since the trigger's operative function is the reset of the hammer—not how the user or a zip tip pulls the trigger. The zip tie test is irrelevant to the statutory definition provided by Congress and as interpreted by *Cargill*.

ROA.1315-1316 (emphasis added).  This conclusion was quoted and cited favorably by this Court in rejecting Appellees' Motion for an Emergency Stay.  *See* Emergency Stay Order at 5.  Appellants make no effort to show that the district court's factual finding was clearly erroneous, yet effectively ask this Court to reject it.  This Court should decline that invitation.

### *iii.*   **FRTs Are Distinguishable from Mechanical Bump Stocks Like the Akins Accelerator**

Appellants' analogy to mechanical bump stocks such as the Akins Accelerator misses the mark.  First and foremost, this Court *did not* find that mechanical bumps stocks *are* machineguns.  Rather, as the district court observed, *Cargill* "merely recognized that the only issue before it was whether non-mechanical bump stocks were machineguns, and that the outcome may differ for a mechanical bump stock depending on how it worked."  ROA.1312; *see Cargill*, 57 F.4th at 462 ("[T]he case *might* well be different if we were considering a semiautomatic weapon equipped with a mechanical bump stock…. But we are not considering that case." (emphasis added)); *see also* Emergency Stay Order at 6 ("*Cargill* said, in dicta, [that mechanical bumpstocks] *might* be machineguns.").

Even if this Court were to embark on a new comparison of the FRTs and mechanical bump stocks—a comparison that is neither necessary nor appropriate— it would show key differences that distinguish FRTs. Bump stocks use the firearm's recoil force to allow the trigger to reset automatically, but it is only an *external* force provided by the user that causes the subsequent *function* (i.e., actuation or "pulling") of the trigger. Thus, the *Cargill* plurality found that a firearm equipped with a non-mechanical bump stock only fires one round per single function of the trigger. *Cargill*, 57 F.4th 464.

"Mechanical" bump stocks, such as the referenced Akins Accelerator, include an internal spring to assist the *actuation* (functioning)—*not the reset*—of the trigger. In theory, it was argued, these devices did not require an external force by the user to *actuate* the trigger repeatedly *i.e.,* cause the trigger automatically to function repeatedly. But non-mechanical bump stocks lack this internal spring. An external force supplied by the user is required to cause actuation of the trigger. This is what distinguished "mechanical" bump stocks from "nonmechanical" bump stocks.

Like bump stocks, FRTs use the cycling of the firearm's action to assist or force the trigger to *reset*. Like non-mechanical bump stocks (and unlike mechanical bump stocks), FRTs do not include any internal spring or other internal means to assist *actuation* of the trigger. An external force must be applied by the user to cause the trigger to function (actuate the trigger) each time a shot is fired. The only force that moves the trigger rearward in an FRT comes from the user's finger. ROA.2241:10-12.

This distinction also defeats Appellants' inaccurate straw man: claiming that the district court opinion would legalize a box that "continuously fires after the operator presses and releases a button" as long as "the button [] oscillate[s] up and down (without any further input from the shooter) each time the box fires a shot." Opening Br. at 32. This claim is wrong. The button in Appellants' hypothetical does not reset after each shot; its mechanical operation continues undisrupted

25

automatically.  That is not how FRTs work. It is undisputed that, as the district court found, FRTs *do* reset after every shot. Appellants' comparisons are inapt.

### iv.    Appellants' Approach to the Definition of "Machinegun" Has Repeatedly Changed

Appellants also suggest that the district court decision "would not only legalize the Akins Accelerator, but would upend nearly five decades of consistent ATF practice with respect to devices that operate like the FRT-15 and WOT." Opening Br. at 31.  But this is not true.

In 2002, the ATF determined that the Akins Accelerator—the very mechanical bump stock Appellants cite as an example of a machinegun—was *not* a machinegun because "the agency read the term 'single function of the trigger' to mean 'single movement of the trigger.'"  Pet. Br. at 7, *Garland v. Cargill*, Case No. 22-976, (U.S. Dec. 26, 2018) (quoting *Final Rule: Bump-Stock-Type Devices,* Bureau of Alcohol, Tobacco, Firearms, and Explosives, 83 Fed. Reg. 66,514, 66,517 (Dec. 26, 2018)).  Tellingly, the ATF's position in 2002—that single function of the trigger means "single movement of the trigger"—bears a striking resemblance to the district court's test that Appellants now claim is inconsistent with their "longstanding practices."

