No. 23-11138

---

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

---

National Association for Gun Rights, Incorporated; Texas Gun Rights, Incorporated; Patrick Carey; James Wheeler; Travis Speegle,

Plaintiffs-Appellees,

v.

Merrick Garland, U.S. Attorney General; United States Department of Justice; Steven Dettelbach, in his official capacity as Director of the Bureau of Alcohol, Tobacco, Firearms and Explosives; Bureau of Alcohol, Tobacco, Firearms, and Explosives,

Defendants-Appellants.

---

On Appeal from the United States District Court
for the Northern District of Texas
District Court Case No. 4:23-cv-830 (Hon. Reed O'Connor)

---

# REPLY BRIEF FOR APPELLANTS

---

BRIAN M. BOYNTON
  *Principal Deputy Assistant Attorney General*

LEIGHA SIMONTON
  *United States Attorney*

MARK B. STERN
BRAD HINSHELWOOD
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7256*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-7823*

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ........................................................................................ii

INTRODUCTION AND SUMMARY OF ARGUMENT .............................................1

ARGUMENT ..............................................................................................................2

I.     Plaintiffs Lack Standing ............................................................................. 2

II.    These Triggers Are Machineguns ............................................................... 6

III.   The Remaining Equitable Factors Likewise Militate Against a
       Preliminary Injunction .............................................................................. 17

CONCLUSION ....................................................................................................... 26

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Cases:**                                                                    **Page(s)**

*Abbott Labs. v. Gardner,*
  387 U.S. 136 (1967) ............................................................................ 25

*Cargill v. Garland,*
  57 F.4th 447 (5th Cir. 2023), *cert. granted,*
  No. 22-976 (U.S. Nov. 3, 2023) ....................................... 1, 2, 8, 9, 12, 15, 16

*Deaver v. Seymour,*
  822 F.2d 66 (D.C. Cir. 1987) ............................................................. 25

*Douglas v. City of Jeannette,*
  319 U.S. 157 (1943) ........................................................................... 24

*Franciscan Alliance, Inc. v. Becerra,*
  47 F.4th 368 (5th Cir. 2022) .............................................................. 22

*Friends of the Earth, Inc. v. Chevron Chem. Co.,*
  129 F.3d 826 (5th Cir. 1997) ........................................................... 3, 4

*Gettman v. DEA,*
  290 F.3d 430 (D.C. Cir. 2002) ............................................................. 4

*Hunt v. Washington State Apple Advert. Comm'n,*
  432 U.S. 333 (1977) ............................................................................. 3

*International Union, United Auto., Aerospace & Agric. Implement Workers of Am. v. Brock,*
  477 U.S. 274 (1986) ............................................................................. 3

*Lujan v. Defenders of Wildlife,*
  504 U.S. 555 (1992) ............................................................................. 6

*McDonald v. City of Chicago,*
  561 U.S. 742 (2010) ............................................................................. 9

*MedImmune, Inc. v. Genentech, Inc.,*
  549 U.S. 118 (2007) ........................................................................... 25

*New Prime Inc. v. Oliveira,*
  139 S. Ct. 532 (2019) ........................................................................... 9

*Nken v. Holder,*
  556 U.S. 418 (2009) ............................................................................. 9

*Rohm & Hass Tex., Inc. v. Ortiz Bros. Insulation, Inc.,*
  32 F.3d 205 (5th Cir. 1994) ............................................................... 6

*Rumsfeld v. Forum for Acad. & Inst. Rights, Inc.,*
  547 U.S. 47 (2006) ............................................................................ 5

*Sorenson Commc'ns, LLC v. FCC,*
  897 F.3d 214 (D.C. Cir. 2018) ......................................................... 5

*Staples v. United States,*
  511 U.S. 600 (1994) ........................................................................ 10

*Stolt-Nielsen, S.A. v. United States,*
  442 F.3d 177 (3d Cir. 2006), as amended (May 16, 2006) .................. 24-25

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.,*
  600 U.S. 181 (2023) .......................................................................... 5

*Susan B. Anthony List v. Driehaus,*
  573 U.S. 149 (2014) .......................................................................... 2

*United States v. Camp,*
  343 F.3d 743 (5th Cir. 2003) .......................................................10-11, 11

*United States v. Cox,*
  342 F.2d 167 (5th Cir. 1965) ...................................................... 24, 25

*United States v. Rare Breed Triggers, LLC,* No. 23-cv-369 (NRM) (RML),
  2023 WL 5689770 (E.D.N.Y. Sept. 5, 2023) .............................. 17

*Whitfield v. United States,*
  574 U.S. 265 (2015) .......................................................................... 9

*Winter v. Natural Res. Def. Council,*
  555 U.S. 7 (2008) ...................................................................... 20, 21

*Younger v. Harris,*
  401 U.S. 37 (1971) .......................................................................... 24

**Statutes:**

26 U.S.C. § 5845(b) ................................................. 1, 6, 8, 14, 15, 19

26 U.S.C. § 5845(c) ........................................................................ 11

26 U.S.C. § 5845(d) ........................................................................ 11

26 U.S.C. § 5845(j) ................................................................................................... 24

