No. 23-11138

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

National Association for Gun Rights, Incorporated; Texas Gun Rights, Incorporated; Patrick Carey; James Wheeler; Travis Speegle,

Plaintiffs-Appellees,

v.

Merrick Garland, U.S. Attorney General; United States Department of Justice; Steven Dettelbach, in his official capacity as Director of the Bureau of Alcohol, Tobacco, Firearms and Explosives; Bureau of Alcohol, Tobacco, Firearms, and Explosives,

Defendants-Appellants.

On Appeal from the United States District Court
for the Northern District of Texas
District Court Case No. 4:23-cv-830 (Hon. Reed O'Connor)

## SUPPLEMENTAL BRIEF FOR APPELLANTS

BRIAN M. BOYNTON
  *Principal Deputy Assistant Attorney General*

LEIGHA SIMONTON
  *United States Attorney*

MARK B. STERN
BRAD HINSHELWOOD
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7256*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-7823*

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES..................................................................................ii

INTRODUCTION AND SUMMARY OF ARGUMENT.............................................1

ARGUMENT ..................................................................................................2

*Cargill* Confirms That These Devices Are Machineguns........................................2

CONCLUSION ............................................................................................. 11

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Cases:** Page(s)

*United States v. Carter*,
　465 F.3d 658 (6th Cir. 2006) ............................................................................. 9

*Cargill v. Garland*,
　144 S. Ct. 1613 (2023) ............................................................... 1, 2, 3, 4, 5, 6, 8, 10

*United States v. Jokel*,
　969 F.2d 132 (5th Cir. 1992) ............................................................................. 5

**Statute:**

26 U.S.C. § 5845(b) ............................................................................................ 1

# INTRODUCTION AND SUMMARY OF ARGUMENT

*Garland v. Cargill*, 144 S. Ct. 1613 (2023), confirms the correctness of ATF's longstanding treatment of devices like the ones at issue here as machineguns.

A machinegun is a weapon that fires "automatically more than one shot … by a single function of the trigger." 26 U.S.C. § 5845(b). In *Cargill*, the Supreme Court explained that definition by contrasting the operation of a typical semiautomatic rifle with that of a typical machinegun. A semiautomatic rifle with a standard trigger assembly will fire "only one time" when the shooter "engag[es] the trigger," and "[t]he shooter must release and reengage the trigger to fire another shot." 144 S. Ct. at 1617. The need for release and reengagement results from the operation of a component called the "disconnector," which prevents the weapon from firing again by retaining the weapon's "hammer" (the component that strikes the firing pin for each shot) until the trigger is released. *Id.* at 1621-22. The disconnector stops the firing cycle, requiring a separate and distinct function of the trigger to fire another shot. *Id.* at 1622.

By contrast, "[w]ith a machinegun, a shooter can fire multiple times, or even continuously, by engaging the trigger only once." *Cargill*, 144 S. Ct. at 1617. A machinegun firing automatically does not use a disconnector, instead using an "auto sear." The auto sear "catches the hammer as it swings backwards, but will release [the hammer] again once a new cartridge is loaded if the trigger is being held back." *Id.* at 1622 n.4. Functionally, the auto sear briefly retains the hammer

between shots to allow the weapon to safely reload, and then is automatically tripped by the "bolt carrier" of the weapon to fire the next shot.

The FRT-15 and WOT likewise eliminate the need for the shooter to "release and reengage the trigger" between shots, *Cargill*, 144 S. Ct. at 1617, instead allowing a shooter to engage the trigger once to fire repeatedly. These devices have no disconnector to interrupt the firing cycle. They instead achieve continuous fire through the "locking bar," which serves the same purposes as an auto sear. The locking bar momentarily delays release of the hammer until the weapon is safely reloaded and ready to fire again, and the locking bar is automatically tripped by the bolt carrier to enable another shot. The chief difference between the locking bar and an auto sear is that while an auto sear retains the hammer directly, the locking bar does so indirectly by briefly restraining movement of the trigger. In a firearm with an FRT-15 or WOT the trigger thus moves as part of the automatic mechanical process of retaining and releasing the hammer. But those separate movements of the trigger are part and parcel of the devices' automatic operation and do not constitute separate and distinct "function[s]" of the trigger.