In 2006, the ATF changed its interpretation of "single function of the trigger," "determin[ing] that 'the best interpretation of the phrase 'single function of the trigger' includes a 'single pull of the trigger,'" *id*. at 8 (citing 83 Fed. Reg. at 66,517),

and thus reclassified the Akins Accelerator as a "machinegun."  There was no relevant statutory change from 2002 to 2006.

The ATF's mercurial approach to interpreting the law played out again with non-mechanical bump stocks.  From 2008-2017, the ATF issued ten letter rulings concluding that non-mechanical bump-stocks "did not enable a firearm to fire 'automatically' and thus did not convert weapons into machineguns."  *See* Pet. Br. at 8, *Garland v. Cargill*, Case No. 22-976 (U.S. Dec. 18, 2023). In 2017, for policy reasons bearing no relationship to a change in underlying law, Appellants again changed course, culminating in the final Bump Stock rule in 2018.  *See id*. at 9 (acknowledging the "ATF decided to conduct notice-and-comment rulemaking to reconsider its position on bump stocks" following the tragic 2017 Las Vegas shooting).  In doing so, Appellants again changed their definition of "single function of the trigger," claiming it now was synonymous with a "a single pull of the trigger *and analogous motions*."  27 C.F.R. § 479.11 (emphasis added).

In this case alone, Appellants have offered *at least six* different definitions of "single function of the trigger":[6]

---

[6] *See* Plaintiffs' Combined Brief in Response to Defendants' Cross-Motion for Summary Judgment and Reply in Support of Plaintiffs' Motion for Summary Judgment at 19-20, *National Association for Gun Rights, et al. v. Garland, et al.*, Case No. 4:23-cv-00830 (N.D. Tex. Dec. 22, 2023) (ECF No. 84).

- A "single pull of the trigger and analogous motions;"[7]

- The application of "constant rearward pressure;"[8]

- A "continuous pull;"[9]

- A "constant rearward pull" or "single function of the trigger means single pull of the trigger;"[10]

- The "initiation of the firing sequence" plus "constant rearward pressure."[11]

- "[A]single initiation of the firing sequence by some act of the shooter." Opening Br. at 22.

Appellants do not have a single "longstanding" practice nor interpretation of the term "single function of the trigger." What they have instead is a 20-year odyssey through various definitions, adopted and rejected based on multiple policy considerations,

---

[7] 27 C.F.R. § 479.11. Appellants have since untethered themselves from this previously official ATF regulatory definition. *See* ROA.2234:22-2236:4.

[8] ROA.1554-1619 (ATF's FRT Report, July 15, 2021), ROA.1621-1635 (ATF's WOT Report, October 21, 2021), *National Association for Gun Rights, et al. v. Garland, et al.*, Case No. 4:23-cv-00830 (N.D. Tex. Nov. 3, 2023) (ECF No. 62-1).

[9] ROA.1554-1619 (ATF's FRT Report, July 15, 2021).

[10] ROA.1693-1695 (ATF's FRT Report, April 27, 2023, at 5), ROA.1741 (Prelim. Inj. Hr'g. Tr. 162:1-4, *United States v. Rare Breed Triggers, LLC*, et al., No. 23-cv-369 (NRM) (RML), 2023 WL 5689770 (E.D.N.Y. Aug. 1, 2023)).

[11] ROA.2260:10-17 (Prelim. Inj. Hr'g. Tr.).

rather than any change in the actual statute. This is not sufficient to overcome the plain meaning of the Act.

In any event, "the fact that the Defendants have likely acted in violation of the law for years does not make the action any less unlawful." *National Association for Gun Rights, Inc., et al. v. Garland, et al.*, Case No. 4:23-cv-00830-O at 7 (Nov. 11, 2023) (order denying stay of preliminary injunction) (ROA.2123). Moreover, even on its own terms, Appellants' argument is highly misleading. Appellants' approach to the definition of "machinegun" has been anything but consistent over the past three decades.

## B. If the Statute is Ambiguous, the Rule of Lenity Applies

Even "[i]f the statutory definition of machinegun were indeed ambiguous—not unambiguous, as the *Cargill* plurality concluded—then the rule of lenity means that ambiguity should be resolved in [Appellees'] favor." Emergency Stay Order at 5-6. "When interpreting a criminal statute, we do not play the part of a mindreader." *U.S. v. Santos*, 553 US 507, 515 (2008). In the seminal rule-of-lenity decision, Chief Justice Marshall rejected the impulse to speculate regarding a dubious congressional intent. "[P]robability is not a guide which a court, in construing a penal statute, can safely take." *United States v. Wiltberger*, 5 Wheat. 76, 105 (1820). And Justice Frankfurter, writing for the Court in another case, said the following: "When Congress leaves to the Judiciary the task of imputing to

Congress an undeclared will, the ambiguity should be resolved in favor of lenity." *Bell v. United States*, 349 U.S. 81, 83 (1955).