**Other Authorities:**

*Bump Stock Type Devices,*
  83 Fed. Reg. 66,514 (Dec. 26, 2018) .............................................................. 11

11A Charles Alan Wright & Arthur R. Miller,
  *Federal Practice and Procedure* § 2948.1 (3d ed.),
  Westlaw (database updated Apr. 2023) .......................................................... 21

## INTRODUCTION AND SUMMARY OF ARGUMENT

A shooter firing a rifle equipped with a forced reset trigger can pull the trigger once, maintain continuous pressure on the trigger, and fire repeatedly at a rate comparable to an M16 or similar machinegun. In other words, the "shooter using" the weapon "need only pull the trigger once to activate the firing sequence," which the device then maintains "of its own accord." *Cargill v. Garland*, 57 F.4th 447, 462 n.8 (5th Cir. 2023) (en banc) (plurality op.), *cert. granted*, No. 22-976 (U.S. Nov. 3, 2023). Such weapons are machineguns because they enable the firing of "automatically more than one shot . . . by a single function of the trigger." 26 U.S.C. § 5845(b). The Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) has consistently classified devices that operate in this fashion as machineguns for nearly 50 years.

The district court did not acknowledge that decades-long practice in issuing a preliminary injunction that for the first time allows these devices to be manufactured, distributed, and possessed by thousands of unknown persons with no background checks or recordkeeping. Plaintiffs do not seriously dispute that a shooter using a forced reset trigger initiates an automatic firing sequence with a single pull of the trigger. Their argument turns on the assertion that a weapon cannot be a machinegun if the trigger moves to release the hammer and resets for each shot. That contention clashes with the text and contemporaneous understanding of the statute, and would take a variety of devices outside the scope

of the statutory prohibition. That includes the Akins Accelerator, notwithstanding the recognition of a plurality of this Court in *Cargill* that the rationale given there—and endorsed by plaintiffs here—"would not apply" to that device. 57 F.4th at 462 n.8.

Plaintiffs also offer no sound reason why a preliminary injunction could properly issue when the government has made clear that it has no plans to prosecute any named plaintiff during the pendency of this litigation. Moreover, the breadth of the injunction depends on a claim to standing by organizations that make no effort whatsoever to demonstrate that they have actual "members" who direct or control the organization's activities in any way. At a minimum, the injunction should be narrowed to reflect the status quo the district court purported to be preserving based on "FRT possession or ownership," ROA.1327, and to respect traditional equitable limitations on injunctions against prospective criminal prosecutions.

## ARGUMENT

### I.     Plaintiffs Lack Standing

**A.** As discussed in our opening brief (at 18-19), all plaintiffs lack standing because they have not shown an "imminent" threat of prosecution. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014). As before, we discuss those points below in conjunction with the overlapping discussion of irreparable harm. *See infra* p. 22.

2

**B.**  Our opening brief explained that the two organizational plaintiffs here have provided no evidence demonstrating that they are membership organizations capable of representing their members in litigation.  Gov't Br. 16-18.  Organizational standing exists only if an organization's members expect it to press claims on their behalf and that they will be bound by a judgment—favorable or adverse—obtained by the organization that purports to represent them.  *See, e.g.*, *International Union, United Auto., Aerospace & Agric. Implement Workers of Am. v. Brock*, 477 U.S. 274, 290 (1986).  That is the case with "traditional" membership organizations, which typically have "a clearly articulated and understandable membership structure" that allows members to direct and control the organization through elections or other means.  *Friends of the Earth, Inc. v. Chevron Chem. Co.*, 129 F.3d 826, 828-29 (5th Cir. 1997) (quotation omitted); *see Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 344-45 (1977).

Organizational standing is not established by a bare assertion that an organization has members.  This Court in *Friends of the Earth* reviewed the crucial "indicia of membership" relevant to determine whether an organization has standing to assert claims on behalf of its members set out by the Supreme Court in *Hunt*.  As the Supreme Court made clear, it is these criteria and not an organization's label that is determinative in this inquiry.  This Court applied those indicia to conclude that Friends of the Earth had met its burden of establishing standing.  The Court noted as among critical elements in the inquiry "who elected the governing body of the

3

organization and who financed its activities." It concluded that Friends of the Earth had "a clearly articulated and understandable membership structure," that individuals "testified in court that they were members of" the organization, and that "[t]his suit clearly is within [the organization's] central purpose, and thus within the scope of reasons that individuals joined the organization. *Friends of the Earth, Inc.*, 129 F.3d at 829. For all these reasons, [Friends of the Earth] has associational standing to represent its members." *Id.*

In contrast, the plaintiff organizations here have provided no indication that their purported "members" exercise any control over the activities of the organizations. They instead assert that the court should simply assume that they are "traditional membership organizations" because they "have claimed to be" and because some individuals have "confirmed that they are members." Br. 14-15. These assertions do not address, much less satisfy, the criteria set out by the Supreme Court and this Court. And, as *Friends of the Earth* also makes clear, plaintiffs are wrong to urge that the criteria are only relevant when a plaintiff is a non-traditional organization such as the state agency representing apple growers in *Hunt.* Indeed, on plaintiffs' approach, a magazine could establish standing by renaming its subscribers as "members," *Gettman v. DEA*, 290 F.3d 430, 435 (D.C. Cir. 2002), or an entity could do so by asserting that its "members" are "passive subscribers to its e-mail list and

individuals who 'follow' the group's Facebook page," *Sorenson Comm'ns, LLC v. FCC*, 897 F.3d 214, 225 (D.C. Cir. 2018).