## ARGUMENT

### *Cargill* Confirms That These Devices Are Machineguns

**A.** In *Cargill*, the Supreme Court explained that "'a 'trigger' is an apparatus, such as a 'movable catch or lever,' that 'sets some force or mechanism in action,'" and

2

that the term "function" means "the mode of action by which [an object] fulfils its purpose." 144 S. Ct. at 1620. Thus, "[t]he phrase 'function of the trigger' … refers to the mode of action by which the trigger activates the firing mechanism." *Id.* This analysis examines the entire "trigger assembly" and its relationship to the "mechanics of the firing cycle." *Id.*

The Supreme Court explained that on an unmodified semiautomatic rifle with a standard trigger assembly, "[f]or each shot, the shooter must engage the trigger and then release the trigger to allow it to reset." *Cargill*, 144 S. Ct. at 1622; *accord id.* at 1617. The shooter's engagement of the trigger begins a mechanical process that fires a single shot. The trigger releases the hammer, which strikes the firing pin. The explosive force of the resulting shot forces the weapon's "bolt carrier" backwards, and the rearward travel of the bolt carrier forces the hammer down until the hammer is retained by the disconnector. The disconnector "will hold the hammer in that position for as long as the shooter holds the trigger back, thus preventing the firearm from firing another shot." *Id.* at 1621-22. "[W]hen the shooter takes pressure off the trigger and allows it to move forward … the hammer slips off the disconnector," positioning the gun to be fired again. *Id.* at 1622. This "complete process … constitutes 'a single function of the trigger'" on such a weapon and "[a]ny additional shot fired after one cycle is the result of a separate and distinct 'function of the trigger.'" *Id.*

3

In applying the statutory definition to non-mechanical bump stocks, the Court emphasized that those devices do not alter the trigger mechanism or the process required for the firing of a shot. *Cargill*, 144 S. Ct. at 1622. Those devices instead replace the stock on an ordinary semiautomatic rifle and allow the gun to slide back and forth in the device between shots. The movement results from the combination of the recoil of each shot and the shooter's forward pressure on the barrel of the weapon. While the shooter's finger remains stationary on the device's "ledge," the recoil of each shot causes the trigger to separate from the shooter's finger as the gun travels backwards, and the shooter's forward pressure then slides the gun forward again so that the trigger strikes the shooter's finger. *Id.* at 1618. Such devices are not machineguns because "[w]ith or without a bump stock, a shooter must release and reset the trigger between every shot." *Id.* at 1620; *accord id.* at 1622 ("[T]he shooter must release pressure from the trigger and allow it to reset before reengaging the trigger for another shot."). Those devices only "accelerate the rate of fire by causing these distinct 'function[s]' of the trigger to occur in rapid succession." *Id.* at 1620.

The Court contrasted such weapons with machineguns with "auto sears." An auto sear—a common component of many machineguns, such as M16-type machineguns—allows a shooter to "fire multiple shots while engaging the trigger only once," because the auto sear "catches the hammer as it swings backwards, but will release [the hammer] again once a new cartridge is loaded if the trigger is being held

4

back." *Cargill*, 144 S. Ct. at 1622 n.4. More specifically, with an auto sear, the recoil of the first shot drives the bolt carrier backwards, and the bolt carrier depresses the hammer, which is retained on the auto sear until a new cartridge is safely loaded. *E.g.*, ROA.1129-32. By delaying release of the hammer while the weapon reloads, the auto sear "effectively tim[es] the hammer to fall" once the weapon has reloaded, ROA.1132, avoiding malfunctions that would result if the hammer released too early, *e.g.*, ROA.1098. As the bolt carrier returns forward when the weapon is safely loaded, the auto sear is contacted by the "trip surface" of the bolt carrier, automatically releasing the hammer from the auto sear and firing another shot. ROA.1133. Machineguns with auto sears require a bolt carrier engineered to include this trip surface, which serves no purpose on a weapon with a standard semiautomatic trigger assembly. ROA.1030, 1091.