Appellants have argued that the statutory interpretation recited in *Cargill* and advocated by Appellees is that of a *plurality* (eight of sixteen judges) of the en banc Court of Appeals and not a *majority*. However, the *majority* (twelve of sixteen judges) of the Fifth Circuit agreed that if the statute does not unambiguously compel that interpretation, then the rule of lenity applies and the statute *must* be construed in Plaintiffs' favor.[12] *Cargill* held:

> Nor can we say that the statutory definition *unambiguously* supports the Government's interpretation. As noted above, we conclude that it unambiguously does not. But even if we are wrong, the statute is at least

---

[12] The Circuit explained:

> Of the sixteen members of our court, thirteen of us agree that an act of Congress is required to prohibit bump stocks, and that we therefore must reverse. Twelve members (CHIEF JUDGE RICHMAN and JUDGES JONES, SMITH, STEWART, ELROD, SOUTHWICK, HAYNES, WILLETT, HO, DUNCAN, ENGELHARDT, and WILSON) reverse on lenity grounds. Eight members (JUDGES JONES, SMITH, ELROD, WILLETT, DUNCAN, ENGELHARDT, OLDHAM, and WILSON) reverse on the ground that federal law unambiguously fails to cover non-mechanical bump stocks.

> CHIEF JUDGE RICHMAN, JUDGE STEWART, and JUDGE SOUTHWICK concur in the judgment and join in Part V, as does JUDGE Ho, who also writes separately. JUDGE OLDHAM concurs in the judgment and joins in Parts I-IV.A. JUDGE HAYNES only concurs in the judgment and writes separately.

*Id*. at 448, n*.

30

> ambiguous in this regard. And if the statute is ambiguous, Congress
> must cure that ambiguity, not the federal courts.

*Cargill*, 57 F.4th at 451. The rule of lenity prevents Congress from passing an ambiguous criminal statute, only to have a federal agency decide what it means. *Id*. at 470. Twelve members of the Circuit in *Cargil* held that the statute was "at least" ambiguous and must be construed against the Government.

As this Court explained, "[i]f the statutory definition of machinegun is indeed ambiguous—not unambiguous, as the *Cargill* plurality concluded—then the rule of lenity means that ambiguity should be resolved in Plaintiffs' favor." Emergency Stay Order at 5-6. Appellees believe that the *Cargill* plurality was correct and, as a consequence, that the statute unambiguously does not apply to FRTs. But if this conclusion is wrong, then the statute is ambiguous. This ambiguity is highlighted by the constantly shifting definitions employed by Appellants, including multiple different definitions advanced in the course of this litigation. Appellants' utter inability to proffer a consistent definition of "single function of the trigger" that supports their preferred outcome means that the term is *at worst* ambiguous. As *Cargill* counsels, in the face of such ambiguity, the rule of lenity tips the scales in favor of Appellees.

Appellants claim that *Cargill*'s rule of lenity "holding has no bearing here" because "*Cargill* invoked the rule of lenity based on two separate perceived ambiguities in the statute as applied to non-mechanical bump stocks—whether those

devices operated 'by a single function of the trigger' and whether they operated 'automatically'" and "[n]o such combination of ambiguities applies." Opening Br. 28.

Nothing in *Cargill* suggests that *both* ambiguities are necessary for the rule of lenity to apply. In contrast, a more faithful reading of *Cargill* is that ambiguity in "single function of the trigger" and "automatically" are each independent and adequate grounds for finding the statute grievously ambiguous. For example, *Cargill* states "[a]t the very least, lenity is appropriate … if after 'having tried to make sense of a statute using every other tool, we face an unbreakable tie between different interpretations.' That is the case here *in two respects.*" *Cargill* at 57 F.4th at 470 (citation omitted). Similarly, *Cargill* states "[b]ut having utilized all available tools of statutory interpretation, and assuming arguendo that those *two* provisions are indeed ambiguous, we are unable to resolve *either of the ties.*" *Id*. Similarly, Judge Ho's concurrence treats both ambiguities as independent and adequate bases for applying the rule of lenity. *See Cargill*, 57 F.4th at 477 (Ho, J., concurring in judgment) ("As between construing 'single function of the trigger' from the weapon's perspective or the shooter's perspective, then, the statute appears to be in equipoise. And statutory equipoise is a textbook case for lenity."); *id*. at 478 ("[T]he ultimate question, then, is how much human input is contemplated by the word 'automatically.' But [t]hat is a question of degree that the statute's text does not

definitively answer. And because there is no definitive answer, lenity compels reversal." (internal quotation marks and citations omitted) (alterations in original).