The Supreme Court's decision in *Students for Fair Admissions, Inc. v. President & Fellows of Harvard College*, 600 U.S. 181 (2023), does not alter this analysis. That decision addressed an organization that had demonstrated that it had 47 members and was proceeding, in one of the consolidated cases, on behalf of "four members in particular" who "filed declarations" stating their support for the lawsuit and who provided "input and direction" on the case. *Id.* at 201 (quotation omitted). In those circumstances, where "an organization has identified members and represents them in good faith," there was no occasion for "further scrutiny into how the organization operates." *Id.* Nor was there any question in that case about the scope of the relief to which the plaintiffs were entitled; identifying even one represented individual with standing would be sufficient to reach the merits of the dispute. *See, e.g.*, *Rumsfeld v. Forum for Acad. & Inst. Rights, Inc.*, 547 U.S. 47, 52 n.2 (2006).

Here, by contrast, the plaintiff organizations are purporting to litigate not solely on behalf of specific "identified members" but also on behalf of thousands of unidentified members—who do not control the organization or this litigation and many of whom may not even know about the litigation. Nothing about the Supreme Court's decision undermines the principle that an organization that does not satisfy the criteria set out in *Hunt* and *Friends of the Earth* cannot litigate on behalf of

5

thousands of persons who will presumably be bound by a judgment in litigation of which they may have no knowledge. The importance of that principle is highlighted here, where the breadth of the injunction is entirely dependent on the organizations' bare assertion that they represent those individuals in a meaningful way.

Plaintiffs' suggestion that the Court may simply assume the organizations' standing at this stage without evidentiary support (Br. 16) clashes with fundamental principles of standing law. It is plaintiffs' burden to establish their entitlement to a preliminary injunction, including their standing, by appropriate evidence, and standing cannot be waived or assumed. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992); *Rohm & Hass Tex., Inc. v. Ortiz Bros. Insulation, Inc.*, 32 F.3d 205, 208 (5th Cir. 1994).

## II.     These Triggers Are Machineguns

Our opening brief explains (at 18) that a firearm shoots more than one shot "by a single function of the trigger," 26 U.S.C. § 5845(b), if a single act by the shooter, such as a push or a pull, initiates the firing of multiple shots. That describes the devices at issue here, which allow a shooter to pull the trigger, maintain pressure, and fire at a rate of over 900 rounds a minute. These weapons are thus practically indistinguishable from military M16-type rifles or similar weapons that all agree are machineguns, which likewise allow a shooter to pull the trigger and fire repeatedly. Unsurprisingly, therefore, ATF has consistently classified materially similar devices as machineguns for nearly 50 years.

6

**A.** The operation of these forced reset triggers is described in detail in our opening brief. Gov't Br. 6-7. These devices replace the standard trigger assembly on a semiautomatic firearm and enable a shooter to pull the trigger once to fire a shot, maintain steady, continuous pressure on the trigger, and fire repeatedly while the device rapidly pushes the trigger slightly forward against the shooter's continuous pressure.

Plaintiffs themselves offer no general definition of the phrase "single function of the trigger." They instead focus on the specific mechanics of these devices, asserting that because the trigger must "reset after each round is fired" by moving forward and "retain[ing] the hammer" for a fraction of a second, the trigger must "separately function to release the hammer by moving far enough to the rear in order to fire the next round." Br. 19 (quotation omitted); *accord* Br. 4 (contending that a separate "function" occurs for each shot because the trigger "moves" and "resets" for each round). Plaintiffs argue that, under that definition, a rifle equipped with an FRT fires only one shot for each function of the trigger. And they urge that in consistently classifying these devices as machineguns ATF has mistakenly understood the term "single function of the trigger" to refer to "shooter input" rather than the specific mechanical details they emphasize. Br. 21.

The distinction between a shooter's actions and the mechanics of the weapon that plaintiffs draw is misconceived. A trigger does not initiate a firing sequence by

7

itself.  The essential characteristic of a trigger is that it allows a push, pull, or other act by the shooter to initiate a firing sequence.  It is thus natural to read "single function of the trigger" to require consideration of the shooter's interaction with the trigger.  And it is equally natural to use the term "pull" in describing that action, as that is the most common way by which shooters interact with a trigger.  Indeed, the *Cargill* plurality employed that natural formulation it in its opinion.  *Cargill v. Garland*, 57 F.4th 447, 463 (5th Cir. 2023) (en banc) (plurality op.) ("[T]he act of pulling and holding the trigger is one function.").