**B.** *Cargill* underscores the correctness of ATF's longstanding treatment of devices like the ones at issue here as machineguns. As the Court explained, the dispositive consideration is "how many shots discharge when the shooter engages the trigger." *Cargill*, 144 S. Ct. at 1623. This understanding—and the Court's explication of the terms "trigger" and "function"—mirrors the longstanding view of this Court and others that a trigger fundamentally serves "to initiate the firing sequence" of a weapon. *United States v. Jokel*, 969 F.2d 132, 135 (5th Cir. 1992) (per curiam).

5

Unlike non-mechanical bump stocks, these devices entirely replace a firearm's trigger assembly. Most significantly, these devices lack a disconnector—the component of a standard semiautomatic rifle trigger that "hold[s] the hammer" and prevents the firing of further shots until "the shooter takes pressure off the trigger and allows it to move forward." *Cargill*, 144 S. Ct. at 1622. As a result, these devices do not require the shooter to "release and reengage" the trigger or "take[] pressure off" the trigger for each shot. *Id.* at 1617, 1622. Instead, as plaintiffs' expert explained, the weapon will continue to fire "even if the shooter does not lessen his rearward pressure on the trigger." ROA.2172-73. ATF testing confirmed the same by applying a metal cable tie to the trigger to apply continuous pressure and observing that the weapon fired repeatedly. *E.g.*, ROA.946.

As discussed in our brief, *see* Opening Br. 6-7, the shooter's initial engagement of the trigger causes a shot to be fired and the weapon's bolt carrier to travel backwards. As on an unmodified semiautomatic rifle, the rearward travel of the bolt carrier presses the hammer down. But rather than having the hammer be retained by the disconnector, the hammer is forced directly onto the trigger sear surface. ROA.1097-98. The pressure from the hammer pushes down on the trigger to force the trigger forward, where the trigger is held in place by the locking bar. *Id.* The locking bar restrains the movement of the trigger, thereby briefly holding the hammer in place while the bolt carrier is still traveling. This brief delay is critical to the

6

operation of the weapon: releasing the hammer too early could result in a malfunction. *Id.* As the bolt carrier returns forward, it strikes the locking bar, thus automatically releasing the trigger (and the hammer) and firing another shot. ROA.1098-99. That firing cycle will continue as long as the shooter's engagement of the trigger continues.

The devices at issue here are thus practically and legally indistinguishable from a machinegun equipped with an auto sear. Recall that an auto sear fulfills two purposes that enable automatic fire: it retains the hammer and also times the hammer's subsequent release for when a new cartridge is loaded and ready to fire by interacting with the trip surface of the bolt carrier. The locking bar on these devices serves the same two purposes by timing the release of the hammer until the locking bar interacts with the trip surface of the bolt carrier "in the same manner that the [trip surface] interacts with an automatic sear." ROA.1091. Indeed, for these devices to work on an AR15-type rifle, the shooter must use a weapon equipped with the bolt carrier for an M16-type machinegun that includes this trip surface. *E.g.*, ROA.1030, 1091, 1102, 1128. The difference between the locking bar and the auto sear is that the auto sear directly physically retains the hammer (on the auto sear's "shelf," ROA.1132), while the locking bar retains the hammer indirectly by momentarily restraining the trigger while the hammer rests on the trigger sear surface. But that difference does not change the status of the devices: with both types of firing

7

mechanism, the hammer is automatically and repeatedly released by a single engagement—"single function"—of the trigger. And that conclusion is further reinforced by *Cargill*'s discussion of the statutory definition as a whole. As the Court observed, "Congress defined a machinegun by what happens 'automatically' 'by a single function of the trigger,'" and "[s]imply pressing and holding the trigger down on a fully automatic rifle … is what causes the trigger to function in the first place." *Cargill*, 144 S. Ct. at 1625.