*Cargill* held that both portions of the statute were previously ambiguous. As a result, each ambiguity is an independent and adequate basis for application of the rule of lenity.

Moreover, even if it were not, both ambiguities are at issue here. While briefing has primarily centered on "single function of the trigger," it is also at worst ambiguous as to whether FRTs function "automatically."

Appellees are likely to succeed on the merits of this case.

## III. The District Court Correctly Found that Appellees Face a Significant Risk of Irreparable Harm

"[C]omplying with [an agency order] later held invalid almost always produces the irreparable harm of nonrecoverable compliance costs." *Wages and White Lion Investments, L.L.C. v. United States*, 16 F.4th 1130, 1142 (5th Cir. 2021) (emphasis added) (second alteration in original) (quoting *Texas v. EPA*, 829 F.3d 405, 433 (5th Cir. 2016)). Accordingly, "Federal courts have long recognized that, 'when the threatened harm is more than de minimis, it is not so much the magnitude but the irreparability that counts for purposes of a preliminary injunction.'" *Enter. Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana*, 762 F.2d 464, 472 (5th Cir. 1985) (quoting *Canal Auth. v. Callaway*, 489 F.2d 567, 575 (5th Cir. 1974)); *see also VanDerStok v. Garland*, 625 F. Supp.3d 570, 584 (N.D. Tex. 2022) (quoting

*Enter. Int'l.*, 762 F.2d at 472). And "compliance costs are 'likely unrecoverable,' usually 'because federal agencies generally enjoy sovereign immunity for any monetary damages.'" *VanDerStok*, 625 F. Supp.3d at 584 (quoting *Wages and White Lion Investments*, 16 F.4th at 1142).

As the district court found, Appellees face irreparable economic compliance costs "stem[ming] from the Hobson's choice Plaintiffs still face: continue to exercise ownership and constitutionally protected freedoms while risking federal prosecution *or* forfeit those freedoms to avoid civil and criminal consequences." ROA.1321. Likewise, Appellees are concerned with the harm derived from the loss of use and enjoyment of their property, even for a limited period of time.

Appellants do not directly address—and thus effectively concede—that Appellees will incur economic costs and will suffer the loss of the use and enjoyment of their property in the absence of the district court's preliminary injunction. Indeed, with respect to the harms suffered from the loss of the use and enjoyment of Appellees' property, the district court found "[Appellants] did not sufficiently address this point at the [Temporary Restraining Order] stage and once again fail[ed] to do so at [the preliminary injunction] stage." ROA.1322. They have failed to do so for a *third* time here.

The district court also found that Appellees are irreparably harmed by the credible threat of prosecution. ROA.1319-1321. This Court previously described

that finding as "apt" and noted "[s]uffice it to say that we agree that, absent a preliminary injunction, [Appellees] face a credible threat of civil or criminal prosecution for what is likely a lawful activity." Emergency Stay Order at 7. This constitutes a more than *de minimis* harm justifying a permanent injunction.

In response, Appellants raise the same unavailing arguments they raised to challenge standing. Appellants claim "[t]he individual plaintiffs face no prospect of imminent enforcement, whether civil or criminal," because "[t]he government specifically represented that it has no imminent plans to bring enforcement action (such as criminal prosecution) against the individual plaintiffs, and promised to inform the district court if that changed." Opening Br. at 38. But, as described above, this "prosecutorial indecision" is cold comfort to Appellees and does nothing to obviate the harm caused by the continued threat of government enforcement. *See Franciscan Alliance*, 47 F.4th at 376. In the words of the district court, "without disavowing these plans [to seize Appellees' property], [Appellees] face endemic uncertainty and pressure to comply with [Appellants'] interpretation of the definition to avoid prosecution. Such uncertainly and pressure chill constitutional and ownership rights." ROA.1323.

Appellants astoundingly claim "[n]o individual plaintiff alleges that he has been subject to any enforcement action" since Appellants declared FRTs to be "machineguns" in 2021. Opening Br. at 39. This claim is false and appears to be

predicated on the misguided belief that only an actual criminal prosecution counts as an "enforcement action." Armed federal agents visited Appellee Carey and gave him a letter stating, "the unlawful receipt and possession of any of these devices is a felony violation of Federal law." ROA.11-12. Appellee Carey specifically averred that he surrendered two FRTs to Appellants based on a fear of civil or criminal prosecution—a fear that was well-founded under the circumstances. ROA.12, ¶ 6; *see also* ROA.1319-1320 ("Armed federal agents visited [Appellee] Carey at his home, prompting him to surrender his FRTs to avoid prosecution."). Moreover, as the district court found, Appellee Carey is hardly alone: "Other individual FRT owners have experienced similar enforcement activities, such as seizures and search warrants." ROA.1320. This is an enforcement action by any reasonable definition.