The absence of a dichotomy between "shooter input" and the operation of the firearm is underscored by the remainder of the statutory definition.  Congress defined the term "machinegun" to include "any weapon which shoots . . . *automatically* more than one shot, without *manual* reloading, by a single function of the trigger."  26 U.S.C. § 5845(b) (emphases added).  No one disputes that a court must consider the shooter's acts in deciding whether a firearm shoots "automatically."  Nor does anyone dispute that a court must consider the shooter's acts in deciding whether a firearm shoots without "manual reloading."  So too, applying the phrase "single function of the trigger" necessarily involves considering the shooter's actions.  Indeed, the fundamental difference between a machinegun and a semiautomatic weapon is that on a semiautomatic weapon multiple pulls are required to trigger multiple shots, and no pull initiates an automatic firing sequence.

8

The legislative history discussed in our opening brief confirms the natural reading of the statutory text, but plaintiffs err insofar as they assert (Br. 21-22) that ATF's classification depends on "legislative history." The legislative history and dictionaries of the period are useful to the extent that they cast light on the contemporaneous understanding of relevant terms by English speakers around the time the statute was enacted. *See, e.g.*, *New Prime Inc. v. Oliveira*, 139 S. Ct. 532, 540 & nn. 2-5 (2019); *Whitfield v. United States*, 574 U.S. 265, 267-68 (2015).

That approach is especially appropriate in considering the meaning of a phrase rather than a single word. Phrases often mean more than the sum of their parts. *See, e.g.*, *Nken v. Holder*, 556 U.S. 418, 430 (2009) ("The sun may be a star, but 'starry sky' does not refer to a bright summer day."). And here, "[t]he phrase 'single function of the trigger' is not a matter of common parlance." *Cargill*, 57 F.4th at 475 (Ho, J., concurring in part and concurring in the judgment). Instead, it appears to have been used only in connection with legislation regulating machineguns. The most reliable way to interpret the phrase is thus to consider how speakers—whether legislators, executive officials, judges, or ordinary citizens—used and understood it in the context of those statutes. *See McDonald v. City of Chicago*, 561 U.S. 742, 828 (2010) (Thomas, J., concurring in part and concurring in the judgment) ("Statements by legislators can . . . demonstrate the manner in which the public used or understood a particular word or phrase.").

9

That contemporaneous usage is not "speculation as to Congress' intent," Br. 22 (quotation omitted); instead, it is evidence of what the words Congress used were understood to mean at the time. It is understandable that plaintiffs ask the Court to disregard this evidence. As we documented, many speakers at or near the time of the statute's enactment—including the President of the National Rifle Association, two congressional committees, multiple members of Congress, and the Department of the Treasury—understood the term "single function of the trigger" to include a single pull of the trigger. *See* Gov't Br. 24-26. The Supreme Court has stated that the term "machinegun" includes a firearm that "fires repeatedly with a single pull of the trigger," *Staples v. United States*, 511 U.S. 600, 602 n.1 (1994), and many courts of appeals have likewise used the word "pull" when applying the statute, *see* Gov't Br. 23-24. Those sources confirm that the term "single function of the trigger" focuses on what the shooter does to initiate the firing of multiple shots (*e.g.*, pull the trigger) rather than on the internal mechanics of the firearm or the physical movement of the trigger itself. And plaintiffs themselves offer no evidence of contemporaneous meaning or early practice that supports their view of the statute.

Plaintiffs similarly offer no account of how to square their reading with devices that automatically activate a conventional firearm's trigger. For example, in *United States v. Camp*, this Court addressed a rifle modified with a motor-operated fishing reel that pulled and released the rifle's original trigger when activated by a switch. 343

10

F.3d 743, 745 (5th Cir. 2003). The original trigger on that weapon "reset" and "move[d]" for every round fired, but this Court had no difficulty concluding that the legally relevant trigger was the switch, even though the switch lacked any direct connection to the hammer or other internal components of the firearm to which it was attached. *Id. Camp* thus underscores that "trigger" refers to the mechanism by which the shooter initiates a firing sequence rather than to a specific mechanical component of the firearm, and that the phrase "single function of the trigger" focuses on how the shooter interacts with the firearm to initiate the firing sequence rather than on the firearm's mechanical details. A reading of "function of the trigger" that is tied to the mechanics of a particular type of firearm is thus inconsistent with the breadth of the definition Congress adopted.

That breadth also illustrates the error in plaintiffs' reliance (Br. 22) on other definitional provisions of the National Firearms Act that refer to a "pull of the trigger." 26 U.S.C. § 5845(c), (d). Whatever the scope of those definitions, Congress chose the broad term "function" in defining machineguns to capture the full range of ways a shooter can initiate the firing sequence. Some machineguns that were well known in 1934 used triggers that had to be pushed with the thumb rather than pulled with the index finger. For example, push triggers featured on the Maxim, Vickers, and M2 Browning machineguns. *See Bump Stock Type Devices*, 83 Fed. Reg. 66,514, 66,519 n.5 (Dec. 26, 2018). Congress's use of the more general term "function"

11

rather than "pull" ensured that the statute would also cover those types of automatic firearms.