As this illustrates, these devices are machineguns because the shooter engages the trigger just once to initiate the firing sequence, and that single engagement begins an automatic cycle of fire that is the product of "a single function of the trigger."

**C.** Plaintiffs have contended that these devices are not machineguns because each movement of the trigger constitutes a separate function, arguing that the trigger must "separately function to release the hammer by moving far enough to the rear in order to fire the next round." Br. 19. The district court employed similar reasoning. *E.g.*, ROA.1313, 1315. But *Cargill* did not embrace that rule. The Court instead repeatedly emphasized that with a semiautomatic weapon a shooter "must release and reengage the trigger to fire another shot," while with a machinegun "a shooter can fire multiple times, or even continuously, by engaging the trigger only once." 144 S. Ct. at 1617; *id.* at 1618, 1620, 1622.

8

That distinction is important. *Cargill* does not undermine the status of weapons where the trigger moves automatically for each shot. For example, in *United States v. Carter*, the Sixth Circuit considered a firearm the lacked a standard trigger and would fire repeatedly if a shooter manually pulled back and released the bolt once. Once the bolt was released it "would go forward [stripping] a cartridge off out of the magazine into the chamber and it would fire" and the bolt would then "retract" and fire again with no further engagement by the shooter. 465 F.3d 658, 665 (6th Cir. 2006) (per curiam). The bolt is the "trigger" on such a weapon because it initiates firing, but the repeated automatic movements of that trigger—even though necessary to fire the weapon and "reset" the trigger between shots—do not change its status as a machinegun. The same principle is illustrated by our hypothetical example (Opening Br. 31-32) of a box with a button trigger that moves up and down with each shot after the shooter's initial press. Even though operation of the device requires trigger movement for each shot fired, the weapon would still be a machinegun because it fires repeatedly after the trigger is engaged once.

The same reasoning applies here. As noted, there is no point at which the trigger is disengaged (or "released") to be re-engaged for another shot. Instead, after the initial engagement of the trigger, the weapon fires repeatedly as a result of the automatic operation of the device. The subsequent movements of the trigger are not

9

the result of separate and distinct "engagements" or "functions," but are rather the result of an automatic mechanical process after the shooter engages the trigger once.

Plaintiffs may seek to rely on *Cargill*'s language that "[o]n weapons with these standard trigger mechanisms, the phrase 'function of the trigger' means the physical trigger movement required to shoot the firearm." 144 S. Ct. at 1620. That language concerns only standard trigger assemblies for semiautomatic weapons—not replacement trigger assemblies like the ones at issue here. And *Cargill* described that "physical trigger movement" as encompassing not only the initial engagement of the trigger but also the subsequent disengagement of the trigger by "tak[ing] pressure off" the trigger, which was necessary to the "complete process" of "a 'single function of the trigger.'" *Id.* at 1622. Here, by contrast, the mechanical process is not meaningfully different from an auto sear: the shooter engages the trigger once and the components of the device enable repeated fire, with the locking bar taking on the role of an auto sear.

# CONCLUSION

The judgment of the district court should be reversed.

Respectfully submitted,

BRIAN M. BOYNTON
   *Acting Assistant Attorney General*

LEIGHA SIMONTON
   *United States Attorney*

MARK B. STERN

*s/ Brad Hinshelwood*
BRAD HINSHELWOOD
   *Attorneys, Appellate Staff*
   *Civil Division, Room 7256*
   *U.S. Department of Justice*
   *950 Pennsylvania Avenue NW*
   *Washington, DC 20530*
   *(202) 514-7823*
   *bradley.a.hinshelwood@usdoj.gov*

July 2024

# CERTIFICATE OF COMPLIANCE

This brief complies with the Court's order of July 2, 2024, limiting supplemental briefs to 2,500 words, because it contains 2,500 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Microsoft Word 2016 in Garamond 14-point font, a proportionally spaced typeface.

*s/ Brad Hinshelwood*
Brad Hinshelwood