Finally, Appellants suggest that "the lack of imminent injury is reflected in plaintiffs' lengthy delay in bringing suit"—a delay that, based on Appellants' own calculations, lasted just over two years. Opening Br. at 39.[13]

---

[13] Tellingly, Appellants cite to the ATF's 2021 classification of the FRT—*not* the alleged "50 years" during which ATF claims it "has classified certain devices known as 'forced reset triggers' as machineguns." Opening Br. at 5. This further reinforces that the operative time frame for the Appellants' erroneous classification of FRTs is two—not 50—years.

Appellants cite *Opulent Life Church v. City of Holy Springs* in support of this proposition. *See* Opening Br. at 39 (citing 697 F.3d 279, 297 (5th Cir. 2012)). Appellants tellingly omit that *Opulent Life Church* considered *and rejected* the argument that plaintiff waited too long to claim an irreparable harm, stating "[w]hether frivolous or not" the argument that plaintiff's "'long litigation delay' suggests it is not suffering irreparable harm" "is unconvincing on these facts." 697 F.3d at 297 (citation omitted). This is not an endorsement of the view that courts must reject Appellees' claims of irreparable harm based on Appellants' conclusory claims that the passage of time between the adoption of Appellants' incorrect interpretation and today means there is no harm. Rather, it suggests the Court should evaluate harm on the facts before it.

*Opulent Life Church* reiterated that "[t]he loss of [constitutionally protected] freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." 697 F.3d at 295 (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). This is true even when the right at issue is merely statutory, rather than, as here, constitutional. *See Opulent Life Church*, 697 F.3d at 295 ("This principle applies with equal force to the violation of [the Religious Land Use and Institutionalize Persons Act].").  The timing of this lawsuit does not counsel against finding irreparable harm, particularly, where, as here, Appellants are engaged in an aggressive and ongoing enforcement campaign in support of their erroneous

interpretation of law.  Appellees are irreparably harmed by Appellants' erroneous interpretation of law.

## IV.     The Balance of Hardships and the Public Interest Support the Preliminary Injunction

Appellees are law-abiding citizens who wish to continue lawfully exercising freedoms they have exercised for several years.  All Appellees are U.S. citizens. Appellees Carey, Wheeler, and Speegle are all permitted by law to possess firearms. Appellee Wheeler even holds a Federal Firearms License. ROA.118. The Associational Appellees aver that they only seek to vindicate the rights of their members who are lawfully able to possess firearms in this matter. ROA.114-115, 118-119, 120-121. As described above, Appellees will be irreparably harmed in the absence of a preliminary injunction through both the imposition of compliance costs and through the chilling impact of Appellants' interpretation.

Appellants seek to elide these harms by misstating the status quo the preliminary injunction preserves.  Appellants spill much ink criticizing how the district court "framed" its injunction as "preserv[ing] the status quo" by claiming that the true status quo is Appellants' purportedly longstanding treatment of FRTs and similar devices as "machineguns."  *See* Opening Br. at 32-34.  But this ignores that the status quo being preserved is one where Appellees currently possess FRTs. Reversing the district court would risk upending *this* status quo by leaving Appellees vulnerable to enforcement actions, including seizure of their property.

38

Worse, amid Appellants' criticism of the district court for purportedly analyzing the wrong status quo, Appellants make no mention of the fact that district court explicitly considered and rejected the significance of their preferred categorization:

> [Appellants] argue that the status quo is instead the "classif[ication] of FRTs as machineguns for years.' [citation omitted]. The Court disagrees with this characterization. Although true that FRTs have been classified as machineguns since at least July 2021, *[Appellants'] statements regarding no enforcement plans against these [Appellees] constitutes the operative status quo*."

ROA.1327 n.92. The district court did not misapprehend either the facts or Appellants' arguments. It rightly disagreed. The Preliminary Injunction preserves the status quo by protecting Appellees from enforcement or the threat of enforcement.