Plaintiffs also appear to acknowledge that their interpretation would sweep far beyond the devices at issue here to legalize other devices understood to be machineguns. The *Cargill* plurality emphasized that its reasoning "would not apply to an Akins Accelerator," 57 F.4th at 462 n.8, a device that used a spring in the stock to repeatedly force the trigger against a shooter's finger after the shooter pulled the trigger once. The trigger thus moved and reset for each shot in precisely the same fashion as a typical unmodified semiautomatic rifle. But the plurality explained that "a shooter using an Akins Accelerator need only pull the trigger once to activate the firing sequence" and the device would then fire "of its own accord." *Id.* Plaintiffs apparently reject this reasoning, stating that the Akins Accelerator "cause[s] the trigger automatically to function repeatedly," Br. 25—in other words, that the device does not operate "by a single function of the trigger."

Plaintiffs suggest that the Akins Accelerator could be distinguished because it does not "require an external force by the shooter to *actuate* the trigger repeatedly," while with the devices here "[a]n external force must be applied by the user to cause the trigger to function (actuate the trigger) each time a shot is fired." Br. 25. But plaintiffs' argument turns on whether the trigger moves once or multiple times during the firing sequence, and they do not dispute that the trigger moves repeatedly on a

weapon equipped with an Akins Accelerator. And insofar as the shooter must provide "external force" to allow the firing of repeated shots with a firearm equipped with a forced reset trigger, the devices are no different from an M16 or similar machinegun, where the shooter must maintain continuous pressure on the trigger to fire repeatedly.

Plaintiffs are similarly unable to grapple with the hypothetical example of a device that fires multiple bullets after the shooter presses a button, with the button oscillating up and down each time a bullet is fired. Plaintiffs instead fight the hypothetical, insisting that the button "does not reset after each shot" because "its mechanical operation continues undisrupted automatically." Br. 25-26. That answer conflates the components of the statutory definition of a machinegun. The fact that the trigger is moving *automatically*—just as the trigger on a weapon equipped with an Akins Accelerator is moving automatically—should on plaintiffs' view have no bearing on whether the trigger is functioning for each shot fired, such as by repeatedly releasing a hammer or playing some other necessary mechanical role in the firing sequence.

Plaintiffs fail to grapple with ATF's decades-long and consistent treatment of devices that operate in materially the same manner as the FRT-15 and WOT as machineguns. As our opening brief explained (at 20-21, 33-34), ATF classified a similar device as a machinegun in 1975, and has repeatedly classified similar devices as

machineguns in the decades since. Plaintiffs do not dispute that ATF has acted consistently with respect to the devices at issue here, instead focusing (Br. 26-27) on changes in ATF's treatment of various bump-stock-type devices that do not bear on its treatment of forced reset triggers.   And the purportedly "different definitions" plaintiffs identify from filings in this litigation (Br. 27-28) are simply restatements of the same basic principle: that a firearm shoots more than one shot "by a single function of the trigger," 26 U.S.C. § 5845(b), if a single act, such as a push or a pull, initiates the firing of multiple shots.  That principle plainly applies here: using these devices a shooter can pull the trigger, maintain continuous pressure, and fire repeatedly at a rate comparable to an M16 or similar machinegun.

Plaintiffs also emphasize (Br. 4, 19-20, 23) that a shooter using one of these devices could cause the device to malfunction if he pulled the trigger with sufficient force to overcome the operation of the device by preventing the trigger from moving, and so a shooter cannot hold the trigger still in its most rearward position.  That is accurate but without legal relevance.  The salient undisputed fact is that the shooter can apply continuous pressure to the trigger while the device automatically repeatedly forces the trigger forward, releases the hammer, and fires.  As plaintiffs' expert explained, with each shot these devices exert "enough pressure to move the trigger forward and reset it with the hammer, even if the shooter does not lessen his rearward pressure on the trigger."  ROA.2172-73 (quotation omitted).  ATF illustrated the same

14

point by using a zip tie to apply a continuous amount of pressure to the trigger sufficient to release the hammer: when that pressure was applied, the weapon fired repeatedly. *See, e.g.*, ROA.946.

**C.** Plaintiffs contend (Br. 29-33) that the statute is ambiguous as applied to forced reset triggers, relying on this Court's decision in *Cargill*. As discussed above, the application of the statutory definition to these devices is not ambiguous, much less grievously so. But *Cargill*'s lenity holding does not aid plaintiffs in any event. In *Cargill*, a majority of this Court held that 26 U.S.C. § 5845(b) was grievously ambiguous as applied to non-mechanical bump stocks, and thus that "the rule of lenity demands that we resolve that ambiguity in favor of [the plaintiff], and in turn conclude that a non-mechanical bump stock is not a machinegun for purposes of the National Firearms Act and Gun Control Act." 57 F.4th at 471. That "ambiguity" as applied to non-mechanical bump stocks arose from two aspects of the statutory definition—both the application of the term "automatically" and the application of the term "single function of the trigger." *Id.* at 470.