Appellees' high likelihood of success on the merits severely undercuts *any* countervailing interest identified by Appellants. Appellants have no "interest in the perpetuation of unlawful agency action." *League of Women Voters of United States v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) (citations omitted). It is not unduly burdensome to the Appellants to obey the law. *Hodgson v. First Fed. Sav.& L. Ass'n of Broward Cty.*, 455 F.2d 818, 826 (5th Cir. 1972). Rather, the "public interest is in having governmental agencies abide by the federal laws that govern their existence and operations." *Wages & White Lion Investments*, 16 F.4th at 1143 (quoting *Texas v. Biden*, 10 F.4th 538, 559 (5th Cir. 2021)). And there is undoubtedly "an overriding

public interest [in] … an agency's faithful adherence to its statutory mandate." *Jacksonville Port Auth. v. Adams,* 556 F.2d 52, 59 (D.C. Cir. 1977).

Appellants lean heavily on generalized concerns about public safety. In doing so, they cite liberally the Declaration of Special Agent Craig Saier. ROA 1988-2032. This is inappropriate and these references should be stricken from the record or disregarded. The Saier Declaration was not before the district court when it ruled on Appellees' Motion for Preliminary Injunction, but rather was submitted later in support of Defendants' stay motion. It is well-settled that appellate courts do not consider evidence that was not before the lower court when it issued the ruling on appeal. *Casas v. Aduddell*, 404 Fed. Appx. 879, 881 (5th Cir. 2010) (quoting *Theriot v. Parish of Jefferson*, 185 F.3d 477, 491 n. 26 (5th Cir.1999)); *Midwest Fence Corp. v. United States Dep't of Transp*., 840 F.3d 932, 946-47 (7th Cir. 2016). "Papers submitted to the district court *after* the ruling that is challenged on appeal should be stricken from the record on appeal." *Kirshner v. Uniden Corp*., 842 F.2d 1074, 1077-78 (9th Cir. 1988) (*cited with approval by Ford v. Potter*, 354 Fed. App'x 28, 31-32 (5th Cir. 2009) ("Some of the materials referenced in appellant's brief are part of the record on appeal as they were attached in support of various pre-trial motions. But they were not admitted into evidence at trial, and were not considered by the district court in issuing its memorandum opinion. Accordingly, we will limit our analysis to the evidence that was before the district court.")). When faced with similar attempts

to sandbag trial court judges, this Court has either not considered (as in *Casas* and *Ford*) or stricken from the record such improper materials. *See Watson v. Rhode Island Ins. Co.*, 196 F.2d 254, 255–56 (5th Cir. 1952).

Even on their own terms Appellants' arguments are unavailing. First, Appellants seek to bootstrap the harms associated with "machineguns" onto FRTs. Opening Br. at 34-35. This approach begs the question by implicitly assuming FRTs *are* machineguns—the very question at issue in this case. In one sentence, Appellants claim that FRTs "fire at a rate functionally indistinguishable from M16-type machineguns." Opening Br. at 35. But this is offered with no supporting analysis and ignores that, as even Appellants concede, ROA.2232:11-14, the definition of "machinegun" is conspicuously *not* tied to rate of fire.

Next, Appellants seek to argue that FRTs are dangerous devices that are frequently involved in violent criminal activity. By Appellants' own admission, attempting to recover FRTs is not part of ATF's "core mission of investigating and disrupting violent crime." Opening Br. at 37 ("[T]he attempt to recover [FRTs] would entail ATF's substantial expenditure of resources *at the expense of other law enforcement efforts, including ATF's 'core mission of investigating and disrupting violent crime.'*" (emphasis added)).

This is not a case of loose language. Appellants claim that individual possession of FRTs poses an acute threat to public safety. *See generally* Opening

Br. at 32-37. Yet, at the same time, Appellants claim that their enforcement activities are "focused on large-scale manufactures and sellers of FRTs, not individual otherwise law-abiding owners." Opening Br. at 38. These positions are irreconcilable. If FRTs pose such a significant threat to public safety, how can Appellants state that they will not prioritize enforcement against individual owners?

Similarly, the negative inference of Appellants' representation that they will not focus enforcement activities on "otherwise law-abiding owners" suggests that the prohibition on FRTs does no work in protecting public safety. If Appellees (or anyone else) violate *other* gun laws, they can be charged with violating those *other* laws. If the only individuals Appellants bring enforcement actions against are those who violate *other gun laws* and are charged with violating *other gun laws*, then the prohibition on FRTs does no work protecting the public. It is neither a necessary nor sufficient condition for protecting public safety, but rather merely an extra charge to be larded on after Appellants have determined an individual is a danger for other reasons and after they have brought other charges against him or her.