Plaintiffs suggest that "both ambiguities are at issue here." Br. 33. Aside from a brief assertion in their appellate brief, *see* Br. 20, plaintiffs have never contended that the FRT-15 and WOT do not operate "automatically," and the district court did not address that question. In *Cargill*, the plurality would have held that non-mechanical bump stocks do not operate automatically "because the shooter must manually apply

15

forward pressure on the barrel with his or her non-trigger hand" for the firing

sequence to continue, which the plurality contrasted with a machinegun where "force

must be maintained on the trigger" to fire repeatedly. 57 F.4th at 463. Of course, the

central feature of the forced reset triggers at issue here is that the shooter need only

maintain pressure on the trigger while the device does all the other work required to

fire repeatedly, just like an M16 or other weapon all agree is a machinegun.

Plaintiffs are likewise mistaken in suggesting (Br. 31-33) that this Court in

*Cargill* held that the statute is ambiguous as applied to any device for which the trigger

moves for each shot. That reading would likewise legalize the Akins Accelerator,

again despite the plurality's statement that the Akins Accelerator would remain

unaffected. *Cargill*, 57 F.4th at 462 n.8. And this Court repeatedly characterized its

lenity holding as addressing only whether the statute was grievously ambiguous as

applied to non-mechanical bump stocks. *E.g.*, *id.* at 470 ("As we understand it, the

National Firearms Act and Gun Control Act do not unambiguously criminalize the

possession of a non-mechanical bump stock."); *id.* ("[W]e are wholly persuaded that if

the definition of 'machinegun' does not unambiguously exclude non-mechanical

bump stocks, its inclusion of the latter is at the very least ambiguous."); *id.* at 471

("[W]e are bound to construe the definition of machinegun to exclude a semi-

automatic weapon equipped with a non-mechanical bump stock."); *id.* at 473 ("We

cannot say that the National Firearms Act and Gun Control Act give that fair warning

that possession of a non-mechanical bump stock is a crime."). *Cargill*'s lenity holding thus does not control as to these distinct devices.

## III.  The Remaining Equitable Factors Likewise Militate Against a Preliminary Injunction

**A.** Plaintiffs do little to rehabilitate the district court's fundamental misapprehension of the status quo governing forced reset triggers.  As noted, they do not dispute that ATF has treated materially similar devices as machineguns since the 1970s, and thus make no effort to defend the district court's erroneous and repeated assertions that the treatment of these devices was the result of the 2018 bump stock rulemaking.  *See* Gov't Br. 32-33 (cataloguing examples).  Even the portion of the district court's opinion that they characterize as "explicitly consider[ing]" the appropriate status quo (Br. 39) mistakes the relevant history, stating that "FRTs have been classified by the ATF as machineguns since at least July 2021."  ROA.1327 n.92.  Similarly, plaintiffs' assertion that they "wish to continue lawfully exercising freedoms they have exercised for several years," Br. 38, disregards that these devices have *never* been treated as lawful, including at the time they were sold to plaintiffs, and that in fact another district court has concluded that the sellers of those devices likely committed fraud in representing that they were lawful, *see United States v. Rare Breed Triggers, LLC*, No. 23-cv-369 (NRM) (RML), 2023 WL 5689770, at *27-34 (E.D.N.Y. Sept. 5, 2023).  Plaintiffs cannot leverage that conduct into a new "status quo" where individuals "possess FRTs."  Br. 38.

The question is thus whether a preliminary injunction should issue that would convert these devices from machineguns into legal and unregulated firearms accessories that may be possessed and sold without the background checks or recordkeeping otherwise required of firearms before a final ruling from any court concluding that the longstanding treatment of these devices was mistaken. And as we explained, the harm of allowing the unfettered manufacture, distribution, and transfer of these devices to the government and the public interest is considerable. These devices operate indistinguishably from other machineguns and pose the same dangers to the public. *See, e.g.*, ROA.1051. These devices have been unlawfully sold without the background checks or recordkeeping required of other firearms, and under the injunction would continue to be, rendering it difficult, if not impossible, to locate and recover these devices if the government ultimately prevails on the merits. *See* ROA.1998. In the meantime, ATF has repeatedly encountered these devices in criminal investigations, and even without the records described above has identified dozens of instances in which these devices have been transferred to individuals generally barred from possessing firearms under federal law. ROA.2001-02.

Plaintiffs repeatedly criticize ATF's efforts to prioritize enforcement against large-scale manufacturers and sellers of FRTs, suggesting that this necessarily means that "the prohibition on FRTs does no work in protecting public safety" because ATF is not pursuing enforcement against otherwise law-abiding possessors of FRTs. Br.