The evidence Appellants marshal to support their claim does little to refute these logical inconsistencies. Appellants claim "Rare Breed Triggers alone likely distributed over 100,000 of these devices nationwide in roughly two years, while other manufactures distributed a significant number of similar devices." Opening Br. at 35. Yet, Appellants can only point to "approximately seventy-one criminal

examinations of these types of devices." Opening Br. at 35. Any criminal misuse is lamentable, but 71 criminal examinations stemming from hundreds of thousands of devices in circulation does not suggest that FRTs pose some uniquely dangerous level of risk.

To elide this dearth of evidence, Appellants claim "[t]hese statistics understate the prevalence of these devices in crime." Opening Br. at 36. But this is naked speculation. Similarly, Appellants cite to an "approximately 44% increase in the number of machinegun conversion devices recovered by law enforcement as compared to recoveries in 2022," while ignoring that this surge is primarily driven by other devices, such as so-called "auto switches"—not FRTs. *See* ROA.2004, n.6.

Similarly, Appellants point to "at least 63 instances in which these devices were transferred to individuals prohibited from possessing firearms." Opening Br. at 36. Again, 63 instances out of hundreds of thousands of devices in circulation is hardly an epidemic. But this statistic also ignores a basic reality of how FRTs operate. FRTs are not firearms. They only work if the user *already has a firearm.* Prohibited persons, by definition, cannot lawfully possess firearms. Once again, the FRT prohibition is doing no work to protect public safety—such individuals are already breaking the law and could already be arrested for illegally possessing firearms regardless of whether FRTs are also legal or illegal.

The district court rightly determined that Appellants' self-contradictory and

speculative public safety arguments are outweighed by the specific and concrete harms identified by Appellees. That finding was well within its discretion and Appellants have not come close to showing that it clearly erred in reaching it. The balance of harms and public interest favors the preliminary injunction.

## V. There is No Reason to Narrow the Preliminary Injunction

### A. The Preliminary Injunction Appropriately Provided Relief to Members of the Associational Appellees

For the reasons set forth above, the Associational Appellees have standing. They are full parties to this lawsuit. They and their members are not second-class parties. Thus, the district court appropriately extended the protection of the preliminary injunction to members of the Associational Appellees.

### B. Extending the Preliminary Injunction Beyond Possession is Necessary to Provide Full Relief to Appellees

This Court previously observed "a narrower preliminary injunction that protects just possession—not manufacture, distribution, or transfer—ignores that Plaintiffs must be able to acquire FRTs in order to use them." Emergency Stay Order at 7. Appellants offer nothing to show that this Court got it wrong the first time.

As the district court observed, "[a]n injunction 'should be crafted to provide complete relief to the plaintiffs.'" ROA.1329 (quoting *Mock v. Garland*, 75 F.4th 563, 587 (5th Cir. 2023)). Several Appellees—including Appellee Carey—do not currently own an FRT. In order to "possess" one, they must be able to obtain one.

For them to legally obtain one, someone must be able to legally manufacture, sell, and transfer FRTs. Thus, the district court appropriately applied the preliminary injunction to the manufacture, sale, and transfer of FRTs.

In response, Appellants claim "[p]lainitffs have not expressed any intent to transfer or manufacture these devices." Opening Br. at 40. This is plainly false and falls well below the standards of candor that should be expected from lawyers representing the United States. Appellee Wheeler said "I intend to continue to *buy and sell* forced reset triggers. However, I am chilled from doing so by the government's interpretation of 'machinegun,' and am not willing to risk civil or criminal prosecution for doing so." ROA.118 ¶ 7. Similarly, Appellee Carey stated "[b]ut for the ATF's threat of federal prosecution, I would purchase new forced reset triggers," ROA 114, ¶7, and Appellee Speegle stated "I intend to purchase additional forced reset triggers. I am currently unable to do so due to the ATF's interpretation, which places myself and anyone who sells a forced reset trigger to me at risk of civil and/or criminal prosecution." ROA.120, ¶7. "Buying and selling" FRTs necessarily involves "transferring" them. Appellees plainly expressed an intent to transfer FRTs, which is properly protected by the preliminary injunction.

**C. Appellants' Argument Against Enjoining Criminal Prosecutions Would Allow the Government to Arrest and Prosecute Citizens for Actions that Are Not Crimes**

The preliminary injunction appropriately restrained criminal prosecutions. Appellants claim that equitable relief to enjoin criminal enforcement can only be granted in response to a constitutional claim to vindicate constitutional rights. Opening Br. at 42. But Appellants offer little to support this bold proposition, citing only two cases, *Stolt-Nielsen, S.A. v. United States*, 442 F.3d 177 (3d Cir. 2006) and *Deaver v. Seymour*, 822 F.2d 66, 68-71 (D.C. Cir. 1987). Both are inapposite.