18

42. As we have explained throughout this case—and again in our opening brief (at 38)—ATF has limited resources and has chosen to triage the problem it faces by devoting those resources to stemming the flow of these devices to the public. The fact that the government has to prioritize its efforts in this fashion does not mean that individual possession of these devices is of no concern.

The same error is apparent in plaintiffs' contention that the prohibition on FRTs cannot "protect public safety" because the devices require a firearm to work and firearm possession would be a separate crime for individuals prohibited from possessing firearms. Br. 43. That ignores the judgment Congress made in barring the possession of "any part designed and intended solely and exclusively . . . for use in converting a weapon into a machinegun." 26 U.S.C. § 5845(b). Congress thus recognized that possessing such a part wholly apart from any weapon posed unique dangers. Someone in possession of the part could borrow, steal, or otherwise acquire a weapon and immediately have a machinegun, perhaps before any enforcement action could be taken.

At bottom, plaintiffs' attempted distinctions rest on their view that these devices are not machineguns, and that therefore there can be no harm from the injunction. As discussed above, that view is wrong on the merits. But at a minimum, the decades of historical practice treating these weapons as machineguns, as well as the fact that they are practically indistinguishable from other machineguns and the

other harms that would flow from an injunction, should have given the district court pause before legalizing their ownership or transfer on a vast scale on an interlocutory basis. *See, e.g.*, *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 23-24, 32-33 (2008) (holding that a preliminary injunction was improper even assuming plaintiffs were likely to prevail on the merits).

**B.** The irreparable harms plaintiffs identify, by contrast, are minimal. They repeat their claims of lost "compliance costs" or "loss of use and enjoyment of their property . . . for a limited period of time." Br. 34. Even assuming that these allegations were adequate to establish standing notwithstanding the lack of any imminent enforcement action, *see infra* p. 22, these harms would carry little weight in the preliminary injunction calculus. As noted, ATF's view of these and materially similar devices has been the same for decades. Plaintiffs cannot contend that having purchased devices ATF has viewed as unlawful for decades, they now face any new compliance costs or other obligations that have not been present since ATF first addressed a materially similar device nearly 50 years ago. Nor can plaintiffs claim any "compliance costs" related to future purchases of these devices. *See, e.g.*, ROA.115 (plaintiff who does not own these devices bur would like to purchase them in the future). To the extent a forfeiture or similar action were to occur, plaintiffs could seek return of their property through those proceedings. But at all events, those harms— by definition temporary—are far outweighed by the harms to the government and the

public interest of allowing the unfettered manufacture, distribute, and transfer of these devices while this litigation proceeds.  And plaintiffs' claims of harm are further vitiated by their lengthy delay in seeking judicial relief.  For example, plaintiffs emphasize that ATF communicated to plaintiff William Carey that it viewed FRTs as illegal and that Carey took steps in response, Br. 9, but they offer no explanation for why Carey waited over a year after receiving that letter before bringing suit.

Plaintiffs' continued reliance on a supposed threat of criminal prosecution (Br. 34-35) similarly misunderstands the inquiry for a preliminary injunction.  As discussed below, *see infra* pp. 24-25, a criminal prosecution is not a form of irreparable harm that can support an injunction in these circumstances.  Moreover, the government has specifically stated that has no present intention to bring any enforcement action, including a criminal prosecution, against any individual plaintiff and has promised to inform the district court if that changes.  Because the purpose of a preliminary injunction is to prevent irreparable harm in the interim period before final judgment, plaintiffs cannot plausibly contend that they will face criminal prosecution or other enforcement before a final judgment on the merits.  *See Winter*, 555 U.S. at 20 (emphasizing that a plaintiff must show "that he is likely to suffer irreparable harm in the absence of preliminary relief"); 11A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2948.1 (3d ed.), Westlaw (database updated Apr. 2023)

21

("[I]f a trial on the merits can be conducted before the injury would occur there is no need for interlocutory relief.").

These points also illustrate that plaintiffs lack standing. Plaintiffs still have not identified a single otherwise law abiding individual FRT owner who was subject to civil or criminal enforcement based on their possession of an FRT-15 or WOT. The cases they cite (Br. 10 n.3) all involve prosecutions of individuals who committed other gun-related felonies in addition to possessing an FRT-15 or WOT. Nor do they identify any civil enforcement actions ATF has taken as to similarly-situated parties. The most they identify is that some plaintiffs or "members" of the organizations have received letters from ATF stating the agency's view that these devices are unlawful machineguns. Br. 9-10, 35-36. Those letters advising of ATF's view are not themselves enforcement actions. Plaintiffs' reliance on *Franciscan Alliance, Inc. v. Becerra*, 47 F.4th 368 (5th Cir. 2022), is likewise misplaced. That case not only involved the cessation of government conduct—where it is the government's burden to demonstrate mootness—but also a situation where the government had engaged in no consideration of whether to apply the statute to the plaintiffs. *Id.* at 376. Here, by contrast, plaintiffs bear the burden of establishing standing, and they have both failed to show any history of enforcement against similarly-situated individuals and received statements from the government that no enforcement action is imminent.