While *Stolt-Nielsen* has some broad language arguably consistent with Appellants' thesis, the facts of the case render it inapposite. In *Stolt-Nielsen*, the plaintiff sued to enforce a conditional leniency agreement with the government that the government purported to revoke as a consequence of plaintiff's behavior. The dispute at the heart of *Stolt-Nielsen* was thus fundamentally an individualized determination. It did not concern the validity of a generally applicable law. Similarly, *Deaver* involved a civil challenge to the appointment of an independent counsel to stop an on-going grand jury investigation and preempt an imminent indictment. On its facts, it concerned a fundamentally individualized concern.

Moreover, Appellants' position would yield absurd results. Appellants do not and could not challenge the court's authority to enter a declaratory judgment ruling finding that FRTs are not machineguns and may not be prohibited by administrative

fiat. Instead, Appellants argue that, even if that is true, Appellants should still be allowed to *arrest and prosecute* people for possessing them. This is a recipe for blatant Due Process violations. The executive branch cannot arrest and prosecute people for things that are not crimes, and it does not violate the separation of powers for the Court to say as much. *See generally Franciscan Alliance*, 47 F.4th at 378 ("[A]n agency 'literally has no power to act…unless and until Congress authorizes it to do so by statute.'" (quoting *Fed. Election Comm'n v. Cruz*, 596 U.S. 289, 301 (2022))).

In prior cases where injunctive relief was denied in favor of vacatur only, the courts noted that "Defendants have represented that they will abide by the Court's order." *See O.A. v. Trump*, 404 F. Supp. 3d 109, 154 (D.D.C. 2019). Here, Appellants have made no such representation.  Instead, if anything, their litigation positions suggest the exact opposite.

Finally, Appellants challenge the district court's citation to the APA, claiming that the APA's general provisions permitting challenges to criminal proceedings is superseded by section 702, which, provides "[n]othing herein … affects other limitations on judicial review or the power or duty of the court to dismiss any action or deny relief on any other appropriate legal or equitable ground."  Opening Br. at 43; 5 U.S.C. § 702. But Appellants' bold position would create an exception that swallows the rule and runs counter to the text and purpose of the APA itself.

"[T]he Administrative Procedure Act's 'generous review provisions' must be given a 'hospitable' interpretation." *Abbott Laboratories v. Gardner*, 387 U.S. 136, 140-41 (1967) (quoting *Shaughnessy v. Pedreiro*, 349 U.S. 48, 51 (1955)). The APA itself refers to "mandatory or injunctive decree[s]" issued thereunder. 5 U.S.C. § 702. The import of this text is that injunctive relief is available under the APA. Moreover, the entire purpose of section 702 is to ensure that "[a] person suffering a legal wrong because of agency action" can obtain an appropriate remedy. 5 U.S.C. § 702. This purpose would be eviscerated if section 702 conferred no right to obtain meaningful relief through the courts when wronged by agency action.

The crux of this case is that an agency of the executive branch has improperly usurped legislative authority by enacting criminal prohibitions that are beyond the scope of its legislatively granted authority. Now, Appellants seek to arrogate unto themselves the judicial authority as well by placing their actions beyond the reach of pre-enforcement judicial review. This is not and cannot be correct.

## CONCLUSION

For the foregoing reasons, the district court properly exercised its discretion in granting a preliminary injunction.  This Court should affirm.

Date: March 15, 2024       Respectfully submitted,

               *s/David A. Warrington*
               DAVID WARRINGTON
               GARY M. LAWKOWSKI
               Dhillon Law Group, Inc.
               2121 Eisenhower Avenue, Suite 608
               Alexandria, VA 22314

               WHITNEY DAVIS
               Eggleston King Davis, L.L.P.
               102 Houston Avenue
               Suite 300
               Weatherford, TX 76086

               GLENN D. BELLAMY
               Wood Herron & Evans, L.L.P.
               600 Vine Street
               Suite 2800
               Cincinnati, OH 45202

## CERTIFICATE OF SERVICE

I hereby certify that on March 15, 2024, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system. Service will be accomplished by the appellate CM/ECF system.

*s/ David A. Warrington*
David A. Warrington

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of FED. R. APP. P. 32(a)(7)(B) because this brief contains 11,350 words, excluding the parts of the brief exempted by FED. R. APP. P. 32(a)(7)(B)(iii). This brief complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the type style requirements of FED. R. APP. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word for Windows in Times New Roman font 14-point type face.

*s/David A. Warrington*
David A. Warrington