**C.** At a minimum, these considerations support narrowing the injunction in multiple respects.

**1.** As discussed above, *see supra* pp. 3-6, extending relief to the "members" of organizations in the absence of any evidence suggesting that these organizations actually have members was inappropriate. Any injunctive relief should be limited to the named individual plaintiffs.

**2.** The district court purported to be preserving a status quo based on "FRT possession or ownership," ROA.1327, and plaintiffs themselves describe "the status quo being preserved" as "one where Appellees currently possess FRTs," Br. 38. But the district court's injunction extends beyond that (mistaken) status quo to allow the unfettered manufacture and distribution of these devices while the litigation proceeds. As we explained (Gov't Br. 40-41), the injunction should be narrowed as it applies beyond possession and permits the continued manufacture, distribution, and transfer of these devices, which will open the door to widespread distribution of deadly weapons. A temporary delay in plaintiffs' ability to acquire further devices provides even less weight that could counterbalance the government and the public's interest in not having these devices freely distributed while this litigation proceeds.

Plaintiffs assert that one of their number—James Wheeler—intends to sell these devices. Br. 45. Plaintiffs' complaint alleges that Wheeler is a partial owner of a business that owns and sells FRTs. ROA.19. However, that business is not a party to

23

this lawsuit, and neither the complaint nor either of Wheeler's declarations provide any information about its identity, corporate form, or even ownership structure to suggest that he has standing to assert any alleged injury on its behalf. *See* ROA.19, ROA.118, ROA.1274. And the other individuals plaintiffs identify (Br. 45) have expressed an intent to purchase more forced-reset triggers (and thus to receive and possess them), not to transfer those devices. *See* 26 U.S.C. 5845(j) (defining "transfer" as including "selling, assigning, pledging, leasing, loaning, giving away, or otherwise disposing of").

**3.** Finally, plaintiffs fail to justify the injunction's application to criminal prosecutions. They do not identify a single case supporting the issuance of a preliminary injunction against a federal criminal prosecution based on the assertion that the prosecution would be based on a mistaken reading of the relevant statute. That reflects the general rules that "courts of equity do not ordinarily restrain criminal prosecutions," *Douglas v. City of Jeannette*, 319 U.S. 157, 163 (1943); *accord United States v. Cox*, 342 F.2d 167, 171 (5th Cir. 1965) (en banc), and that "the cost, anxiety, and inconvenience of having to defend against a single criminal prosecution" is not an injury "considered 'irreparable' in the special legal sense of that term," *Younger v. Harris*, 401 U.S. 37, 46 (1971), so as to support the issuance of a preliminary injunction. That is why courts of appeals have repeatedly rejected efforts to enjoin federal criminal prosecutions in the absence of meaningful constitutional issues. *See*

24

*Stolt-Nielsen, S.A. v. United States*, 442 F.3d 177, 183 (3d Cir. 2006), as amended (May 16, 2006); *Deaver v. Seymour*, 822 F.2d 66, 68-71 (D.C. Cir. 1987). And plaintiffs nowhere attempt to explain how their claims—which raise solely issues of statutory interpretation—involve "constitutional" harm. Br. 37.

Plaintiffs note that *Stolt-Nielsen* and *Deaver* involved only "individualized determination[s]" rather than the "validity of a generally applicable law." Br. 46. Of course, this case does not involve the validity of a statute either, and plaintiffs do not explain why that distinction would matter in any event. Courts have properly refused to countenance injunctions limited to a single prospective defendant, and there is no justification for distinguishing those cases because plaintiffs here seek a far more intrusive injunction that they assert applies to thousands of individuals nationwide.

Nor would recognizing the longstanding rule against enjoining criminal proceedings leave plaintiffs with "no right to obtain meaningful relief through the courts when wronged by agency action." Br. 48. Plaintiffs themselves observe that they could seek a declaratory judgment. Br. 46-47; *see, e.g.*, *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128-32 (2007); *Abbott Labs. v. Gardner*, 387 U.S. 136, 152 (1967). But an injunction intrudes on "the free exercise of the discretionary powers of the attorneys of the United States in their control over criminal prosecutions," which is "an incident of the constitutional separation of powers." *Cox*, 342 F.2d at 171. Injunctive relief that intrudes on that constitutionally-assigned power—and in

particular *preliminary* injunctive relief, which by definition occurs before a definitive

determination of the merits—is thus quite inappropriate in the absence of serious

constitutional claims.

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be

reversed, or, at a minimum, narrowed as described above.

Respectfully submitted,

BRIAN M. BOYNTON
  *Acting Assistant Attorney General*

LEIGHA SIMONTON
  *United States Attorney*

MARK B. STERN

  *s/ Brad Hinshelwood*
BRAD HINSHELWOOD
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7256*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-7823*
  *bradley.a.hinshelwood@usdoj.gov*

April 2024

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 6,309 words.  This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Microsoft Word 2016 in Garamond 14-point font, a proportionally spaced typeface.


*s/ Brad Hinshelwood*
Brad Hinshelwood